# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### Western Division

| | |
|---|---|
| **CITY OF ROCKFORD and ACUMENT GLOBAL TECHNOLOGIES, INC.** *on behalf of themselves and all others similarly situated,* | **Civil Action No.: 3:17-cv-50107** |
| Plaintiffs, | Honorable Frederick J. Kapala<br>Judge Presiding |
| v. | Magistrate Judge Iain D. Johnston |
| **MALLINCKRODT ARD INC.,** *formerly known as* **QUESTCOR PHARMACEUTICALS, INC.; MALLINCKRODT PLC; EXPRESS SCRIPTS HOLDING COMPANY; EXPRESS SCRIPTS, INC.; CURASCRIPT, INC.,** doing business as **CURASCRIPT, SD; ACCREDO HEALTH GROUP, INC.;** *and* **UNITED BIOSOURCE CORPORATION,** | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD ............................................................................................................1

ARGUMENT .........................................................................................................................2

I.    Plaintiffs' Federal Antitrust Claims Fail (Counts VI and VII). ..........................................2

     A.  The *Illinois Brick* Doctrine Bars Plaintiffs' Federal Antitrust Claims. .........................2

     B.  Plaintiffs Fail to State a Plausible Federal Antitrust Claim. ...........................................5

        1.  Neither the Distribution Arrangement nor Synacthen Purchase Violate
Section 2. ................................................................................................................5

          a.  Exclusive Distribution Arrangement ...............................................................5

          b.  Purchase of Synacthen. ...................................................................................9

        2.  The Acthar Distribution Arrangement Does Not Violate Section 1 ....................10

        3.  High Prices are More Plausibly Caused by the Orphan Drug Status. .................11

II.   Plaintiffs' State Law Antitrust Claims Fail and Should be Dismissed
(Count VIII). ....................................................................................................................12

     A.  Plaintiffs Lack Article III and Statutory Standing To Bring Claims On Behalf
of Residents of States Other than Illinois or Tennessee. ............................................12

        1.  Article III Standing. .............................................................................................12

        2.  Plaintiffs Cannot Meet The Requirements of *Associated General
Contractors of California, Inc. v. California State Council of
Carpenters.* ........................................................................................................14

     B.  Plaintiffs Fail to State a Claim under the Laws of the Respective States. ...................15

        1.  Antitrust Claims ...................................................................................................15

        2.  Consumer Protection Claims. ..............................................................................16

III.  Plaintiffs Fail to State a Claim for Any RICO Violation (Counts IX–XI). ......................17

     A.  Plaintiffs Fail to State a Claim Under Section 1962(c) (Count IX). ............................18

        1.  Plaintiffs' Allegations Improperly Lump Together Defendants. .........................18

        2.  Plaintiffs Do Not Adequately Allege the Existence of an Enterprise. ................18

        3.  Plaintiffs' Allegations Reveal No Conduct of a RICO Enterprise. .....................19

        4.  Plaintiffs Fail to Allege Any Predicate Acts with Requisite Specificity. .............20

        5.  Plaintiffs' Allegations Do Not Establish RICO Injury or Causation. .................22

    B.  Plaintiffs Fail to State a Claim Under Section 1962(a) (Count X). ................................24

    C.  Plaintiffs' Section 1962(d) Conspiracy Claim Similarly Fails (Count XI). ...................25

IV.  Plaintiffs' Fraud Claim Fails Because They Have Not Alleged False Statements
    of Material Facts or Reliance with Particularity (Count IV)..................................................25

V.  Plaintiffs' Conspiracy to Defraud/Concerted Action Claim (Count V) and Unjust
    Enrichment Claims (Counts II and III) Fail as Derivative of Their Other Claims................27

VI.  Statutes of Limitations..........................................................................................................28

CONCLUSION................................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All-Tone Commc'ns, Inc. v. American Info. Tech.,*
    No. 89 C 7883, 1991 WL 166532 (N.D. Ill. Aug. 26, 1991) .................................................... 18

*Amerigas Propane, LP v. BP America, Inc.,*
    691 F. Supp. 2d 844 (N.D. Ill. 2010) .......................................................................................... 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................................................................................... 1

*Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.,*
    493 F.3d 841 (7th Cir. 2007) ........................................................................................................ 28

*Assoc. General Contractors of Cal. Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ....................................................................................................................... 14

*Baker v. IBP, Inc.,*
    357 F.3d 685 (7th Cir. 2004) ........................................................................................................ 19

*Banks v. Nat'l Collegiate Athletic Ass'n,*
    977 F.2d 1081 (7th Cir. 1992) ........................................................................................................ 2

*BCBS United of Wis. v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995) .......................................................................................................... 2

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................................. 1, 10

*Bigalke v. Creditrust Corp.,*
    162 F. Supp. 2d 996 (N.D. Ill. 2001) ............................................................................................ 2

*Bigelow v. RKO Radio Pictures,*
    327 U.S. 251 (1946) ....................................................................................................................... 10

*Braman v. CME Grp., Inc.,*
    149 F. Supp. 3d 874 (N.D. Ill. 2015) ..................................................................................... 10, 28

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    248 F.3d 668 (7th Cir. 2001) .................................................................................................... 4, 11

*Bunker Ramo Corp. v. United Bus. Forms, Inc.,*
    713 F.2d 1272 (7th Cir. 1983) .................................................................................................... 7, 9

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) .................................................................. 2, 7

*Carnival Corp. v. Rolls-Royce, PLC*,
    No. 08-23318, 2009 WL 3861450 (S.D. Fla. Nov. 17, 2009) ................................. 17

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) .................................................................................. 19

*D & S Auto Parts, Inc. v. Schwartz*,
    838 F.2d 964 (7th Cir. 1988) .................................................................... 18

*In re Dairy Farmers of Am., Inc. Cheese Antitr. Litig.*,
    767 F. Supp. 2d 880 (N.D. Ill. 2011) .......................................................... 5

*In re Dairy Farmers of Am., Inc. Cheese Antitr. Litig.*,
    No. 9 CV 3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) .............................. 13

*Damato v. Merrill Lynch, Pierce, Fenner & Smith*,
    878 F. Supp. 1156 (N.D. Ill 1995) ............................................................. 27

*Del. Valley Surgical Supply Inc. v. Johnson & Johnson*,
    523 F.3d 1116 (9th Cir. 2008) .................................................................... 3

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
    8 F.3d 1217 (7th Cir. 1993) ....................................................................... 10

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...................................................................... 6

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
    No. 06-3044 (FLW), 2008 WL 5413105 (D.N.J. Dec. 23, 2008) ......................... 22

*Dominguez v. UAL Corp.*,
    666 F.3d 1359 (D.C. Cir. 2012) ................................................................. 10

*E&L Consult., Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2nd Cir. 2006) ...................................................................... 8

*Eastman Kodak Co. v. Image Tech. Servs.*,
    504 U.S. 451 (1992) ................................................................................. 5

*Emery v. Am. Gen. Fin., Inc.*,
    938 F. Supp. 495 (N.D. Ill. 1996) ............................................................. 18

*Endsley v. City of Chi.*,
    230 F.3d 276 (7th Cir. 2000) ..................................................................... 5

*Filter Queen of the Virginias, Inc. v. Health-Mor, Inc.*,
   No. 89 C 5511, 1990 WL 36824 (N.D. Ill. Mar. 20, 1990) ........................................8

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*,
   218 Ill. 2d 326 (Ill. 2006) ..........................................................................................27

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986) ........................................................................................9

*Fitzgerald v. Chrysler Corp.*,
   116 F.3d 225 (7th Cir. 1997) ................................................................................18, 19

*Goren v. New Vision Int'l, Inc.*,
   156 F.3d 721 (7th Cir. 1998) ............................................................18, 20, 22, 25

*Griffin v. Dugger*,
   823 F.2d 1476 (11th Cir. 1987) ..................................................................................13

*Grove Fresh Distrib., Inc. v. Flavor Fresh Foods, Inc.*,
   720 F. Supp. 714 (N.D. Ill. 1989) ..............................................................................25

*Hawkins v. Groot Indus., Inc.*,
   No. 01 C 1731, 2003 WL 22057238 (N.D. Ill. Sept. 2, 2003) ..................................13

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992) ....................................................................................................23

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006) ........................................................................................................7

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ......................................................................................................2

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) ......................................................................................................9

*Jennings v. Emry*,
   910 F.2d 1434 (7th Cir. 1990) ....................................................................................21

*Kanne v. Visa U.S.A. Inc.*,
   272 Neb. 489 (2006) ..............................................................................................16, 17

*Kostovetsky v. Ambit Energy Holdings, LLC*,
   242 F. Supp. 3d 708 (N.D. Ill. 2007) ..........................................................................28

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ................................................................................................9, 11

*Lerma v. Univision Commc'ns, Inc.*,
 52 F. Supp. 2d 1011 (E.D. Wis. 1999) ........................................................................ 12

*Loeb Indus. Inc. v. Sumitomo Corp.*,
 306 F. 3d 469 (7th Cir. 2002) ............................................................................... 14, 15

*Martis v. Grinnell Mut. Reins. Co.*,
 388 Ill. App. 3d 1017 (3d Dist. 2009) ......................................................................... 28

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
 859 F.3d 408 (7th Cir. 2017) ......................................................................................... 7

*Minn-Chem, Inc. v. Agrium Inc.*,
 657 F.3d 650 (7th Cir. 2011) ....................................................................................... 14

*Myers v. Seung Heun Lee*,
 No. 1:10-cv-131, 2010 U.S. Dist. LEXIS 99707 (E.D. Va. Sept. 21, 2010) .............. 19

*Nesbitt v. Regas*,
 No. 13-C-8245, 2015 WL 1331291 (N.D. Ill. March 20, 2015) ................................. 20

*Olstad v. Microsoft Corp.*,
 700 N.W.2d 139 (Wis. 2005) ....................................................................................... 16

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
 555 U.S. 438 (2009) ....................................................................................................... 5

*In re Plasma-Derivative Protein Therapies Antitr. Litig.*,
 MDL No. 2109, 1:09-cv-07666, 2012 WL 39766 (N.D. Ill. 2012) ....................... 13, 14

*R.C. Dick Geothermal v. Thermogenics*,
 890 F.2d 139 (9th Cir. 1989) ....................................................................................... 15

*Rao v. BP Products N. Am., Inc.*,
 589 F.3d 389 (7th Cir. 2009) ....................................................................................... 25

*Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*,
 381 F.3d 717 (3rd Cir. 2004) ......................................................................................... 7

*Reves v. Ernst & Young*,
 507 U.S. 170 (1993) ..................................................................................................... 19

*Serfecz v. Jewel Food Stores*,
 No. 82 C 4171, 1994 U.S. Dist. LEXIS 12239 (N.D. Ill. Aug. 31, 1994) .................. 15

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*,
 192 F. Supp. 3d 963 (N.D. Ill. 2016) .......................................................................... 23

*Siegel v. Shell Oil Co.*,
  656 F. Supp. 2d 825 (N.D. Ill. 2009) ..................................................................27

*Simon v. Eastern Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .............................................................................................13

*Slaney v. Int'l Amateur Athletic Fed'n*,
  244 F.3d 580 (7th Cir. 2001) ........................................................................21, 25

*So. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*,
  No. 08-cv-5175, 2009 WL 3151807 (S.D.N.Y. Sep. 30, 2009) ........................22

*St. Paul v. FMC Corp.*,
  Civil File No. 3-89-0466, 1990 U.S. Dist. LEXIS 18142 (D. Minn. Feb. 26,
  1990) ....................................................................................................................16

*State v. Infineon Tech. AG*,
  531 F. Supp. 2d 1124 (N.D. Cal. 2007) .............................................................16

*Story Parchment Co. v. Patterson Parchment Paper Co.*,
  282 U.S. 555 (1931) .............................................................................................9

*Suburban Buick, Inc. v. Gargo*,
  No. 08-C-0370, 2009 WL 1543709 (N.D. Ill. May 29, 2009) ...........................27

*Sullivan v. All Web Leads, Inc.*,
  No. 17C1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017) ..................................1

*Swanson v. Citibank, N.A.*,
  614 F.3d 400 (7th Cir. 2010) ...............................................................................1

*Thompson's Gas & Elec. Services, Inc. v. BP America, Inc.*,
  691 F. Supp. 2d 860 (N.D. Ill. 2010) ...........................................................26, 27

*Tricontinental Indus., Ltd. v. Pricewaterhouse-Coopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) ..............................................................................26

*United Food & Comm. Unions & Employers Midwest Health Benefits Fund v.
Walgreens Co.*,
  719 F.3d 849 (7th Cir. 2013) .................................................................19, 20, 25

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ..............................................................................................5

*VBR Tours, LLC. v. Nat'l R.R. Passenger Corp.*,
  No. 14-cv-804, 2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) .............................8

*Verizon Commc'ns Inc. v. Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)................................................................5, 12

*Vicom, Inc. v. Harbridge Merchant Servs., Inc.*,
   20 F.3d 771 (7th Cir. 1994) ..............................................17, 22

*Warren Gen. Hosp. v. Amgen, Inc.*,
   643 F.3d 77 (3rd Cir. 2011) .....................................................3

*Williams v. Aztar Indiana Gaming Corp.*,
   351 F.3d 294 (7th Cir. 2003) .................................................21

*In re Yasmin*,
   Nos. 3:09-cv-20071, 3:09-md-02100, 2010 WL 3119499 (S.D. Ill. Aug. 5,
   2010).......................................................................................23

**Statutes**

740 Ill. Comp. Stat. 10/7(2) ...................................................15

18 U.S.C. § 1962(c) .................................................................18

18 U.S.C. § 1964(c) .................................................................22

21 U.S.C. § 360aa−ff ...............................................................12

21 U.S.C. § 360bb(a)(2)(A−B) ................................................12

A.C.A. § 4-88-101(1)...............................................................17

Ariz. Rev. Stat. § 4-88-101(1) ................................................16

Ariz. Rev. Stat. § 44-1415 ......................................................16

Cal. Bus. & Prof. Code §§ 16720(e)(2)−(3), 16750, 16702 ........16

Fla. Deceptive and Unfair Trade Practices Act ......................17

Haw. Rev. Stat. Ann. § 480-4(a) ............................................16

Haw. Rev. Stat. Ann. § 480-13.3(a)(1)...................................16

Iowa Code § 553.5, 553.12, 553.3 ..........................................16

Mich. Comp. Laws § 445.771 .................................................16

Mass. Gen. Laws ch. 93A, § 11 ..............................................17

Minn. Stat. Ann. § 325D.54....................................................16

N.C. Gen. Stat. § 75-1 ................................................................................................................16

N.D. Cent. Code § 51-08.1-01 .....................................................................................................16

N.M. Stat. Ann. § 57-1-1 .............................................................................................................16

N.R.S. § 598A.060....................................................................................................................16, 17

N.Y. Gen. Bus. Law § 340(1)......................................................................................................16

Neb. Rev. Stat. § 59-801 .............................................................................................................16

Neb. Rev. Stat. § 59-1601............................................................................................................17

Nev. Rev. Stat. Ann. § 598A.210 ...............................................................................................16

R.I. Gen. Laws § 6-36-4 ..............................................................................................................16

S.D. Codified Laws § 37-1-3.1 ...................................................................................................16

Tenn. Code Ann. § 47-25-101 .....................................................................................................17

Utah Code Ann. § 76-10-3109(9), § 76-10-919(9)......................................................................16

**Other Authorities**

Phillip E. Areeda & Herbert J. Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF
ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1810 (2013) .............................................6

**Regulations**

21 C.F.R. 316.20 *et seq*...............................................................................................................12

Mallinckrodt plc and Mallinckrodt ARD Inc. ("Mallinckrodt") submit this Memorandum in Support of their Motion to Dismiss the City of Rockford and Acument Global Technologies, Inc. (collectively, "Plaintiffs")'s Second Amended Class Action Complaint (the "Complaint" or "SAC").

## INTRODUCTION

Mallinckrodt is a leading global specialty pharmaceutical company responsible for saving and improving the lives of millions of individuals worldwide. Its adrenocorticotropic hormone or ACTH drug, HP Acthar Gel ("Acthar"), is critical in the care and treatment of babies suffering from a rare condition of infantile spasms and instrumental in treating adults with conditions ranging from multiple sclerosis to arthritis.

Through their amendments, Plaintiffs' Complaint has new claims, changed allegations, and an additional plaintiff, but the crux of the case remains the same—a grievance over the price of Acthar. Like before, however, the Complaint suffers from serious standing and pleading defects. As set out herein, Plaintiffs' Complaint, even in its amended form, fails to state any claim against Mallinckrodt and should be dismissed in its entirety.

## LEGAL STANDARD

A motion to dismiss should be granted when a complaint fails to provide enough factual information to "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A plaintiff must "give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Simple "threadbare recitals" of the elements of the claim "supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Sullivan v. All Web Leads, Inc.*, No. 17C1307, 2017 WL 2378079, at *4 (N.D. Ill. June 1, 2017). Importantly, a court is "neither bound by the plaintiff's legal

characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claim." *Bigalke v. Creditrust Corp.*, 162 F. Supp. 2d 996, 997 (N.D. Ill. 2001). When viewing Plaintiffs' Complaint in this light, dismissal is required.

## ARGUMENT

### I.     Plaintiffs' Federal Antitrust Claims Fail (Counts VI and VII).

The Complaint asserts two antitrust claims under the Sherman Act—one alleging monopolization under Section 2, and another alleging anticompetitive agreements in restraint of trade under Section 1.

As a preliminary and decisive matter, the *Illinois Brick* doctrine categorically bars Plaintiffs from bringing federal antitrust claims due to their status as *indirect* purchasers since Plaintiffs did not buy Acthar directly from Mallinckrodt. Next, even if Plaintiffs were properly positioned in the distribution chain, they fail to state plausible claims for relief. Their grievances about high prices do not provide federal causes of action since "the antitrust laws are not a price-control statute" and "[a] monopolist has no duty to reduce its prices or keep them low." *BCBS United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995). Also, Plaintiffs fail to make any non-conclusory allegations that Mallinckrodt's conduct had an adverse impact on competition as required to support federal antitrust claims. *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1093−94 (7th Cir. 1992). "[I]nvocation of antitrust terms of art does not confer immunity from [dismissal]; to the contrary, these conclusory statements must be accompanied by supporting factual allegations." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984). Plaintiffs offer none, requiring dismissal of their claims.

### A.     The *Illinois Brick* Doctrine Bars Plaintiffs' Federal Antitrust Claims.

Section 4 of the Clayton Act permits injured parties to recover for antitrust violations, but recovery is firmly limited to *direct* purchasers following the landmark decision in *Illinois Brick*

*Co. v. Illinois*, 431 U.S. 720 (1977). In *Illinois Brick*, "[t]he Supreme Court intended to make a bright line rule for identifying the proper plaintiff when an antitrust violation occurs in a multi-tiered distribution system." *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1122 (9th Cir. 2008).

Courts review the "mechanics of the transaction" when considering whether a party is a direct purchaser of pharmaceutical drugs. *See, e.g.*, *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 88 (3rd Cir. 2011) (hospital was an indirect purchaser of manufacturer's drugs since it ordered drugs through a distributor, paid the distributor, and took delivery from the distributor); *see also Del. Valley*, 523 F.3d at 1122−3 (hospital was not a direct purchaser of medical products even though list prices were set by agreement between the manufacturer and a GPO representing hospital since purchases were made through a distributor). Here, Plaintiffs allege that they purchased Acthar from Express Scripts, Inc. ("ESI") and CVS Caremark—not from Mallinckrodt—which makes them indirect purchasers.

Specifically, with respect to Rockford, the Complaint sets out a straightforward distribution chain where "Mallinckrodt set the average wholesale price used by Express Scripts for reimbursement." (SAC ¶ 80). ESI and Rockford then reached a separate agreement on the retail price Rockford paid for Acthar. ("Rockford agreed to pay ESI certain reimbursement rates for specialty pharmacy drugs as established by ESI for each such drug." SAC ¶ 80). "ESI then charged Rockford for the Acthar, pursuant to the terms of the ESI PBM Agreement. Rockford paid ESI such charges." (SAC ¶ 81). For Acument, the Complaint again adds a layer between Mallinckrodt and the purchaser: "Acument contracted with CVS Caremark for the provision of specialty drugs, like Acthar" and "made direct payments to CVS Caremark." (SAC ¶¶ 196, 246).

Notwithstanding Plaintiffs' admissions that they purchased Acthar from ESI and CVS Caremark at prices set in agreements with ESI and CVS Caremark, Plaintiffs nonetheless allege that they are direct purchasers from Mallinckrodt because shipments and payments flow through "Mallinckrodt's agent[s]" and "Express Scripts only deducts its agreed-upon share of Rockford's payments before forwarding them to Mallinckrodt [and] CVS Caremark does the same." (SAC ¶ 233). In situations like this, even though "the manufacturers' increased prices [are] passed in whole or part down the chain of distribution to the ultimate consumers," Plaintiffs' federal antitrust claims nonetheless are barred by *Illinois Brick* because they "ha[ve] not purchased the drugs directly from the defendants, but rather from retailers." *In re Brand Name Prescription Drugs Antitrust Litig.*, 248 F.3d 668, 670 (7th Cir. 2001).

Finally, apparently recognizing their *Illinois Brick* problem, Plaintiffs allege that they should be treated as direct purchasers of Acthar "because of the conspiracy between Express Scripts and Mallinckrodt, as Rockford and Acument are direct purchasers from co-conspirators." (SAC ¶ 234). First, this conclusory allegation directly contradicts the allegation that Acument "made direct payments to CVS Caremark" for Acthar. (SAC ¶ 196). CVS Caremark is *not* an alleged co-conspirator. Second, as set out *infra*, the supposed "conspiracy" between Mallinckrodt and ESI is a common and pro-competitive distribution arrangement. Mallinckrodt sets the wholesale prices; however, the price paid to ESI by Rockford was set by an agreement between Rockford and ESI, it was not set pursuant to any agreement between Mallinckrodt and ESI. Although Plaintiffs contend that ESI should have pushed back against Mallinckrodt's price increases, ESI's alleged failure to do so does not amount to a conspiracy.[1]

---

[1] This allegation that Plaintiffs purchased from co-conspirators is irrelevant to the claims relating to Mallinckrodt's purchase of Synacthen since 1) ESI was not a party to that transaction and 2) Plaintiffs did not buy directly from Mallinckrodt.

Because Plaintiffs are not direct purchasers from Mallinckrodt, both of their federal antitrust claims (Counts V and VI) should be dismissed.

## B. Plaintiffs Fail to State a Plausible Federal Antitrust Claim.

In addition to their *Illinois Brick* problem, Plaintiffs fail to state a claim under the Sherman Act. Plaintiffs allege that Mallinckrodt's use of an "exclusive" distribution arrangement and its purchasing the rights to Synacthen give rise to a claim under Section 2 for improperly maintaining and enhancing a monopoly. Plaintiffs also allege that the "exclusive" distribution arrangement for Acthar is an agreement in restraint of trade giving rise to claims under Section 1. However, these unremarkable business activities do not support their causes of action.

### 1. Neither the Distribution Arrangement nor Synacthen Purchase Violate Section 2.

"Simply possessing monopoly power and charging monopoly prices does not violate § 2." *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009); *Verizon Commc'ns Inc. v. Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). A Section 2 monopolization claim requires: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *In re Dairy Farmers of Am., Inc. Cheese Antitr. Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). Moreover, "the willful acquisition or maintenance" of monopoly power must be "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" to state a viable claim. *Endsley v. City of Chi.*, 230 F.3d 276, 282 (7th Cir. 2000) (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992)).

#### a. Exclusive Distribution Arrangement.

Plaintiffs contend that the Acthar distribution arrangement enables Mallinckrodt to illegally maintain and enhance its monopoly power in violation of Section 2. However, they offer

5

no allegations explaining how the exclusive distribution arrangement is anticompetitive. Instead, Plaintiffs levy only general charges about the distribution process paired with conclusory statements regarding monopolistic conduct.[2] This manner of pleading is insufficient. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) ("Because [the plaintiff] has failed to allege facts which, if true, would establish that the two licensing agreements at issue are unreasonable restraints on trade that caused antitrust injury to consumers, its § 1 and § 2 claims fail as a matter of law.").

As an initial matter, in amending the complaint a second time and adding Acument as a party, Plaintiffs concede that distribution and sales of Acthar are not handled exclusively through ESI, CuraScript, Accredo, and UBC. Plaintiffs' admission that one of ESI's primary competitors (CVS Caremark) is an alternative source for obtaining Acthar totally undercuts Plaintiffs' allegations that an "exclusive" arrangement with ESI led to high prices. In short, there is no exclusive distribution arrangement.

Moreover, even if there were an exclusive distribution arrangement, it is well-accepted that "[t]he benefits of exclusive dealing are many." Phillip E. Areeda & Herbert J. Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1810

---

[2] For example (with conclusory language in italics):
- "In 2007, Mallinckrodt decided to embark on a 'new strategy' and it changed its distribution of Acthar . . . *In effect, Mallinckrodt contracted with the agent of its leading customers in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly.*" (SAC ¶ 7).
- "Mallinckrodt *leveraged and enhanced its monopoly power* by limiting the distribution of its sole specialty drug to just one specialty pharmacy distributor . . . *This allowed Mallinckrodt to raise its prices tenfold initially, and nearly double in the ensuing years.*" (SAC ¶ 74).
- "On July 2, 2007, Mallinckrodt decided to restrict distribution from three wholesalers . . . to Express Scripts. *The goal of this strategy was to lock patients into receiving Acthar through one channel and prevent a competitive product from entering the market.*" (SAC ¶ 222).

(2013).[3] "Unlike horizontal agreements between competitors, vertical exclusive distributorships . . . are presumptively legal." *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 736 (3rd Cir. 2004). As Judge Posner recently noted, "[w]hat is more common than exclusive dealing?" *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017).

There are only two situations where exclusive distribution agreements can have "adverse economic consequences:" (1) "allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods" or (2) "allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Plaintiffs have alleged neither of these situations. Consequently, there is nothing in the Complaint to suggest the supposed exclusive distribution agreement is anticompetitive other than the bare allegations that the arrangement at issue enabled Mallinckrodt to charge higher prices.

That is fatal to Plaintiffs' claim. Because exclusive distribution agreements are common and only rarely anticompetitive, a plaintiff must plead an anticompetitive effect of the agreement. *See Car Carriers*, 745 F.2d at 1107. Specifically, "the plaintiff must allege, not only an injury to himself, but an injury to the market as well." *Id.*; *see also Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1285 (7th Cir. 1983) (dismissing Section 1 claim where plaintiff had "not alleged any anticompetitive effect . . . nor [was the court] able to infer such an effect" because

---

[3] In fact, the Complaint recites many procompetitive reasons for the distribution arrangement here. (*See, e.g.*, SAC ¶¶ 57–64). Indeed, Rockford itself must recognize the benefits of exclusive arrangements since it retained ESI as its "exclusive specialty pharmacy provider and distributor" in 2015, a point in time when the exclusive arrangement between Mallinckrodt and ESI about which it now complains had been in place for some eight years. (SAC ¶ 78).

"[t]he closest [the plaintiff came] to implicating any effect on competition [was] a bare allegation that it was charged an 'artificially high, non-competitive price'"). Plaintiffs do not explain how the supposed exclusive distribution arrangement allowed Mallinckrodt to raise its price any more than it otherwise could given its alleged status as a monopolist.

To elaborate, a monopolist by definition is able to control its prices regardless of whether it handles distribution itself or outsources the function to one or more distributors. *See E&L Consult., Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2nd Cir. 2006) (exclusive distribution arrangement "provides no monopolistic benefit to [defendant] that it does not already enjoy"); *VBR Tours, LLC. v. Nat'l R.R. Passenger Corp.*, No. 14-cv-804, 2015 WL 5693735, at *12–13 (N.D. Ill. Sept. 28, 2015) (rejecting as implausible allegations that exclusive distribution arrangement entered into by monopolist foreclosed competition, since such arrangement did nothing to enhance monopolist's existing power). As a result, the Acthar distribution arrangement simply has no bearing on monopolist status or the ability to set monopoly prices.

Further, it is clear that merely alleging an exclusive distribution arrangement is insufficient to state a plausible monopolization claim. *See Filter Queen of the Virginias, Inc. v. Health-Mor, Inc.*, No. 89 C 5511, 1990 WL 36824, at *3–4 (N.D. Ill. Mar. 20, 1990). In *Filter Queen*, for example, the plaintiffs claimed a new exclusive distribution system was "an attempt to monopolize and a conspiracy between [defendant] and its distributors in restraint of trade." *Id.* at * 3. When considering dismissal, the court was "somewhat confused by the monopolization . . . claims, since plaintiffs d[id] not tell us how the vertical distribution restraints . . . lead to monopolization or

drive competitors from the marketplace." *Id.* Ultimately, the Court found "[i]t is not an antitrust violation to change distributors" and dismissed the claim. *Id.* at *4. Such reasoning applies here.[4]

### b.      *Purchase of Synacthen.*

Plaintiffs also allege Mallinckrodt's purchase of the rights to Synacthen violated Section 2 since, at that time, "Synacthen constituted a nascent competitive threat to Questcor's ACTH drug monopoly." (SAC ¶ 128). Specifically, Plaintiffs refer to a June 11, 2013 contract between Questcor [Mallinckrodt] and Novartis through which "Questcor gained the exclusive rights to develop, market, and sell Synacthen." (SAC ¶ 144). Plaintiffs appear to claim that if *another* company had bought Synacthen, it would have been on the market and either disciplined Acthar pricing or have been a substitute product that Plaintiffs would have purchased at a lower price.

Mallinckrodt denies that the acquisition of Synacthen was an antitrust violation but, even if true, Plaintiffs could still not state a claim. An antitrust violation alone is insufficient to pursue a damages claim. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981). A plaintiff must also show it was injured as a result of the violation. *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931). Plaintiffs must allege how the market would have been different "but-for" the supposed wrongful conduct and show how its injury would have been avoided in that "but-for" market. *E.g.*, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 550 (7th Cir. 1986) (showing fact of damage requires "quantifying the difference between what actually happened and what would have happened in a hypothetical free market"). Here then, Plaintiffs

---

[4] Finally, Plaintiffs offer no non-conclusory allegations that the distribution arrangement harms or restricts competition, particularly *interbrand* competition. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) ("[The] primary purpose of the antitrust laws is to protect [interbrand] competition"). Plaintiffs only allege their "injuries consist of paying higher prices to purchase Acthar than it would have paid absent the unlawful conduct of Mallinckrodt and its exclusive agents, Express Scripts." (SAC ¶ 223). Pleading one's own payment of "high, non-competitive" prices is not enough. *Bunker Ramo*, 713 F.2d at 1285. Plaintiffs' failure to allege anticompetitive harm requires dismissal.

9

must sufficiently allege that "but-for" the acquisition of Synacthen, prices for Acthar would have been lower or that a cheaper substitute product would have been available. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 259–63 (1946).

Plaintiffs make no such allegations, nor could they because of the Food and Drug Administration ("FDA")'s rigorous drug approval process. Plaintiffs themselves acknowledge the "uncertainty that Synacthen, a preclinical drug, would be approved by the FDA" since "FDA approval is required to market pharmaceuticals to U.S. consumers." (SAC ¶¶ 122, 128). Plaintiffs offer no facts plausibly showing that, by the time in 2015 and 2016 that Plaintiffs purchased Acthar, the "potentially" competitive Synacthen: (i) could have gone through additional development; (ii) obtained necessary government approvals; (iii) would have been in the market; and (iv) would have been priced lower than Acthar. As a result, Plaintiffs' claim of injury is wholly speculative. And given that the antitrust laws require a "reasonable degree of certainty" that "injury-in-fact" occurred, the Complaint is entirely inadequate. *See, e.g.*, *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361–62 (D.C. Cir. 2012) (injury too speculative to satisfy "injury-in-fact" requirement and not supported by "specific facts").

### 2. *The Acthar Distribution Arrangement Does Not Violate Section 1.*

Plaintiffs also claim that the exclusive distribution arrangement violated Section 1. A Section 1 claim requires: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Braman v. CME Grp., Inc.*, 149 F. Supp. 3d 874, 895 (N.D. Ill. 2015) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). *Twombly* requires "enough factual matter (taken as true) to suggest that an agreement [to restrain trade] was made." 550 U.S. at 556. Under the Supreme Court's *Leegin* decision, vertical agreements, even those that fix prices, are not per se illegal, but rather, are assessed under a rule of reason analysis. 551 U.S. 877.

The crux of the Section 1 claim seems to be that ESI "did not push back against" Mallinckrodt's price increases and instead ESI "accepted" the prices set by Mallinckrodt and included them in its PBM agreement with Rockford. (SAC ¶¶ 243, 245). Plaintiffs characterize this as an agreement between ESI and Mallinckrodt to "fix and charge artificially inflated prices for Acthar." (SAC ¶ 247). This allegation of a price-fixing agreement, however, is contradicted by the more specific allegations in the Complaint that Mallinckrodt set wholesale prices and then "Rockford agreed to pay ESI certain reimbursement rates" for the drugs pursuant to a separate agreement with ESI. (SAC ¶ 80). The acceptance by a distributor of a wholesale price set by a manufacturer is not price-fixing, even if that price is later used as the baseline for the determination of the retail price the distributor sets with its customer. *In re Prescription Drugs*, 248 F.3d at 670.

To the extent Plaintiffs contend that the distribution agreement for Acthar is itself a violation of Section 1, the claim fails for the same reasons discussed above as to the Section 2 claim. First, exclusive distribution agreements are presumptively legal. Second, the procompetitive benefits of Mallinckrodt's agreement with the ESI entities are obvious. It essentially outsources its distribution and hub functions to the renowned expert in the field. It retains a company that is able to provide the specialized handling required on orphan and specialty drugs. The services provided by the Express Scripts entities (*see* SAC ¶¶ 57–64) streamline the entire process and facilitate the delivery of Acthar to patients who need it. Finally, as discussed above, this alleged exclusive distribution agreement does not harm competition in any way.

3.     *High Prices are More Plausibly Caused by the Orphan Drug Status.*

"Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns*, 540 U.S. at 411. "To survive a motion to dismiss, a claim must make economic and factual sense." *Lerma*, 52 F. Supp. 2d at 1025. Plaintiffs' claims fail to set out plausible antitrust violations, particularly in light of the Orphan Drug Act.

The Orphan Drug Act incentivizes pharmaceutical companies to develop drugs for rare diseases and conditions. *See* 21 U.S.C. § 360aa–ff . One such incentive is codified as "orphan drug exclusivity" status, 21 U.S.C. § 360bb(a)(2)(A–B), which provides a seven-year exclusivity period if "[t]he disease or condition for which the drug is intended affects fewer than 200,000 people in the United States" or "there is no reasonable expectation that costs of research and development of the drug for the indication can be recovered by sales of the drug in the United States[.]" 21 C.F.R. 316.20 *et seq*. During that period, the FDA will not approve any other version of the drug. Plaintiffs admit that "the FDA approved the [infantile spasm] indication for Acthar and granted it orphan drug status." (SAC ¶ 45). They further concede that an orphan drug model means high prices. (SAC ¶ 130). Therefore, the more plausible explanation for the Acthar pricing about which Plaintiffs complain is that it is the natural result of a lawful monopoly for an orphan drug and reflects the price consumers are willing to pay for this important drug. This further reinforces the conclusion that Plaintiffs have failed to state viable antitrust claims.

## II.    Plaintiffs' State Law Antitrust Claims Fail and Should be Dismissed (Count VIII).

Plaintiffs also bring claims for purported violations of numerous states' antitrust laws[5] based on the same alleged conduct. Plaintiffs lack standing to pursue these claims and, moreover, Plaintiffs do not state survivable claims under the laws of the various states as set out below.

### A.    Plaintiffs Lack Article III and Statutory Standing To Bring Claims On Behalf of Residents of States Other than Illinois or Tennessee.

#### 1.    *Article III Standing*.

Rockford and Acument make claims based on payments made on behalf of employees located only in Illinois and Tennessee. They do not assert anything happened in any other state.

---

[5] While Plaintiffs refer to "state antitrust claims" in their Complaint, Plaintiffs appear to be bringing claims under certain state consumer protection statutes in some instances.

Article III standing requires an injury-in-fact, and it is Plaintiffs' burden to allege facts sufficient to demonstrate it has such standing to bring *each* discrete claim. *See Hawkins v. Groot Indus., Inc.*, No. 01 C 1731, 2003 WL 22057238, at *2 (N.D. Ill. Sept. 2, 2003) (citing *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987)) ("[I]t is not enough that a named plaintiff can establish a case or controversy . . . by virtue of having standing as to just one of many claims he wishes to assert. Rather, each claim must be analyzed separately[.]").[6] That Plaintiffs seek to represent a class does not alter this burden: "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *In re Dairy Farmers of Am., Inc. Cheese Antitr. Litig.*, No. 9 CV 3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20 (1976)) (internal quotation omitted) (holding a named plaintiff must have suffered injury in each state whose laws it invokes); *see also In re Potash Antitr. Litig.*, 667 F. Supp. 2d 907, 924 (N.D. Ill. 2009) (dismissing state antitrust, consumer protection or unfair competition, and unjust enrichment claims in states where no named plaintiff had suffered injury), *rev'd on other grounds by Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011); *In re Plasma-Derivative Protein Therapies Antitr. Litig.*, MDL No. 2109, 1:09-cv-07666, 2012 WL 39766 at * 6 (N.D. Ill. 2012) (where plaintiff "does not claim to suffer its own personalized injury by virtue of defendants' alleged violations of non-California state-law, [it] lacks standing to assert those claims").

---

[6] The instant motion is an appropriate time to resolve the question of Article III standing. Although, "courts have not always taken a uniform view" as to whether such standing should be assessed prior to or after class certification, class certification issues are not "logically antecedent" to the Article III standing question here. *Plasma*, 2012 WL 39766.

Accordingly, all state law claims other than those based on Illinois or Tennessee law must be dismissed.

2.     *Plaintiffs Cannot Meet The Requirements of* Associated General Contractors of California, Inc. v. California State Council of Carpenters.

In addition to the constitutional standing requirement mandating injury-in-fact, the "court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Assoc. General Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (hereinafter, "*AGC*"). Plaintiffs must demonstrate that the putative class they seek to represent is not too "remote" from the injury claimed under the test set forth in *AGC*. *See, e.g.*, *Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F. 3d 469, 484 (7th Cir. 2002). This determination is "analytically distinct" from the direct purchaser inquiry set forth in *Illinois Brick*, discussed above.[7]

Courts apply six *AGC* factors when evaluating whether an antitrust plaintiff has standing, including: (1) directness of the injury; (2) risk of duplicate recovery or complex damage apportionment; (3) type of injury and whether it was one Congress sought to redress; (4) causal connection between the violation and the harm; (5) speculative nature of the damages; and (6) presence of improper motive. *Loeb*, 306 F. 3d at 484. No single factor is determinative and a court must balance all of the factors to determine whether standing is appropriate. *Serfecz v. Jewel Food Stores*, No. 82 C 4171, 1994 U.S. Dist. LEXIS 12239, at *6–7 (N.D. Ill. Aug. 31, 1994) (citing *R.C. Dick Geothermal v. Thermogenics*, 890 F.2d 139, 146 (9th Cir. 1989)).     In this case,

---

[7] A number of state courts have expressly adopted *AGC* or held that at least some of the *AGC* factors should be applied to state antitrust claims: Arizona, California, Illinois, Iowa, Kansas, Michigan, Minnesota, Mississippi, Nebraska, North Carolina, North Dakota, New York, Oregon, South Dakota, Utah, and Wisconsin. Others have held state antitrust law must be interpreted in harmony with federal law, which requires an application of *AGC*. Only a few states, Arkansas, Florida, Massachusetts, Rhode Island, and Tennessee, have not addressed this issue either way.

Plaintiffs' injury, if any, is indirect since they do not buy Acthar from the alleged monopolist and, furthermore, any such injury in the form of high prices is speculative and not the sort which Congress sought to redress through the Sherman Act. Here, there are many intermediary parties and steps separating Mallinckrodt from Plaintiffs [*see*, *infra*, III.A.5.] which create difficult damage calculation and apportionment issues and raise the possibility of duplicate recoveries. Thus, application of these factors precludes Plaintiffs' standing to bring this case.

**B.      Plaintiffs Fail to State a Claim under the Laws of the Respective States.**

As a separate basis for dismissal of the "state antitrust claims," Plaintiffs fail to state a claim under each of the various state statutes, as detailed below.

*1.      Antitrust Claims.*

**Illinois**. The Illinois Antitrust Act, 740 Ill. Comp. Laws 10/7(2), provides that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General[.]" Accordingly, Plaintiffs are not permitted to bring this private indirect purchaser class action, and their Illinois antitrust claim should be dismissed.

**Arizona, California, Hawaii, Iowa, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Wisconsin.** The antitrust laws of these states limit their reach to activities which occur within the state.[8] Because Plaintiffs fail to allege conduct within those states that would violate the respective statutes, each claim should be dismissed.

---

[8] **Arizona:** Ariz. Rev. Stat. § 4-88-101(1) (applies to a "contract, combination or conspiracy . . . any part of which is *within this state*"); **California**: Cal. Bus. & Prof. Code §§ 16720(e)(2)–(3), 16750, 16702; **Hawaii**: Haw. Rev. Stat. Ann. § 480-4(a) ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce *in the State*, or in any Section *of this State* is illegal."); **Iowa**: Iowa Code § 553.5, 553.12, 553.3; **Michigan**: Mich. Comp. Laws § 445.771; **Minnesota**: Minn. Stat. Ann. § 325D.54 (2017); *St. Paul v. FMC Corp.*,

Arizona, Hawaii, Utah, Nevada. Plaintiffs fail to plead compliance with the provisions of these states' antitrust statutes requiring notice of an action prior to filing suit. Arizona, Hawaii, Nevada, and Utah require service of the complaint on the attorney general. Ariz. Rev. Stat. § 44-1415; Haw. Rev. Stat. Ann. § 480-13.3(a)(1); Nev. Rev. Stat. Ann. § 598A.210; Utah Code Ann. § 76-10-3109(9), § 76-10-919(9). Plaintiffs' Complaint lacks any allegations which would satisfy these statutory prerequisites, so their claims require dismissal.

> 2.    *Consumer Protection Claims.*

Florida, Nebraska, Nevada, Massachusetts, and Tennessee. The statutes of Florida, Nebraska, Nevada, Massachusetts, and Tennessee require allegations of intrastate conduct to survive dismissal. Namely, Florida's Deceptive and Unfair Trade Practices Act only applies to actions that occur within the state of Florida and thus requires a plaintiff to allege that misconduct took place within the state. *See Carnival Corp. v. Rolls-Royce, PLC*, No. 08-23318, 2009 WL 3861450, at *6 (S.D. Fla. Nov. 17, 2009) (citation omitted). Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*, "preclude[s] claims where the alleged injury is too remote."

---

Civil File No. 3-89-0466, 1990 U.S. Dist. LEXIS 18142, at *23−24 (D. Minn. Feb. 26, 1990) ("interpreting the statute to apply only to purchasers within Minnesota"); **Mississippi:** *State v. Infineon Tech. AG*, 531 F. Supp. 2d 1124, 1158 (N.D. Cal. 2007) (dismissing complaint where "it is wholly devoid of any allegations relating to intrastate trade or commerce"); **Nebraska:** Neb. Rev. Stat. §§ 59-801, *et seq.* (restricted to activity "within this state"); *Kanne v. Visa U.S.A. Inc.*, 272 Neb. 489, 494-500 (2006); **Nevada:** N.R.S. § 598A.060 (unlawful to conduct enumerated activities "*in this State*"); **New Mexico:** N.M. Stat. Ann. § 57-1-1 ("Every contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce *is within this state*, is unlawful."); **New York:** N.Y. Gen. Bus. Law § 340(1) (limited contracts, agreements, arrangements or combinations "in *this state*"); **North Carolina:** N.C. Gen. Stat. § 75-1 (applies to "trade or commerce *in the State of North Carolina*."); **North Dakota:** N.D. Cent. Code § 51-08.1-01 (defining the "relevant market" as the "geographical area of actual or potential competition in a line of commerce, all or any part of which is *within this state*"); **Rhode Island:** R.I. Gen. Laws § 6-36-4; **South Dakota:** S.D. Codified Laws § 37-1-3.1 (South Dakota's antitrust statute governs "trade or commerce any part of which is *within this state*."); **Wisconsin:** *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005) (requiring "(1) actionable conduct   . . . occurred *within this state* . . . or (2) the conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state") (emphases added).

*Kanne*, 272 Neb. at 494–500. And, the Nevada Unfair Trade Practice Act makes it unlawful to conduct enumerated activities "in this State." N.R.S. § 598A.060. Likewise, the Massachusetts Consumer Protection Act limits claims to "actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11. The Tennessee Unfair Trade Practices Act is limited to "arrangements, contracts, agreements, trusts, or combinations" that affect "competition in the importation or sale of articles imported into this state." Tenn. Code Ann. § 47-25-101. Plaintiffs do not include allegations of improper conduct in these states which would violate the relevant statutes.

**Arkansas.** The Arkansas Deceptive Trade Practices Act does not apply to practices "which are subject to and comply with any rule, order, or statute administered by the Federal Trade Commission." A.C.A. § 4-88-101(1). Here, as referenced in the Complaint, Mallinckrodt is subject to an FTC order relating to the allegations in the Complaint. (*See, e.g.*, SAC ¶ 155). Accordingly, dismissal of the Arkansas claim is warranted.

## III. Plaintiffs Fail to State a Claim for Any RICO Violation (Counts IX-XI).

Courts should use "common sense" when analyzing RICO claims. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994). The statute intends to prevent instances "in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person[.]" *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997). Here, Plaintiffs seek to effectively criminalize Mallinckrodt's pricing and unremarkable distribution network. This bears no resemblance to the organized criminal conduct which Congress sought to eradicate with RICO.

## A. Plaintiffs Fail to State a Claim Under Section 1962(c) (Count IX).

A Section 1962(c) RICO claim requires allegations of: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. 18 U.S.C. § 1962(c). A plaintiff cannot simply allege these elements in "boilerplate fashion," but "must allege sufficient facts to support each element." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998).

### 1. Plaintiffs' Allegations Improperly Lump Together Defendants.

A plaintiff cannot state a RICO claim by "lumping together" defendants. *Id.* at 730. Yet, Plaintiffs define "Mallinckrodt" as both Mallinckrodt ARD, Inc. and its parent, Mallinckrodt plc. (SAC ¶¶ 1–2, 25). When Plaintiffs attribute conduct to "Mallinckrodt," their faulty naming convention thus results in improperly blurred allegations against two distinct companies.[9] Plaintiffs also define Mallinckrodt and "Express Scripts"[10] as "Defendants" and, in so doing, improperly levy collective allegations against seven distinct companies. (SAC ¶¶ 32, 351–52, 356–60, 362–66, 368–69). This alone warrants dismissal.

### 2. Plaintiffs Do Not Adequately Allege the Existence of an Enterprise.

Plaintiffs allege "an association-in-fact enterprise . . . consisting of Mallinckrodt and Express Scripts, including their directors, employees, and agents." (SAC ¶ 347). But a corporation plus its agents is not an "enterprise." *Chrysler*, 116 F.3d at 228; *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004). Plaintiffs claim Express Scripts is "Mallinckrodt's exclusive agent for the

---

[9] "There is no vicarious liability under RICO." *Emery v. Am. Gen. Fin., Inc.,* 938 F. Supp. 495, 499 (N.D. Ill. 1996) (rejecting RICO claim against parent where plaintiff merely alleged existence of parent-subsidiary relationship). Further, "[a] parent company will be a proper RICO defendant only if it participated in the wrongful conduct of its subsidiary." *All-Tone Commc'ns, Inc. v. American Info. Tech.*, No. 89 C 7883, 1991 WL 166532, at *2 (N.D. Ill. Aug. 26, 1991) (citing *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 966-67 (7th Cir. 1988)).

[10] Plaintiffs define "Express Scripts" to refer collectively to five separate defendants: Express Scripts Holding Company ("ESHC"), Express Scripts, Inc. ("ESI"), CuraScript, Inc., doing business as CuraScript, SD ("CuraScript"), Accredo Health Group, Inc. ("Accredo"), and United BioSource Corporation ("UBC"). (SAC ¶ 1).

delivery of its products" and repeatedly refer to Express Scripts as Mallinckrodt's agent. (SAC ¶¶ 1, 20, 33, 52–53, 74, 94, 96, 221, 224–25, 232–33, 250, 366, 381, Ex. A). But, RICO does not apply "to a free-standing corporation . . . merely because [it] does business through agents, as virtually every manufacturer does[.]" *Chrysler*, 116 F.3d at 227.

Plaintiffs allege no facts showing an enterprise, which "must be distinguishable from the normal day to day activities." *Myers v. Seung Heun Lee*, No. 1:10-cv-131, 2010 U.S. Dist. LEXIS 99707, at *18 (E.D. Va. Sept. 21, 2010); *see United Food & Comm. Unions & Employers Midwest Health Benefits Fund v. Walgreens Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013). The RICO enterprise is allegedly "manifested in the ASAP program." (SAC ¶¶ 360, 376). But ASAP is simply the system Mallinckrodt utilizes with Express Scripts to, as Plaintiffs note, "distribute and sell Acthar directly to patients." (SAC ¶ 23).

### 3. Plaintiffs' Allegations Reveal No Conduct of a RICO Enterprise.

A defendant must "participate in the operation or management of the enterprise itself" and "have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 183 (1993). Plaintiffs' allegations are devoid of facts showing Mallinckrodt "conducted or participated in the conduct of the enterprise's affairs," as opposed to simply furthering their own commercial interests. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (citations omitted). *Walgreens* is instructive. There, the Seventh Circuit rejected the employee benefit plan's RICO claim where Walgreens and a drug maker, Par, allegedly overcharged for prescriptions. 719 F.3d at 850. Although the companies "regularly communicated" there was "nothing in the complaint reveal[ing] how one might infer that these communications or actions were undertaken on behalf of the enterprise as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests." *Id.* at 855.

A complaint must plead facts plausibly alleging a degree of cooperation and coordination "that fell outside the bounds of the parties' normal commercial relationships." *Nesbitt v. Regas*, No. 13-C-8245, 2015 WL 1331291, at *8 (N.D. Ill. March 20, 2015). As noted in *Walgreens*:

> [C]ooperation describes virtually every prescription pharmaceutical distribution chain. The allegations in the complaint do not indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy, and without such an indication, we cannot find a basis for inferring [they] were conducting the enterprise's affairs.

719 F.3d at 856 (emphasis added).

Plaintiffs fail to identify *any* communications or facts revealing conduct of an enterprise's affairs as opposed to cooperation furthering each party's own interests. Generalized claims about "a common communication network" by which Defendants "shared and continue to share information on a regular basis" are of no moment. (SAC ¶ 363). And while Plaintiffs contend "Mallinckrodt's conduct in sending e-mails, faxes and other communications to Express Scripts to direct the exclusive distribution, sale and reimbursement of Acthar through ASAP" reveals a price inflation scheme, this is entirely consistent with each party advancing its own interests to sell and distribute Acthar and support patients. (SAC ¶ 383). Plaintiffs offer only conclusory allegations that all "Defendants" exerted control over the enterprise and conducted or participated in its affairs. (SAC ¶¶ 364(b)–(f), 365). The only allegation of control specific to *Mallinckrodt* is the bare assertion that "Mallinckrodt establishes the prices of Acthar through fraudulent conduct." (SAC ¶ 364). These boilerplate allegations do not pass muster. *Goren*, 156 F.3d at 727.

### 4.     *Plaintiffs Fail to Allege Any Predicate Acts with Requisite Specificity.*

Plaintiffs claim Defendants engaged in anticompetitive conduct and charged "inflated" prices for Acthar. (SAC ¶ 73). High prices do not constitute an antitrust violation and, in any event, a "violation of antitrust law is not a predicate act under RICO." *Jennings v. Emry*, 910 F.2d 1434, 1437 (7th Cir. 1990).

20

Plaintiffs allege Defendants "us[ed] a fraudulent scheme to market and sell Acthar at inflated prices." (SAC ¶ 364(f)). However, "[a] necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact." *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003). Plaintiffs allege no facts whatsoever—much less with heightened Rule 9(b) specificity—supporting a plausible inference that any party engaged in fraud in connection with distributing Acthar. Fraud does not arise simply because a party believes a company charges too much.

Plaintiffs' mail and wire fraud claims, which must also be pled with heightened specificity, are woefully deficient. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597–99 (7th Cir. 2001). Plaintiffs fail to allege facts showing a *single* instance of wire or mail fraud. They refer to a "common communication network" and that "Mallinckrodt and Express Scripts all agree to charge inflated prices for Acthar" in unspecified communications that "typically" occurred "by use of the wires and mails," but Plaintiffs do not specify the time, place, or content of any such communications. (SAC ¶ 363).

Plaintiffs try to mask this flaw by claiming the submission of "[t]housands of" ASAP forms to "Express Scripts offices" and "[t]housands [of] phone calls . . . between physicians and patients with Express Scripts" were instances of wire fraud. (SAC ¶ 370). Yet Plaintiffs offer no details of these claimed communications and do not explain how any such communication (i) contained a misrepresentation, (ii) was made to, and (iii) reasonably relied upon by Plaintiffs or any member of the Class. *Goren*, 156 F.3d at 729.[11]

---

[11] Plaintiffs also claim ESI "explicitly advertised to all existing and prospective patients and payors that the ASAP Program would benefit them providing lower and affordable sales prices." (SAC ¶ 366(a)). Similarly, Plaintiffs allege that "Mallinckrodt and Express Scripts misled Rockford by fraudulently stating over the internet and through the mail that Rockford and the Class would

Plaintiffs' speculation that unspecified communications "likely involved hundreds, if not thousands, of separate instances" of the use of mail or wires or that "[e]ach of these fraudulent mailing and interstate wire transmissions" was "racketeering activity" is also inadequate. (SAC ¶¶ 367, 370). "The Seventh Circuit . . . does not look favorably on relying on many instances of mail and wire fraud to form a pattern." *Vicom*, 20 F.3d at 781. Plaintiffs fail to sufficiently allege *any* mail or wire fraud, so, *a priori* they fail to allege a pattern of racketeering activity.

### 5.  *Plaintiffs' Allegations Do Not Establish RICO Injury or Causation.*

Plaintiffs' alleged RICO injury is "economic injuries in the form of overcharges." (SAC ¶ 168). "A plaintiff alleging damages in out-of-pocket losses must allege these damages as a quantifiable, 'clear and definite' monetary amount." *So. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08-cv-5175, 2009 WL 3151807, at *4 (S.D.N.Y. Sep. 30, 2009) ("Courts disfavor damages estimates that require speculation or that are based upon factors other than the defendant's misrepresentations.") (citation omitted). Only a "concrete financial loss" constitutes a cognizable injury under RICO. *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, No. 06-3044 (FLW), 2008 WL 5413105, at *7 (D.N.J. Dec. 23, 2008) (TPP-plaintiff's overpayment for prescription drugs did not constitute cognizable RICO injury). Even if such a vague "overcharges" claim could otherwise support RICO injury, Plaintiffs cannot plausibly show any "overcharges" were caused "by reason of a violation" of RICO. 18 U.S.C. § 1964(c).

A RICO violation must be both the "but-for" and proximate cause of injury. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Here, Plaintiffs posit that but-for (i) the use of a single distributor, (ii) the Synacthen acquisition, (iii) Synacthen not coming to market, and (iv) ESI not "contain[ing] costs" to reduce Mallinckrodt's prices, Plaintiffs would have paid "lower"

---

receive affordable healthcare and contained costs of Acthar." (SAC ¶ 366(b)). Plaintiffs' lawsuit is utterly devoid of facts evidencing any misrepresentations or fraudulent representations.

Acthar payments. (SAC ¶¶ 99, 366). Yet, Plaintiffs allege no facts showing how using multiple distributors would have impacted prices. (SAC ¶¶ 363−64, 364(f)). Nor have Plaintiffs plausibly alleged that alternative drugs could have been available in the market to impact Acthar pricing at all, let alone by the time Plaintiffs paid for Acthar in 2015.

Nor do Plaintiffs' allegations plausibly demonstrate proximate cause. This Court has recognized that claims by third party payors (TPPs) seeking to recoup "losses" of prescription reimbursements pose proximate causation issues. *E.g.*, *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 192 F. Supp. 3d 963, 968 (N.D. Ill. 2016) (collecting cases) (dismissing TPP-plaintiffs' putative class action for lack of causation). The *Hillman* court concluded "the distinguishing characteristic [is] whether the drug manufacturer directly made misrepresentations to the TPP because otherwise intervening factors—such as a physician's independent medical judgment or a patient's decision making—interrupt the chain of causation." *Id.* at 970.

Also, in *In re Yasmin*, Nos. 3:09-cv-20071, 3:09-md-02100, 2010 WL 3119499, at *5 (S.D. Ill. Aug. 5, 2010), the health benefit fund-plaintiffs could not establish causation to pursue RICO claims related to improper promotion of FDA-approved drugs. "[A] majority of courts considering the issue have concluded that the injury for which third party payors seek reimbursement is too remote and speculative to maintain a RICO claim." *Id.* at *6 (collecting cases). The "injury" of paying too much for the drug was too attenuated since "multiple steps separate[d] the alleged wrongful conduct . . . and the alleged injuries," with "the causal link necessarily involv[ing] the decision making process of the patient, the prescribing physician, and the third party payor." *Id.* at *7. So too here, as Plaintiffs fail to plausibly allege Mallinckrodt made any representations to Plaintiffs, much less *misrepresentations that caused Plaintiffs to decide to pay for Acthar*.

Plaintiffs' own allegations also reveal the contingent steps that must occur before they actually reimburse for Acthar, and which courts have said interrupt causation. The ASAP program "requires patient, physician and payor authorization before Mallinckrodt agrees to ship Acthar to patients." (SAC ¶ 52). A physician must determine Acthar is "medically necessary." (SAC Ex. A, p. 1). The patient or physician "contacts Mallinckrodt for a prescription" and then fills out the Acthar Start Form. (SAC ¶ 51, Ex. A). The patient authorizes "'Mallinckrodt and its agents' to do a number of things in relation to the prescription and distribution of Acthar," including sharing the patient's health information and providing various services, like reimbursement coverage and support. (SAC ¶¶ 51, 52, Ex. A). A "preliminary assessment of benefit verification" is conducted to "confirm[] the patient's insurance coverage or other source of payment." (SAC ¶¶ 51, 54, Ex. A). As noted on the physician certification, "insurance verification is ultimately the responsibility of the provider and third-party reimbursement is affected by a variety of factors." (SAC Ex. A). Plaintiffs do not describe the remaining steps, but common sense dictates they include, at least: the insurer or other payment source confirming it approves and/or will pay for Acthar; Acthar being ordered, delivered, and paid for; and Plaintiffs at some point receiving and paying a reimbursement demand. And, of course, the patient must decide to proceed with the Acthar treatment. This is too remote to state a claim.

**B.      Plaintiffs Fail to State a Claim Under Section 1962(a) (Count X).**

Plaintiffs' RICO investment injury claim requires facts showing Defendants (1) received income from a pattern of racketeering activity; (2) used or invested that income in the operation of an enterprise; and (3) caused injury by the use or investment of the racketeering income in an enterprise. *Rao v. BP Products N. Am., Inc.*, 589 F.3d 389, 399 (7th Cir. 2009). The harm from the investment activity must be distinct from the 1962(c) harm. *Grove Fresh Distrib., Inc. v. Flavor Fresh Foods, Inc.*, 720 F. Supp. 714, 716–17 (N.D. Ill. 1989). Plaintiffs offer only boilerplate

allegations that racketeering "income was used to acquire, establish, and/or operate the ASAP Enterprise" and conflate their 1962(a) claim with the same racketeering activity and injury alleged in their 1962(c) claim: "inflated reimbursements" and "overpayment" for Acthar. (SAC ¶¶ 371, 385). Plaintiffs' bare allegation that their injury "was distinct from the injury caused by the pattern of racketeering activity" is devoid of factual support. (SAC ¶ 378).

### C. Plaintiffs' Section 1962(d) Conspiracy Claim Similarly Fails (Count XI).

Plaintiffs' RICO conspiracy claim fails for all of the reasons above. When a 1962(c) claim fails, a 1962(d) claim premised upon the same facts also fails. *Walgreens*, 719 F.3d at 387; *Goren*, 156 F.3d at 732. Plaintiffs' conspiracy claim fails for another reason: Plaintiffs offer no non-conclusory allegations evidencing an illicit agreement. *Slaney*, 244 F.3d at 600. "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren*, 156 F.3d at 732. Plaintiffs' generalized, conclusory allegations that Defendants agreed "to limit the distribution of Acthar" and "inflate prices and maximize profits" cannot support a RICO claim. (SAC ¶¶ 382–383).

### IV. Plaintiffs' Fraud Claim Fails Because They Have Not Alleged False Statements of Material Facts or Reliance with Particularity (Count IV).

Plaintiffs' claim for common law fraud fails because Plaintiffs allege no facts showing a fraudulent scheme, much less with requisite particularity. Plaintiffs have not identified with particularity *any* false statements[12] purportedly made by Mallinckrodt upon which to base their fraud claim. Their reference to unidentified statements regarding "affordability" utterly fails to support a claim. (*See, e.g.*, SAC ¶ 366). Nor do Plaintiffs' vague assertions that "Defendants" made unspecified "material misrepresentations" that the prices for Acthar "represented a calculation of

---

[12] Plaintiffs have not identified: *what* the allegedly false statements are, *by whom* the statements were made, *to whom* the statements were made, *when* the statements were made, *where* the statements were made, and *how* the statements were made. *See Tricontinental*, 475 F.3d at 844.

real and fact-based prices for their drugs, and that they represented the actual value of the product in the marketplace" support a claim of fraud. (SAC ¶ 204).

Plaintiffs appear to theorize that Acthar prices were in and of themselves fraudulent statements. (*See, e.g.*, SAC ¶¶ 204, 206) (claiming Acthar was sold at "artificial prices, unrelated to any actual, reasonable price in the marketplace, or actual value of Acthar, but created and manipulated by the Defendant . . . thus constituting false representations"). However, this Court has squarely rejected the notion that an inflated price can itself constitute a fraudulent misrepresentation for a common law fraud claim. *See Thompson's Gas & Elec. Services, Inc. v. BP America, Inc.*, 691 F. Supp. 2d 860, 870 (N.D. Ill. 2010) (rejecting theory that "inflated" price could constitute a false representation for common law fraud); *see also Amerigas Propane, LP v. BP America, Inc.*, 691 F. Supp. 2d 844, 852 (N.D. Ill. 2010) (dismissing fraud claim where plaintiff alleged unspecified false statements caused inflated prices and defendants engaged in "illegal market manipulation"). Here too, Plaintiffs' assertion that an "inflated" price is a misrepresentation fails as a matter of law.[13] (SAC ¶¶ 204, 206).

Plaintiffs' fraud claim also fails because Plaintiffs cannot establish justifiable reliance upon any alleged misrepresentation. Here, Plaintiffs allege they "justifiably relied" on Defendants' unspecified false statements, but do not plead fact supporting this allegation. (SAC ¶ 209). Indeed, even assuming a "false price" could otherwise underlie a fraud claim, which it cannot, Plaintiffs

---

[13] Nor can Plaintiffs save their fraud claim by alleging, in conclusory fashion, that Defendants' actions "violate the common law against negligent misrepresentation and fraud." (SAC ¶ 203). Where, as here, a plaintiff seeks purely economic damages, and not damages for personal injury or property damage, it cannot recover for negligent or innocent misrepresentation unless the defendant has a duty to avoid negligently conveying false information. Such a duty arises where a defendant is "in the business of supplying information for the guidance of others in their business transactions." *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 335 (Ill. 2006). Plaintiffs have not alleged that Mallinckrodt owed them such a duty, nor is there a basis for such a claim.

do not allege they issued reimbursements for Acthar in reliance on the price or representations to Acthar patients regarding affordability. *See Thompson*, 691 F. Supp. 2d at 870–71 (rejecting "fraud-on-the market theory of reliance" because defendants could not allege personal reliance on alleged misinformation).

## V.  Plaintiffs' Conspiracy to Defraud/Concerted Action Claim (Count V) and Unjust Enrichment Claims (Counts II and III) Fail as Derivative of Their Other Claims.

Plaintiffs' claims for conspiracy to defraud and unjust enrichment center on the same conduct that underlies their deficient RICO and fraud claims, which render the claims defective.

In Illinois, civil conspiracy is not an independent tort. *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 836 (N.D. Ill. 2009). Where a plaintiff's conspiracy claim is premised upon the same conduct as a deficient fraud or RICO claim, the conspiracy claim also fails. *See, e.g.*, *Damato*, 878 F. Supp. at 1156 (dismissing conspiracy to defraud claim based upon same conduct as failed RICO and common law fraud claims); *Suburban Buick, Inc. v. Gargo*, No. 08-C-0370, 2009 WL 1543709, at *11 (N.D. Ill. May 29, 2009) ("[f]ailure to allege sufficiently the underlying fraud claim will result in dismissal of the conspiracy claim"). Since Plaintiffs cannot sustain a claim for violation of RICO or fraud, their claim for conspiracy to defraud too fails.[14]

Plaintiffs' unjust enrichment claims likewise fail because there is no underlying tort or unlawful conduct. *Martis v. Grinnell Mut. Reins. Co.*, 388 Ill. App. 3d 1017, 1025 (3d Dist. 2009). Unjust enrichment is not a separate cause of action that, standing alone, justifies an action for

---

[14] Plaintiffs' conspiracy to defraud claim independently fails for failure to satisfy Rule 9(b). Plaintiffs have not alleged *any* particular facts showing that Defendants agreed to defraud Plaintiffs or took any overt acts in furtherance of the alleged conspiracy. Instead, they offer vague and conclusory allegations that Defendants "entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud and deceive Plaintiffs . . . by causing them to pay more for Acthar than they otherwise would have paid." (SAC ¶ 212). This manner of pleading is insufficient to support a conspiracy claim.

recovery. *Id.* at 1024. "Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence." *Id.* (internal citations omitted). Further, "Illinois courts have held that conduct rises to the level of *wrongful*, in the context of an unjust enrichment claim, when it violates the law." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) (emphasis in original). When an underlying claim of fraud is not sufficiently pleaded, a claim for unjust enrichment also must be dismissed. *Martis*, 388 Ill. App. 3d at 1025; *Caremark*, 493 F.3d at 855 ("resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well"). Dismissal is also required where an unjust enrichment claim is premised upon a deficient RICO or antitrust claim. *See Kostovetsky v. Ambit Energy Holdings, LLC*, 242 F. Supp. 3d 708, 727 (N.D. Ill. 2007); *Braman*, 149 F. Supp. 3d at 896–97.

Plaintiffs offer the exact same allegations of "unlawful conduct" in support of their unjust enrichment claim that form the basis for their defective antitrust, RICO, and state law claims. (SAC ¶¶ 192, 200). Plaintiffs explicitly allege that their unjust enrichment claims are premised upon violations of "federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Illinois and other states." *Id.* Plaintiffs also claim that Mallinckrodt was unjustly enriched because Plaintiffs paid "extremely high" reimbursement rates for Acthar, resulting in "grossly inflated revenue" but again, this grievance is derivative of the other failed claims. (SAC ¶¶ 189–190, 197–198).

## VI.    Statutes of Limitations.

In addition to the Complaint's aforementioned deficiencies, much of the alleged conduct supporting each claim falls outside of the applicable limitations period. Plaintiffs allege that the supposedly wrongful conduct began in July 2007, almost ten years prior to the filing of their Complaint. To the extent Plaintiffs seek recovery for the putative class based on payments for

28

Acthar which fall outside of each claim's respective limitations period, Plaintiffs' claims are time-barred.

## CONCLUSION

The Court should, respectfully, dismiss the Complaint against Mallinckrodt with prejudice in its entirety.

Dated: January 22, 2018                     Respectfully Submitted,

**COUNSEL FOR DEFENDANTS**
**MALLINCKRODT plc and**
**MALLINCKRODT ARD INC.**

<u>/s/ Scott C. Sullivan</u>
Scott Collins Sullivan
WilliamsMcCarthyLLP
120 West State St.
P.O. Box 219
Rockford, IL 61105-0219
(815) 987-8900
ssullivan@wilmac.com

G. Patrick Watson
Lindsay Sklar Johnson
Bryan Cave LLP
One Atlantic Center, 14th Floor
1201 W. Peachtree St., NW
Atlanta, GA 30309
(404) 572-6600
patrick.watson@bryancave.com
lindsay.johnson@bryancave.com

Rebecca A. Nelson
Herbert R. Giorgio, Jr.
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102
(314) 259-2000

ranelson@bryancave.com
herb.giorgio@bryancave.com

Philip D. Bartz
Bryan Cave LLP
1155 F Street, N.W.
Washington, DC 20004
(202) 508-6000
philip.bartz@bryancave.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2018, a true and correct copy of the foregoing Defendants Mallinckrodt ARD Inc.'s and Mallinckrodt PLC's Memorandum in Support of Motion to Dismiss the Second Amended Class Action Complaint was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

   /s/ Scott C. Sullivan
Scott C. Sullivan
WILLIAMSMCCARTHYLLP
120 W. State Street
P.O. Box 219
Rockford, IL 61105-0219
(815) 987-8936
ssullivan@wilmac.com

2015 WL 5693735
United States District Court,
N.D. Illinois, Eastern Division.

VBR Tours, LLC, Plaintiff,

v.

National Railroad Passenger Corp. and Yankee Leisure Group, Inc., Defendants.

Case No.: 14–cv–00804
|
Signed September 28, 2015

**Attorneys and Law Firms**

Paul J. Kozacky, Alastar Sean McGrath, John Norris Rapp, Kozacky Weitzel McGrath, P.C., Chicago, IL, Nipun Patel, Reed Smith, LLP, Philadelphia, PA, for Plaintiff.

Diane Green-Kelly, Reed Smith, LLP, Chicago, IL, Henry F. Reichner, Nipun Patel, Reed Smith, LLP, Philadelphia, PA, Kenneth L. Racowski, Buchanan Ingersoll & Rooney, PC, Philadelphia, PA, Loren Scott Cohen, Wilson, Elser, Moskowitz, Edelman, Dicker, Chicago, IL, Michael P. McCloskey, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, San Diego, CA, for Defendants.

## MEMORANDUM OPINION AND ORDER

Robert M. Dow, Jr., United States District Judge

 **\*1** Before the Court is Plaintiff's motion to reconsider the Court's Opinion and Order [46] granting Defendants' motions to dismiss. For the reasons set forth below, the Court denies Plaintiff's motion. Plaintiff is given until 10/26/2015 to file a motion for leave to file an amended complaint if it believes it can overcome the deficiencies identified below consistent with Fed.R.Civ.P. 11.

## I. Background [1]

[1]     The Court assumes as true all well-pleaded allegations set forth in the complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir.2007).

Although the Court summarized the facts in its previous Opinion and Order, Plaintiff has clarified the nature of its factual allegations and legal arguments, warranting a new discussion. Plaintiff alleges that Amtrak is a monopoly created by federal statute and America's only long-distance leisure passenger rail service. Compl. [1] ¶¶ 1, 10. VBR and Yankee are tour operators who sell Amtrak vacation travel packages. *Id.* ¶¶ 2, 4. The relevant geographic market is the United States, and the relevant product market is "the market for Amtrak leisure travel packages sold by tour operators to consumers, either utilizing an intermediary travel agent or selling directly to the consumer-vacationer themselves." *Id.* ¶¶ 8, 9.

Plaintiff alleges that tour operators purchase tickets from Amtrak and combine them with other components, such as hotels, meals, local transportation, tour guides, and admission to tourist attractions, to create a travel package. *Id.* ¶¶ 2, 4, 16–20. They sell these travel packages to consumers through two distributional channels. *Id.* ¶ 8. In the first distributional channel, Amtrak sells tickets to tour operators; tour operators then sell travel packages to travel agents; and travel agents resell the travel packages to consumers. *Id.* In the second distributional channel, Amtrak sells tickets to tour operators, who then sell their travel packages directly to consumers. [2] *Id.* Tour operators profit from (1) commissions on tickets,

provided by Amtrak, and (2) a mark-up on the total cost of a package. *Id.* ¶ 22. Travel agents, meanwhile, profit by receiving a commission from tour operators. *Id.*

2     Plaintiff argues in its motion for reconsideration that the Court misunderstood the nature of the relevant market because it ignored the alleged existence of the two distributional channels. That is incorrect. However, in the interest of clarity and completeness, the Court again outlines the two channels in this Opinion and Order.

Amtrak owns its own brand of travel packages called Amtrak Vacations®. *Id.* ¶ 27. Since 2006, Amtrak has contracted with Yankee, its national tour operator, to run operations under its brand, compensating Yankee through a 19% commission on tickets. *Id.* ¶¶ 27, 28, 14. Meanwhile, other tour operators have operated their own brands, historically receiving a lower commission. Plaintiff alleges that toward the end of 2007, Amtrak partnered with a travel agent consortium, Vacation.com, to launch an online booking tool called Rail Agent. *Id.* ¶ 25. Travel agents and tour operators who were members of Vacation.com could book tickets directly with Amtrak through Rail Agent. *Id.* By booking through Rail Agent, they could earn an 8% commission on commissionable trains from Amtrak or a 10% commission if the booking were for a party of 20 or more. *Id.* They could receive up to 3% additional commission–a "commission override"—depending on the growth of their quarterly revenues from the sale of Amtrak tickets. *Id.* Plaintiff used these commissions to expand its tour offerings, grow its business, and increase Amtrak's sales, becoming one of Amtrak's "best promoters" based on "exceptional customer service and its own marketing investments and talent." *Id.* ¶¶ 40–42; see also *id.* ¶¶ 34, 36, 38.

**\*2** In February 2013, Amtrak submitted a request for proposals for its national tour operator contract. *Id.* ¶ 78. Plaintiff alleges that it submitted a proposal including two key terms. *Id.* ¶ 79. "The first key term in VBR's proposal was a commission rate of 8%, not the 19% or better rate Amtrak had been paying Yankee." *Id.* ¶ 80. This lower commission allegedly could have saved Amtrak approximately $3 million in commissions over three years. *Id.* "The second key term in VBR's proposal was that the commission rate of 8% was to be paid to any travel agent or tour operator, under VBR's aegis or not, whenever they favored Amtrak with a rail ticket purchase." *Id.* ¶ 81.

Amtrak rejected VBR's proposal, opting for Yankee's instead. *Id.* ¶ 83. In its contract with Amtrak, Yankee agreed to provide extensive services, including, but not limited to, the following:

1.1 *Amtrak Vacations.* Tour Operator shall design, develop, implement, operate and administer all aspects of a nationwide tour-package program featuring Amtrak train services, known as Amtrak Vacations. * * *

1.4 *Amtrak Vacations Terms and Conditions.* Tour Operator shall develop program terms and conditions for Amtrak Vacations, which shall be subject to Amtrak's prior written approval. Such terms and conditions shall include booking policy, deposit, and payment schedule, price, refunds changes and cancellation policy, and respective responsibilities of Tour Operator and Amtrak. Tour Operator must fully and adequately communicate such program terms and conditions to consumers and travel agents.

1.5 *Amtrak Vacations Tour Package Pricing.* Subject to Amtrak's prior written approval, Tour Operator shall determine the pricing of the tour packages.

1.6 *Call Center Operations.* Tour Operator shall operate and maintain a phone system to handle all phone calls (including customer and travel agent phone calls) * * * Tour Operator shall: (a) operate a full-service call center offering information and reservations; (b) staff the call center with well-trained and supervised agents; (c) offer referrals to regional tour operators, (d) answer eighty percent (80%) or better of the calls offered in twenty (20) seconds or less and the remaining calls within forty (40) seconds or less; and (e) provide call answering capabilities a minimum of Monday through Friday (excluding national holidays) between the hours of 7:30 a.m. CT and 7:00 p.m. CT and Saturday and Sunday between the hours of 9:00 a.m. CT and 3:00 p.m. CT * * *; and provide means for handling customer problems and emergencies on a twenty-four (24) hour, seven (7) day per week basis.

1.7 *Reservation System.* Tour Operator will operate and maintain a state-of-the-art web and mobile reservation system for consumer direct and travel agent bookings to automate (a) booking train space and tour components; and (b) issuing itinerary, rail tickets and tour documents. The reservation system will also have the capability to produce (a) accounting and reporting of payments, deposits and refunds; and (b) sales and marketing reports and ad hoc reports.

1.8 *AmtrakVacations.com.* Tour Operator will design, develop and maintain an Amtrak Vacations website, with the domain name AmtrakVacations.com. * * * Tour Operator will offer online booking capabilities to consumers and travel agents. * * *

1.9 *Mobile Site.* Tour Operator will design, develop and maintain an Amtrak Vacations mobile site. Amtrak shall have prior approval of all aspects of the mobile site.

1.10 *Customer Service.* Tour Operator shall handle all customer and travel agent inquiries and complaints in a prompt, courteous and diligent manner. All customer service issues prior to travel and while en route are to be handled immediately by telephone and resolved to the extent possible. * * *

**\*3** 1.13 *Amtrak Vacations Customer/Travel Agent Database.* Tour Operator shall develop and maintain an automated Amtrak Vacations customer/travel agent database[.] * * * Tour Operator shall develop and launch Amtrak Vacations eSpecials to Amtrak Vacations customers and travel agents on a weekly schedule (or an agreed upon schedule) throughout the year.

1.14 *Trip Protection Insurance.* Tour Operator shall develop, maintain, promote, and implement a trip protection option for Amtrak Vacations customers.

1.15 *Operations.* Tour Operator will continue to design, provide and staff its operation to meet the requirements of this Agreement and provide a dedicated staff and multi-functional support personnel in functional and developmental areas. * * *

1.16 *Quality Control.* Amtrak and Tour Operator will conduct quarterly reviews to discuss Amtrak Vacations, sales and payments, technology issues, customer service, booking and ticketing, marketing staffing, budget and ongoing initiatives * * *

2.1 *Booking and Ticketing.* Tour Operator shall book reservations and issue itineraries, tickets and vouchers for Amtrak Vacations to customers and travel agents. * * *

Tour Operator will develop, enter into contractual agreements, promote and sell the Amtrak Vacations product to travel agents, travel consortiums, and travel industry partners. * * *

5.1 *Marketing Plan.* * * * Tour Operator shall advertise, market and promote Amtrak Vacations to consumers and travel agents. * * *

5.4 *Partnerships.* Tour Operator shall establish preferred partnerships with travel agent consortiums and industry partners (such as AAA, Vacation.com, and Avoya) to enhance the sale of the Amtrak Vacations brand. * * *

17.1 *Reports.* Tour Operator shall provide to Amtrak the reports specified below [on revenue, data, call volume, destinations, top performing packages, travel agency/consortia/travel industry partners, finances.] * * *

21.1 Tour Operator shall procure and maintain, at its own cost and expense, continuously during the term of this Agreement * * * the types of insurance specified below [including Workers' Compensation, Commercial General Liability Insurance, Errors and Omissions/Professional Liability Insurance, Automobile Liability Insurance, Claims–Made Insurance, Crime Insurance.]

VBR ~~Case: 1:21-cv... National Railroad Passenger Corp., Not Reported in F.Supp.2d (2015)~~ 190... Page ID #:1524
Case: 3:1-50428-JTD Doc 22-4 Filed 05/21/21 Page 46 of 202

2015 WL 5693735, 2015-2 Trade Cases P 79,327

Compl. Ex. A[1–1] at 4–26. As compensation for Yankee's services, Amtrak agreed to provide a commission on the Amtrak rail and Amtrak accommodation portion of a reservation. *Id.* at 11. The term of the contract was five years. *Id.* at 12. The contract included an option for Amtrak to extend twice for one year each time. *Id.*

Plaintiff alleges that Amtrak chose unwisely. There was "no sensible reason to pay Yankee $3 million more for poorer performance in contradistinction to the better service that VBR had proven itself capable of, subjectively, and that would cost Amtrak and the American taxpayer $3 million less, objectively." *Id.* ¶ 84. In support of its allegation of Yankee's "lackluster customer service," Plaintiff states that "[o]n numerous occasions, when VBR had to contact Yankee to purchase, for example, Glacier National Park lodging that Yankee had locked up for some specific period, VBR would experience telephone hold times exceeding ten minutes, far longer than the 20–to 40–second hold times required of Yankee under the national tour operator contract." *Id.* ¶ 47.

 **\*4** When Plaintiff lost the contract, it contacted Amtrak and learned that "Amtrak had not even considered the (at least) $3 million difference!" *Id.* ¶ 85. Amtrak allegedly explained that it had identified Plaintiff's proposal as nonresponsive. [3] Amtrak subsequently announced that, effective November 1, 2013, it would stop paying commissions to all travel agents and tour operators with two exceptions: (1) Yankee and (2) Vacation.com and AAA, but only until the two associations' commission contracts expired. *Id.* ¶ 94. Amtrak then announced that it would sell Amtrak Vacations® packages to travel agents, providing an 8% to 10% commission on the Amtrak ticket portion of a package and a 12% commission on the non-rail portion of a package. *Id.* ¶ 95. Yankee allegedly told VBR that "Yankee will enjoy a complete monopoly as all other travel agents and tour operators will be driven out of the Amtrak leisure travel package business." *Id.* ¶ 100.

[3]     More specifically, it allegedly provided four reasons for finding Plaintiff's proposal nonresponsive. First, Amtrak stated that the resumes of Plaintiff's key personnel were too brief. Yet, according to Plaintiff, Amtrak had never asked for more detailed resumes; moreover, it had worked closely with Plaintiff's principals for almost a decade. *Id.* Second, Amtrak stated that Plaintiff would have to train people to work with Amtrak. Plaintiff contends that this was mere pretext because it had worked successfully with Amtrak for years, received better feedback than Yankee, and hired ten new employees. *Id.* ¶ 87. Third, Amtrak stated that VBR did not provide a detailed list of the hotels it offered. According to Plaintiff, however, those hotels were listed on its website, and Yankee and Plaintiff use the same hotel consolidators. *Id.* ¶ 88. Fourth, Amtrak argued that Plaintiff had never operated a third-party brand. Plaintiff counters that, in fact, "VBR had created two railway leisure brands without any preferential treatment and was growing sales at amazing rates, thusly (sic) expanding the promotion of Amtrak by magnitudes. In addition, when Amtrak rolled out its new on-line booking system, it was VBR, not Yankee, that helped Amtrak de-bug it." *Id.* ¶ 89.

The complaint alleges antitrust injury occurring through the following mechanism:

> Paying a 19% or better commission to Yankee while paying VBR, other tour operators and travel agents no direct commission will result in all of those entities other than Yankee departing the market of selling railway leisure tickets. While in the short term consumers might benefit from lower prices for railway leisure packages from Yankee (which will be able to undercut the competition on price to achieve a monopoly in the market), the long-term effect is to remove competition, resulting in higher prices and worse service for consumers.

Compl. ¶¶ 107, 131; see also *id.* ¶¶ 113, 119, 137, 143. Plaintiff also alleges that Amtrak's new commission system will cause antitrust injury by reducing Plaintiff's revenue and hampering its ability to "innovate through better technology and marketing." *Id.* ¶¶ 110, 125, 134, 141, 150.

Counts I and IV respectively allege that Yankee committed monopolization in violation the Sherman Act (15 U.S.C. §§ 1, 2 [4]) and the Illinois Antitrust Act (740 ILCS 10/3(3)). Counts II and V respectively allege that Amtrak and Yankee entered a conspiracy to attempt to monopolize the travel package market in violation of the Sherman Act (15 U.S.C. § 2) and the Illinois Antitrust Act (740 ILCS 10/3(2)). Counts III and VI respectively allege that Amtrak and Yankee

2015 WL 5693735, 2015-2 Trade Cases P 79,327

entered into a combination, contract or conspiracy to restrain trade in violation of the Sherman Act (15 U.S.C. § 1) and the Illinois Antitrust Act (740 ILCS 10/3(3)).

4  Count II includes what is likely a typo in that it alleges "Violation of § 2 of the Sherman Act (15 U.S.C. § 1)." Compl. [1] at 29. Because it involves monopolization, the Court construes it as a § 2 claim.

## II. Legal Standards

### A. Motion for Reconsideration

**\*5** Plaintiff moves for reconsideration under Federal Rule of Civil Procedure 60(b), which creates grounds for relief from a "final judgment, order or proceeding." Fed.R.Civ.P. 60(b). Because the Court previously dismissed without prejudice, its Opinion and Order was not a "final judgment, order or proceeding," and Rule 60(b) is inapplicable. That said, the Court does have inherent authority to reconsider its own orders entered prior to final judgment. See *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."); *Diaz v. Indian Head, Inc.,* 686 F.2d 558, 562–63 (7th Cir.1982) (stating that interlocutory orders may be "reconsidered and reviewed at any time prior to final judgment") (citation and internal quotation marks omitted); *Sims v. EGA Prods., Inc.,* 475 F.3d 865, 870 (7th Cir.2007) ("[N]onfinal orders are generally modifiable * * *." (citation omitted)) (Cudahy, J., concurring).

It is well-established that "[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 707 (N.D.Ill.2006) (quoting *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1269 (7th Cir.1996)). In regard to the "manifest error" prong, the Seventh Circuit has explained that a motion to reconsider is proper when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990) (citation and internal quotation marks omitted); see also *Wiegel v. Stork Craft Mfg., Inc.,* 2012 WL 2130910, at \*2 (N.D. Ill. June 6, 2012) ("Reconsideration is not appropriate where a party seeks to raise arguments that could have been raised in the original briefing."); *Oto v. Metropolitan Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir.2000) ("A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.' "). And with respect to the second prong, the Seventh Circuit has explained that a motion to reconsider may be appropriate if there has been "a controlling or significant change in the law or facts since the submission of the issue to the Court." *Bank of Waunakee,* 906 F.2d at 1191 (citation and internal quotation marks omitted). Because the standards for reconsideration are exacting, our court of appeals has stressed that issues appropriate for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Id.*

### B. Motion to Dismiss

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth,* 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting *Twombly,* 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only

VBR ~~Case: 1:17-cv-06453 National Railroad Passenger Corp, Not Reported in F.Supp.2d (2015)~~ Case 21-50428-JTD Doc 22-4 Filed 05/21/21 Page 48 of 202 PageID #:1526

2015 WL 5693735, 2015-2 Trade Cases P 79,327

give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (citing *Twombly,* 550 U.S. at 555). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago,* 631 F.3d 823, 832 (7th Cir.2011); *cf. Scott v. City of Chicago,* 195 F.3d 950, 952 (7th Cir.1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III. Analysis

**\*6** The Court previously dismissed Plaintiff's complaint, finding that it failed plausibly to allege antitrust injury. To state an antitrust claim under the Sherman Act, a private plaintiff must allege antitrust injury—that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) (quotation marks omitted). More specifically, a plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis Indus., Inc. v. King,* 965 F.2d 469, 471 (7th Cir.1992). The Court found that Plaintiff failed to plausibly allege antitrust injury because it alleged that Yankee would reduce prices without alleging that those prices would be predatory. The Court noted that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Atl. Richfield Co.,* 495 U.S. at 340.

Plaintiff moved for reconsideration, arguing that it did not and need not allege predatory pricing because its theories of anticompetitive conduct were a refusal to deal, denial of an essential facility, and exclusive dealing, not predatory pricing. Mot. to Recon. [47] at 7, 8. Concerned that it may have misapprehended Plaintiff's contentions, the Court allowed full briefing on the motion. See [52, 57]. Given its clarified understanding of the factual allegations, the Court now addresses whether Plaintiff's theory of anticompetitive conduct plausibly gives rise both to antitrust violations and antitrust injury.

### A. Federal Claims

### 1. Counts I and II

Counts I and II allege violations of § 2 of the Sherman Act, which prohibits monopolization, attempted monopolization, or combinations or conspiracies to monopolize. 15 U.S.C. § 2. Monopolization requires (1) monopoly power and (2) anticompetitive conduct designed to maintain or enhance that power improperly. *Olympia Equip. Leasing Co. v. W. Union Tel. Co.,* 797 F.2d 370, 373 (7th Cir.1986). Attempted monopolization requires a defendant to engage in predatory or anticompetitive conduct with the specific intent to monopolize and a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993). Conspiracy to monopolize requires the existence of a combination or conspiracy, overt acts in furtherance of the conspiracy, an effect upon a substantial amount of interstate commerce, and the existence of specific intent to monopolize. *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 540–41 (7th Cir.1986). While § 2 creates a cause of action for monopolization, attempts to monopolize, and conspiracies to monopolize, it does not create one for conspiracies to attempt to monopolize. [5] Accordingly, the Court construes Count II as either an attempt to monopolize or conspiracy to monopolize.

[5]  *S. Concrete Co. v. U.S. Steel Corp.,* 394 F.Supp. 362, 372 (N.D.Ga.1975) aff'd, 535 F.2d 313 (5th Cir.1976); *Windy City Circulating Co. v. Charles Levy Circulating Co.,* 550 F.Supp. 960, 967 (N.D.Ill.1982); *In re Visa Check/Mastermoney Antitrust Litig.,* 2003 WL 1712568, at \*6 (E.D.N.Y. Apr. 1, 2003); *Manwin Licensing Int'l S.A.R.L. v. ICM Registry, LLC,* 2012 WL 3962566, at \*5 (C.D.Cal. Aug. 14, 2012); *Xtreme Caged Combat v. Cage Fury Fighting Championships,* 2015 WL 3444274, at \*8 (E.D.Pa. May 29, 2015); 3B Phillip Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 809 (3d ed. 2006) ("An occasional complaint has alleged that the defendant conspired to attempt to monopolize. Courts have correctly held that § 2 states no such offense. Nor is there any need for it, because the combination that offends antitrust policy violates § 1.").

Regardless of whether a plaintiff alleges monopolization, attempted monopolization, or conspiracy to monopolize, § 2 requires a plausible allegation of anticompetitive conduct. See *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*

*LLP,* 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*"). Plaintiff contends that Amtrak violated § 2 through a refusal to deal, the denial of an essential facility, and exclusive dealing. The Court addresses (and rejects) each theory in turn and further explains why Plaintiff fails to state a claim under the Supreme Court's *Pacific Bell* decision or to plausibly allege antitrust injury.

### a. Refusal to Deal and Essential Facilities Claim

**\*7** Businesses are generally "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438, 448 (2009). This right to refuse to deal exists for three reasons. First, it encourages competition: "Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Trinko,* 540 U.S. at 407–08. Second, enforced sharing "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing–a role for which they are ill suited." *Id.* at 408; accord *Pac. Bell,* 555 U.S. at 452. Third, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko,* 540 U.S. at 408.

For these reasons, the Supreme Court has been "very cautious" in recognizing limited exceptions to the right not to deal. *Trinko,* 540 U.S. at 408. The first exception requires predatory pricing, meaning "below-cost prices that drive rivals out of the market and allow the monopolist to raise its prices later and recoup its losses." *Pac. Bell,* 555 U.S. at 448. The second exception requires a refusal to deal in violation of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605 (1985). Closely related is the essential facilities doctrine, a controversial concept articulated in *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir.1983). See *Trinko,* 540 U.S. at 411 ("We have never recognized such a doctrine * * *."). If Plaintiff's claim is cognizable at all, it must fall within one or both of the latter two exceptions.

*Aspen Skiing* created a limited refusal-to-deal exception located "at or near the outer boundary of § 2 liability." *Trinko,* 540 U.S. at 399. The case involved a ski area consisting of four mountain areas, three owned by the defendant and one owned by the plaintiff. As part of a joint venture, the parties issued a joint multiple-day ticket covering all four mountains. The defendant subsequently demanded a higher percentage of revenue. When the plaintiff objected, the defendant withdrew from the deal. Faced with the prospect of declining revenue, the plaintiff reattempted to negotiate a deal, even offering to buy defendant's tickets at retail price. But the defendant refused. The plaintiff consequently sued under the Sherman Act.

The Supreme Court affirmed the judgment against the defendant because the defendant's "unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko,* 540 U.S. at 409. In particular, the "defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* The evidence thus supported an inference that the defendant "was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Aspen Skiing,* 472 U.S. at 610–11. Put differently, the evidence suggested that the defendant's decision was "irrational but for its anticompetitive effect." *Novell, Inc. v. Microsoft Corp.,* 731 F.3d 1064 (10th Cir.2013); see also 3B Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 772, at 223 (3d ed.2008) (the refusal must be "irrational" but for its anticompetitive tendencies). Since deciding *Aspen Skiing,* the Supreme Court has declined to recognize any other cases falling within this "limited exception." *Trinko,* 540 U.S. at 399.

Plaintiff's claim lacks essential features of *Aspen Skiing*. First, unlike the defendant there, Amtrak has not terminated its dealings with Plaintiff. On the contrary, it continues to offer Amtrak tickets to Plaintiff—just not at Plaintiff's desired

price. Put differently, the commissions are the functional equivalent of a contingent discount offered to wholesalers. When Amtrak removed Plaintiff's commission, it removed the discount, raising the cost of Plaintiff's tickets from wholesale to retail prices. In direct contrast, the defendant in *Aspen Skiing* refused to sell Plaintiff tickets "*even if compensated at retail price.*" *Trinko,* 540 U.S. at 409. Thus, while *Aspen Skiing* involved an absolute refusal to deal, this case involves a refusal to deal at Plaintiff's desired (below-retail) price.

**\*8** A claim involving a refusal to deal at a certain price is ill-suited to judicial resolution. "If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions. That would not only risk judicial complicity in collusion and dampened price competition. It would also require us to become 'central planners,' a role for which we judges lack many comparative advantages and a role in which we haven't always excelled in the past." *Novell,* 731 F.3d at 1073 (citing *Trinko,* 540 U.S. at 407–08; 3B Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 772, at 220 (3d ed.2008)). Plaintiff's request that the Court create an equal playing field by invalidating the Amtrak–Yankee contract implicates precisely these concerns. If the Court prohibited unequal commissions, Amtrak could easily eliminate all commissions, pay Yankee through a separate mechanism, and achieve the identical effect. In other words, implementing Plaintiff's request could degenerate into a promethean effort to supervise Amtrak's dealings with tour operators—a task normally addressed by regulators, not courts.

Second, Plaintiff's claim is distinguishable from *Aspen Skiing* because, by attaching the Yankee—Amtrak contract to the complaint, Plaintiff itself pleads valid business reasons for Amtrak to (1) select Yankee as its tour operator and (2) pay Yankee through commissions. As to the first choice, Yankee agreed in the contract to provide Amtrak extensive services in exchange for payment. [6] Thus, unlike the scenario in *Aspen Skiing,* where the defendant destroyed short-term value for itself, the contract here enabled Amtrak to receive value. Plaintiff's claim that Amtrak had "no sensible reason" to choose Yankee is therefore legally implausible; numerous procompetitive business reasons appear on the face of the contract. *Id.* ¶ 84. A valid reason to provide compensation specifically through commissions also appears on the face of the contract: by making payment contingent on sales, Amtrak created an incentive for Yankee to sell as many tickets as possible, generating more value for Amtrak.

[6]  In exchange for the 19% commission, Yankee agreed, for example, to "design, develop, implement, operate and administer all aspects" of Amtrak Vacations®; "develop program terms and conditions for Amtrak Vacations"; "adequately communicate such program terms and conditions to consumers and travel agents"; "determine the pricing of the tour packages"; "operate and maintain a phone system to handle all phone calls (including customer and travel agent phone calls)"; "operate and maintain a state-of-the-art web and mobile reservation system"; "design, develop and maintain an Amtrak Vacations website"; "handle all customer and travel agent inquiries and complaints in a prompt, courteous and diligent manner"; "develop and maintain an automated Amtrak Vacations customer/travel agent database"; "develop, maintain, promote, and implement a trip protection option for Amtrak Vacations customers"; "design, provide and staff its operation to meet the requirements of this Agreement"; "conduct quarterly reviews to discuss Amtrak Vacations, sales and payments, technology issues, customer service, booking and ticketing, marketing staffing, budget and ongoing initiatives"; "book reservations and issue itineraries, tickets and vouchers for Amtrak Vacations to customers and travel agents"; "develop, enter into contractual agreements, promote and sell the Amtrak Vacations product to travel agents, travel consortiums, and travel industry partners"; "advertise, market and promote Amtrak Vacations to consumers and travel agents"; "establish preferred partnerships with travel agent consortiums and industry partners (such as AAA, Vacation.com, and Avoya) to enhance the sale of the Amtrak Vacations brand"; provide Amtrak with specified reports; and purchase insurance in compliance with the contract. Compl. Ex. A[1– 1] at 4–26.

Plaintiff contends that the Amtrak–Yankee contract was nevertheless anticompetitive for three reasons. First, Yankee provided worse customer service than Plaintiff. The Court is unpersuaded by this conclusory allegation; Plaintiff supports it only by contending that, when it called Yankee, it experienced hold times of more than ten minutes. *Id.* ¶ 47. It is not the judicial role to evaluate whether VBR or Yankee has better customer service. Second, Plaintiff contends that Amtrak's four reasons for finding its proposal nonresponsive were pretextual. Even if that were true, it only explain why Amtrak rejected Plaintiff's proposal, not why Amtrak lacked procompetitive reasons to choose Yankee. Third, Plaintiff argues that its offer cost $3 million less over the first three years. Because Plaintiff provides no explanation of what

services it offered Amtrak, the $3 million differential fails to explain why its offer was more cost-effective than Yankee's, even if it was cheaper.

**\*9** Most importantly, none of these reasons is persuasive because the question is not whether Amtrak chose the most competitive offer but whether it had *any* procompetitive purpose. It is not whether Amtrak optimally (or even prudently or competently) exercised its business judgment but whether it had any valid business reason. Antitrust law does not authorize courts (or disappointed bidders) to impose their business judgments on market players. *Aspen Skiing*'s limited exception authorizes intervention only when a defendant's decision is "irrational but for its anticompetitive effect." *Novell,* 731 F.3d at 1075; see also 3B Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 772, at 223 (3d ed.2008) (the refusal must be "irrational" but for its anticompetitive tendencies).

In sum, by attaching the Amtrak–Yankee contract to its complaint, Plaintiff provides numerous valid business reasons for the contract that it seeks to undo. It then fails to address, let alone plausibly rebut, those reasons in the body of its complaint. "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend,* 163 F.3d 449, 454 (7th Cir.1998); see also *Matter of Wade,* 969 F.2d 241, 249 (7th Cir.1992) ("A plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment."). Accordingly, Plaintiff pleads itself out of court based on the information in the contract. [7]

[7]     Case law does not make clear whether a procompetitive business reason is a pleading requirement or an affirmative defense that a Plaintiff need not anticipate in its complaint. See *United States v. N. Trust Co.,* 372 F.3d 886, 888 (7th Cir.2004) ("Resolving defenses comes after the complaint stage."). Here, the difference is immaterial because Plaintiff itself supplied the procompetitive business reasons without effectively countering them.

Because Plaintiff does not allege a refusal to deal that was "irrational but for its anticompetitive effects," it fails to state a claim within the outer bounds of § 2 liability recognized in *Aspen Skiing*.

### b. Denial of an Essential Facility

Finding no plausible refusal to deal claim under *Aspen Skiing,* the Court now considers whether Plaintiff states an essential facilities claim, to whatever extent such a claim may be distinct from a refusal-to-deal claim. See *Trinko,* 540 U.S. at 410–11 (suggesting that the essential facilities doctrine falls partly if not wholly within the refusal-to-deal rubric); *Olympia,* 797 F.2d at 377 ("[*Aspen Skiing* ] is like the essential-facility cases in that the plaintiff could not compete with the defendant without being able to offer its customers access to the defendant's larger facilities.").

In short, the essential facilities doctrine, as articulated in *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir.1983), says that "firms controlling an essential facility [have] the obligation to make the facility available on non-discriminatory terms." *MCI,* 708 F.2d at 1132. The purpose of the doctrine is to prevent a monopolist from using its "control of an essential facility (sometimes called a 'bottleneck') [to] extend monopoly power from one stage of production to another, and from one market into another." *Id.* at 1132.

As an initial matter, the Court notes that the viability of the essential facilities doctrine is in question. The doctrine "has been criticized as having nothing to do with the purposes of antitrust law," in part because consumers "are not better off if the natural monopolist is forced to share some of his profits with potential competitors." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406, 1413 (7th Cir.1995). As Professors Areeda and Hovenkamp have explained,

        **\*10** a monopolist cannot earn double profits by monopolizing a second, vertically related market.
        If a single firm controlled the world's only bauxite mine, the firm could monopolize aluminum

VBR...ase: 3:17 v. Amtrak Railroad Passenger Corp., Not Reported in F.Supp.3d (2015) ...2015...

Case: 3:17-50428-JTD Doc 22-4 Filed 05/21/21 Page 52 of 202 PageID #:1530

2015 WL 5693735, 2015-2 Trade Cases P 79,327

> manufacture as well by refusing to sell bauxite to others. Access to the mine is undeniably essential to a would-be aluminum manufacturer, but we cannot infer from the bauxite monopolist's refusal to sell ore that any less aluminum would be produced or that its price would be any higher.

3B Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 773c, at 248 (3d ed. 2008) ("Lest there be any doubt, we state our belief that the essential facilities doctrine is both harmful and unnecessary and should be abandoned"). [8] Although the Seventh Circuit has criticized its own doctrine—whether tangentially in *Schor* (as explained below) or explicitly in *Blue Cross*—it also has stated that it is unauthorized "to abrogate doctrines that have been endorsed and not yet rejected by the Supreme Court." *Blue Cross,* 65 F.3d at 1413. And although the Supreme Court observed in *Trinko* that it has "never recognized such a doctrine," it did not take the opportunity to repudiate either. *Trinko,* 540 U.S. at 411. *Trinko* thus leaves the essential facilities doctrine hobbling on one foot.

[8] An exception to this general principle exists where a price-regulated monopolist projects its monopoly into another market to capture more surplus. See *Olympia Equip.,* 797 F.2d at 374; *Fishman v. Estate of Wirtz,* 807 F.2d 520, 571 (7th Cir.1986) (Easterbrook, J., dissenting). This exception is not at issue here.

With that in mind, the Seventh Circuit's analysis in *Schor v. Abbott Labs.,* 457 F.3d 608, 612 (7th Cir.2006)—a factually similar case not involving the essential facilities doctrine—becomes informative here. *Schor* involved a defendant with a patent on a drug called *Norvir*. In additional to selling *Norvir*, the defendant also sold *Kaletra*, a combination drug that included *Norvir* as one component. The defendant allegedly monopolized the market for combination drugs by charging too much for *Norvir* alone and too little for *Kaletra*; it allegedly planned to induce patients to buy *Kaletra*, drive other combination vendors out of business, and permit the defendant to increase the price of both *Kaletra* and *Norvir*. The Seventh Circuit affirmed dismissal for failure to state a claim, reasoning that

> a firm that monopolizes some essential component of a treatment (or product or service) can extract the whole monopoly profit by charging a suitable price for the component alone. If the monopolist gets control of another component as well and tries to jack up the price of that item, the effect is the same as setting an excessive price for the monopolized component. The monopolist can take its profit just once; an effort to do more makes it worse off and is self-deterring.

*Schor,* 457 F.3d at 612.

Although *Schor* was not an essential facilities or refusal-to-deal claim, its reasoning is applicable by analogy. As in *Schor,* Plaintiff here alleges that Amtrak charges tour operators other than Yankee too much for the input (the ticket) and that Yankee will therefore charge consumers too little for the combination (Amtrak Vacations®), so that it can drive competitors out of business and then sell Amtrak Vacations® for more. To be sure, the facts alleged here are different in one respect: Plaintiff alleges that Amtrak created two input prices—one for Yankee and another for everyone else—and that Yankee, not Amtrak, sells Amtrak Vacations®. But the same economic principles apply because the commissions were payment for services that only Yankee provided to Amtrak; Amtrak could have created one high price for all tour operators, putting itself in the position of the defendant in *Schor* by acquiring Yankee or creating an in-house tour operator. Instead, it contracted with Yankee and paid it through commissions. Its decision to accomplish via contract what it could have done by acquiring Yankee or creating an in-house tour operator does not plausibly implicate the "prime concern" of the essential facilities doctrine, which is to prevent a monopolist from using its monopoly power in one market "as a lever to impede or destroy competition in other markets." *MCI,* 708 F.2d at 1144. Thus, the viability of Plaintiff's claim is questionable under *Schor*.

**\*11** But even assuming that the doctrine still stands, Plaintiff fails to state an essential facilities claim. To state an essential facilities claim, a plaintiff must allege four elements: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility

2015 WL 5693735, 2015-2 Trade Cases P 79,327

to a competitor; and (4) the feasibility of providing the facility." *MCI*, 708 F.2d at 1132–33. Where there is a "legitimate business or technical reason" to deny access, there is no essential facilities claim. *MCI*, 708 F.2d at 1133.

Plaintiff's essential facilities claim is problematic for three reasons. First, it improperly defines the essential facility as Amtrak tickets at wholesale prices, rather than Amtrak tickets alone. Case law does not support a definition of an essential facility that includes a price term. It generally identifies essential facilities as the facilities alone,[9] and for good reason: a definition of a facility that included price terms would require courts to assume the role of price-regulating agencies—a role for which they are ill-equipped.

[9]  See, *e.g., Aspen Skiing,* 472 U.S. 585 (arguably an essential facilities case in which the facility was a mountain); *Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973) (arguably an essential facilities case in which the facility was a power facility); *Associated Press v. United States,* 326 U.S. 1 (1945) (arguably an essential facilities case where the facility was membership in the Associated Press); *Terminal R.R. Ass'n of St. Louis,* 224 U.S. 383, (arguably an essential facilities case where the facility was a railroad terminal); *MCI,* 708 F.2d at 1133 (defining the essential facility as the "interconnections for FX and CCSA service"); *Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986) (identifying the facility as a sports arena).

Second, Plaintiff fails to plausibly allege the third element of an essential facilities claim—namely, "the denial of the use of the facility to a competitor." *MCI,* 708 F.2d at 1132–33. Relevant here is the degree of access required to state an essential facilities claim: no access or merely unequal access? *United States v. Terminal R.R. Ass'n of St. Louis,* 224 U.S. 383 (1912), the progenitor of the doctrine, required equal access to an essential facility. Since *Terminal Railroad,* however, the Supreme Court has made clear that to the extent the essential facilities doctrine is viable, "the indispensable requirement for invoking [it] is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose." *Trinko,* 540 U.S. at 411. Consistent with this statement, Seventh Circuit case law has required an absolute denial or its functional equivalent. *MCI* involved AT & T's complete refusal to interconnect MCI to the local distribution facilities of Bell operating companies—a refusal that precluded MCI from offering certain services to its customers. *MCI,* 708 F.2d at 1132. Similarly, in *Fishman v. Estate of Wirtz,* 807 F.2d 520, 539 (7th Cir.1986), the defendants' "discriminatory" terms were tantamount to a complete denial of access. [10] See also *United Asset Coverage, Inc. v. Avaya Inc.,* 409 F.Supp.2d 1008, 1049 (N.D.Ill.2006) ("[T]he absolute refusal to deal that the essential facilities doctrine appears to contemplate is not present here.").

[10]  *Fishman* involved Chicago Basketball's attempt to sell the Chicago Bulls to the plaintiffs. The sale was contingent on NBA approval, which required the plaintiffs to obtain a lease from a stadium. The stadium owner, who was a member of a competing bidder, thwarted the sale by offering terms so unreasonable that he effectively refused to grant them a lease. More specifically, he offered to give Chicago Basketball a ten-year lease that would be assignable only if Chicago Basketball agreed to an onerous guarantee, including rent payments, for the entire ten-year term. The Seventh Circuit found these terms tantamount to a refusal to lease because (1) they dealt with the owner of the Bulls, not the plaintiff; (2) he promised but failed to follow up on his offer, indicating intent not to lease; (3) there was good reason to believe that Chicago Basketball would reject the offer; and (4) the evidence sufficiently supported the conclusion that the owner agreed to withhold the stadium from the plaintiffs and give his own group a lease instead. See *id.* at 540–41.

**\*12** Plaintiff fails to allege a complete denial of access or its functional equivalent. More specifically, it fails to explain why Amtrak's commission to *Yankee* precludes *Plaintiff* from purchasing Amtrak tickets, or why access at retail prices amounts to a de facto denial of access (and perhaps it is precisely for this reason that Plaintiff attempts to define the essential facility as the tickets at wholesale prices). In effect, Plaintiff asks not for access but for access on its own terms. The essential facilities doctrine is not amenable to this demand[11] and, again, for good reason, as Plaintiff's requested relief could require ongoing supervision beyond the technical competency of the judiciary.

[11]  See *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996) (finding no essential facility violation where the defendant continued servicing the plaintiff but charged it significantly more than market price); *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539, 545 (4th Cir.1991) (finding no essential facility violation where a defendant railroad offered

to ship the plaintiff's sand and gravel but would not grant trackage rights allowing the plaintiff to ship them on its own); *Valet Apartment Servs., Inc. v. Atlanta Journal & Constitution,* 865 F.Supp. 828, 833 (N.D.Ga.1994) (finding no essential facility claim where a defendant newspaper permitted plaintiff to purchase certain types of advertisements but not others).

Plaintiff's citation to *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451 (1992) is unpersuasive, regardless of whether the Court construes it as an essential facilities case or a refusal to deal case. *Kodak* imposes a duty to deal where changing an existing course of distribution enables a firm to "take advantage of customers' sunk costs":

> Kodak sold copiers that customers could service themselves (or through independent service organizations). Having achieved substantial sales, Kodak then moved to claim all of the repair work for itself. That change had the potential to raise the total cost of copier-plus-service above the competitive level–and, we observed in *Digital Equipment,* above the price that Kodak could have charged had it followed a closed-service model from the outset. Schor does not accuse Abbott of any similar switch that would exploit customers' sunk costs; none is possible in this market.

*Schor,* 457 F.3d at 614. In contrast to copiers and maintenance service, both VBR and Yankee sell Amtrak tickets within the packages, precluding any equivalent lock-in effect.

Third, as explained above, Plaintiff pleads itself out of court by alleging a "legitimate business or technical reason" (*MCI,* 708 F.2d at 1133) for Amtrak's conduct.

For these reasons, Plaintiff fails to state an essential facilities claim.

### c. Exclusive Dealing

Plaintiff also alleges a theory of anticompetitive conduct based on exclusive dealing. [12] Plaintiff's theory is implausible for two reasons. First, there is no exclusivity. Amtrak continues to sell tickets to tour operators other than Yankee. Second, even if exclusivity existed, Plaintiff still would fail to state a claim. "Unlike horizontal agreements between competitors, vertical exclusive distributorships * * * are presumptively legal. Rather than condemning exclusive dealing, courts often approve them because of their procompetitive benefits," such as increasing allocative efficiency, reducing adverse selection and moral hazard barriers to deals, and preventing free-riding. *Republic Tobacco,* 381 F.3d at 736. [13] Accordingly, exclusive dealings violate the Sherman Act "only when they foreclose competition in a substantial share of the line of commerce at issue." *Id.* (addressing exclusive dealing claims brought under § 1 and § 2); see also *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 320–27 (1961).

[12]    Plaintiff did not present this argument in its complaint or in response to Defendants' motions to dismiss, instead arguing it for the first time in this motion to reconsider. In the interests of efficiently managing the litigation moving forward, however, the Court explains why this theory also is implausible based on Plaintiff's factual allegations.

[13]    For example, exclusive dealing may enhance allocative efficiency: if "exclusive dealing leads dealers to promote each manufacturer's brand more vigorously than would be the case under nonexclusive dealing, the quality-adjusted price to the consumer (where quality includes the information and other services that dealers render to their customers) may be lower with exclusive dealing than without [.]" *Roland Mach,* 749 F.2d at 395. Exclusive distributorships also may address adverse selection or moral hazard concerns inhibiting productive deals: "A dealer who expresses his willingness to carry only one manufacturer's brand of a particular product indicates his commitment to pushing that brand; he doesn't have divided loyalties. If the dealer carries several brands, his stake in the success of each is reduced." *Id.* Exclusive dealing also can "prevent dealers from taking a free ride on [the seller's] efforts (for example, efforts in the form of national advertising) to promote his brand." *Id.*

**\*13** The contention that the Amtrak–Yankee agreement forecloses competition is implausible for the reasons explained by the Second Circuit in *E & L Consulting, Ltd. v. Doman Indus. Ltd.,* 472 F.3d 23, 26–29 (2d Cir.2006), which parallel

VBR... v. National Railroad Passenger Corp., Not Reported in F.Supp.3d (2015), 2015 WL 5693735...

Case: 3:17-... Case:21-50428-JTD... Doc:23-4... Filed:05/21/21... Page:55 of 202... PageID #:1533

2015 WL 5693735, 2015-2 Trade Cases P 79,327

in many respects the Seventh Circuit's analysis in *Schor. E & L* concerned Doman, a defendant with a monopoly on green hem-fir lumber, and E & L, one of its distributors. Doman terminated its agreement with E & L and entered an exclusive agreement with an alternative distributor. The Second Circuit affirmed the dismissal of E & L's complaint for failure to state a claim under § 1 or § 2, reasoning that "such a vertical arrangement provides no monopolistic benefit to Doman [the defendant] that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined." *E & L,* 472 F.3d at 29. It added:

> [H]ad Doman established its own in-house distribution system with the same monopoly that Sherwood is alleged to possess, there would have been no increase in the restriction of output of green hem-fir lumber and in the resultant misallocation of resources.

> Indeed, an exclusive distributorship would be counterproductive so far as any monopolization goal of Doman is concerned. A monopolist manufacturer of a product restricts output of the product in order to maximize its profits. The power to restrict output to maximize profit is complete in the manufacturing monopoly, and there is no additional monopoly profit to be made by creating a monopoly in the retail distribution of the product. On the contrary, a firm with a monopoly at the retail distribution level will further reduce output to maximize *its* profits, thereby reducing the sales and profit of the monopoly manufacturer. Like any seller of a product, a monopolist would prefer multiple competing buyers unless an exclusive distributorship arrangement provides other benefits in the way of, for example, product promotion or distribution. In fact, we have explicitly noted that a vertically structured monopoly can take only one monopoly profit.

> The only detriment to competition alleged to result from the Doman–Sherwood agreement is that end-users of lumber and finished wood products have fewer options to purchase their required supplies and are now required to pay artificially inflated prices. This, by itself, is not a sufficient allegation of harm to competition caused by the exclusive distributorship, again, because the alleged single source and price increase, even if monopolistic, is something Doman can achieve without the aid of a distributor.

*Id.* at 29–30 (internal citations omitted). The same is true here. Amtrak has not increased its surplus by hiring Yankee and paying it in the form of an exclusive commission. It could have accomplished the same effect by acquiring a tour operator or creating its own in-house tour operator.

In addition, the scenario presented here and in *E & L* is distinguishable from those in the cases cited by Plaintiff. Here and in *E & L,* a monopolist allegedly deals exclusively with one downstream player. In contrast, *LePage's Inc. v. 3M,* 324 F.3d 141 (3d Cir.2003), and *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254 (3d Cir.2012), involve downstream buyers purchasing exclusively from one upstream seller, threatening to foreclose opportunities to other sellers. The second scenario threatens to expand the seller's market share, whereas the scenario here and in *E & L* provides the seller no new surplus. [14] Plaintiff may be dissatisfied that Amtrak chose to share its monopoly surplus with Yankee, not Plaintiff, [15] but an antitrust action is not an appropriate vehicle for redistributing Amtrak's monopoly surplus according to Plaintiff's preferences.

[14]    *LePage* is also distinguishable in that it involved bundled rebates and all-or-nothing discounts analogous to product tying. *Id.* at 154–59.

[15]    Plaintiff's allegation regarding the distribution of monopoly surplus is implausible itself in that it suggests that Amtrak gave away all of its monopoly surplus in exchange for nothing. *Id.* ¶¶ 122, 146. ("Amtrak is not advancing its own interests, but instead only advancing Yankee's interests; *to wit*— the elimination of all of Yankee's competition.").

### d. *Pacific Bell*

VBR **Case: 3:17-cv-...** v. National Railroad Passenger Corp., Not Reported in F.Supp.2d (2015)   Case: 3:17-cv-50428-JTD   Doc 22-4   Filed 05/21/21   Page 56 of 202 PageID #:1534

2015 WL 5693735, 2015-2 Trade Cases P 79,327

**\*14** Plaintiff also fails to state a claim under *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438 (2009). Although neither party cites it, *Pacific Bell* is instructive. *Pacific Bell* was brought by internet service providers (ISPs) that sold DSL to retail customers. The defendant, AT & T, owned infrastructure and facilities that the ISPs needed to provide DSL to their customers. AT & T operated at the wholesale and retail levels, providing ISPs with wholesale DSL transport service and selling DSL directly to retail consumers. The ISPs sued AT & T under § 2 of the Sherman Act, alleging a novel price-squeezing claim. Specifically, they contended that AT & T set a high price for wholesale DSL transport service and a low price for its own retail DSL service, placing the ISPs at a competitive disadvantage and squeezing their profit margins. The Supreme Court affirmed dismissal for failure to state a claim, finding no violation either in the wholesale or retail markets.

At the wholesale level, the Court found no antitrust duty to deal because any such duty arose only from FCC regulations. See *Pacific Bell,* 555 U.S. at 450. Under *Trinko,* "a firm with no duty to deal in the wholesale market has no obligation to deal under terms and conditions favorable to its competitors." *Id.* at 450–51. Accordingly, "AT & T was not required to offer this service at the wholesale prices the plaintiffs would have preferred," and its wholesale prices did not violate the Sherman Act. *Id.* at 451.

At the retail level, the *Pacific Bell* plaintiffs failed to state a claim because they only alleged low retail prices, not predatory prices. As this Court explained extensively in its previous Opinion and Order, antitrust law encourages rather than prohibits low prices. "[C]utting prices in order to increase business often is the very essence of competition." *Pacific Bell,* 555 U.S. at 451 (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986)). Thus, "[i]n cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are 'especially costly, because they chill the very conduct the antitrust laws are designed to protect.' " *Id.* (quoting *Matsushita,* 475 U.S. at 594). The Supreme Court has thus "carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low." *Id.* Specifically, a plaintiff must demonstrate that "(1) the prices complained of are below an appropriate measure of its rival's costs; and (2) there is a dangerous probability that the defendant will be able to recoup its investment in below-cost prices." *Id.* (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222–24 (1993) (internal quotation marks omitted)).

Taking into account both retail and wholesale prices, the Supreme Court held that combined effect was a failure to state a claim:

> *Trinko* holds that a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals. Brooke Group holds that low prices are only actionable under the Sherman Act when the prices are below cost and there is a dangerous probability that the predator will be able to recoup the profits it loses from the low prices. In this case, plaintiffs have not stated a duty-to-deal claim under *Trinko* and have not stated a predatory pricing claim under *Brooke Group.* They have nonetheless tried to join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability never before recognized by this Court. We decline the invitation to recognize such claims. Two wrong claims do not make one that is right.

*Pac. Bell Tel. Co.*, 555 U.S. at 457 (internal citations omitted).

Like the plaintiff in *Pacific Bell,* Plaintiff fails to state a claim; it fails to allege a duty to deal at the wholesale level, and it fails to allege predatory pricing at the retail level. The facts are not identical insofar as Yankee and Amtrak are two separate entities, whereas in *Pacific Bell,* AT & T alone operated at the wholesale and retail levels. However, this difference is immaterial; again, Amtrak could have accomplished the same effect by acquiring Yankee or creating an in-house tour operator.

Case: 3:17-cv-... (2013) 160 PageID #:1535
VBR Case, 3:1 v-...tional Railroad Passenger Corp., Not Reported in F.Supp.2d (2013)...

Case 21-50428-JTD Doc 22-4 Filed 05/21/21 Page 57 of 202

2015 WL 5693735, 2015-2 Trade Cases P 79,327

**\*15**  The Court previously dismissed Plaintiff's claim because it failed to allege predatory prices. Instead of amending its complaint, Plaintiff moved to reconsider, expressly disclaiming a predatory pricing scheme and continuing to argue that Yankee's commission will enable it to drop prices and drive competitors out of business. Unless Plaintiff can allege that Yankee will adopt below-cost prices with a dangerous probability of recoupment, it can only show lower prices that benefit consumers. Plaintiff may plausibly allege reduced profits, but that is not enough to allege an antitrust violation under § 2.

### e. Antitrust Injury

For many of the same reasons, the Court continues to believe that Plaintiff fails to allege antitrust injury—in other words, "that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis,* 965 F.2d at 471. To the extent that Plaintiff suggests that reduced innovation without reduced output or increased prices creates antitrust injury, the Court is unpersuaded. First, it is well-established that either increased price or reduced output is necessary to show antitrust injury. See, *e.g., Tri–Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL–CIO,* 433 F.3d 1024, 1031 (7th Cir.2006) (quoting *Stamatakis,* 965 F.2d at 471). Second, Plaintiff cites case law that did not involve lone allegations of reduced innovation but also increased prices or reduced output. See *Free FreeHand Corp. v. Adobe Sys. Inc.,* 852 F.Supp.2d 1171, 1185 (N.D.Cal.2012). Third, Plaintiff's theory that an inability to innovate constitutes antitrust injury is a variation on a theme already rejected above. Plaintiff allegedly wishes to innovate by reinvesting profits back into the company—that is, by using profits to develop new products. It contends that it will have less money to develop its products because Yankee will reduce prices, consumers will choose Yankee's products over Plaintiff's products, and Plaintiff's profits will drop. But as long as Yankee's prices are not predatory, antitrust law is not concerned with Plaintiff's lower profit margins. Accordingly, Plaintiff fails to allege antitrust injury.

### 2. Count III

Count III alleges a violation under § 1 of the Sherman Act, which prohibits contracts or conspiracies in restraint of trade or commerce. 15 U.S.C. § 1. To adequately state a claim under § 1, a plaintiff must allege: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury. *Denny's Marina, Inc. v. Renfro Prods., Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993). "There are two standards for evaluating whether an alleged restraint of trade is unreasonable: the rule of reason and the *per se* rule." *Id.* at 1220. Regardless of which rule applies, the focus is the same. Both rules "are employed to form a judgment about the competitive significance of the restraint." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,* 468 U.S. 85, 103 (1984) (citation and internal quotation marks omitted).

Viewed under § 1 or § 2, the economics of Plaintiff's factual allegations remain the same. [16] As explained above, Amtrak uses Yankee to accomplish what it could do alone, rendering the Amtrak–Yankee relationship unlikely to increase Amtrak's monopoly surplus, raise prices, or decrease output. As a result, Amtrak and Yankee's conduct does not create antitrust injury, nor is it of "competitive significance," *id.,* and Plaintiff thus fails to state a claim under both sections of the Sherman Act.

[16]    The Court accepts for purposes of this opinion Plaintiff's assertion, see [47], at 12, that the Robinson– Patman Act is inapplicable to the allegations of Plaintiff's complaint.

### B. State Claims

**\*16**  Because Illinois law directs courts to "use the construction of the federal law by the federal courts as a guide in construing" the Illinois Antitrust Act "when the wording [of the Act] is identical or similar to that of federal antitrust

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.          15

law" (740 ILCS 10/11), courts have held that Illinois Antitrust Act claims "will stand or fall" with federal Sherman Act claims based on the same underlying facts and legal theories. *Int'l Equip. Trading, Ltd. v. AB Sciex LLC,* 2013 WL 4599903, at *3 (N.D.Ill. Aug. 29, 2013). Plaintiff has provided no reason either in its response to Defendants' motions to dismiss or in its motion to reconsider for the Court to find otherwise. Accordingly, the Court's conclusion that the Sherman Act claims are subject to dismissal portends the same result for Plaintiff's state law claims under the Illinois Act.

## IV. Conclusion

For the reasons stated above, the Court denies Plaintiff's motion to reconsider [46]. Plaintiff is given until 10/26/2015 to move for leave to file an amended complaint if it believes it can overcome the deficiencies identified below consistent with Fed.R.Civ.P. 11.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 5693735, 2015-2 Trade Cases P 79,327

---

**End of Document**  <span style="float:right">© 2018 Thomson Reuters. No claim to original U.S. Government Works.</span>

Case: 3:17-cv-50428-JTD, Doc 22-4, Filed 05/21/21, Page 59 of 202, PageID #:1537

1991 WL 166532
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

ALL–TONE COMMUNICATIONS, INC., Plaintiff,

v.

AMERICAN INFORMATION TECH., a/k/a Ameritech, et al., Defendants.

No. 89 C 7883.
|
Aug. 26, 1991.

*MEMORANDUM OPINION AND ORDER*

ZAGEL, District Judge.

## I.

**\*1** All–Tone Communications, Inc. (All–Tone) files a six count complaint against American Information Technologies a/k/a Ameritech ("Ameritech"), Illinois Bell Telephone Company ("Bell") and various individual defendants affiliated with these two defendant companies, as well as a number of public officials serving the City of Chicago (collectively, "individual defendants"). The essence of All–Tone's complaint is that defendants conspired to offer a number of bribes to public officials in order to receive the pay telephone business from State of Illinois agencies, thus depriving All–Tone of business it might otherwise have received. This conduct, according to All–Tone, violates §§ 1962(a), (b) and (c) of the Racketeering Influenced and Corrupt Organizations Act ("RICO").[1] *See* 18 U.S.C. §§ 1961–68. Ameritech, Bell and the individual defendants, filing separately, seek to have this suit dismissed and argue that All–Tone has neither alleged a RICO conspiracy nor any violation under RICO by defendants, and that the complaint fails to allege any injury to plaintiff's business or property under RICO.

## II.

The RICO provisions impose criminal and civil liability on "any person" who uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce (§ 1962(a)); who acquires or maintains an interest in or control of such an enterprise "through a pattern of racketeering activity" (§ 1962(b)); who being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs "through a pattern of racketeering activity," (§ 1962(c)); or who conspires to violate the first three subsections of § 1962 (§ 1962(d)). Section 1964(c) provides for a private cause of action and allows for treble damage recovery. RICO's broadly drafted provisions, as well as the opportunity for substantial recovery, has made RICO claims in commercial disputes quite popular. A RICO complainant's task, however, is not as simple as it may appear; he or she must properly allege an injury caused by a pattern of racketeering activity to sustain its RICO claim.

Counts II–VI allege violations by defendants of RICO § 1962(a), (b) and (c). All–Tone states that "from at least 1984 to the present and continuing, Ameritech and IBT have attempted to, or did offer, give or promise to give, directly or indirectly, to public officials of the City of Chicago and the City of Chicago Department of Aviation, among other public officials, benefits, reward and consideration to which they were not legally entitled, with the intent to influence such public officials with respect to performance, employment or function of their powers and duties as public officials."

Case: 3:17-cv-50428-JTD   Doc #: 22-4   Filed: 05/21/21   Page 60 of 202   PageID #:1538

The basis for All-Tone's claims, stated in the complaint, are the following acts by some or all defendants for public officials with the authority to influence the award of pay telephone contracts: 1) providing all expense paid trip to the Pan Am games in Indianapolis, 2) purchasing meals by defendants or employees of defendants with company credit cards, 3) providing baseball and hockey game tickets, 4) providing in excess of $17,000 in connection with the printing of a Chicago Municipal directory, 5) hosting a partner for profit luncheon and 6) providing a consulting contract for a former Commissioner of Aviation. This activity All-Tone argues constituted a scheme to bribe public officials and as a result All-Tone suffered in its business and property by, among other things, being deprived of the ability to compete for the business of many public agencies.

**\*2** Three flaws are apparent in All-Tone's RICO pleadings, which I address more fully below: 1) the facts alleged against defendant Ameritech do not consist of a RICO claim and there is no justification for its inclusion in the purely RICO complaint; 2) plaintiff has not pleaded a § 1962(a) claim and 3) All-Tone has not established that defendants were the proximate cause of its alleged injury as required by RICO.

## A.

Ameritech argues that it is not a proper defendant because there are no allegations that it specifically engaged in activity which violates RICO and its only relation to the controversy is as Illinois Bell's parent company. It is inconsistent with the purposes of the RICO statute to hold Ameritech accountable under RICO, merely because it is Illinois Bell's parent. *D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d 964, 966–67 (7th Cir.1988) (refusing to hold corporation liable under *respondeat superior* theory because "person" cannot be liable under RICO without "fault" or "participation"). A parent company will be a proper RICO defendant only if it participated in the wrongful conduct of its subsidiary. *Id.* Here, All-Tone claims that Ameritech uses the funds derived from its subsidiary but does not provide information beyond this vague accusation. In fact, the only action that All-Tone attributes to Ameritech (in part) is offering the trip to the Pan Am Games to two public officials. This clearly does not satisfy Fed.R.Civ.P. 9(b) pleading provisions or the pattern requirement under the RICO statute.

## B.

All-Tone's claim based on § 1962(a) is most easily addressed. Section 1962(a) provides, in relevant part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

28 U.S.C. 1962(a)(1990). I have found, consistent with the majority of the opinions, that a plaintiff who invokes 1962(a) may not recover if the only allegation is of an injury by a pattern of racketeering. *See Grove Fresh Distributors, Inc. v. EverFresh Juice Co.,* 1989 WL 152670, 1989 U.S. Lexis 14147 (N.D.Ill.1989). Rather, under § 1962(a) it must allege injury by reason of defendant's use or investment of the income derived from a pattern of racketeering. *See Rose v. Bartle,* 871 F.2d 331, 357–58 (3rd Cir.1989); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1149 (10th Cir.1989).

The Seventh Circuit has yet to address this issue, however, many courts in this district agree that investment of racketeering proceeds back into the enterprise is insufficient to satisfy the proximate cause requirement of 1962(a). *Palumbo v. Simon & Co.,* 710 F.Supp. 1407 (N.D.Ill.1988) (reviewing relevant case-law). All-Tone's claim is that it is injured by the defendants' acts of bribery. Plaintiff's own statement is that the complaint here does not allege an injury

by proceeds derived from a pattern of racketeering. Count II must be stricken for failure to state a claim upon which relief can be granted.

C.

**\*3** Neither can plaintiff recover, with respect to the remaining defendants, under the other RICO provisions upon which it relies. In order to recover RICO damages a plaintiff must have been injured by the conduct constituting the RICO violation. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 105 S.Ct. 3275 (1985). Section 1964 of the RICO statute permits civil remedies only for a plaintiff injured "by reason of" a violation of § 1962. This imposes a proximate cause requirement, so that the injury must relate to the violative conduct. *Haroco v. American National B. & T. Co. of Chicago,* 747 F.2d 384, 398 (1984). Thus, to successfully plead its RICO claims All–Tone has to show that it had a right to the State of Illinois' (or City of Chicago's) pay telephone business and that but for defendants' acts (the alleged bribes) it would have received the State's pay telephone business.

In *Robinson v. City Colleges of Chicago,* 656 F.Supp. 562, 561 (N.D.Ill.1987), the court dismissed the RICO claims where plaintiffs alleged they had lost contracts for manual and vending machine food services with the City Colleges of Chicago when the Board awarded contracts to the lower bidder because of their fraudulent scheme. The *Robinson* court reasoned that the plaintiffs had failed to allege causation because the Board was not required to award food service contracts by competitive bidding, and even if plaintiffs had submitted the highest bids, plaintiffs had not alleged facts establishing that but for the alleged RICO violation they would have obtained the contracts. *Id.*

All–Tone argues that *Robinson* is distinguishable from its case because Ill.Rev.Stat., ch. 24 ¶ 8–10–1 *et seq.* requires competitive bidding for contracts for pay telephone services. That statute, however, excludes from competitive bidding "all contracts or transactions, other than the sale of personal property, pursuant to which the municipality is the recipient of the money." Ill.Rev.Stat., ch. 24 ¶ 8–10–4 (1990). Contracts for pay telephone services such as those with the State of Illinois require payments by the pay telephone company to the customer in the form of commissions. Awarding telephone contracts is within the State's or the City's discretion and it was not bound to choose any particular service. *Cf. Hassett Storage Warehouse, Inc. v. Board of Election Com'rs for City of Chicago,* 387 N.E.2d 785 (Ill.App.1979) (when a public body not required to call for bids, does so, it may award the contract to any bidder it considers responsible). Thus, because the City of Chicago has the discretion to choose its pay telephone contracts, All–Tone has not established a right to the contracts, and therefore, cannot show an injury. *See Robinson,* 656 F.Supp. at 561. *See also District Telecommunications Development Corp. v. District Cablevision, Inc.,* 638 F.Supp. 418 (D.D.C.1985) (plaintiff claims that as a result of a pattern of fraud and misrepresentation in violation of RICO, it was deprived of a cable television franchise for which it had bid, the court dismissed the RICO claim for lack of causation because plaintiffs had not shown that the franchise had to be awarded by competitive bidding, and thus, could not show that "but for defendants' alleged fraud plaintiff would have received the cable franchise").

**\*4** In any event, even if competitive bidding were required for the contracts, All–Tone has not alleged any facts to show that it could have prevailed in the competition, but for the bribery. All–Tone does not say that it offered the City of Chicago a better deal than Illinois Bell or that its service would be more favorable to the City. In fact, All–Tone does not specify any contract that it actually believes it would have received absent defendants' allegedly illegal conduct.

All–Tone argues that its RICO claims must pass muster because its complaint is patterned after that of *H.J. Inc. v. Bell Telephone Co.,* 109 S.Ct. 2893 (1989), the recent Supreme Court case explaining the "continuity plus relationship" in the context of RICO's "pattern of racketeering" requirement. Although the Supreme Court found that plaintiffs had properly alleged a RICO claim, the same is not necessarily true in this case; All–Tone fails to see the distinctions in this case. In *H.J. Inc.,* the plaintiffs alleged that Northwestern Bell made cash payments to commissioners of the Minnesota Public Utilities Commission, negotiated with commissioners regarding future employment, funnelled payments to a

commissioner through a third party; and provided free airline tickets and all expense paid trips to the horse racing track to commissioners, all with the intent to influence the members of the commission. *Id.* at 2897. Admittedly there are some similarities in the facts of the case, however, in *H.J. Inc.* the plaintiffs were residential customers and rate-paying businesses of Northwestern Bell who claimed a direct injury in the form of higher rates as a result of the alleged fraudulent acts by Northwestern Bell with respect to members of the Utility Commission in Minnesota. The Supreme Court in *H.J. Inc.* did not confront a causation problem. As discussed previously, All–Tone does not show that it has suffered a similar injury because its business competitors obtained business that it did not.

Finally, even if plaintiff could demonstrate a direct or even indirect injury, to obtain RICO remedies plaintiff must properly plead the elements of the underlying racketeering offense as well as the RICO claim. The Seventh Circuit emphasized in *Ray v. Karris,* that RICO's limited purpose is to enhance "remedies for certain criminal activity carried on in particular circumstances" and a complaint is not sufficient to state a RICO violation if it does not specify the nature of the predicate act to a degree that will allow defendant to comprehend the specific acts to which it is required to answer. 780 F.2d 636, 645 (1985). Mere assertions of a statutory violation are insufficient. *Id.* All–Tone has not properly pleaded the elements of its bribery claim because it fails to establish the requisite intent on the part of defendants to influence the acts of the public officials. This does not comply with even the liberal notice pleading requirement of the Federal Rules. *See Conley v. Gibson,* 78 S.Ct. 99 102–103 (1957). Moreover, in this case intent has a particular significance. Defendants' intent may determine whether the acts complained of were actually illegal bribes or lawful, ordinary business dealings to promote favorable business relations between the telephone company and its client (in this case the City). *See United States v. Johnson,* 621 F.2d 1073, 1076 (10th Cir.1980) (to constitute bribery, money or benefit must be offered with intent to influence official bad action in exchange for donation). *See also United States v. Mandel,* 591 F.2d 1347, 1365 (4th Cir.1979); *United States v. Arthur,* 544 F.2d 730 (1976). There is simply no showing that defendants gave or accepted anything of value with the intent for it to influence official duties.

 **\*5** If the only flaw with plaintiff's complaint were its failure to comply with the pleading requirement, it would clearly deserve the opportunity to try again under the liberal pleading provisions. The difficulty, however, with allowing plaintiff to replead, is that All–Tone simply has not satisfied the causation requirement under RICO and this is a fault it cannot remedy given the facts of this case. [2]

All–Tone's complaint is dismissed in its entirety, with prejudice.

[1]     Count I of All–Tone's complaint also makes out a pendant claim under an Illinois criminal statute for bribery of public officials. Defendants point out that there is no authority for conferring a private right of action under this criminal provision. Plaintiff responds that it does not pursue a finding under this statute, but that Count I is asserted solely to provide details concerning the illegality of defendants' activity. On the basis of this response, I look to Count I only for the information it provides and assume that plaintiff seeks no relief under Illinois law.

[2]     A finding that All–Tone's allegations fail to establish proximate cause is fatal to the RICO claims and I do not examine the question of whether All–Tone adequately pleaded the other requirements of a RICO claim, such as the pattern requirement or the continuity relationship.

**All Citations**

Not Reported in F.Supp., 1991 WL 166532

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3861450
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

CARNIVAL CORP., et al., Plaintiffs,

v.

ROLLS-ROYCE PLC, et al., Defendants.

No. 08-23318-CIV.
|
Nov. 17, 2009.

**Attorneys and Law Firms**

Maria Isabel Hoelle, Fowler Rodriguez, Coral Gables, FL, Antonio J. Rodriguez, George J. Fowler, III, Fowler Rodriguez Valdes-Fauli, New Orleans, LA, for Plaintiffs.

Larry Allen Stumpf, Black Srebnick Kornspan & Stumpf, Anthony Peter Strasius, Wilson Elser Moskowitz Edelman & Dicker, Jared M. Lopez, Miami, FL, for Defendants.

### *ORDER DENYING IN PART CONVERTEAM'S MOTION TO DISMISS*

PATRICIA A. SEITZ, District Judge.

**\*1** THIS MATTER is before the Court on the Motion to Dismiss Plaintiffs' Amended Complaint [DE-41] filed by the Converteam Defendants. [1] Plaintiffs' eleven count Amended Complaint alleges the following claims against Converteam: (1) breach of implied warranty of fitness for particular purpose; (2) breach of implied warranty of merchantability; (3) negligent misrepresentation; (4) fraud in the inducement; (5) fraudulent misrepresentation; (6) deceptive and unfair trade practices; (7) negligent testing, inspecting, repairing and/or servicing; (8) breach of warranty of workmanlike performance; (9) negligent professional services; (10) false, misleading, and deceptive advertising and sales; and (11) civil conspiracy. Converteam moves to dismiss on seven grounds. Converteam seeks: (1) dismissal of the breach of warranty claims based on a lack of privity; (2) dismissal of the fraud, misrepresentation, and conspiracy counts for failure to comply with Federal Rule of Civil Procedure 9(b); (3) dismissal of all claims as barred by the applicable statutes of limitations; (4) dismissal of the Florida Deceptive and Unfair Trade Practices Act claim, Count VI, because the statute does not apply to these circumstances; (5) dismissal of the false advertising claim because the statute does not apply to these circumstances; (6) dismissal of the negligence claims based on the economic loss rule; and (7) dismissal of all counts based on forum non conveniens. For the following reasons, the Court denies in part and grants in part Converteam's motion.

[1]     The Converteam Defendants consist of Converteam SAS and Converteam, Inc. and will be referred to jointly as "Converteam."

**Background Facts**
The dispute between the parties arises from the purchase and installation of a propulsion system for the Queen Mary 2, a passenger cruise ship owned and operated by Plaintiffs. Plaintiffs allege that the Converteam Defendants are alter-egos of one another and that the Converteam Defendants entered into a joint venture with the Rolls-Royce Defendants. Plaintiffs further allege that Defendants joined together to design, manufacture, market, sell, and service a podded propulsion system for seagoing vessels. These Defendants designed, manufactured, marketed, and sold the propulsion

2009 WL 3861450

system chosen for use on the Queen Mary 2. This propulsion system is known as the Mermaid pod propulsion system. Since installation of the Mermaid system, the system has experienced numerous problems and has undergone several repairs, which Defendants recommended. Despite these repeated repairs, problems with the system persist. The facts alleged in the Amended Complaint are lengthy. Thus, the Court will set out only a summary of the events upon which Plaintiffs base their claims.

When Plaintiffs entered into the 2000 contract to build the Queen Mary 2 it was decided that a podded propulsion system would be used. After that, Defendants began marketing the Mermaid system to Plaintiffs in order to have Plaintiffs choose to purchase and install the Mermaid system on the Queen Mary 2. The marketing effort included several letters and brochures that touted the benefits of the Mermaid system and that led Plaintiffs to believe that the Mermaid pod system was a fully developed product. In reliance on the representations made by Defendants, Plaintiffs chose the Mermaid system for installation on the Queen Mary 2.

**\*2** Thereafter, Plaintiffs became aware of problems with the Mermaid systems installed on other ships and problems with the manufacturing of the specific pods to be installed on the Queen Mary 2. As a result of manufacturing problems, in spring 2003, the already assembled and delivered Mermaid pods were returned to Defendants for reassembly and other work. As the assembly problems and problems with Mermaid systems on other ships came to light, Plaintiffs and Defendants held numerous meetings, exchanged numerous letters and phone calls, and exchanged other communications. For example, at a meeting on May 15, 2003, specific Rolls-Royce representatives, identified in the Amended Complaint, stated that the thrust bearing problem had been solved. *See* Amended Complaint, ¶ 53. At another meeting on July 9, 2003, Defendants, through identified agents, made numerous representations to Plaintiffs regarding the difference between the design of the pods for the Queen Mary 2 and other ships and how these design differences would avoid the problems other ships had experienced. *See* Amended Complaint, ¶ 54. At that same meeting, Defendants' identified agents also made specific representations regarding the lifetime of the bearings used in the Mermaid system for the Queen Mary 2. *See* Amended Complaint, ¶ 55. These representations have proven to be inaccurate. At another meeting on August 14, 2003, specific individuals on behalf of Defendants again made representations about the life of the bearings that proved to be inaccurate. *See* Amended Complaint, ¶ 56. Additionally at a couple of meetings prior to delivery of the Queen Mary 2, specific agents of Defendants made representations to Plaintiffs that the propulsion pods were fit for their intended purpose and that failures of the types that had occurred on other ships using the Mermaid system would not occur on the Queen Mary 2 because of design modifications. *See* Amended Complaint, ¶ 57.

Plaintiffs accepted delivery of the Queen Mary 2, with the Mermaid system installed, in December 2003. Prior to the Queen Mary 2's first dry-docking in November 2005, Defendants made representations to Plaintiffs and recommended replacement of the bearings. Based on these recommendations and representations, Plaintiffs replaced all of the bearings at the November 2005 dry-docking. *See* Amended Complaint, ¶ 61. Inspection of the original bearings after their removal indicated that they were not wearing as expected and indicated other problems with the Mermaid system. *See* Amended Complaint, ¶ 62. In November 2006, the Queen Mary 2 returned to dry-dock and Defendants again recommended that the bearings be replaced. Plaintiffs again replaced the bearings based on Defendants' representations and recommendations. Inspection of the replaced bearings indicated that they still were not wearing as expected. *See* Amended Complaint, ¶ 65. At the November 2006 dry-docking problems were also discovered with the exciter frame. *See* Amended Complaint, ¶ 67. After the November 2006 dry-docking additional problems developed involving the damper bars. *See* Amended Complaint, ¶ 69. At the 2008 dry-docking, repairs were undertaken to resolve these problems but they have been unsuccessful. *See* Amended Complaint, ¶ 69. The Queen Mary 2 continues to have problems with its Mermaid system and Plaintiffs have incurred costs in making repairs to the system. These repairs have been recommended by Defendants but have proved inadequate. As a result, Plaintiffs filed this action.

### 1. The Motion to Dismiss Should Be Granted in Part and Denied in Part as to the Breach of Warranty Claims

**\*3** Converteam moves to dismiss Plaintiffs' breach of warranty claims, Counts I, II, and VIII, for lack of privity. Converteam asserts that Florida law requires that there be privity of contract in order to recover on a breach of warranty

Case: 3:17-cv-50428-JTD Doc #: 22-4 Filed: 05/21/21 Page 65 of 202 PageID #:1543
Carnival Corp. v. Rolls-Royce PLC, Not Reported in F.Supp.2d (2009)
2009 WL 3861450

claim. Converteam also asserts that the claims should be dismissed because they are brought pursuant to Florida's version of the Uniform Commercial Code (UCC), which does not apply to these circumstances. Plaintiffs respond that direct contacts between Defendants and Plaintiffs establish privity between the parties and that the UCC does apply to this case.

While generally privity of contract is required to sustain a breach of warranty claim, *see Intergraph Corp. v. Stearman,* 555 So.2d 1282, 1283 (Fla. 2d DCA 1990), actual privity is not always necessary, *Cedars of Lebanon Hosp. Corp. v. European X-Ray Distributors of America, Inc.,* 444 So.2d 1068, 1072 (Fla. 3d DCA 1984). Despite the lack of a direct purchase from the manufacturer, Florida courts have found that the privity requirement was satisfied where the manufacturer's representative had direct contacts with the purchaser. *Id.* (holding the privity requirement satisfied where manufacturer made direct representations to the ultimate purchaser about equipment that was purchased from a third-party distributor); *see also New Nautical Coatings, Inc. v. Scoggin,* 731 So.2d 145, 147 (Fla. 4th DCA 1999) (affirming a breach of warranty claim against a manufacturer when the manufacturer's representative was heavily involved in the transaction but a third-party shop provided the services to the plaintiff); *MacMorris v. Wyeth, Inc.,* 2005 WL 1528626 (M.D.Fla. June 27, 2005) (holding that under Florida law certain circumstances satisfy the privity requirement even in the absence of a direct purchase from the manufacturer). Further, Official Comment 2 to § 2-313 of the Uniform Commercial Code (UCC), which addresses express warranties, states "[a]lthough this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract." Fla. Stat. § 672.313, Official Cmt. 2.

In the present case, the Amended Complaint alleges that, prior to the purchase of the Mermaid system, Converteam had several significant direct contacts with Plaintiff, that during those contacts Converteam made representations about the qualities and attributes of the Mermaid system, and that Plaintiffs relied on these representations in deciding to purchase the Mermaid system. Such direct contacts are sufficient to meet the privity requirement. *See Cedars of Lebanon,* 444 So.2d at 1072 (stating that "[i]t seems fundamentally unfair, and anomolous in the extreme, to allow the manufacturer to hide behind the doctrine of privity when the product, which it induced the purchaser to buy, turns out to be worthless"). Consequently, for purposes of a motion to dismiss, Plaintiffs have met the privity requirement.

**\*4** Converteam also argues that the warranty claims should be dismissed because Florida Statutes §§ 672.314 and 672.315, part of Florida's version of the UCC, do not apply to the purchase of the Mermaid system. Converteam asserts that the UCC does not apply because the purchase of the system does not have "an appropriate relationship" to the state of Florida. Plaintiffs assert that Florida does have an appropriate relationship with the transaction because Plaintiffs are residents of Florida, substantial negotiations to purchase the Mermaid system took place in Florida, Defendants targeted and solicited Plaintiffs in Florida, the Queen Mary 2 is located in Florida for part of the year, and the economic injury that resulted occurred in Florida.

In interpreting the phrase "an appropriate relationship" courts have considered the following factors: the residence of the parties, the location of negotiations, the place of purchase of the goods, and the physical location of the goods at issue. *Premix-Marbletite Manufacturing Corp. v. SKW Chemicals, Inc.,* 145 F.Supp.2d 1348, 1353 (S.D.Fla.2001).[2] Based on these factors and the allegations in the Amended Complaint, Florida has an appropriate relationship with the transaction. Plaintiffs are residents of Florida, substantial portions of the negotiations took place in Florida and Defendants specifically solicited Plaintiffs' business in Florida, many of the representations that form the basis of the alleged warranties were made in Miami or directed to Plaintiffs' employees located in Miami, and the Mermaid system is located in Florida for part of the year. Although the Mermaid system was not delivered in Florida, the economic injury occurred in Florida. Consequently, based on the allegations in the Amended Complaint an appropriate relationship exists between the transaction and Florida making the Florida UCC applicable to this transaction.

2      The *Premix-Marbletite* court also noted that the court in *In re Masonite Corp. Hardboard Siding Products Liability Litigation,* 21 F.Supp.2d 593 (E.D.La.1998) seems to conflate the common law choice of law rules with the specific choice of law rule set

2009 WL 3861450

out in the Florida UCC. Thus, Converteams' reliance on *In re Masonite* for the proposition that the place of delivery of the goods is the most important factor for consideration is unfounded.

Lastly, Converteam argues that the claim for breach of warranty of workmanlike performance, Count VIII, should be dismissed because of lack of privity. Courts recognize an implied warranty of workmanlike performance in maritime contracts. *Messina v. Ocean Repair Serv. Co.,* 1994 A.M.C. 402, *11-12 (S.D.N.Y.1993). Converteam argues that such a claim requires an underlying contract for the repair or service of a vessel, which Plaintiffs have not alleged. Plaintiffs respond that direct privity is not necessary to sustain a claim for breach of the warranty. While Plaintiffs may be correct that direct privity is not necessary, an underlying contract for the repair or service of the vessel is. *See Waterman S.S. Corp. v. Dugan & McNamara, Inc.,* 364 U.S. 421, 424, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); *Messina,* 7 F.3d 1077, 1994 A.M.C. at *12 (listing elements of a claim for breach of warranty of workmanlike performance which include a contract for services). The Amended Complaint does not allege the existence of a contract, to which Defendants are a party, for the provision of services to the Queen Mary 2. Consequently, Plaintiffs' claim for breach of the warranty of workmanlike performance, Count VIII, should be dismissed without prejudice.

### 2. The Fraud, Misrepresentation, Advertising and Civil Conspiracy Claims Should Not Be Dismissed Pursuant to Federal Rule of Civil Procedure 9(b)

**\*5** Converteam next moves to dismiss Plaintiffs' fraud, misrepresentation, advertising and civil conspiracy claims for lack of particularity as required by Federal Rule of Civil Procedure 9(b). More specifically, Converteam asserts that Plaintiffs have failed to plead the specific statements made, the exact individual who made the statements, the exact content of the statements, and how the statements misled Plaintiffs. In response, Plaintiffs assert that they have pled with particularity and that their allegations that the parties were alter-egos of each other and acted in concert satisfy the pleading requirements.

Rule 9(b) requires that a claim of fraud be pled with particularity. The Eleventh Circuit has stated:

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1237 (11th Cir.2008) (internal quotations and citations omitted). Thus, under Rule 9(b) a plaintiff must plead "the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Id.*

Plaintiffs have pled the allegations of fraud and misrepresentation with particularity. Specifically paragraphs 40, 42, 50, and 52-57 allege the who, what, when, where, and how of the allegedly fraudulent statements made by Converteam or its agents. Consequently, Plaintiffs have satisfied the particularity requirement of Rule 9(b) and the portion of the motion that rests on these grounds must be denied.

### 3. Plaintiffs' Claims Are Not Barred By the Applicable Statutes of Limitations

Converteam argues that all of Plaintiffs' claims are barred by the applicable statutes of limitations. Converteam asserts that all of Plaintiffs claims are subject to a four-year statute of limitations, except for the negligent professional services claim, which is subject to a two-year statute of limitations. [3] Converteam alleges that Plaintiffs were aware of problems with the Mermaid system as early as November 2002 and as late as November 2003, when Plaintiffs accepted delivery of the Mermaid system, and thus Plaintiffs' claims were filed well outside the applicable statutes of limitations. Plaintiffs assert that they timely filed all of their claims.

3      Plaintiffs agree that these are the applicable statutes of limitations.

Under Florida law, the statute of limitations begins to run when the cause of action accrues. Fla. Stat. § 95.031. A cause of action accrues when "when the last element constituting the cause of action occurs." Fla. Stat. § 95.031(1). Thus, Plaintiffs' claims did not accrue until Plaintiffs suffered damages. Despite Converteam's arguments, the Amended Complaint does not allege that Plaintiffs suffered damages as a result of the spring 2003 return of the Mermaid system, nor does it seek damages for that. 4 The only damages alleged by Plaintiffs and sought by Plaintiffs are for damages that were discovered or incurred during or after the November 2005 dry-dock. Thus, the complaint is timely as to all claims, except the negligent professional services claim.

4      Furthermore, it is not clear what damages Plaintiffs could have suffered prior to accepting delivery of the Queen Mary 2, and with it the Mermaid system.

**\*6** Plaintiffs assert that the negligent professional services claim constitutes a continuing tort and thus is not time barred because the statute of limitations begins to run when the tortious conduct ceases. Furthermore, Plaintiffs argue that whether something constitutes a continuing tort is a question of fact for the jury and thus cannot be decided on a motion to dismiss. Lastly, Plaintiffs assert that the statute of limitations was tolled by Converteam's fraudulent concealment of the fact that it was providing negligent professional services.

Florida does recognize the continuing tort doctrine. *See Halkey-Roberts Corp. v. Mackal,* 641 So.2d 445, 447 (Fla. 2d DCA 1994). Moreover, Florida courts have held that whether the doctrine applies to a particular set of circumstances is a question for the trier of fact. *Id., Pearson v. Ford Motor Co.,* 694 So.2d 61, 67-68 (Fla. 1st DCA 1997). Thus, at this stage of the litigation it is not appropriate to dismiss Plaintiffs' negligent professional services claim based on the statute of limitations. 5 Consequently, the Amended Complaint should not be dismissed based on the statutes of limitations.

5      Because the Court is not dismissing the negligent professional services claim based on the running of the statute of limitations, it will not address Plaintiffs' tolling argument.

**4. The Motion to Dismiss the Florida Deceptive and Unfair Trade Practices Act Claim is Granted in Part**
Converteam asserts that Plaintiffs' claim that Defendants violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) must be dismissed because FDUTPA does not apply to matters of foreign commerce. Plaintiffs respond that much of the commerce alleged took place in Florida and thus FDUTPA applies.

FDUTPA defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8). Based on this definition, Plaintiffs have clearly alleged that Defendants conducted trade or commerce in the state of Florida. However, FDUTPA applies only to action that occurred within the state of Florida. *Millennium Communications & Fulfillment, Inc. v. Office of Attorney General,* 761 So.2d 1256, 1262 (Fla. 3d DCA 2000) (stating that purpose of FDUTPA is to prohibit unfair and deceptive practices which have transpired within the territorial boundaries of the state of Florida). Consequently, Plaintiffs' claim that Defendants violated FDUTPA must be based entirely on actions that occurred within Florida. Plaintiffs' Amended Complaint has alleged numerous actions that occurred in Florida and thus, Plaintiffs' FDUTPA claim, Count VI, will not be dismissed but Plaintiffs may only proceed on this claim based on actions that occurred within the state of Florida.

**5. Count VII Should Not Be Dismissed While Count IX of the Amended Complaint Should Be Dismissed Based on the Economic Loss Rule**
Converteam asserts that Plaintiffs' negligence claims, Count VII for negligent testing, inspecting, repairing, and servicing and Count IX for negligent professional services, should be dismissed based on the economic loss rule, which bars a negligence action brought solely to recover economic damages where a product's failure to perform causes injury only

Case: 3:17-cv-50428-JTD, Doc 22-4, Filed 05/21/21, Page 68 of 202
Carnival Corp. v. Rolls-Royce PLC, Not Reported in F.Supp.2d (2009)  PageID #:1546
2009 WL 3861450

to the product itself. In response, Plaintiffs argue that their negligence claims are not barred by the economic loss rule because the rule does not bar claims for negligent professional services or negligent testing, inspecting, repairing, or servicing.

**\*7** The economic loss rule prohibits recovery in tort where a product has damaged only itself and the damages are purely economic in nature. *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (stating that damage to a product itself is most naturally understood as a warranty claim); *Moransais v. Heathman,* 744 So.2d 973, 983 (Fla.1999). However, in defining the scope of the economic loss rule the Moransais Court stated that "[w]here a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract. *Id.* at 981 (quoting *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238, 1239 (Fla.1996)). Thus, the Florida Supreme Court held that, in many circumstances, the economic loss rule does not bar claims for professional services. *Id.* at 983.

Plaintiffs' claim for negligent testing, inspecting, repairing and servicing, Count VII, is not barred by the economic loss rule because it alleges negligent acts separate and apart from any warranty claim. Count VII is based on acts that occurred after the purchase and installation of the Mermaid system. Count VII is based on the servicing and repair of the Mermaid system, not the purchase and installation of the system, which would form the basis of any warranty claims. Thus, the Motion to Dismiss should be denied as to Count VII.

Count IX of the Amended Complaint alleges that Defendants did not exercise reasonable care in designing, constructing, servicing, maintaining, testing and repairing problems with the Mermaid system. The portions of Count DC based on servicing, maintaining, testing and repairing problems are the same as the negligence claim in Count VII and thus should be dismissed as duplicative. The remaining bases for the claim, designing and constructing the Mermaids, are barred by the economic loss rule because these actions are not separate and independent from any breach of warranty claim Plaintiffs have. Plaintiff argues that the Motion to Dismiss should also be denied as to Count IX because the economic loss rule does not bar such claims when a "special relationship" exists between the parties. Plaintiffs have failed to establish the existence of a "special relationship." Further and most importantly, Plaintiffs have not pled facts that are independent from those upon which Plaintiffs base their warranty claims. As the Supreme Court stated in *East River,* "[d]amage to a product itself is most naturally understood as a warranty claim." *East River,* 476 U.S. at 872. Consequently, the economic loss rule bars Plaintiffs' remaining claim for negligent professional services. Thus, Count IX should be dismissed in its entirety.

### 6. Plaintiffs' False Advertising Claim Should Not Be Dismissed

Converteam moves to dismiss Plaintiffs' false advertising claim, Count X. Converteam argues that Florida Statute § 817.41 does not apply because the allegedly fraudulent misrepresentations were not made to the general public. Plaintiffs respond that Defendants did make representations to the public, specifically the cruise ship industry, and thus the motion to dismiss should be denied as to Count X. Section 817.41(1), which prohibits misleading advertising, prohibits dissemination of misleading advertising to the "general public of the state, or any portion thereof." Converteam argues that a representation by a salesman to a purchaser does not fall within the ambit of Florida's false advertising statute. However, the allegations of the Amended Complaint allege that Defendants made misrepresentations to the "public, particularly the South Florida based cruise ship industry ... including through the mail and at industry wide conferences." *See* Amended Complaint, ¶ 140. Thus, for purposes of a motion to dismiss, where the pleadings must be viewed in the light most favorable to the non-moving party, Plaintiffs have met their pleading burden and Count X should not be dismissed.

### 7. This Action Should Not Be Dismissed Based on Forum Non Conveniens

**\*8** Lastly, Converteam moves to dismiss the entire Amended Complaint on forum non conveniens grounds. Converteam argues that most of the parties are located in Europe; all of the issues relating to the Mermaid system, design,

manufacture, assembly, testing, service and repair, occurred in Europe; and that most of the witnesses are located in Europe. Plaintiffs respond that Converteam has not met its burden of establishing that there is an adequate alternative forum and that the public and private interest factors weigh in favor of dismissing this case.

In a forum non conveniens analysis there is a strong presumption in favor of a plaintiff s choice of forum. *La Seguridad v. Transytur Line,* 707 F.2d 1304, 1307 (11th Cir.1983). The party seeking dismissal on forum non conveniens grounds may overcome that presumption by demonstrating three things: 1) an adequate alternative forum is available; 2) the public and private factors weigh in favor of dismissal; and 3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice. *Membreno v. Costa Crociere S.p.A.,* 425 F.3d 932, 937 (11th Cir.2005) (quotations and citation omitted). In order to demonstrate the availability of an adequate alternative forum the moving party must show that the foreign court can exercise jurisdiction over the litigation and that the alternative forum is adequate. *Leon v. Million Air, Inc.,* 251 F.3d 1305, 1311 (11th Cir.2001). Courts are strict in requiring the movant demonstrate that the alternative forum offers at least some relief. *Id.*

In this case, Converteam has failed to meet its burden of proving that the alternative forum is adequate. Converteam has failed to show that all of the parties would be subject to jurisdiction in either of the alternative forums offered, France or the United Kingdom. Converteam has also failed to show that either of the alternative forums offer at least some relief. Converteam has simply alleged, with no support, that "upon information and belief [both France and the United Kingdom] recognize the causes of action in this litigation." This is not enough to meet the burden of proving the availability and adequacy of the alternative forum. Thus, because Converteam has not met the first element to support its forum non conveniens argument, the Court need not consider the other elements. Consequently, Converteam's Motion to Dismiss on forum non conveniens grounds should be denied.

Accordingly, it is hereby

ORDERED that Converteam's Motion to Dismiss Plaintiffs' Amended Complaint [DE-41] is DENIED in part and GRANTED in part:

1) The Motion to Dismiss is GRANTED as to Count VIII. Count VIII is dismissed without prejudice. Plaintiffs may file an Amended Complaint, as to Count VIII, by **December 4, 2009.**

2) The Motion to Dismiss is GRANTED in part as to Count VI. Count VI is dismissed to the extent that it relies on any conduct that occurred outside of Florida and DENIED in all other respects.

 **\*9**  3) The Motion to Dismiss is GRANTED as to Count DC.

4) The Motion to Dismiss is DENIED in all other respects.

DONE AND ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3861450

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:17 Case 21-50428-JTD, Doc 22-4 Filed 05/21/21 Page 70 of 202 PageID #:1548
District 1199P Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d...

2008 WL 5413105, RICO Bus.Disp.Guide 11,598

2008 WL 5413105
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

DISTRICT 1199P HEALTH AND WELFARE PLAN, individually
and on behalf of all others similarly situated, Plaintiff,

v.

JANSSEN, L.P., et al., Defendants.
Ironworkers Local No. 399 and Participating Employers Health and
Welfare Funds, on behalf of itself and all others similarly situated, Plaintiff,

v.

Janssen, L.P., et al., Defendants.
International Brotherhood of Electrical Workers Local 98,
on behalf of itself and all others similarly situated, Plaintiff,

v.

Janssen, L.P., et al., Defendants.
Southeastern Pennsylvania Transportation Authority, on
behalf of itself and all others similarly situated, Plaintiff,

v.

Janssen, L.P., et al., Defendants.

Civil Action Nos. 06–3044 (FLW), 07–2224(FLW), 07–2608(JAP), 07–2860(GEB).
|
Dec. 23, 2008.

**Attorneys and Law Firms**

Scott A. George, Seeger Weiss, LLP, Joseph J. Depalma, Lite, Depalma, Greenberg & Rivas, LLC, Newark, NJ, Brian J. McCormick, Jr., Sheller, PC, Philadelphia, PA, Joseph H. Meltzer, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, Benjamin F. Johns, Joseph G. Sauder, Chimicles & Tikellis, LLP, Haverford, PA, for Plaintiffs.

David J. Antczak, Drinker Biddle & Reath, LLP, Philadelphia, PA, Susan M. Sharko, Thomas F. Campion, Jr., Heidi E. Hilgendorff, Drinker, Biddle & Reath, LLP, Florham Park, NJ, for Defendants.

## OPINION

WOLFSON, District Judge.

**\*1** Presently before the Court is a motion by defendants, Janssen, L.P. and Johnson & Johnson (collectively, "Defendants"), to dismiss Counts I–III of the Consolidated Amended Class Action Complaint ("Complaint"), pursuant to Fed. R. Civ. P. 12(b)(6). This putative class action involves Defendants' alleged off-label sale and marketing of the prescription drug, Risperdal®, which is approved for the treatment of schizophrenia, bipolar mania, and autistic disorder. Plaintiffs, District 1199P Health and Welfare Plan, Ironworkers Local Union No. 399 and Participating Employers Health and Welfare Funds, International Brotherhood of Electrical Workers Local 98, and Southeastern Pennsylvania Transportation Authority (collectively, "Plaintiffs"), are third-party payors that allegedly paid for Risperdal® on behalf of their beneficiaries, insured, or employees. Plaintiffs, individually and on behalf of all others similarly situated, in Counts I–III, allege that Defendants by engaging in improper off-label promotion of Risperdal®

violated: (1) the RICO Act, 18 U.S.C. § 1961, *et seq.*; (2) RICO conspiracy, 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. § 1962(c); and (3) the New Jersey RICO Act, N.J.S.A. 2C:41–1 *et seq.,* ("NJRICO"). [1] Defendants deny any improper marketing, but even if true, contend that Plaintiffs have failed to adequately plead RICO violations. For the reasons that follow, the Court grants Defendants' Motion to Dismiss Counts I–III of Plaintiffs' Complaint.

[1]    Plaintiffs also claim that Defendants' alleged off-label promotion of Risperdal was tortious and violated the consumer protection laws of nearly every state in the country in Counts IV–X. These claims are not at issue in this motion.

## I. Background and Procedural History

Since Defendants move to dismiss Plaintiffs' RICO claims pursuant to *Fed.R.Civ.P.* 12(b)(6), the following version of events assumes Plaintiffs' allegations to be true. The Court will only recount facts that are relevant for the purposes of deciding this Motion.

In their Complaint, filed on February 29, 2008, Plaintiffs allege, *inter alia,* [2] that Defendants perpetrated a carefully orchestrated scheme to illegally market and promote, resperidone, sold under the brand name Risperdal® ("Risperdal"), for "off-label" uses, meaning uses not approved by the Food and Drug Administration ("FDA") and the safety and efficacy of the drug for these uses have not been established. Compl. ¶¶ 2, 5.

[2]    In this class action lawsuit, four separate complaints were filed and then consolidated into this action, including District 1199P Health and Welfare Plan, Civil Action No. 06–3044; Ironworkers Local Union No. 399 and Participating Employers Health and Welfare Funds, Civil Action No. 07–2224; International Brotherhood of Electrical Workers Local 98, Civil Action No. 07–2608; and Southeastern Pennsylvania Transportation Authority, Civil Action No. 07–2860.
District 1199P is a jointly trusteed employee benefit trust fund and an employee welfare benefit plan providing benefits for approximately 2,600 participants. Compl. ¶ 13. Ironworkers Local Union No. 399 is a health and welfare fund. *Id.* ¶ 14. IBEW Local 98 is an employee welfare benefit plan and employee benefit plan that pays for medical benefits and prescription drugs for approximately 3,000 participants. *Id.* ¶ 15. SEPTA employs a work force of approximately 9,000 people and provides medical benefits for eligible employees. *Id.* ¶ 16.

Risperdal is now sold and marketed by Ortho–McNeil–Janssen Pharmaceuticals, Inc., formerly known as Janssen Pharmaceutia Inc., the general partner of Janssen, L.P. and a wholly-owned subsidiary of Johnson & Johnson. *Id.* ¶ 17; *see* Df. Mot. at 1. Johnson & Johnson is one of the world's largest manufacturers of health care products for consumer and pharmaceutical markets. Compl. ¶ 18. Risperdal is a second generation atypical antipsychotic prescription medication that is FDA approved for: (1) long-term treatment of acute manic or mixed episodes of bipolar I disorder in adults; (2) monotherapy for the short-term treatment of acute manic or mixed episodes of bipolar I disorder in adults; (3) a combination therapy, with Lithium or Valproate, for the short-term treatment of acute manic or mixed episodes associated with bipolar I disorder in adults; (4) the treatment of irritability associated with autistic disorder in children and adolescents (between the ages of 5 and 16); (5) the treatment of schizophrenia in adolescents ages 13–17 years; and (6) the short-term treatment of bipolar I disorder in children and adolescents ages 10–17 years. *Id.* ¶ 4.

**\*2**  Plaintiffs allege that Defendants, fully aware of the federal laws that prohibit "off-label" marketing and promotion of pharmaceuticals, nonetheless illegally marketed and promoted Risperal for unapproved or "off-label" uses, including uses in children and adolescents as well as in the elderly population. *Id* . ¶ 5. Congress and the FDA have promulgated laws designed to regulate two of the most prevalent indirect promotional strategies: (1) manufacturer dissemination of medical and scientific publications concerning the off-label uses of their products, and (2) manufacturer support for Continuing Medical Education ("CME") programs that advocate off-label uses of their drugs. *Id.* ¶ 31. Plaintiffs allege that Defendants illegally conspired to aggressively market Risperdal through a nationwide, uniform marketing campaign to "misrepresent[ ] the comparative safety, efficacy and superiority of Risperdal over other traditional/typical or atypical antipsychotics to the health care community, consumers, third-party payors, and others, with the common goal to increase sales of Risperdal and the Defendants' profits," which has led to approximately 66% of Risperdal sales stemming from off-label uses. *Id.* ¶¶ 6, 55.

District of 999 Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d... Case: 3:17-cv-50428-JTD Doc 22-4 Filed 05/21/21 Page 72 of 202 PageID #:1550

2008 WL 5413105, RICO Bus.Disp.Guide 11,598

Plaintiffs claim that Defendants "overstat[ed] the drug's uses, while understating (if not outright concealing) Risperdal's side effects and even life threatening medical conditions" in a deliberate and calculated campaign designed to increase the sales of the drug by misleading physicians to write off-label prescriptions of Risperdal. *Id.* ¶¶ 50, 68, 71. Despite Defendants' alleged promotion of Risperdal's "superior safety and effectiveness," Plaintiffs assert that Risperdal and other atypical antipsychotics are "neither more effective nor safer than older, less expensive, typical antipsychotics." *Id.* ¶¶ 51, 67. Targets of Defendants' alleged scheme were health assistance programs; children who suffer from insomnia, attention deficit disorder or display behavior problems; elderly who experience Alzheimer's disease and dementia; and patients who experience depressive or mood disorders; and patients who experience the symptoms of generalized anxiety disorder, post traumatic stress disorder and substance abuse. *Id.* ¶¶ 74. Defendants allegedly committed numerous predicate acts of racketeering, specifically, multiple instances of bribery, in violation of state statutes; mail fraud, in violation of 18 U.S.C. § 1341; and wire fraud, in violation of 18 U.S.C. § 1343, including acts of sending illegal marketing, advertising, sale, and promotional material relating to Risperdal. *Id.* ¶¶ 9, 212. [3]

[3]  Plaintiffs allege in conclusory fashion that Defendants engaged in an ongoing, open-ended pattern of racketeering using interstate mail and wire communications. *Id.* ¶¶ 160, 211–218.

Defendants allegedly created and used a "Marketing Firms Enterprise" ("the enterprise"), comprised of Defendants and "seemingly-independent research organizations and marketing and public relations firms," who all shared "the common goals of illegally marketing, advertising, promoting and selling Risperdal in order to increase profits by increasing the off-label use of Risperdal," and acted as the "vehicle or tool to effectuate the Defendants' pattern of racketeering activity." *Id.* ¶¶ 10, 207–08. Defendants' alleged illegal scheme consisted of a campaign combining their own significant personnel and financial resources with a discreet and identifiable number of medical marketing firms, peer physicians, public officials, and purported independent charities and social programs to market and promote Risperdal's off-label use. *Id.* ¶ 73. [4]

[4]  Plaintiffs do not identify the number or the names of any of these entities.

**\*3**  Defendants allegedly used the enterprise to organize and direct the publication of articles and statements in studies to promote Risperdal's off-label use. *Id.* ¶ 97. This enterprise allegedly hosted CMEs, which are typically independently-sponsored educational programs, but it is alleged here, that at these CMEs, physicians, compensated by Defendants, relayed misleading information to encourage other physicians to prescribe Risperdal for off-label uses. *Id.* ¶¶ 84–96. According to Plaintiffs, Defendants were successful in influencing the off-label promotion because they hand-picked peer-sellers and key physicians as leaders to speak favorably about the drug [5] and induced attendee physicians to listen to their off-label marketing pitch, to prescribe Risperdal for off-label use, and to recommend off-label use of Risperdal to other physicians. *Id.* ¶¶ 90–93, 136–37. In exchange, Defendants allegedly provided financial incentives, including expensive dinners and vacations at "lavish" accommodations, disguised grants, and paid drug trials. *Id.* ¶¶ 136–37.

[5]  For example, Plaintiffs allege "Dr. Charles Nemeroff, the presenter for the 2007 CME presentation entitled *Add On Atypical Antipsychotics Efficacious in Short Term for Unipolar Depression,* references the ARISE–RD study, which was an attempt to demonstrate the efficacy of Risperdal for depression.... Dr. Nemeroff claimed that a peer-reviewed study showed Risperdal improved sexual functioning, when the effects of treatment on sexual functioning were not mentioned in the ARISE–RD study. Additionally, Dr. Nemeroff claimed that the study showed Risperdal demonstrates efficacy over placebo, which the ARISE–RD study in fact did not.... Dr. Nemeroff has been a long time key opinion leader for Defendants and has participated in a Janssen-financed journal supplement in 2005." *Id.* ¶ 96.

Defendants allegedly omitted or misrepresented information about Risperdal's off-label uses when they marketed it to physicians, inflating the number of prescriptions written and filled and causing Plaintiffs to overpay for the drug. *Id.* ¶¶ 12, 146, 160, 182, 187. Defendants allegedly published only favorable, and suppressed unfavorable, results about the adverse effects of the Rispersal drug, such as, *inter alia,* increased risk of death, and made false and misleading claims regarding its efficacy, including that it has a low incidence of movement disorders, sedation, and anticholinergic effects (variety

of movement disorders). *Id.* ¶¶ 108, 121, 133. Plaintiffs acknowledge that "[p]hysicians are free to prescribe approved drugs for their patients as they see fit to adequately treat any condition or symptom." *Id.* ¶ 56. Plaintiffs claim, however, that Defendants' alleged scheme and deceptive conduct directly and proximately caused economic loss to Plaintiffs because they unnecessarily paid for Risperdal off-label use prescriptions for their members or beneficiaries because of the misinformation disseminated by Defendants, which fraudulently increased the demand and sale of Risperdal and deprived Plaintiffs of cheaper alternatives and/or resulted in inflated prices. *Id.* ¶¶ 11–12, 36, 193.

Plaintiffs allege that they were injured by their "economic loss," which is "unaffected by whether any given patient ingested Risperdal or suffered adverse side effects." *Id.* ¶ 11. Plaintiffs assert that they, as third-party payors, had to pay for Risperdal in situations where it was not approved as safe and effective by the FDA, after it had been placed on the formulary for on-label use by the Pharmacy Benefit Managers ("PBMs"). *Id.* ¶¶ 189, 191. For example, according to Plaintiffs, "[p]hysicians have been misled by Defendants' scheme to believe that Risperdal is superior in its effectiveness and safety to other lower-costing and equally effective antipsychotic drugs," and thus, Risperdal's sales increased. *Id.* ¶ 67. Plaintiffs claim that "Dr. Rosenheck reported that Trilafon [is more cost-effective than the newer drugs in terms of their 'human benefit' because it] cost[s] between $300 and $600 less per month, compared to Risperdal. Trilafon is no less effective and substantially less expensive—by between $3,600 and $7,000 a year." *Id.* ¶ 62. As a result of the foregoing, Plaintiffs allege that they were fraudulently denied comparably safe and effective, cheaper alternatives to Risperdal and overpaid hundreds of millions of dollars for doses of Risperdal that were prescribed by physicians because of Defendants' off-label marketing scheme. *Id.* ¶¶ 12, 67, 71, 193.

**\*4** On March 31, 2008, Defendants filed their motion to dismiss Counts I–III of Plaintiffs' Complaint with prejudice for failure to state a claim upon which relief may be granted pursuant to *Fed.R.Civ.P.* 12(b)(6). Defendants argue that Plaintiffs' RICO and NJRICO claims are substantively flawed because (1) Plaintiffs did not suffer a cognizable RICO injury, (2) Plaintiffs' theory of causation is too attenuated and speculative as the physicians exercised independent medical judgment on an individual patient basis and Plaintiffs did not rely on Defendants' alleged misrepresentations, [6] and (3) Plaintiffs do not sufficiently allege predicate acts, including mail or wire fraud, necessary to adequately plead RICO. Therefore, Defendants argue, Plaintiffs' RICO conspiracy claim cannot be sustained as a matter of law. On April 30, 2008, Plaintiffs filed their opposition asserting that they adequately allege a cognizable injury, that Defendants' conduct proximately caused their injury, and that they sufficiently plead RICO predicate acts and conspiracy to violate RICO. On May 15, 2008, Defendants filed their reply. Thereafter, both parties submitted supplemental authority and briefing therewith. The Court grants Defendants' Motion for the reasons that follow.

[6]     In *Bridge v. Phoenix Bond & Indemnity Co.,* ––––U.S. ––––, ––––, 128 S.Ct. 2131, 2139, 170 L.Ed.2d 1012 (2008), the Supreme Court recently determined that first-party reliance is not an element in civil RICO claims. *See* Part III.A .2., *infra.*

This Court has subject matter jurisdiction over this federal RICO action pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## II. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). Recently, in *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 1968 (quoting *Conley,* 355 U.S. at 45–46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a

claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 127 S.Ct. at 1965).

### III. Discussion

#### A. Plaintiffs' RICO and NJRICO Claims

**\*5** To properly plead under RICO, a Plaintiff must allege " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity' as well as an injury resulting from the conduct constituting a violation." *Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.,* 87 Fed. Appx. 227, 231 (3d Cir.2003) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The Act "provides for liability in civil suits brought by any person injured 'in his business or property' by a RICO violation, with a compulsory award of treble damages, costs, and attorneys fees ... [and] makes it unlawful for 'any person' who is employed by or associated with 'any enterprise' affecting interstate commerce to 'participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' " *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 906 (3d Cir.1991) (citing 18 U.S.C. §§ 1962(c), 1964(c)). The Third Circuit has articulated that Section 1964(c) requires "a RICO plaintiff to make two related but analytically distinct threshold showings ...: (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962." *Maio v. Aetna, Inc.,* 221 F.3d 472, 483 (3d Cir.2000). The Court will address these standing requirements below.

#### 1. Injury

Defendants argue that Plaintiffs did not suffer a cognizable RICO injury because Plaintiffs seek recovery solely for alleged economic loss, which Defendants argue are mere allegations of "overpayment" or "diminished value" for a safe and effective drug that is plainly speculative and not a "concrete financial loss" cognizable under RICO. Plaintiffs, however, assert that they plead a cognizable injury, past and present, in the form of a financial loss from overpayment, sufficient to confer standing.

The Supreme Court has stated that a plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation [of RICO]." *Sedima,* 473 U.S. at 496; *see* 18 U.S.C. § 1964; *Genty,* 937 F.2d at 906; *see also Cetel v. Cmmw. Life Ins. Co.,* 460 F.3d 494, 510 (3d Cir.2006) ("[T]he New Jersey Supreme Court believe[s] the New Jersey RICO statute was and should be consistent with the federal RICO statute."); N.J.S.A. 2C:41–4(c). [7] While the Supreme Court has generally stated that RICO is to be read broadly, the Third Circuit has held that § 1964(c)'s standing limitation assures that not every plaintiff has a federal cause of action arising under RICO. *See Maio,* 221 F.3d at 483 (internal citations and quotations omitted). "[A] showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Id.* (internal citations and quotations omitted).

[7]     As the facts alleged apply to both the RICO and NJRICO claims and the RICO and NJRICO statutes are intended to have the same reach, the Court addresses these claims together under the RICO analysis.

Plaintiffs allege that they suffered economic loss as third-party payors because Defendants' scheme "depriv[ed them] of cheaper alternatives and/or result[ed] in higher prices for [Risperdal] than otherwise would have existed." Compl. ¶ 12. Plaintiffs argue that their Complaint sufficiently alleges a concrete financial loss for amounts they overpaid for Risperdal due to Defendants' illegal or deceptive marketing practice, which inflated the number of prescriptions written and filled and led to higher co-payments and out-of-pocket costs. Compl. ¶¶ 187, 192–193. To support their claim of a cognizable injury sufficient to confer standing, Plaintiffs cite to a number of cases, all of which are distinguishable from the instant action. *Cf. Sedima,* 473 U.S. at 484, 494 (finding the plaintiff properly pled an injury under RICO when he allegedly

Case: 3:17-cv-50438, JTD, Doc 22-4, Filed 05/31/21, Page 75 of 202
District 1999 Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d... 2008 WL 5413105, Page ID #:1553
2008 WL 5413105, RICO Bus.Disp.Guide 11,598

paid falsified bills that the defendant created and presented); *P & P Mktg., Inc. v. Ditton,* 746 F.Supp. 1354, 1358, 1361 (N.D.Ill.1999) (finding the plaintiff sufficiently pled a RICO injury by alleging he paid overcharges where defendants caused submission of falsified invoices).

**\*6** For example, Plaintiffs cite *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 531 (3d Cir.2004), in which the Third Circuit held that "[third-party payors], like individual consumers, suffered direct economic harm when, as a result of [the pharmaceutical companies'] alleged misrepresentations, they paid supracompetitive prices for [the brand drug] instead of purchasing lower-priced generic [drug]," but no RICO claims were alleged. Plaintiffs also direct the Court to the Second Circuit's recognition of the right of health benefit providers to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices. *Desiano v. Warner–Lambert Co.,* 326 F.3d 339, 349–50 (2d Cir.2003). In *In re Warfarin* and *Desiano,* however, the plaintiffs sought relief under federal antitrust laws and consumer fraud claims, which are distinct from the RICO allegations brought here. Similarly, Plaintiffs cite *Blue Cross & Blue Shield United v. Marshfield Clinic of Wis.,* 65 F.3d 1406, 1414–16 (7th Cir.1995), another antitrust case in which no RICO claims were alleged, and the plaintiffs allegedly paid supracompetitive prices directly to the monopolist. Moreover, in a subsequent Seventh Circuit case, the court limited the Marshfield Clinic reasoning and applicability in RICO cases. *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.,* 196 F.3d 818, 826–27 (7th Cir.1999).

Plaintiffs also direct the Court to *In re Zyprexa Prods. Liab. Lit.,* 493 F.Supp.2d 571, 576 (E.D.N.Y.2007), where RICO claims were alleged and survived a motion to dismiss, but which relied on *Schwab v. Philip Morris USA, Inc.,* 449 F.Supp.2d 992 (E.D.N.Y.2006), *rev'd sub nom. McLaughlin v. American Tobacco Co.,* 522 F.3d 215, 228 (2d Cir.2008). In overturning *Schwab,* the Second Circuit found that plaintiffs' theories of injury—loss causation—were not cognizable under RICO. *See McLaughlin,* 522 F.3d at 228. The court held that the "loss of value model is designed to award plaintiffs damages based on the benefit of their bargain. Such damages are generally unavailable in RICO suits ... [where the statute] compensates only for injury to 'business or property.' " *Id.* (internal citations omitted). Moreover, the defendants' misrepresentation "could in no way have reduced the value of the [product] that plaintiffs actually purchased," but rather the defendants "simply could have induced plaintiffs to buy [the product over other products]." *Id.* at 229. The Second Circuit determined that this alleged injury did not satisfy the requisite pleading of concrete financial loss for RICO claims. *See Id.* at 228–29. Thus, Plaintiffs' reliance on these cases is misplaced. [8]

[8]    In Plaintiffs' causation argument, they also allege that damage models will demonstrate the effect of Defendants' scheme, contending that they have pled a cognizable injury and that Defendants were the cause of the injury. Pl. Opp. at 17. In that connection, the Court notes that this is not a viable approach. Plaintiffs essentially concede that they cannot identify any ascertainable concrete injury, since they assert that Defendants' "arguments [that Plaintiffs lack a cognizable injury or that they were the cause] are especially inappropriate at this early stage of the litigation, when the damage models that Plaintiffs will use to demonstrate the effect of Defendants' scheme have yet to be presented, let alone tested." Pl. Opp. at 17. Some sort of damage model, yet to be presented, does not substitute for adequately pleading an injury or causation. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 929 (3d Cir.1999) (rejecting the use of "aggregation and statistical modeling" to satisfy burden of pleading causation). Thus, Plaintiffs' only identified injury is their alleged economic loss from "overpayment."

Defendants assert that Plaintiffs' allegations of "overpayment" are insufficient to constitute a RICO injury, where Plaintiffs seek recovery solely for an alleged economic loss, on the theory that alternative medications *might have been* at least as effective and cheaper than Risperdal. Defendants argue that Plaintiffs fail to allege that their beneficiaries, insured, or employees received an ineffective medication or that Risperdal physically harmed them, but rather concede that Risperdal was safe and effective. Thus, according to Defendants, Plaintiffs' purported injury, based on paying too much for a safe and effective medication, is plainly speculative and not a "concrete financial loss" cognizable under RICO. *See Maio,* 221 F.3d at 483–84. Indeed, in *Maio,* a case on which Defendants rely, the Third Circuit found that the plaintiffs failed to allege the facts necessary to support their assertion that they suffered a cognizable injury to business or property due to the alleged inferiority of the product received as compared to the product the defendants promised to

Case: 3:17-cv-50438-JTD Doc 23-4 Filed 05/21/21 Page 76 of 202 PageID #:1554

District 1999...ealth and Welfare Fun v. Janssen, L.P., Not Reported in F.Supp.2d...

2008 WL 5413105, RICO Bus.Disp.Guide 11,598

deliver because the plaintiffs did not allege that they suffered any medical injuries, received inadequate or inferior care, or sought but were denied necessary care as a consequence of the defendants' plan. *Id .* at 501.

**\*7** In response, Plaintiffs assert that their injury is "strikingly *dissimilar"* to those alleged by the plaintiffs in *Maio* because the property interest at stake in that case was in the nature of a contractual right to receive a certain level (quantity or quality) of health care benefits from the defendants, rather than a tangible property right. Pl. Opp. at 7. Plaintiffs also assert that, in *Maio,* the plaintiffs' injury was predicated on the conclusion that the alleged economic value of the product purchased was reduced because of the *possibility* that the alleged inferiority of the product would manifest itself at some point in the future. [9] *Id.* at 8. Although *Maio* did deal with an health insurance "product," Plaintiffs' attempt to distinguish themselves is unconvincing, as they assert a substantially similar "overpayment" argument as that made by the unsuccessful plaintiffs in *Maio.* 221 F.3d at 487–88, 492–94.

[9] The *Maio* court, in analyzing the plaintiffs' claim that "they need not plead and prove allegations concerning the level of care that they received to establish the fact of damage," which was their RICO injury to property theory, determined that the plaintiffs did not have standing. *Maio,* 221 F.3d at 494. It was under this analysis that the court found that insofar as the plaintiffs' argument was predicated "exclusively on the possibility that future events might occur [and that the quality of care administered may suffer in some undefined way], rather than on the actual occurrence of those events and their present effect on the value of the health insurance" received, the plaintiffs' theory of present economic loss was too speculative and was insufficient to support a cause of action under RICO. *Id.* at 494–55. Thus, in this case, Plaintiffs plead past and present injury due to the alleged injury of overpaying for the "inferior" product they purchased. But similarly, here, Plaintiffs do not identify any present injury to their insured or beneficiaries. *Maio's* analysis of injury based on the economic loss of the product allegedly marketed and that an inferior product was allegedly received is pertinent.

The plaintiffs in *Maio* argued that their RICO injury was based on each member of the nationwide class paying too much in premiums for an "inferior" health care product. *Id.* at 484. [10] In *Maio,* the plaintiffs' RICO injury theory was grounded in the argument that they paid too much in premiums for a health insurance plan of lesser value, namely the product received was inferior to the product the defendants promised to deliver. *Id.* at 484 n. 11, 486. There, the plaintiffs categorized their "concrete financial loss" as the "difference in value between the health insurance promised and the [allegedly 'inferior' and less valuable] health insurance actually received." *Id.* at 486. The Circuit Court rejected the plaintiffs' injury theory based on financial losses of overpayment that the plaintiffs purportedly sustained by enrolling in this inferior plan, since the plaintiffs did not plead that the enrolled "individuals were denied medically necessary benefits, received inadequate, inferior or delayed medical treatment, or even worse, suffered personal injuries as a result of [the defendants' conduct]." *Id.* at 488.

[10] The Third Circuit noted that if the product "simply was *different* than that which was promised to appellants, then there would be no factual basis for an argument that they overpaid, inasmuch as a 'different' but equally good health insurance package would have an equivalent economic value." *Id.* at 484 n. 11 (emphasis in original). The court determined that the defendants' health insurance "could not be characterized as 'worth less' in monetary value unless it was inferior in some respect" to the product that had been contracted for. *Id.*

Similar to Maio, in the instant case, Plaintiffs categorize their "concrete financial loss" as overpaying for Risperdal for off-label uses due to Defendants' allegedly fraudulent and deceptive marketing practices, which inflated the number of prescriptions of Risperdal written and filled and increased Plaintiffs' co-payments and out-of-pocket costs. Compl. ¶¶ 187, 192–93; Pl. Opp. at 5. Plaintiffs plead that they overpaid for Risperdal because it was "neither more effective nor safer than older typical antipsychotics ." Compl. ¶ 51. In addition, Plaintiffs plead that "the efficacy of all [second generation antipsychotics] is similar" and that none of the second generation antipsychotics are superior in efficacy to the cheaper older typical antipsychotics. *Id.* In that regard, Plaintiffs plead that they were injured by their "economic loss," which is "unaffected by whether any given patient ingested Risperdal or suffered adverse side effects." *Id .* ¶ 11. This is substantially similar to the Maio plaintiffs' argument of overpayment; in that, the "difference in value between the [drug] promised and the [allegedly "inferior" and less valuable drug] actually received." Maio, 221 F.3d at 486. Yet, according to Third Circuit precedent, Plaintiffs' injury theory based on financial losses of overpayment that Plaintiffs

Case: 3:17-cv-50428-JTD Doc 22-4 Filed 05/21/21 Page 77 of 202
District 1199 J Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d... Case 2:15-cv-00899-JTD Doc 22-4 Filed 05/21/21 Page 77 of 202 PageID #:1555
2008 WL 5413105, RICO Bus.Disp.Guide 11,598

purportedly sustained by paying for this "inferior" drug is inadequate for sustaining a RICO injury, absent allegations that Defendants' drug was on some level "inferior and therefore 'worth less' than what [Plaintiffs] paid for it." *Id.* at 488.

**\*8** Plaintiffs here allege that Defendants "admitted that [they] omitted material information about Risperdal, minimized potentially fatal risks, and made misleading claims suggesting superior safety in comparison to other atypical antipsychotics without adequate substantiation." Compl. ¶ 131. Further, Plaintiffs allege that treating behavioral disorders in elderly patients with dementia with atypical (second generation) antipsychotic medications, like Risperdal, is associated with increased mortality. *Id.* ¶ 132. However, nowhere do Plaintiffs allege that any beneficiaries, insured, or employees taking Risperdal "received [an] inadequate[ or] inferior [drug] or even worse, suffered personal injuries as a result of" Defendants' alleged misrepresentations. *Maio,* 221 F.3d at 488.

Furthermore, Plaintiffs do not plead that Risperdal is inferior to competitor drugs, i.e., that Risperdal is less effective and/ or less safe than, or that the side effects of Risperdal are also not associated with, other comparable drugs. Plaintiffs assert that "[r]esearch and studies have illustrated that physicians can prescribe lower-cost and equally effective alternatives to treat the conditions for which Defendants have promoted the off-label use of Risperdal." Compl. ¶ 56. For example, Plaintiffs assert that Trilafon is more cost-effective than the newer drugs, like Risperdal, in terms of their "human benefit" because it is no less effective and substantially less expensive, by between $3,600 and $7,000 a year. *Id.* ¶ 62. Applying *Maio,* however, merely stating that Risperdal is "equally effective," "no ... more effective," or "neither more effective nor safer," all of which imply that it is no less effective or safe, is not a sufficient pleading of inferiority to sustain Plaintiffs' RICO injury. *See* 221 F.3d at 488 (finding that without pleading denial of benefits, inadequate, inferior or delayed treatment, or actual injury, "there is no factual basis for appellants' conclusory allegation that they have been injured in their 'property' because the health insurance they actually received was inferior and therefore 'worth less' than what they paid for it"); Compl. ¶¶ 51, 56, 59. In addition, where no additional pleading of injury is alleged, Plaintiffs' allegations that there are more "cost-effective" alternatives do not meet the required pleading of overpayment as a concrete financial loss. *See Maio,* 221 F.3d at 488.

"Inasmuch as there are no allegations in the complaint to the effect that appellants have received inadequate care, suffered medical injuries, or have been denied medically necessary care, the fair inference to be drawn from the complaint ... is that none of those events have occurred." *Maio,* 221 F.3d at 500. Similarly, Plaintiffs allege that Defendants' fraud is their misrepresentation of the safety and efficacy of Risperdal for off-label uses and that it is worth less than what they paid for it, without alleging that the drug harmed the beneficiaries in any way or that the drug lacked safety or efficacy; as such, the Court must infer that the drug did not harm the beneficiaries. "Without alleging that a product failed to perform as advertised, a Plaintiff has received the benefit of his bargain and has no basis to recover purchase costs." *Williams v. Purdue Pharma Co.,* 297 F.Supp.2d 171, 176 (D.D.C.2003) (citation omitted). Therefore, Plaintiffs do not plead a concrete financial loss in the form of overpayment, absent allegations that the drug was inferior on some level and worth less than what they paid for it. Because Plaintiffs fail to sufficiently allege a cognizable RICO injury under federal or New Jersey law, they lack standing to bring such claims.

### 2. Causation

**\*9** Defendants argue that Plaintiffs also lack standing to bring Counts I and III of their Complaint because Plaintiffs' theory of causation is too attenuated and speculative. In their supplemental filing, dated June 11, 2008, Defendants concede that the Supreme Court, in *Bridge v. Phoenix Bond & Indemnity Co.,* ––– U.S. ––––, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), held that a plaintiff need not plead and prove that it relied on the defendant's alleged misrepresentations. While Defendants concede that first-party, or here, third-party payor, reliance is no longer an issue, [11] they press their other independent bases for dismissal on causation grounds. Plaintiffs counter that their Complaint adequately alleges that Defendants' conduct proximately caused their alleged injury. [12] However, as Plaintiffs fail to adequately plead a cognizable RICO or NJRICO injury, they fail to assert that Defendants' conduct proximately caused their injury.

Case: 3:17-cv-50428-JTD Doc 22-4 Filed 05/21/21 Page 78 of 202
District 1999 Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d... Case 2:15-0428-JTD Doc 22-4 Filed 05/21/21 Page 78 of 202 PageID #:1556

2008 WL 5413105, RICO Bus.Disp.Guide 11,598

[11]    Defendants also note, and this Court agrees, that the Supreme Court, in *Bridge,* stated that "none of this is to say that a RICO plaintiff who alleges injury 'by reason' of a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *128 S.Ct. at 2144* (internal citations omitted) (emphasis in original). Therefore, as the Supreme Court said, it will be unlikely that Plaintiffs will be able "to establish even but-for causation if no one relied on the misrepresentation" and "the complete absence of reliance may prevent the plaintiff from establishing proximate cause." *Id.* "Accordingly, it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.*

[12]    Defendants argue that Plaintiffs' "inflated price" theory of causation is "a quintessential fraud-on-the-market theory" of causation. Plaintiffs assert they do not allege such a theory. Pl. Opp. 9 n. 3. The Court notes, however, that if indeed that is what Plaintiffs are pleading, this theory is not recognized in the RICO context, and thus, not a viable theory here. See, e.g., *McLaughlin,* 522 F.3d at 228; *Stikes v. Teleline, Inc.,* 281 F.3d 1350, 1362–63 (11th Cir.2002), abrogated on other grounds, *Bridge v. Phoenix & Indem.* Co., ––– U.S. ––––, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008); *Summit Props., Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 561 & n. 24 (5th Cir.2000); *In re Rezulin Prods. Liab. Litig.,* 524 F.Supp.2d 436, 441 (S.D.N.Y.2007); *Heindel v. Pfizer, Inc.,* 381 F.Supp.2d 364, 380 (D.N.J.2004); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* 192 N.J. 372, 392, 929 A.2d 1076 (2007).

Notwithstanding Plaintiffs' failure to properly plead an injury, the Court also has a substantial question as to whether Plaintiffs could ever properly plead proximate causation, as required by *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), or if the independent and individualized decision-making of physicians prescribing *Risperdal* breaks any chain of causation between Defendants' alleged misconduct and Plaintiffs' payment for the medication. *See, e.g., Mazur v. Merck & Co., Inc.,* 964 F.2d 1348, 1355 (3d Cir.1992); *Heindel v. Pfizer, Inc.,* 381 F.Supp.2d 364, 382 (D.N.J.2004). In addition, in a recent, substantially similar action, in which the plaintiffs were represented by many of the same counsel as in this case, the court determined that the plaintiff third-party payors' claims were "too remote" to satisfy civil RICO's proximate causation. *Ironworkers Local Union No. 68 & Participating Employers Health & Welfare Funds, et al. v. Astrazeneca Pharms. LP, et al.,* No. 07–5000, 2008 WL 4832659, at *4 (M.D.Fla. Nov.4, 2008). Nevertheless, because Plaintiffs do not sufficiently allege an injury under federal or New Jersey law, they lack standing to bring RICO and NJRICO claims, and the Court need not address causation more fully.

### 3. Enterprise

Although Defendants have not briefed the issue or disputed the adequacy of Plaintiffs' allegations regarding enterprise, the Court will briefly address whether Plaintiffs' allegations are sufficient to survive a motion to dismiss. An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise is "an entity [made up of] a group of persons associated together for the common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To establish the existence of an enterprise, a plaintiff must prove that (1) the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) the members of the enterprise function as a continuing unit with established duties; and (3) the enterprise must be separate and apart from the pattern of activity in which it engages. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 789–90 (3d Cir.1984). However, as the rules of pleading require nothing more at this early juncture than a bare allegation, where a plaintiff identifies the "entities it believed were the enterprises that had been marshalled against it," a plaintiff sufficiently alleges the existence of an enterprise. *Id.* at 790.

 **\*10**   Plaintiffs allege that Defendants created and used a "Marketing Firms Enterprise," comprised of Defendants and "seemingly-independent research organizations and marketing and public relations firms," as the "vehicle or tool to effectuate the Defendants' pattern of racketeering activity" in its alleged "scheme to market *Risperdal* for off-label use." Compl. ¶¶ 10, 207–08. Plaintiffs further allege that this uniform marketing scheme devised by Defendants was designed to mislead physicians and resulted in increased sales of *Risperdal,* thus depriving Plaintiffs of cheaper alternatives and/ or resulting in higher prices for the drug than otherwise would have existed. *Id.* ¶ 12. Plaintiffs allege that Defendants, through the enterprise, hosted CMEs, at which physicians, compensated by Defendants, relayed misleading information

Case: 3:17-Case2:1b50428-JTD, Doc22-4e Filed 05/21/21d3-Page 79f 06f 202ge ID #:1557

District of N.J. Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d... (2008)
2008 WL 5413105, RICO Bus.Disp.Guide 11,598

to encourage other physicians to prescribe Risperdal for off-label uses. *Id.* ¶¶ 84–96, 136–38. Based on these allegations and Defendants' failure to contest the enterprise component, the Court finds that Plaintiffs have sufficiently alleged that an enterprise existed.

#### 4. Racketeering Activity

To allege a RICO violation, a plaintiff must articulate a pattern of racketeering activity, *i.e.,* predicate acts. [13] *See Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.,* 87 Fed. Appx. 227, 231 (3d Cir.2003) (citations omitted). The claim "must include the allegation of at least two (2) racketeering acts." *Zellner v. Monroe County Mun. Waste Mgmt. Auth.,* No. 07–1976, 2008 U.S. Dist. LEXIS 57769, at *20, 2008 WL 2962595 (M.D.Pa. July 28, 2008). When fraud is the predicate act, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Warden v. McLelland,* 288 F.3d 105, 114 (3d Cir.2002). Specifically, Rule 9(b) states "a party must state with particularity the circumstances constituting fraud or mistake." *Fed.R.Civ.P.* 9(b). In *Frederico v. Home Depot,* 507 F.3d 188 (3d Cir.2007), the Third Circuit qualified what information must be alleged to satisfy the heightened pleading standard of Rule 9(b):

[13] "To set out a prima facie showing of a civil RICO violation under 18 U.S.C. § 1964(c), a plaintiff must have been injured by 'racketeering activity,' 18 U.S.C. § 1962(c)-(d). 'Racketeering activity' is defined as a violation of certain enumerated statutes-commonly known as 'predicate acts'-in 18 U.S.C. § 1961(1)." *Breslin v. Brainard,* 128 Fed. Appx. 237, 240 (3d Cir.2005); *see also Anderson v. Ayling,* 396 F.3d 265, 269 (3d Cir.2005) ("The term 'racketeering activity' is defined in 18 U.S.C. § 1961(1) to include a long list of state and federal crimes, among them the wire fraud alleged here."); *see generally* 18 U.S.C. §§ 1341, 1343. The Third Circuit permits federal common law or "garden variety" fraud, including mail and wire fraud. *Tabas v. Tabas,* 47 F.3d 1280, 1290 (3d Cir.), *cert. denied,* 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995).

Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." *Lum v. Bank of America,* 361 F.3d 217, 223–224 (3d Cir.2004). To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation. *See Id.* at 224.

*Frederico,* 507 F.3d at 200; *see also Seville Indus. Mach. Corp.,* 742 F.2d at 791.

General allegations, such as fraud and theft, will not satisfy the pleading standard as they are "not included as [specifically listed] racketeering activit[ies] pursuant to 18 U.S.C. § 1961(1)." *Zellner,* 2008 U.S. Dist. LEXIS 57769 at *23, 2008 WL 2962595. Instead, Plaintiffs, more specifically, attempt to allege that the predicate acts are mail and wire fraud. [14] "Where acts of mail and wire fraud constitute the alleged predicate racketeering acts, those acts are subject to the heightened pleading requirement of Rule 9(b)." *Warden,* 288 F.3d at 105 (citing *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 657–58 (3d Cir.1998)). The Third Circuit in *Annulli v. Panikkar* addressed the differential pleading nature of mail and wire fraud:

[14] Plaintiffs also allege bribery as a predicate act. *See* Part III.A.4, *infra.*

**\*11** There are two elements of a mail or wire fraud charge: "(a) a scheme to defraud, and (2) a mailing or wire in furtherance of that scheme." *Greenberg v. Brewster,* 816 F.Supp. 1039, 1049 (E.D.Pa.1993). Wholly intrastate use of the mails for fraud violates the mail fraud statute. *See, e.g., In re Burzynski,* 989 F.2d 733, 742 (5th Cir.1993). In contrast, the federal wire fraud statute requires interstate use of the wire. *See, e.g., Smith v. Ayres,* 845 F.2d 1360, 1366 (5th Cir.1988) ("As several courts have recognized, the statute requires that the wire communication cross state lines."). 200 F.3d 189, 200 n. 9 (3d Cir.1999); *see also Zellner,* 2008 U.S. Dist. LEXIS 5776 at *22–23 (citing *Stanley v. Int'l Bhd. of Elec. Workers, AFL–CIO CLC,* 207 Fed. Appx. 185, 189 (3d Cir.2006)) (internal quotations omitted) ("[T]he wire fraud statute, 18 U.S.C. § 1343, 'criminalizes a scheme to defraud that is transmitted by wire 'in interstate or foreign commerce'; thus, a complaint must allege interstate use of the wire for each predicate act."). Moreover, when asserting

Case: 3:17-cv-50428-JTD   Doc 22-4   Filed: 05/21/21   Page 80 of 202

Case 2:1550428-JTD, Doc 22-4, Filed 05/21/21, Page 80 of 202

District Council 999 Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d... 2008 WL 5413105... PageID #:1558

2008 WL 5413105, RICO Bus.Disp.Guide 11,598

mail fraud allegations, a plaintiff must "identify the purpose of the mailing within the defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentations." *Annulli,* 200 F.3d at 201 n. 10. In other words, the plaintiff's pleading must contain the "who, what, when and where details of the alleged fraud." *Bonavitacola,* 87 Fed. Appx. at 231 (quoting *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network,* No. 99–4653, 2001 WL 41143 (E.D.Pa. Jan.18, 2001)).

Accordingly, this Court will only consider as predicate racketeering acts those wire frauds which have been alleged to have been transmitted by wire "in interstate or foreign commerce" and those mail frauds that are alleged to have made use of the United States Postal Service. *See Zellner,* 2008 U.S. Dist. LEXIS 57769 at *23, 2008 WL 2962595 ("As these ... frauds were not properly plead, the Court will not consider them as 'predicate acts.' "). Further, this Court will only consider as predicate racketeering acts those mail and wire frauds alleged with the specificity required by the heightened pleading standard of Rule 9(b). Upon a liberal construction of Plaintiffs' Complaint, this Court cannot discern a communication that arguably rises to the level of specificity needed to satisfy 9(b)'s heightened pleading requirement. *See Bonavitacola,* 87 Fed. Appx. at 231. It is impossible for this Court to discern the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation" of the communications between Defendants. *See Frederico,* 507 F.3d at 200. Thus, Plaintiffs have failed to plead the level of specificity required by the heightened pleading standard of Rule 9(b).

In the instant case, Plaintiffs respond to Defendants' assertion that Plaintiffs' Complaint lacks particularity as "simply unfounded," citing the seventy pages of their Complaint to show their "ample specificity to meet the pleading requirements." Pl. Opp. at 17. Plaintiffs argue that they "have marshaled, even at this pre-discovery phase, abundant substance and specificity." *Id.* at 18. Plaintiffs direct the Court to note, for example, their detailing of "Risperdal's global sales, volume, percentage and total revenue in off-label prescription market segments including the fact that sales of Risperdal and Risperdal Consta accounted for approximately 8% and 6%, respectively, of [Johnson & Johnson's] total revenue for the 2006 fiscal year, and Risperdal was used off-label 66% of the time." *Id.;* Compl. ¶ 49. Yet, even upon a liberal construction of the Complaint, Plaintiffs essentially concede that they "do not indicate the date, time, or place of any misrepresentations" nor do they otherwise inject precision or some measure of substantiation into a fraud allegation to discern a communication that arguably rises to the level of specificity needed to satisfy 9(b)'s heightened pleading requirement. *Lum,* 361 F.3d at 224; *see Bonavitacola,* 87 Fed. Appx. at 231.

**\*12** In their Opposition, Plaintiffs argue that the Court should apply the Third Circuit's more relaxed standard for pleadings under Rule 9(b) in the case of corporate fraud. *See Shapiro v. UJB Fin. Corp. .,* 964 F.2d 272, 284–85 (3d Cir.1992) ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed the (particularity) rule when factual information is peculiarly within the defendant's knowledge or control.") (citing *Craftmatic Sec. Lit. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989)). In *Shapiro,* the Third Circuit reiterated "at the very least plaintiffs must allege that the necessary information lies within defendants' control." *Id.* (internal citations and quotations omitted). In reviewing the district court's dismissal of the plaintiffs' allegations for failure to allege the defendants had exclusive control over the information required to satisfy particularity, the Circuit Court noted that the complaint did not specifically allege that the defendants had exclusive control of the information the plaintiffs needed, but rather "allege[d] only that defendants had access—but not exclusive access—to company information when the alleged misrepresentations and omissions occurred." *Id.* at 285 n. 13. Further, the Third Circuit found that even if the complaint contained boilerplate allegations that the necessary information was within the defendant's exclusive control, Rule 9(b) would still not be satisfied. *See Id.* at 285. Rather, under this more relaxed application of the rule, "plaintiffs must accompany such an allegation with a statement of facts upon which their allegation is based." *Id.* (internal citations omitted). More specifically, "a complaint must delineate at least the nature and the scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity." *Id.*

Plaintiffs assert that they have sufficiently plead with particularity because "the internal corporate mechanisms and activities engaged in by the Defendants in furtherance of their fraudulent scheme are within the exclusive knowledge and

understanding of Defendants," citing to *Craftsmatic* and *Shapiro,* among others. Pl. Opp. at 17–18. Plaintiffs, however, do not make these allegations in their Complaint. As Plaintiffs do not even allege an insufficient boilerplate allegation that the information they require is within the Defendants' control, they certainly fail to meet even the more relaxed application of the Rule that they argue applies. This application still requires Plaintiffs' allegations to include at least the nature and the scope of Plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity. *See Shapiro,* 964 F.2d at 285. Thus, even if the more relaxed standard of Rule 9(b) were applicable, which it is not, Plaintiffs fail to meet the pleading of particularity required for mail and wire fraud as predicate RICO acts.

**\*13** Plaintiffs also appear to allege bribery as a predicate act. Compl. ¶¶ 9, 212. Even though Defendants do not raise the sufficiency of Plaintiffs' pleading with respect to this specific predicate act, Defendants have argued an overall failure to plead the alleged predicate acts with particularity, and the Court finds that Plaintiffs have not sufficiently alleged that Defendants engaged in bribery as a predicate RICO act. While bribery does not invoke the heightened pleading requirements of Rule 9(b), Plaintiffs must satisfy the more liberal pleading requirements of Rule 8(a) to adequately plead bribery as a predicate act, and they do not. Plaintiffs make no effort to delineate the elements of bribery nor do they cite to any statute which does so, and thus, Plaintiffs have failed to put Defendants on notice as to what laws they are alleged to have violated. *See generally Lockheed Martin Corp. v. Boeing Co.,* 357 F.Supp.2d 1350, 1374–75 (M.D.Fla.2005).

"A 'pattern of racketeering activity means' at least two predicate acts that 'are related and that amount to or pose a threat of continued criminal activity.' " *Bonavitacola,* 87 Fed. Appx. at 231 (quoting *H. J., Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). Plaintiffs fail to sufficiently allege even one predicate act as required by RICO, as discussed herein. Accordingly, Plaintiffs have not sufficiently plead their RICO claims under federal or New Jersey law, and the Court grants Defendants' motion to dismiss Counts I and III of Plaintiffs' Complaint pursuant to Rule 12(b)(6).

### B. Plaintiffs' Allegation of Defendants' Conspiracy to Commit RICO

In Count II of their Complaint, Plaintiffs allege that Defendants conspired to violate RICO, 18 U.S.C. § 1962(d). As preliminary matter, Defendants argue that Plaintiffs' RICO conspiracy theory is substantively deficient because it is based on the alleged conspiracy between and among Defendants and their corporate agents. Df. Mot. at 19. More specifically, Defendants argue that Janssen and Johnson & Johnson are subsidiary and parent, respectively, and a corporation is incapable of conspiring with itself, its corporate officers, its subsidiaries or its agents. *See Id.* In response, Plaintiffs claim that the Third Circuit has recognized a claim for intra-corporate conspiracies under RICO in *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1164, 1166–67 (3d Cir.1989), *abrogated on other grounds, Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

Neither the Supreme Court nor the Third Circuit has expressly decided whether RICO, § 1964(d), permits claims of intra-corporate conspiracy, or whether a corporation may conspire with its wholly owned subsidiaries. Federal courts within this Circuit disagree about whether the Third Circuit, in *Shearin,* held that a corporation could conspire with its wholly owned subsidiaries under § 1962(d) to violate § 1962(c) of RICO. [15] *Compare Curley v. Cumberland Farms Dairy, Inc.,* 728 F.Supp. 1123, 1135 (D.N.J.1990) (finding that, in *Shearin,* the Third Circuit "concluded that a corporation could conspire with its wholly owned subsidiaries under § 1962(d)"), [16] *with Albert Einstein Med. Ctr. v. Physicians Clinical Servs., Ltd.,* No. 90–3387, 1991 WL 280274, at \*5–6 (E.D.Pa. Dec.20, 1991) (stating that *Shearin* did not address the issue of whether a corporation and its subsidiaries may conspire to commit a violation of § 1962(d) of RICO, finding that *Curley* misinterpreted the Third Circuit's holding in *Shearin,* and determining that Third Circuit precedent does not allow corporations who were innocent victims of a conspiracy among employees to be exposed to RICO liability). This Court finds that *Shearin* did not address the issue of whether a corporation and its subsidiaries may conspire to commit a violation of § 1962(d) of RICO and that it remains an open issue in this Circuit.

Case: 3:17-cv-50428-JTD, Doc 22-4 Filed 05/21/21 Page 82 of 202 PageID #:1560
District 1999: Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d... 2008 WL 5413105, Page 82 of 202 PageID #:1560
2008 WL 5413105, RICO Bus.Disp.Guide 11,598

15    Defendants argue that even if *Shearin* could be read as permitting a finding that a corporation and its subsidiaries may conspire under RICO, it would only be actionable if "the relationship between the parent corporation and its subsidiaries were established *solely for the purpose* of committing fraud." Def. Reply at 13 (citing *Glessner v. Kenny,* 952 F.2d 702, 714 (3d Cir.1991), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258 (3d Cir.1995)). This, however, was not the finding in *Glessner* or *Shearin.* First, *Shearin* did permit a RICO conspiracy where the facts disclosed an intra-corporate relationship, nonetheless, *Shearin* did not address whether a corporation could conspire with its wholly owned subsidiaries under § 1962(d) to violate § 1962(c) of RICO. See 885 F.2d at 1166–67. Second, in *Glessner,* the Third Circuit merely reiterated that RICO conspiracy claims must allege an "agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity." 952 F.2d at 714. The court then pointed out that, since the plaintiffs in *Shearin* pled that the relationship between the parent corporation and its subsidiaries was established solely for the purpose of committing fraud, the plaintiffs adequately pled the required inference that the defendant companies allegedly agreed to commit predicate acts and knew that they were part of a pattern of racketeering activity. *Glessner,* 952 F.2d at 714. *Glessner* did not hold that this fraudulent creation of a subsidiary is a necessary requirement for pleading RICO conspiracy, as Defendants appear to assert, but rather *Glessner* used the *Shearin* facts to distinguish *Shearin* from the case before the court and to explain why the plaintiffs in *Glessner* failed to provide a similar reasonable inference of adequately pleading RICO in their complaint. *Id.*

16    In *Curley,* the District Court stated that Third Circuit's ruling in *Shearin* on "intracorporate conspiracies is more faithful to the broad remedial purpose of RICO than a narrow reading which is model[ed] on antitrust law." *Curley,* 728 F.Supp. 1123, 1135 (D.N.J.1990) (citing *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). The *Curley* court also stated that "while antitrust law seeks to encourage inter-corporate competition even at a cost to intra-corporate competition, RICO seeks to eliminate all racketeering activity, both inter-corporate and intra-corporate." *Id.* (citing *Continental T.V. Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)).

**\*14** Other federal circuit courts also disagree about whether RICO permits intra-corporate conspiracies. *See Fogie v. THORN Americas, Inc.,* 190 F.3d 889, 898 (8th Cir.1999); [17] *Webster v. Omnitrition International, Inc.,* 79 F.3d 776, 787 (9th Cir.), *cert. denied,* 519 U.S. 865, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996); [18] *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir.1989). [19] Since the law in this area of RICO is unsettled, district courts have looked to antitrust cases for guidance. *See, e.g., In re National Mortgage Equity Corp. Mortgage Pool Cert. Sec. Litig.,* 636 F.Supp. 1138, 1156 (C.D.Cal.1986). The Supreme Court has clearly held that under the Sherman Act, 15 U.S.C. § 1, a parent company and its wholly owned subsidiary are incapable of conspiring with each other. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 776–77, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld,* the Court determined that "[a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Id.* at 771. As the parent and subsidiary always have a "unity of purpose or a common design," *Id.,* the Court held that parent corporation and its wholly owned subsidiary are incapable of conspiring with each other for purposes of § 1 of the Sherman Act. *Id.* at 777.

17    The Eighth Circuit determined where the plaintiffs alleged that the only participants in the conspiracy were the parent corporation and its wholly owned subsidiaries, the plaintiffs "fail[ed] to allege a conspiracy, because as a matter of law a parent corporation and its wholly owned subsidiaries are legally incapable of forming a conspiracy with one another." *Fogie v. Thorn Americas, Inc.,* 190 F.3d 889, 898 (8th Cir.1999). Applying *Copperweld*'s principle that "[i]n any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit," 467 U.S. at 769, the *Fogie* court found that the identical conclusion was required when it is applied to alleged parent-subsidiary RICO civil conspiracies. *Fogie,* 190 F.3d at 898. In *Fogie,* the court stated that an alleged conspiracy between a parent and a subsidiary lacks this crucial element because these entities "have a complete unity of interest." *Id.* The Eighth Circuit criticized the Seventh and Ninth Circuits for failing "to explain why, when two entities are under common control and there is no distinctiveness or independence of action, an agreement or understanding between them creates any of the special dangers § 1962(d) targets." *Id.*

Case: 3:17-cv-50428-JTD Case 21-50428-JTD Doc 22-4 Filed 05/21/21 Page 83 of 202 PageID #:1561

District of 1999 Health and Welfare Plan v. Janssen, L.P., Not Reported in F.Supp.2d...

2008 WL 5413105, RICO Bus.Disp.Guide 11,598

18    The Ninth Circuit, relying on the Seventh Circuit's decision in *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271 (7th Cir.1989), extended § 1962(d) liability to a wholly intra-corporate conspiracy. *See Webster v. Omnitrition International, Inc.,* 79 F.3d 776, 787 (9th Cir.), *cert. denied,* 519 U.S. 865, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996).

19    The Seventh Circuit distinguished the Supreme Court's holding that a parent corporation could not conspire with its wholly-owned subsidiary for purposes of § 1 of the Sherman Act, as a barrier for relief in RICO claims "because the Sherman Act is premised, as RICO is not, on the 'basic distinction between concerted and independent action.' " *Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago,* 747 F.2d 384, 403 n. 22 (7th Cir.1984) (citing *Copperweld,* 104 S.Ct. at 2740–44), *cert. granted,* 469 U.S. 1157, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Further, in *Haroco,* the court stated that "[t]he policy considerations discussed in *Copperweld* [ ] therefore do not apply to RICO, which is targeted primarily at the profits from patterns of racketeering activity." *Id.* The Seventh Circuit determined that the Sherman Act's theoretical "community of interest" that causes a parent and subsidiary to pose "no threat to the goals of antitrust law-protecting competition" differs from RICO conspiracies because "intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits." *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir.1989) (citing *Russello v. United States,* 464 U.S. 16, 26–28, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)). The Eighth Circuit criticized the Seventh Circuit's findings because its "recent decisions regarding intracorporate liability under § 1962(c) ... appear to undercut the conclusions it reached in *Ashland Oil."Fogie,* 190 F.3d at 897 n. 4 (noting that "[m]ore recently ... the Seventh Circuit has indicated that related business entities may not serve as both the person and enterprise).

The majority of courts within this Circuit agree that a corporation cannot conspire with its agents and/or employees under § 1962(d) of RICO. *See, e.g., Castle v. Crouse,* No. 03–5252, 2004 WL 257389, at *6 (E.D.Pa. Feb.11, 2004) (concluding that a corporate entity cannot conspire with its employees); *Hughes v. Technology Licensing Consultants, Inc.,* 815 F.Supp. 847, 851 (W.D.Pa.1992) ("The majority rule is that conspiracy cannot lie against the corporate entity for the concerted action of its employees who violate RICO on its behalf."); *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,* 633 F.Supp. 386, 405 n. 23 (D.Del.1986) (finding parents and subsidiaries "can conspire in violation of RICO no more than they [can] for antitrust purposes"). *Contra Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* No. 95–1698, 1996 WL 135336, *5 (E.D.Pa. Mar.19, 1996) ("a RICO conspiracy can exist between a corporation and its agents or employees"); *Curley,* 728 F.Supp. at 1135 (recognizing intra-corporate conspiracies under RICO). An alleged intra-corporate conspiracy comprised solely of a corporation acting in concert with its officers and employees should not be considered as involving separate actors conspiring under the law. *See Encore Corp. v. PricewaterhouseCoopers LLP,* 102 F.Supp.2d 237, 266 (D.N.J.2000). The decision that a RICO conspiracy claim cannot stand where a corporation is alleged essentially to have done nothing more than act in concert with its officers and employees, stems from the premise that "[a] corporation, legally conceived, is only one person" under RICO. *See Id.* These courts generally agree that an exception to the rule against intra-corporate conspiracies exists where the employees act in pursuit of their own interests and not for the benefit of the corporation. *See Castle,* 2004 WL 257389, at *6 (internal citations omitted). Thus, only where the plaintiff alleges something more than a corporation acting in concert with its officers and employees, can a RICO conspiracy claim proceed.

**\*15** The inquiry of whether a parent corporation is capable of conspiring with its wholly owned subsidiary for purposes of violating § 1962(d) of RICO is similar to that of whether a parent can conspire with its subsidiaries under § 1 of the Sherman Act or whether a corporation can conspire with its agents and/or employees under § 1962(d) of RICO. In all three scenarios, where an intracorporate conspiracy is alleged, the two conspiring entities are but one. The parent and its wholly owned subsidiary share a complete unity of interest, with common objectives. *See Copperweld,* 467 U.S. at 771. Similarly, a corporation typically acts in concert with its officers and employees, as one legal person, with similar goals. *See Encore,* 102 F.Supp.2d at 266. Thus, a parent corporation cannot conspire with its wholly owned subsidiary to violate § 1962(d) of RICO because the two entities always have a "unity of purpose or a common design." *Copperweld,* 467 U.S. at 777. There is a recognized exception, as pointed out above, in the case where a plaintiff alleges that the employees acted in pursuit of their own interests and not for the benefit of the corporation, or there is an allegation that entities no longer act as one and thus may be considered separate actors under the law. *See Id.; Castle,* 2004 WL 257389, at *6. Therefore, to state a claim under § 1962(d), where a parent corporation has allegedly conspired with its

wholly owned subsidiary, there must be some additional allegation, e.g., that the subsidiary was fraudulently created to accomplish the racketeering activity. See, e.g., Shearin, 885 F.2d at 1166–67. That has not been done here. In this case, Plaintiffs allege, albeit inadequately, that Defendants, a parent corporation and its wholly owned subsidiary, conspired with each other and with the other (unnamed) members of the alleged enterprise in violation of § 1962(d). Compl. ¶ 225–226. This is not sufficient.

Furthermore, Plaintiffs fail to adequately plead a RICO conspiracy claim, according to the Third Circuit precedent with requires a claim under § 1962(d) of RICO to include:

> "(1) agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)." *Odesser v. Continental Bank,* 676 F.Supp. 1305, 1312 (E.D.Pa.1987). "(A)llegations of conspiracy are not measured under the ... [Fed.R.Civ.P.] 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal ... (Fed.R.Civ.P.8(a)) pleading standard." ... A conspiracy claim must also contain supportive factual allegations. *Black & Yates, Inc. v. Mahogany Ass'n, Inc.,* 129 F.2d 227, 231–32 (3d Cir.), *cert. denied,* 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942). The allegations must be sufficient to "describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." *Alfaro,* 606 F.Supp. at 1117–18.

**\*16** *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989). Plaintiffs fail to set forth the period of this supposed RICO conspiracy or the actions Defendants allegedly took in support of it. *See Id.* (recognizing "only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose" as sufficient). Plaintiffs also fail show how all of the alleged conspirators knew that their acts were part of a pattern of racketeering activity.

In any event, Plaintiffs' allegations that Defendants violated § 1962(d) by conspiring to violate § 1962(c) in this case fail as a matter of law because Plaintiffs have not sufficiently plead a federal RICO claim under § 1962(c). *See* Part III.A, *supra.* "Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lum,* 361 F.3d at 227 n. 5 (internal citations and quotations omitted). Thus, the Court grants also Defendants' motion to dismiss Count II of Plaintiffs' Complaint, the RICO conspiracy claim.

## IV. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss Count I–III of Plaintiffs' Complaint.

## All Citations

Not Reported in F.Supp.2d, 2008 WL 5413105, RICO Bus.Disp.Guide 11,598

**End of Document**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1990 WL 36824, 1990-1 Trade Cases P 69,086

1990 WL 36824
United States District Court, N.D. Illinois, Eastern Division.

FILTER QUEEN OF the VIRGINIAS, INC. a West Virginia corporation, and David Whitehead, Plaintiffs,

v.

HEALTH–MOR INC., a Delaware corporation, Shannon P. Burke, John Glomb, and Frank Ochoa, Defendants.

No. 89 C 5511.
|
March 20, 1990.

*MEMORANDUM AND ORDER*

MORAN, District Judge.

 **\*1** Plaintiffs were jointly a distributor for Health–Mor, Inc. in Virginia and West Virginia. Health–Mor manufactures and sells vacuum cleaners through a national sales organization headed by defendant Burke. The company has field representatives in established territories, and the field representatives, in turn, select distributors in defined territories. Plaintiffs allege that distributors are expected to sell outside their territories so long as they do not sell in another distributor's territory. The relationship between company and distributor is governed by a contract, which provides, typically, for a quota of minimum sales per month.

According to plaintiffs, they were a distributor from 1982 until November, 1988. The contract terminated at the end of 1987 but they had continued to be recognized as a distributor. Plaintiffs allege that divisional supervisor Glomb and sales manager Ochoa had established James and Patricia Murphy (Murphy) and Filter Queen of Wytheville (Wytheville) in October, 1987, as area distributors under plaintiff Whitehead, with Whitehead to receive override commissions and provide training. In November, 1988, Whitehead accidentally shipped one unit into another distributor's territory. The individual defendants used that as an excuse to terminate the plaintiffs and substitute Murphy and Wytheville as the distributors, even though they had not met sales expectations. Burke did orally agree, however, to continue the override commissions. From those alleged circumstances plaintiffs plead seven claims: breach of contract against Health–Mor, intentional infliction of emotional distress against Burke, libel and slander against Health–Mor, intentional interference with an existing contract against Burke, conspiracy against the individual defendants, intentional interference with a prospective economic advantage against the individual defendants, and antitrust claims against Health–Mor. All defendants move to dismiss for failure to state a claim, and Glomb, in addition, moves to dismiss for lack of personal jurisdiction. The objections to each of the counts differ from the bases for the other objections, and thus we deal with them count-by-count.

Assuming for the purposes of the motion that the 1987 contract terms control, defendants point out that plaintiffs allege that their agreement provides that they will not sell units outside their territory, that Health–Mor has repeatedly informed distributors that sales outside their territory would be a cause for termination, that Whitehead (plaintiffs apparently in the complaint use "Whitehead" as shorthand for "distributor," which was Whitehead and his corporation) had instituted an AT & T WATS number, and as a result he accidentally shipped a unit to another distributor's territory. From that they claim that the termination was justified by plaintiffs' breach. They also contend that the later alleged oral agreement to pay override commissions lacks consideration and is barred by the statute of frauds as an oral agreement extending beyond one year. Plaintiffs argue that the allegations do not establish beyond peradventure that they were in material breach. The complaint alleges that sales to open territories, although not in another's territory, are encouraged, that the shipment of one unit to another's territory was accidental, that they immediately terminated the WATS number and that they reimbursed the offended distributor.

Case: 3:17-cv-50428-JTD Doc 23-4 Filed 05/21/21 Page 86 of 202 PageID #:1564
Citizen of Virginia, Inc. v. Health-Mor, Inc., Not Reported in F.Supp. (1990)
1990 WL 36824, 1990-1 Trade Cases P 69,086

**\*2** Plaintiffs in effect concede a breach of the agreement. They do not concede that it was material. Defendants, for a variety of reasons, argue that it obviously was material. They may well be right. But the motion is to dismiss, not for summary judgment, and defendants can take only limited comfort from an omnibus clause that deems any failure to comply as a basis for termination unless Illinois law honors such sweeping "materiality" clauses regardless of how inconsequential the breach may be (and defendants do not contend that it does). Here the plaintiffs allege that sales into open territories were encouraged by defendants despite the contract terms, that the one sale into an assigned territory was accidental and immediately rectified, and that defendant seized upon it as an excuse to terminate when their reasons were in fact far different. We cannot say that there is no way that plaintiff can show that the breach was immaterial. The parties have yet to develop fully their positions respecting the alleged oral agreement, and we leave to another day its resolution. Accordingly, the motion to dismiss count I is denied.

In count II plaintiffs allege that Health–Mor had shipped over 400 defective units to Whitehead, who complained and thereby embarrassed Burke. Burke in retaliation terminated Whitehead without cause, knowingly causing him to lose almost all his income and causing the corporation to go out of business, with resulting extreme emotional injury to Whitehead. From those circumstances he pleads a claim against Burke for intentional infliction of emotional distress. That concept, however, has only a limited ambit in Illinois. It reaches only conduct beyond all possible bounds of decency —such heinous conduct that no reasonable man could be expected to endure. While we acknowledge that federal pleading is notice pleading, plaintiffs here allege specifically the conduct of which they complain, and that conduct—a wilful breach of a commercial contract—simply is not enough to state a claim for intentional infliction of emotional distress. The motion to dismiss count II is granted.

In count III plaintiffs allege that Burke "published and uttered both written and oral false statements which defamed Whitehead, cast aspersions on his business integrity, and made it more difficult for him to obtain business credit." Here the plaintiffs did not go far enough. Burke may have made statements he believes to be true and plaintiffs believe to be false. He may claim he never made statements that Whitehead believed were made and were defamatory. Without more, neither Burke nor the court can know what plaintiffs are complaining about. The motion to dismiss count III is granted. *See Derson Group, Ltd. v. Right Management Consultants, Inc.,* 683 F.Supp. 1224, 1229 (N.D.Ill.1988).

Count IV alleges intentional interference by Burke with an existing contract for his "own gain and against HMI's interest," and count VI alleges intentional interference by Burke, Glomb and Ochoa with a prospective economic advantage in terminating the distributorship without justification, thereby ending Murphy's sub-distributorship payment of override commissions to plaintiffs. First, plaintiffs allege an existing contractual arrangement with Murphy, not a prospective arrangement. Clear it is that they thought they would benefit from the performance of that alleged contract in the future, so that the benefits were largely prospective, but that is the usual result anticipated by a party disappointed by a contract termination. But the prospective advantage, for the purposes of count VI, must be a prospective arrangement, not the prospective fruits of an existing arrangement. *See Future-vision, Inc. v. Dahl,* 139 Ill.App.3d 61, 66, 93 Ill.Dec. 683, 687, 487 N.E.2d 127, 131 (1st Dist.1985). Plaintiffs, if they have any intentional interference claim, must rest on count IV. Count VI is dismissed.

**\*3** Count IV is problematic. Plaintiffs and Health–Mor had an agreement and it was terminated, allegedly at the instance of Burke. The legal concept goes beyond inducement of a breach; it embraces interference with a terminable relationship by improper means or for improper purposes. But Burke, by virtue of his position, was conditionally privileged (at least with respect to the Health–Mor agreement) so long as he did not act for his own benefit and against his employer's interest. For now, however, we have to read the entire complaint to mean that Burke acted to retaliate against plaintiffs because of their criticism of him or perhaps to solidify his own position in the company. Plaintiffs claim that they were a more successful distributor than Murphy and that the substitution therefore injured Health–Mor. We are therefore presented with the kernel of a claim, more than just invoking the word "malice," that Burke acted to further his personal goals, that he acted for the purpose of injuring plaintiffs, and that he acted contrary to the best interest of the corporation.

Plaintiffs must only satisfy federal notice pleading standards. The possible scenario we have described may not be enough—Illinois courts have been reluctant to expand contract disputes to permit tort actions against corporate representatives—but we cannot know that without far more legal analysis than the parties have yet devoted to the issue. The motion to dismiss count IV is, for now, denied.

We think, however, that the conspiracy claim in count V is deficient even under liberal pleading standards, and we dismiss it. Corporations can only act through their representatives, and actions of agents within the scope of their corporate authority are the acts of the corporation. Perhaps we can tease out of the allegations respecting Burke an alleged non-corporate purpose, but even if we credit plaintiffs' argument that Glomb wanted his own people in the territory (which we understand to mean people who had a continuing rapport with him), that is not an illegal or noncorporate purpose. A mere allegation of "conspiracy" is not enough.

Count VII is a general attack on Health–Mor's distribution system of exclusive distributorship territories in a relevant market for expensive vacuum cleaners. Plaintiffs claim that the system is an attempt to monopolize and a conspiracy between Health–Mor and its distributors in restraint of trade. We are somewhat confused by the monopolization and attempted monopolization claims, since plaintiffs do not tell us how the vertical distribution restraints (and we are talking about vertical rather than horizontal restraints) lead to monopolization or drive competitors from the marketplace, nor are we told what Health–Mor's market share is. Plaintiffs' response to the motion appears to concede that they are really complaining abut a system they claim is an unreasonable restraint of trade, and we so construe their claim.

Defendants contend that there is no such thing as an expensive vacuum cleaner relevant market because all vacuum cleaners are reasonably interchangeable in use, with cross-elasticity of demand. That argument is premature. It may well be that they are right, and price differences often are insufficient to define a relevant market, *see, e.g., Beatrice Foods Co. v. F.T.C.,* 540 F.2d 303, 310 (7th Cir.1976), but saying so doesn't necessarily mean that is always true.

*4 Plaintiffs' antitrust claim founders nonetheless. They allege direct injury to themselves and therefore have standing to complain of it, but they have a claim only if they allege an antitrust injury. *Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Association,* 830 F.2d 1374 (7th Cir.1987). They allege they were terminated and a new distributor substituted. But that doesn't change the marketplace at all. It is not an antitrust violation to change distributors. *Burdett Sound v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir.1975). Plaintiffs' claim must rest upon the premise that the Health–Mor system of closed territories is an unreasonable restraint of trade that has caused injury to competition, not just to them. Clearly it is a restraint upon intrabrand competition that, they allege, has injured them. They have not alleged, however, an injury to competition generally, and that means interbrand competition, with a resultant adverse impact, for example, upon the quality or quantity of expensive vacuum cleaners in the geographic area or upon the competitive process for determining prices in the relevant market. (For that matter, they do not allege why the restraint is unreasonable, and we note that the distributor system imposes both quotas and servicing obligations upon the distributors.) Plaintiffs must not only eventually prove but also initially allege injury to competition, *Hennessy Industries, Inc. v. FMC Corporation,* 779 F.2d 402, 404 (7th Cir.1985); *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101 (7th Cir.1984), *cert. denied,* 470 U.S. 1054 (1985), and that they have failed to do. Count VII is dismissed.

Because the counts naming Glomb as a defendant have been dismissed, his motion to dismiss for lack of jurisdiction is denied as moot.

## All Citations

Not Reported in F.Supp., 1990 WL 36824, 1990-1 Trade Cases P 69,086

---

End of Document                                         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22057238
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Anderson HAWKINS, Lawrence Woodfork, Enrique Hernandez, and Javier
Guerrero, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
GROOT INDUSTRIES, INC. and Groot Recycling and Waste Services, Inc ., Defendants.

No. 01 C 1731.
|
Sept. 2, 2003.

## Attorneys and Law Firms

Uche O. Asonye, Nydia Molina, Asonye and Associates, Chicago, IL, for plaintiffs.

Jeffrey Kenneth Ross, David Elliot Metz, William Francis Dugan, John M. Vande Walle, Seyfarth Shaw, Chicago, IL, for defendants.

*ORDER*

GOTTSCHALL, J.

**\*1** Plaintiffs Anderson Hawkins, Lawrence Woodfork, Enrique Hernandez, and Javier Guerrero have moved for class certification pursuant to Fed.R.Civ.P. 23(b)(2). Specifically, they seek class certification as to Counts I and II of the First Amended Complaint ("complaint" or "FAC"), [1] in which they allege that their former employer(s), defendants Groot Industries, Inc. and Groot Recycling and Waste Services, Inc. (collectively "Groot"), violated Title VII of the Civil Rights Act of 1964, as amended, 42 U .S.C. §§ 2000e, *et seq.,* and 42 U.S.C. § 1981 by engaging in "a pattern and practice of harassment due to race and national origin" and "a pattern and practice of race discrimination in connection with promotions, work assignments, compensation, transfers, discipline and other terms and conditions of employment." (FAC ¶¶ 29, 57.) Plaintiffs seek certification of two classes: (1) all African–Americans that were or are employees of Groot in its Chicago area facilities from July 5, 1994 to the present; and (2) all Hispanics that were or are employees of Groot in their Chicago area facilities from July 5, 1994 to the present. [2] Groot opposes class certification.

[1] Since the motion was filed, plaintiffs have filed the Second Amended Complaint. Because Counts I and II remain substantially the same, and because the briefing for the motion for class certification focuses on the First Amended Complaint, for simplicity, the court shall refer to the First Amended Complaint, but the court's ruling applies with equal force to the Second Amended Complaint.

[2] In plaintiffs' reply brief, they argue for two subclasses as well: (1a) all present and former African American *drivers* employed by Groot at its Chicago facilities from July 5, 1994 to the present; and (2a) all present and former Hispanic *drivers* employed by Groot at its Chicago facilities from July 5, 1994.

Before addressing whether class certification is appropriate, it is necessary to clarify which plaintiffs and counts remain after the court's rulings on Groot's motions for summary judgment. Neither Guerrero nor Hernandez's claims survived summary judgment, so there are no pending claims on behalf of any named Hispanic plaintiff. (Order of September 2, 2003.) Hawkins and Woodfork's hostile work environment claims both survived summary judgment, as did Hawkins'

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.     1

2003 WL 22057238

discriminatory discharge claim, which was based on alleged discriminatory enforcement of discipline policies. Neither Hawkins nor Woodfork has a pending claim based on unequal conditions of employment, *i.e.,* that they were denied promotions, denied light duty, assigned inferior routes and trucks and received unequal pay. To the extent the court did not explicitly make this ruling when it originally ruled on Groot's motions for summary judgment against Hawkins and Woodfork, *Hawkins v. Groot Indus. Inc.,* No. 01 C 1731, 2003 WL 1720069 (N.D.Ill. Mar.31, 2003), it does so now. (The court did not explicitly address these claims earlier was because neither Hawkins nor Woodfork addressed them in any substance in their opposition briefs.) Their claims that they were denied promotions fail because neither Hawkins nor Woodfork ever applied for a promotion, which is an essential element of a failure-to-promote claim. *Bragg v. Navistar Int'l Transp. Corp.,* 164 F.3d 373, 377 (7th Cir.1998). Similarly, Hawkins and Woodfork's claims that they were denied light duty lack merit because it is undisputed that neither of them ever requested light duty. As for the claims that they received unequal pay, the court already granted summary judgment in Groot's favor with respect to Hawkins' claim. For Woodfork, there is no evidence in the record that he was paid less than he was supposed to be paid under the Private Scavengers Agreement, let alone evidence that any similarly situated white drivers were paid more than he was. Likewise, Hawkins and Woodfork's claims that Groot assigned them to inferior routes and trucks also fail because neither of them offers any evidence of any similarly situated white driver who received better routes or trucks.

**\*2** Because there are no pending claims on behalf of any named Hispanic plaintiff, plaintiffs' motion for class certification is denied with respect to certification of any class of Hispanic employees or former employees. *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.1987) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to the claim."). As for the black employees, the only possible class claims are that Groot engaged in a pattern and practice of subjecting black employees to a racially hostile work environment and engaged in a pattern and practice of discriminatory discipline in violation of Title VII and § 1981. Accordingly, these are the only claims the court shall consider in determining whether to certify a class.

Plaintiffs seek certification under Fed.R.Civ.P. 23(b)(2). Under Rule 23(b)(2), class certification is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). As explained by the Seventh Circuit, class claims may be certified under Rule 23(b)(2) "only if the predominant relief sought is injunctive or declaratory ." *Lemon v. Int'l Union of Operating Eng'rs,* 216 F.3d 577, 580–81 (7th Cir.2000). Because Rule 23(b)(2) does not require giving class members notice or the opportunity to opt out of the class, certification under Rule 23(b)(2) "is impermissible unless the requested monetary damages are 'incidental' to requested injunctive or declaratory relief." *Id.* at 581. "Incidental" damages " 'flow directly from liability to the class as a whole' " and "do not 'require additional hearings to resolve the disparate merits of each individual's case.' " *Id.* (citation omitted). Plaintiffs here seek compensatory and punitive damages as well as injunctive relief, and despite their argument to the contrary, the monetary damages they seek are not merely incidental.

But there is a more fundamental reason why the court cannot certify a class of present and former black employees under Rule 23(b)(2): neither Hawkins nor Woodfork, the only named black plaintiffs, have standing to seek injunctive relief. "A plaintiff seeking injunctive relief must show that he is currently suffering some injury or there is some immediate danger of a direct injury. Past exposure to illegal conduct is insufficient to establish a present case or controversy regarding injunctive relief unless accompanied [by] continuing adverse effect." *Koski v. Gainer,* No. 92 C 3293, 1993 WL 153828, at \*4 (N.D.Ill. May 6, 1993) (internal citation omitted); *Gable v. City of Chicago,* No. 97 C 4872, 1998 WL 128712, at \*3 (N.D.Ill. Mar.13, 1998). Both Woodfork and Hawkins are former employees, not current employees, which means there is insufficient likelihood that either of them will be affected by Groot's alleged discrimination in the future. *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.,* 247 F.3d 1262, 1283 (11th Cir.2001); *Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 665 (N.D.Ga.2001). While they can certainly seek monetary damages, they have no standing to seek injunctive relief. Thus, there is no basis to certify a class under Rule 23(b)(2)–the only subsection under which plaintiffs sought class certification.

2003 WL 22057238

**\*3** Plaintiffs' motion for class certification is therefore denied.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22057238

---

**End of Document**                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4506000
United States District Court,
N.D. Illinois,
Eastern Division.

In re DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION.
This Document Relates to: Indirect Purchaser Actions.

Master File No. 09 CV 3690.
|
MDL No. 2031.
|
Aug. 23, 2013.

MEMORANDUM OPINION AND ORDER

ROBERT M. DOW, JR., District Judge.

**\*1** This matter is before the Court on three motions to dismiss [160, 197, 287] filed by Defendants (referred to collectively as "DFA–Keller's Family" in three separate lawsuits which are before this Court as part of MDL No.2031.[1] Also before the Court is DFA's motion to set aside default on behalf of non-existent entity Keller's Creamery LP, which was fully briefed in the Kansas transferor court and is now pending before this Court.[2]

[1] This MDL action was reassigned from the Judge Hibbler's docket to this Court's docket on April 30, 2012. Earlier this year, the Court issued a ruling on the motion to dismiss filed by the one remaining Direct Purchaser Plaintiff (Schreiber Foods) [see 314]. The remaining Direct Purchaser Plaintiffs have filed a motion for preliminary approval of their settlement [327], to which Schreiber has objected [see 339, 341, 344, 354]. Those matters concerning the Direct Purchaser Plaintiffs remain pending and will be addressed in a separate order. The principal difference between "direct" purchasers and "indirect" purchasers is that indirect purchasers purchased products from a person or company that is not one of the defendants, whereas direct purchasers purchased *directly* from the defendants. This opinion relates solely to the motions seeking dismissal of the Indirect Purchaser claims.

[2] The motion to set aside default was brought in the Kansas Indirect Purchaser Action and was filed with the transferor court. The motion has never been filed on this Court's docket. Furthermore, the parties make passing reference to other motions to set aside Keller's default, presumably also brought before transferor courts. To the extent that there are any additional pending motions to set aside default that were filed in the transferor courts and that rest on the same arguments and authority as the Kansas motion, the Court's ruling applies equally to those motions. As a matter of efficient docket management, the parties are directed to re-file any motions previously filed before another court on this Court's docket.

For the reasons set forth below, the Court grants DFA's motion to set aside default. The Court also grants in part Defendants ' motions to dismiss the *Rudman/Palombella* and *Waun* complaints [160, 197] and dismisses Plaintiffs' three federal antitrust claims (Count I–III) for lack of antitrust standing. Disposition of the remaining issues, including Defendants' motion to dismiss the *Asmann* complaint [287] and Defendants' motion to dismiss the state law claims of the *Rudman/Palombella* and *Waun* Indirect Purchaser Plaintiffs, is deferred pending the receipt by the Court of further input from the parties on (1) the Court's subject matter jurisdiction under CAFA, (2) whether, if CAFA jurisdiction is lacking, the Court should exercise supplemental jurisdiction over the Indirect Purchaser Plaintiffs' state law claims given that all federal claims of the Indirect Purchaser Plaintiffs are subject to dismissal, and (3) how the Court's ruling today should affect the overall case management of these MDL proceedings.

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported...

Case: 3:17-Case:2150428-JTD Doc 22-4 Filed 05/21/21 Page 92 of 202 PageID #:1570

2013 WL 4506000, 2013-2 Trade Cases P 78,499

## I. Background

To put Plaintiffs' allegations simply, they claim that Defendants conspired to, and did in fact, buy up all of the available long positions in three months worth of Class III milk futures contracts on the Chicago Mercantile Exchange ("CME") in an effort to gain control of those markets and sell their positions at an unreasonably high price. According to Plaintiffs, in order to successfully pull off their scheme, Defendants also purchased large quantities of cheese at inflated prices on the CME spot cheese market, thereby creating the false impression that Class III milk prices were rising. By creating that impression, they could justify charging the inflated prices for their futures positions and maintain those prices long enough to sell off all of their positions at a profit. Plaintiffs allege that they were injured by Defendants' actions when they purchased finished products at artificially inflated prices. Finally, they allege that Defendants compounded the effects of their actions by conspiring to conceal their scheme for years after they had sold off all of their futures positions. See, e.g., *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation,* 767 F.Supp.2d 880, 886 (N.D.Ill.2011).

### A. Procedural History for Indirect Purchaser Actions

On May 29, 2009, Plaintiff Jacqueline Rudman filed a class action complaint against Defendants Dairy Farmers of America, Inc. ("DFA") and Keller's Creamery LP ("Keller's") in the District of Vermont. On July 7, 2009, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the case to the Northern District of Illinois as part of MDL No.2031. On May 21, 2010, Plaintiff Rudman filed an amended class action complaint that joined Brandi Palombella as a named Plaintiff in the indirect purchaser actions. On February 4, 2011, Judge Hibbler denied in part and granted in part [141 and 142] the motion to dismiss the direct purchaser actions. On March 14, 2011, Plaintiffs Rudman and Palombella filed a second amended class action complaint ("operative complaint") in the indirect purchaser actions, alleging that Defendants violated Sections 1 and 2 of the Sherman Act and the antitrust and consumer protection laws of 24 states and that Defendants were unjustly enriched at Plaintiffs' expense. Defendants collectively moved to dismiss [160] on May 13, 2011.

**\*2** On September 13, 2011, Plaintiffs' counsel filed another class action complaint in the District of Vermont, entitled *Waun v. Dairy Farmers of America, Inc.,* No. 11–cv–00219 ("*Waun*"). On September 14, 2011, the *Waun* Plaintiffs filed a Notice of Potential Tag–Along Action with the JPML. On October 5, 2011, the JPML issued a Conditional Transfer Order that transferred the *Waun* case to this Court pending the Court's consent and the Clerk's filing of the JPML's order. The JPML ruled that the *Waun* action "involves questions of fact that are common to the actions previously transferred to the Northern District of Illinois and assigned to Judge Hibbler." Indeed, the *Waun* complaint contains identical claims and substantially similar allegations as the operative complaint. On November 9, 2011, the Court consolidated the *Waun* complaint with the operative indirect purchaser complaint in the MDL for pretrial purposes. On November 6, 2011, Defendants filed a motion to dismiss the *Waun* action.

On December 15, 2011, Plaintiff Courtney Asmann filed a complaint in the Eighteenth Judicial District Court, Sedgwick County, Kansas. On February 21, 2012, Defendants removed *Asmann v. Dairy Farmers of America, Inc.* ("*Asmann*") to the United States District Court for the District of Kansas. The next day, DFA filed a notice of potential tag along action with the JPML and a motion to stay the action pending the JPML's decision to transfer the case. On April 4, 2012, Magistrate Judge Waxse granted the motion to stay the action against DFA only and granted DFA an extension of time to answer or otherwise plead up to and including 30 days after entry of the JPML's transfer decision. On February 29, 2012, Asmann applied for default under Rule 55(a). On March 29, 2012, a clerk's entry of default was entered against Keller's. On March 30, 2012, DFA moved to set aside the default on behalf of Keller's. On April 18, 2012, DFA moved to dismiss the complaint against Keller's for lack of personal jurisdiction, insufficient process and service of process, and failure to state a claim. Plaintiff Asmann claims that both motions violate Rule 9(a)(2) and were waived and that the motion to dismiss cannot be considered unless and until Keller's is relieved of its default.

On June 8, 2012, the JPMDL transferred *Asmann* to this Court pursuant to 28 U.S.C. § 1407, finding that, "[l]ike several of the already-centralized actions, this action is brought by an indirect purchaser alleging that DFA engaged in a pattern

2013 WL 4506000, 2013-2 Trade Cases P 78,499

of manipulated transactions for cheese and/or milk futures on the Chicago Mercantile Exchange * * * in violation of state antitrust statutes." As with the operative complaint and the *Waun* complaint, the *Asmann* complaint also arises from Defendants alleged "conspiracy to fix, stabilize, raise and maintain the prices of Class I and III Milk and products containing Class I and III Milk including cheeses (other than cottage cheese) * * * through the manipulation of trading on the Chicago Mercantile Exchange." [3] On July 9, 2012, Defendant DFA moved to dismiss the Kansas indirect purchaser complaint.

[3]    While the *Rudman/Palombella* and *Waun* complaints assert three federal antitrust claims for injunctive relief (Count I–III) and claims for damages under state statutes (Count IV) and the common law of unjust enrichment (Count V), the *Asmann* complaint brings only state law claims for antitrust violations (Counts I and II) and unjust enrichment (Count III).

### B. Factual History [4]

[4]    Judge Hibbler's memorandum opinion and order of February 4, 2011, sets forth a detailed factual history, which the Court adopts and incorporates in this opinion. Thus, the Court only briefly recounts the facts alleged in Plaintiffs' complaints.

**\*3**  Plaintiffs allege that Dairy Farmers of America, Inc. ("DFA") conspired with Keller's Creamery LP ("Keller's") to manipulate the prices at which DFA sold its milk and cheese to retailers and cheese producers. The prices at which DFA sells these products are indexed by contract to the Cheese Spot or the Milk Futures market prices. According to the complaint, DFA purchased every single contract on the Cheese Spot market beginning in the spring of 2004, and Defendants purchased every single contract on the Futures Milk market for the periods that expired on June 30, July 31, and August 31, 2004. According to Plaintiffs, Defendants intentional activity caused a spike in the prices on the Cheese Spot and Milk Futures markets and the wholesale prices at which DFA sold milk and cheese. Plaintiffs are consumers of milk and cheese products manufactured by DFA or Keller's and purchased from retailers.

The Cheddar Spot market is the only commodities exchange for the sale/purchase of cheddar cheese in the country. The Cheddar Spot market provides a market for trading cheddar cheese and a pricing mechanism for the sale of a myriad of products. Industry participants rely on the Cheese Spot market prices as the basis for prices at which they buy and sell many of their dairy products. Plaintiffs allege that Defendants knew that the Cheese Spot market was vulnerable to manipulation because it is thinly traded and the pricing structure does not necessarily reflect the actual cost of buying and selling cheese. The operative complaints allege that the CFTC found "[b]eginning on April 14, 2004, as sellers offered cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese. From May 21 to June 23, 2004, DFA * * * was the sole purchaser of cheddar cheese blocks on the CME." DFA also made large purchases of CME cheddar cheese blocks in August and September 2004. According to the complaint, although DFA knew that it would lose money on the resale of the cheese bought on the CME, DFA made these purchases because it also knew that it would profit tremendously from the sales of its own products at the artificially inflated prices caused by the engineered spike in Cheese Spot market prices. [5]

[5]    In ruling on the direct purchasers' motion to dismiss, the Court previously found that the direct purchasers complaint sufficiently alleged that (1) the markets for Milk Futures contracts for June, July and August 2004 were relevant markets; (2) Defendants had market power; and (3) Defendants wrongfully acquired that market power. To the extent that these conclusions, as well as additional conclusions found in Judge Hibbler's prior ruling, apply to the indirect purchasers' allegations, the law-of-the-case doctrine applies, as the law-of-the-case presumption holds when a case is reassigned from one judge to another. See *Minch v. City of Chicago,* 486 F.3d 294, 301 (7th Cir.2007) ("Among other things, the law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination."); *Brengettcy v. Horton,* 423 F.3d 674, 680 (7th Cir.2005); *Mendenhall v. Mueller Streamline Co.,* 419 F.3d 686, 691 (7th Cir.2005) ("In situations where a different member of the same court re-examines a prior ruling, the law of the case doctrine * * * reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one") (internal quotations omitted).

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported in...
Case: 3:17-Case 21:50429-JTD Doc 22-4 Filed 05/21/21 Page 94 of 202 PageID #:1572

2013 WL 4506000, 2013-2 Trade Cases P 78,499

The complaints allege that, between April 14, 2004 and December 31, 2006, Plaintiffs purchased one or more of Defendants' products under the brand names Borden, Mid–America Farms, Hotel Bar, Breakstone's, Plugra, Roberts, Hiland Dairy Foods, Stremick's–Heritage Foods, Wilcox Dairy Farms, HP Hood, Meadow Gold, Flav–O–Rich, Dairy Fresh, Helluva Goods, Maggio, Penn Maid, Dairymens, Chattanooga Dairy, Velda Farms, Coburg Milk, Goldenrod Dairy Foods, Cream O Webber and Stinton Dairy from retailers, such as supermarkets. The complaints further allege that the prices of these products "are based on * * * the Cheddar Spot price or Milk Futures contract price, independent of prices set by any government agency." The complaints allege that DFA is vertically integrated, distributing their products to retailers and wholesalers. Thus, Plaintiffs either purchased directly from a retailer, who bought from DFA, or from a customer of a wholesaler who bought from DFA. In either case, Plaintiffs allege that they purchased one of Defendants' products in the same form as sold by Defendants at a price to the direct purchaser that had been fixed by either the Cheese Spot or Milk Futures market contract price.

**\*4** Plaintiffs further allege that the antitrust violations caused indirect purchasers to pay artificially inflated prices, because the distributors and retailers from whom they buy necessarily pass on the inflated costs. Finally, the complaints allege that the antitrust violations substantially affected intrastate commerce in each and every state in the continental United States and District of Columbia by artificially inflating prices at retail establishments.

In 2008, the DFA and Keller's Defendants entered into consent decrees with the Commodity and Futures Trading Commission ("CFTC") for violations of the Commodity Exchange Act ("CEA") based on their alleged manipulation of milk futures and spot cheese contracts. DFA, Keller's, and Defendants Hanman, Kos, Millar, and Otis did not admit liability, but they agreed to pay fines to settle the CFTC's charges.

## II. Default of Keller's Creamery LP

The Federal Rules of Civil Procedure contemplate that a defendant may move to set aside a clerk's entry of default. Rule 55(c) allows a court to set aside an entry of default for good cause. Fed.R.Civ.P. 55(c). The Seventh Circuit has held that a district court may act *sua sponte* in setting aside an entry of default under Rule 55(c). *Judson Atkinson Candies, Inc. v. LatiniHohberger Dhimantec,* 529 F.3d 371, 386 (7th Cir.2008). The Seventh Circuit also has ruled that Rule 55(c)'s "good cause" standard is "easier to satisfy" than Rule 60(b)'s mistake, inadvertence, and excusable neglect standard. *Sims v. EGA Prods., Inc.,* 475 F.3d 865, 868 (7th Cir.2007). Normally, when a defendant has moved to set aside a default, it must demonstrate: "(1) good cause for default, (2) quick action to correct it, and (3) meritorious defense to plaintiff's complaint." *Pretzel & Stouffer v. Imperial Adjusters,* 28 F.3d 42, 45 (7th Cir.1994).

The record does not establish that Defendants' culpable conduct led to the default. DFA contends that Keller's has not existed as a legal entity for more than six years and could not have been served. In fact, Plaintiffs delivered to DFA the summons and petition in the name of Keller's. At best, there is a legal disagreement as to whether or not Keller's must respond to Plaintiffs' complaints. Furthermore, as demonstrated below, insufficiencies in Plaintiffs' complaints demonstrate that Keller's has a meritorious defense to at least some of Plaintiffs' claims in the form of a motion to dismiss. Good cause having been shown, the Court sets aside the defaults entered against Keller's Creamery LP. Furthermore, the Court will consider the present motions to dismiss not only on behalf of DFA, but also on behalf of Keller's, finding that the failure to do so will only result in unnecessary delay, expense, and inconvenience for all parties, as well as the Court. See *Doe v. White,* 2010 WL 323510, at \*2 (C.D.Ill. Jan.20, 2010) ("There is a substantial amount of case law which provides that successive Rule 12(b)(6) motions may be considered where they have not been filed for the purpose of delay, where entertaining the motion would expedite the case, and where the motion would narrow the issues involved."); see also *Coleman v. Pension Ben. Guar. Corp.,* 196 F.R.D. 193, 196–97 (D.D.C.2000) (allowing argument via successive motion "[i]n the absence of any apparent bad faith, and in the interest of promoting the efficient resolution of this case."); *Donnelli v. Peters Securities Co., L.P.,* 2002 WL 2003217, at \*3–4 (N.D.Ill.2002); *Muhammad v. Village of Bolingbrook,* 2004 WL 1557958, at \*1 (N.D.Ill.2004); *Campbell–El v. District of Columbia,* 881 F.Supp. 42, 43 (D.D.C.1995); *Sharma v. Skaarup Ship Mgmt. Corp.,* 699 F.Supp. 440, 444 (S.D.N.Y.1988).

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported...

Case: 3:17-cv-50420-JTD  Doc: 22-4  Filed: 05/21/21  Page: 95 of 202  PageID #:1573

2013 WL 4506000, 2013-2 Trade Cases P 78,499

## III. Legal Standard on Motion to Dismiss

**\*5** The purpose of a Rule 12(b) motion to dismiss is not to decide the merits of the case, but rather to test the sufficiency of the complaint. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir.1990). In reviewing a motion to dismiss, the Court takes as true all factual allegations in Plaintiffs' complaint and draws all reasonable inferences in their favor. *Killingsworth v. HSBC Bank Nev., N. A.,* 507 F.3d 614, 618 (7th Cir.2007); *Long,* 182 F.3d at 554. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), such that the defendant is given "fair notice of what the \* \* \* claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting *Twombly,* 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the \* \* \* claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555) (ellipsis in original).

## IV. Standing

The Court begins its analysis with Defendants' contention that Indirect Purchaser Plaintiffs lack standing to assert their claims. Defendants maintain that Indirect Purchaser Plaintiffs fail to allege injury in fact, antitrust injury, and antitrust standing. Specifically, Defendants contend that Plaintiffs have failed to allege that Direct Purchasers incurred and passed on any overcharge, and, further, that Plaintiffs did not participate in the allegedly restrained markets and thus their alleged injuries are too remote. Prior to addressing Defendants' *antitrust* injury and standing arguments, two threshold issues must be addressed: (i) whether the Court should defer ruling on standing issues until after class certification; and (ii) whether Indirect Purchaser Plaintiffs have Article III standing for claims brought under the laws of states where no named Plaintiff alleges that he or she purchased Defendants' products.

### A. Class Certification and Article III Standing

Indirect Purchaser Plaintiffs argue that Defendants' standing challenge is premature because class certification issues under Rule 23 are to be decided prior to issues of standing under Article III. Specifically, Plaintiffs argue that in this case class certification questions are "logically antecedent" to standing issues and therefore should be resolved before standing issues are addressed. See, *e.g., Ortiz v. Fireboard Corp.,* 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (in considering the propriety of certifying a settlement-only class involving persons exposed to asbestos, the Court held that courts may evaluate class certification issues before Article III standing if the former are "logically antecedent" to the latter); *Arreola v. Godinez,* 546 F.3d 788, 795 (7th Cir.2008).

**\*6** Several courts—including many in this district-have addressed this issue in recent years and determined that the Supreme Court did *not* intend for district courts to delay determining whether an actual case or controversy is before them. See *In re Potash Antitrust Litigation,* 667 F.Supp.2d 907, 922 (N.D.Ill.2009), rev'd on other grounds sub nom. *Minn–Chem, Inc. v. Agrium Inc.,* 657 F.3d 650 (7th Cir.2011); see also *Easter v. Am. West. Fin.,* 381 F.3d 948, 962 (9th Cir.2004) ("[*Ortiz* ] does not require courts to consider class certification before standing."); *Tillman v. U.S. Energy Sav. Corp.,* 2008 WL 2754813, at \*2 (N.D.Ill. July 14, 2008) (dealing with Article III standing before class certification); *In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 656–57 & n. 3 (E.D.Mich.2011) ("The Court chooses to follow what it finds to be the better-reasoned opinion on this issue which recognize and refuse to abandon the fundamental prudential standing requirements of Article III"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,* 658 F.Supp.2d 299, 302–05 (D.Mass.2009) (ruling on Article III standing issues prior to class certification); *In re Wellbutrin XL Antitrust Litig. .,* 260 F.R.D. 143, 151–56 (E.D.Pa.2009) (refusing to postpone an inquiry into Article III standing);

In re Corn Pacific Nameless of America, Inc. (Inside) Antitrust Litigation, Not Reported..., 2013 WL 4506000...

Case: 3:17-Case 21-50428-JTD Doc 22-4 Filed 05/21/21 Page 96 of 202... Page ID #:1574

2013 WL 4506000, 2013-2 Trade Cases P 78,499

*Carfagno ex rel. Centerline Holding Co. v. Schnitzer,* 591 F.Supp.2d 630, 633 (S.D.N.Y.2008) ("[A]djudication of standing must be made prior to determining whether the requirements of class certification have been satisfied."); *In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F.Supp.2d 579, 605–07 (S.D.N.Y.2006) (same). This Court concurs in these decisions, which interpret *Ortiz* as requiring a court simultaneously facing both class certification and Article III standing to deal with Rule 23 issues first when they are dispositive, but not directing district courts to postpone an inquiry into the threshold issue of justiciability outside of that context. The Court finds the approach followed in the cases cited above to be consistent with recent cases in which the Seventh Circuit has dealt with Article III standing prior to class certification. See *Arreola v. Godinez,* 546 F.3d 788, 794–95 (7th Cir.2008) (deciding individual standing to pursue injunctive relief prior to evaluating class certification issues). Accordingly, the Court now turns to whether Indirect Purchaser Plaintiffs have standing to assert claims in states in which they did not allege that they purchased Defendants' products. See also *In re Potash Antitrust Litigation,* 677 F.Supp.2d at 923.

### B. Article III Standing for State Law Claims

To assert federal and state antitrust claims, Plaintiffs must plead an "injury in fact" that is fairly traceable to the challenged actions of Defendants. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs also must sufficiently allege that they (1) have suffered an *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful" (*Cargill,* 479 U.S. at 109 (quotation marks and citation omitted)); and (2) are the "proper party" to maintain an antitrust action. See *Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC"),* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."); *Kochert v. Greater Lafayette Health Serv., Inc.,* 463 F.3d 710, 715–16 (7th Cir.2006) (citing *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 597–98 (7th Cir.1995)); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374 (7th Cir.1987). The Court first looks at whether Indirect Purchaser Plaintiffs have Article III standing for claims brought under the laws of states where no named Plaintiff alleges that he or she purchased Defendants' products.

*7 Indirect Purchaser Plaintiffs—residents of New York, Tennessee, Massachusetts, Michigan, and Kansas—assert claims under the statutes and common law of these and other states as well as the District of Columbia. Defendants contend that, even if Plaintiffs have met their burden of demonstrating injury-in-fact in the states in which they allegedly purchased Defendants' products, they have not met their burden of establishing injury in any of the other numerous states under whose laws they have brought challenges.

An Article III standing inquiry "focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). It is the "burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Spencer v. Kemna,* 523 U.S. 1, 11, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (internal quotations omitted). To satisfy Article III's standing requirement, a party must establish: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Rawoof v. Texor Petroleum Co.,* 521 F.3d 750, 756 (7th Cir.2008). At the pleading stage, general factual allegations of injury resulting from a defendant's conduct may suffice to establish standing. See *Lujan,* 504 U.S. at 561.

Plaintiffs have alleged that they purchased Defendants' specific brand name products from retailers in New York, Tennessee, Michigan, and Kansas, and that they paid artificially inflated prices as a result of the antitrust violations. The Court will address injury-in-fact in greater detail below, but these allegations likely are sufficient to establish injury-in-fact at the pleading stage with respect to those jurisdictions, as there is no heightened pleading requirement and discovery is available to provide the particulars. See, *e.g., In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 662–63 (E.D.Mich.2011) ("the ACAC alleges that IP Plaintiff Desmond resides in and purchased packaged ice in California,

In re Cold Farmers of America, Inc. Indirect Antitrust Litigation, Not Reported in... 2013 WL 4506000, 2013-2 Trade Cases P 78,499

Case: 3:17-cv-50428-JTD Doc 22-4 Filed 05/31/21 Page 97 of 202 PageID #:1575

that as a result of the nationwide conspiracy each of the IP Plaintiffs has suffered injury in that they have paid more for packaged ice than they would have paid absent the conspiracy and that they have thereby suffered an injury. These facts are sufficient under *Twombly*" ); *D.R. Ward Const. Co. v. Rohm & Haas Co.,* 470 F.Supp.2d 485, 502 (E.D.Pa.2006) (holding "[p]laintiffs' alleg[ations] that they purchased and paid significantly more for products containing plastic additives as a result of defendants' price-fixing conspiracy" were sufficient to defeat motion to dismiss).

The inquiry with respect to the remaining jurisdictions is different. Defendants ask the Court to dismiss claims brought under the laws of states in which no named Indirect Purchaser Plaintiff purchased goods. In response, Indirect Purchaser Plaintiffs fail to provide any support establishing their individual standing to assert claims under the laws of states where they neither reside nor purchased products. Instead, they simply urge the Court to postpone its inquiry into Article III standing until after class certification. As noted above, the Court has rejected this argument.

**\*8** The Article III standing inquiry remains the same even if the case is proceeding as a class action: "That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (internal quotations omitted); see also *Payton v. County of Kane,* 308 F.3d 673, 682 (7th Cir.2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action."). To have standing as a class representative, the plaintiff must be part of the class, "that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Keele v. Wexler,* 149 F.3d 589, 592–93 (7th Cir.1998) (citing *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974)).

Here, the Indirect Purchaser Plaintiffs have not alleged an injury-in-fact for claims outside of New York, Tennessee, Michigan, and Kansas. See *Lujan,* 504 U.S. at 560. Instead, Plaintiffs allege injuries as a result of buying products in New York, Tennessee, Michigan, and Kansas. [6] The indirect complaints do not allege personal injury in any other state. Thus, Indirect Purchaser Plaintiffs fail to satisfy their burden of showing Article III standing for states in which they do not reside and/or did not purchase the products at issue. See *In re Potash Antitrust Litigation,* 667 F.Supp.2d 907, 922 (N.D.Ill.2009); *Zaycer v. Sturm Foods, Inc.,* 896 F.Supp.2d 399, 409 (D.Md.2012) ("Zaycer was neither harmed by the Product, nor purchased the Product, in any state other than Maryland. Zaycer suffered no injury-in-fact, and is not in imminent danger of being injured by the Product in any of the states except Maryland. Because the injury to the named plaintiff occurred in Maryland, she has no standing to sue under any state consumer protection law except for Maryland's."); *Catlin v. Hanser,* 2011 WL 1002736, at \*8 (S.D.Ind.2011) (dismissing state law claims of named plaintiff when he failed to allege a personal injury 33 states under which he claimed damages); see also *In re Plasma–Derivative Protein Therapies Antitrust Litigation,* 2013 WL 39766, at \*6 (N.D.Ill.2012) ("To the extent that San Mateo does not claim to suffer its own personalized injury by virtue of the defendants' alleged violations of non-California state-law, San Mateo lacks standing to assert those claims.") (citing *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. at 40 n. 20). Accordingly, this Court dismisses claims based on the antitrust and consumer unfair competition statutes of jurisdictions other than New York, Tennessee, Michigan, and Kansas.

[6]     Although Plaintiff Palombella resides in Massachusetts, she does not allege that she purchased any products in Massachusetts.

### C. Antitrust Injury and Standing for Federal Claims

**\*9** The indirect purchaser complaints seek injunctive relief for alleged violations of the Sherman Act under § 16 of the Clayton Act. [7] Two limitations have been placed on the scope of antitrust liability and, thus, the availability of injunctive relief under § 16. To maintain an antitrust action, Plaintiffs must establish that they: (1) have suffered an antitrust injury; and (2) are the proper plaintiffs to maintain an antitrust action with respect to the relevant markets, or, in other words, possess antitrust standing. See *Kochert v. Greater Lafayette Health Servs. ., Inc.,* 463 F.3d 710, 715–16 (7th Cir.2006);

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported...

Case: 3:17-cv-50429-JTD Doc 22-4 Filed: 05/21/21 Page: 98 of 202 PageID #:1576

2013 WL 4506000, 2013-2 Trade Cases P 78,499

*Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596–97 (7th Cir.1995); see also *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110–11, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (requiring a party seeking injunctive relief under § 16 to show antitrust injury and antitrust standing).

[7]   Section 16 provides: "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws[.]" 15 U.S.C. § 26.

To satisfy the antitrust injury requirement, Plaintiffs must allege that their "claimed injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.' " *Tri–Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150,* 433 F.3d 1024, 1031 (7th Cir.2006) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Further, a court must determine whether the plaintiffs are consumers or competitors in the market in which trade was restrained. *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 538–39, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). And finally, where a plaintiff's injury is derivative of a more direct injury to some other person, and that person would have a strong motivation to pursue its own antitrust claim against the defendant, standing is not likely to exist. [8]  See, e.g., *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (holding that indirect purchasers are too remote to suffer true "antitrust injury" and therefore do not have standing under federal antitrust law to pursue damages for antitrust violations).

[8]   Although *Illinois Brick* dealt with indirect purchaser suits seeking damages (see *U.S. Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 627 (7th Cir.2003) ("[T]he direct-purchaser doctrine does not foreclose equitable relief."), and Plaintiffs here seek only injunctive relief for their federal antitrust claims, subsequent cases also analyze the directness of the injury when only equitable relief is sought. See, e.g., *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.,* 196 F.3d 818, 825 (7th Cir.1999) (noting that the "direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of *Associated General Contractors* are analytically distinct" and are "independent obstacle[s] to recovery"); *In re Plasma–Derivative Protein Therapies,* 2013 WL 39766, at *8.

Antitrust standing "examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 395 (7th Cir.1993) (citing *Cargill,* 479 U.S. at 111 n. 6). In *Associated General Contractors of California* ("*AGC*"), the Supreme Court outlined a series of factors to be evaluated to determine whether a plaintiff has standing to bring an antitrust action. 459 U.S. at 537–45. These factors are: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the presence of improper motive; (3) the directness between the injury and the market restraint; (4) the speculative nature of the damages; and (5) the risk of duplicate recoveries or complex damages apportionment. [9]  See *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 484 (7th Cir.2002) (citing *AGC,* 459 U.S. at 537–45). When injunctive relief alone is at issue, some factors—namely the speculative nature of the damages and the risk of duplicate recoveries or complex damages apportionment—do not apply to the antitrust standing analysis. See *Cargill,* 479 U.S. at 111 n. 6 ("Standing analysis under § 16 will not always be identical to standing analysis under § 4.").

[9]   In *AGC,* the Supreme Court also held that courts examining antitrust standing are to consider the type of injury and whether it is "of the type that the antitrust statute was intended to forestall." 459 U.S. at 538–39 (citing *Brunswick,* 429 U.S. at 487–88). The Court will consider this factor under the rubric of antitrust injury, as the Seventh Circuit has structured its analysis of antitrust injury and antitrust standing in this manner. See *Kochert,* 463 F.3d at 715–719 (analyzing antitrust injury prior to the antitrust standing factors set out in *AGC* ); *Serfecz,* 67 F.3d at 596–97 (examining antitrust injury and antitrust standing separately); *Local Beauty Supply, Inc. v. Lamaur Inc.,* 787 F.2d 1197, 1201 (7th Cir.1986) (distinguishing between the requirements of antitrust injury and antitrust standing).

**\*10**  Plaintiffs claim that Defendants conspired to manipulate and raise the prices for cheese on the CME Cheese Spot Market and for futures contracts on the Milk Futures Market, knew that these prices were used as a basis for

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported in...
2013 WL 4506000, 2013-2 Trade Cases P 78,499

Case: 3:17-Case 2:50428-JTD Doc 22-4 FiledFiled Pater: 509d1-1650f PageID #:1577

the prices of dairy products with Defendants' customers, and also knew that increasing these prices would increase the price of dairy products with Defendants' customers, who in turn passed on the higher prices to Plaintiffs (purchasers at retail establishments in New York, Tennessee, Michigan, and Kansas). In response, Defendants contend that Indirect Purchaser Plaintiffs have failed to allege injury-in-fact because the complaints purportedly do not identify "what products they purchased or when and from whom they purchased those products" or that "the retailers from whom they purchased * * * incurred an overcharge or passed on any such overcharge." But Plaintiffs have provided enough detail—they purchased dairy products from retailers in their respective states, which were priced higher than they would have been because of Defendants' conduct—to survive this challenge.

Instead, Defendants' best argument as to why Plaintiffs fail to allege injury in fact is that Plaintiffs' complaints say very little about the chain of distribution, including whether the retailers with whom Plaintiffs dealt purchased dairy products directly from a manufacturer or indirectly through one or more distributors. Still, at this stage, Plaintiffs' less than robust allegations suffice to show fairly typical antitrust injury—that is, that Plaintiffs suffered higher prices as a result of Defendants' conduct. See *U.S. Gypsum Co.,* 350 F.3d at 626–27 ("A private plaintiff must show antitrust injury—which is to say, injury by reason of those things that make the practice unlawful, such as reduced output and higher prices."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.,* 196 F.3d 818, 825 (7th Cir.1999) ("To recover under the antitrust laws, the plaintiff must show that its injury flows from that which makes the conduct an antitrust problem: higher prices and lower output."); *Kochert,* 463 F.3d at 715 (observing that "the principal purpose of the antitrust laws is to prevent overcharges to consumers."); *In re Packaged Ice Antitrust Litig.,* 2011 WL 891169, at *16 (E.D.Mich. Mar.11, 2011). As discussed below, Plaintiffs' chain-of-distribution allegations present problems for them with respect to the antitrust standing inquiry, but are sufficient to show typical antitrust injury.

Defendants also contend that Plaintiffs, as consumers who purchased from suppliers in a competitive market, could not have incurred the overcharge. Defendants rely solely on *In re Microsoft Corp. Antitrust Litig.,* 168 F.Supp.2d 541, 546 (D.Md.2001), which, without any analysis, supports Defendants' theory. However, Plaintiffs cite numerous cases offering the conflicting theory that consumers are injured more often than intermediaries. See, *e.g., D .R. Ward Const. Co.,* 470 F.Supp.2d at 503 (denying motion to dismiss where "plaintiffs allege that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives"); *Lorix,* 736 N.W.2d at 631 ("As an end user, plaintiff is the party most likely to be injured by an anticompetitive overcharge because she is the only party in the chain of purchase who cannot pass on part or all of that overcharge"). At this stage of the litigation, Plaintiffs' theory gets the benefit of any doubt; whether the degree of "pass on" [10] of an industry-wide price increase is greater in a more competitive market is a matter that cannot be resolved on the pleadings alone.

[10] In general, "[p]assing on describes the action of an overcharged buyer who passes the extra expense on to those who buy from him." *In re Sugar Industry Antitrust Litig.,* 579 F.2d 13, 16 n. 4 (3d Cir.1978) (internal quotation marks omitted). The "passing-on" theory has been invoked in one of two ways: "Defensive passing on refers to efforts by antitrust defendants to show that a particular plaintiff was not injured because he had foisted the inflated price onto his own customers. Offensive passing on is used to characterize plaintiffs' strategy proving that an overcharge was imposed upon them by buyers closer to the defendant in the chain of distribution." *Id.* (internal quotations omitted); see also *Warren Gen. Hosp. v. Amgen Inc.,* 643 F.3d 77, 85 (3d Cir.2011).

**\*11** Even assuming, based on the foregoing, that Plaintiffs' have sufficiently alleged an injury tied to Defendants' conduct, Plaintiff still must demonstrate that they are the proper plaintiffs to maintain an antitrust action with respect to the relevant markets. The focus of Defendants' argument is that Plaintiffs were not participants in the allegedly restrained markets. See *AGC,* 459 U.S. at 538–39. Defendants maintain that Indirect Purchaser Plaintiffs do not allege that they were participants in the "two relevant markets—the CME cheese spot market and the CME class III milk futures market * * * * To the contrary, [Indirect Purchaser Plaintiffs] allege that they purchased finished 'Dairy Products' from retail establishments." Indirect Purchaser Plaintiffs contend they should be treated as participants in the relevant

market because their injury—paying higher prices for Defendants' products—was a foreseeable, intended consequence of Defendants' illegal actions and flows from that which makes Defendants actions unlawful.[11]

[11] As a threshold matter, Judge Hibbler previously held that the Direct Purchaser Plaintiffs may only recover for damages caused by Defendants' monopolization of the milk futures market. Accordingly, the Court permitted claims to go forward for Plaintiffs whose injuries stem from the anticompetitive effects of monopolization on the milk futures market, including "purchasers of milk futures during months besides June, July, and August 2004 * * * [and] any Plaintiffs who entered into contracts whose value was directly tied to the price of milk futures will also be allowed to proceed." The Court denied recovery for damages arising from the increase of prices in the cheddar spot market because they "stem from the collateral manipulation of the cheese markets." Here, Indirect Purchaser Plaintiffs allege that both facets of Defendants' scheme injured them, as they purchased products whose prices were determined by both the cheese spot and milk futures markets. But, contrary to Plaintiffs' mistaken assumption, Direct Purchaser Plaintiffs also include both cheese and milk commodities buyers at the wholesale level. See Direct Purchaser Compl. ¶¶ 26, 28. Thus, Plaintiffs are not claiming a new category of injuries as they suggest, and they have not put forth any additional reasons for departing from Judge Hibbler's prior ruling. Judge Hibbler previously rejected the claims of Direct Purchasers of milk and cheese not indexed to the CME (based on the filed-rate doctrine) and the monopolization claims of purchasers whose injuries stem from the inflated price of cheese for lack of standing. Because Plaintiffs have offered no support for departing from Judge Hibbler's prior rulings other than one based on a mistaken assumption about the identity of Direct Purchaser Plaintiffs, Judge Hibbler's prior holdings remain law of the case. See *Creek v. Village of Westhaven,* 144 F.3d 441, 445 (7th Cir.1998) ("The law of the case doctrine is a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter.").

The first hurdle that Indirect Purchaser Plaintiffs face is demonstrating that their injury constitutes an integral part of the alleged price-fixing conspiracy: to wit, Defendants' alleged agreement to (1) purchase all of the available long positions in three months' worth of Class III milk futures contracts and large quantities of cheese on the CME in an effort to gain control of those markets, (2) sell their positions at an unreasonably high price to justify charging inflated prices for their futures positions, and (3) maintain those prices long enough to sell off all of their positions at a profit. In short, as Judge Hibbler previously observed, the object of the conspiracy was manipulating the futures market and the players were participants in the futures market, either by virtue of being competitors for the futures contracts who were boxed out of the market temporarily or as purchasers of those allegedly inflated contracts. Indirect Purchaser Plaintiffs allege a general causal relationship between their injury and the alleged anticompetitive activity: Defendants manipulated the futures market and in turn Plaintiffs paid higher prices for finished dairy products. But their injury is not alleged to be a necessary step in furthering the ends of the conspiracy involving the two relevant markets. Instead, their injury is, "at best, a result of—rather than a means to or a cause of"—the injury sustained by the participants in the milk futures and spot cheese markets. See *In re Refrigerant Compressors Antitrust Litigation,* 2013 WL 1431756, at *12 (E.D.Mich. Apr.9, 2013) (citing *Province v. Cleveland Press Publ'g Co.,* 787 F.2d 1047, 1052 (6th Cir.1986)); see also *Potash,* 667 F.Supp.2d at 940–41 (finding that indirect purchasers did not have standing because they failed to allege a chain of causation between the alleged restraint in the market—an illicit agreement to fix the price of potash—and their injury— paying higher prices for potash-containing products, specifically, fertilizer). That does not mean that they did not feel any effects from the conspiracy; however, as explained below, it bears on the directness of the injury.

**\*12** In determining whether a plaintiff has antitrust standing, a court must look at "the directness between the injury and the market restraint." See *Loeb,* 306 F.3d at 484. Because the concept of antitrust standing was developed with common law proximate causation standards in mind, directness is a particularly important factor in the Court's analysis. See *Greater Rockford,* 998 F.2d at 395 (noting that antitrust standing serves the same function as the common law proximate cause requirement) (citing *AGC,* 459 U.S. at 533). In establishing directness as a factor in the antitrust standing analysis, the Court in *AGC* examined two separate considerations: (1) the chain of causation alleged by the plaintiffs; and (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement. *AGC,* 459 U.S. at 540–42.

By way of a few examples, in *Potash,* indirect purchasers bought products containing potash as a component from direct customers of the alleged conspirators. The district court concluded that the indirect purchasers failed to allege a chain of

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported...

2013 WL 4506000, 2013-2 Trade Cases P 78,499

causation between the alleged restraint in the market—an illicit agreement to fix the price of potash—and their injury—paying higher prices for potash-containing products, specifically, fertilizer. 667 F.Supp.2d at 940–41. As here, indirect purchasers argued that they satisfied this requirement by alleging "that Plaintiffs, as consumers, have been forced to pay higher prices for potash products as a result of defendants' price-fixing scheme." However, the court determined that their complaint failed "to allege the necessary links between the anticompetitive activity and their injury," noting in particular the "absence of any allegation regarding whether the parties from whom Indirect Purchaser Plaintiffs purchased fertilizer actually passed on any overcharges they may have paid from parties further up the supply chain resulting from the alleged price-fixing agreement among Defendants." Similarly, in *In re Refrigerant Compressors Antitrust Litigation*, the court concluded that the "causal nexus between the alleged conspiracy in the hermetic compressor market and the IP Plaintiffs' alleged injury (paying inflated prices for finished goods that contain hermetic compressors) [was] too remote and attenuated to support antitrust standing." 2013 WL 1431756, at *14–15 (E.D.Mich. Apr.9, 2013); see also *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* 536 F.Supp.2d 1129, 1136–41 (N.D.Cal.2008) (dismissing state antitrust claims of computer purchasers because they did not participate in the market for computer memory).

Like the indirect purchasers in *Potash, DRAM,* and *Refrigerant Compressors,* Indirect Purchaser Plaintiffs are downstream participants in a retail market (finished dairy products), which is separate from the allegedly restrained markets (spot cheese and milk futures bought and sold on a commodities exchange). Further, the allegedly price-fixed products (commodities/futures contracts) are not even components of the products that Plaintiffs purchased. Plaintiffs' injury, to the extent they have one, occurred in a market secondary to the allegedly monopolized market and occurred only after the spot cheese commodity evolved, eventually, into a finished dairy product. Again, that is not to say that the price of those contracts does not ultimately affect the price of the finished dairy products, but the existence of different markets weighs against finding that they have antitrust standing to pursue their federal antitrust claims. See also *In re Potash Antitrust Litigation,* 667 F.Supp.2d 907, 937–41 (N.D.Ill.2009).

**\*13** The complicating factor here—which was not discussed in *Potash, DRAM,* and *Refrigerant*—is the Seventh Circuit's recognition that different injuries in distinct markets may be inflicted by an antitrust conspiracy and thus differently situated plaintiffs might be able to raise claims for the same anticompetitive behavior. *Loeb,* 306 F.3d at 481. In *Loeb,* purchasers of copper in the cash market, who in turn produced copper wire or repackaged and sold scrap, alleged that the defendants conspired to manipulate price of copper cathode on the futures market in violation of federal and state antitrust laws. The Seventh Circuit held that the fact that copper futures traders had a claim under the Sherman Act did not render purchasers in cash market "indirect purchasers" unable to bring their own claim; however, while copper wire producers who purchased cathode on the physical market could bring a Sherman Act claim, scrap dealers did not suffer direct injury and could not sue under the Sherman Act. In analyzing the relevant markets, the court concluded that the injuries suffered by the plaintiffs who purchased inflated futures contracts from the defendants were distinct from any harm inflicted on plaintiffs who paid inflated cash prices for cathode or who purchased copper rod from integrated producers.

The court pointed out the paradigm in all of the cases cited by the defendants: "Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit overcharges that B passed on to C." [12] *Loeb,* 306 F.3d 482; see, *e.g., Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 207, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (public utilities, but not residential customers to whom they sell, may sue natural gas companies); *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 606 (7th Cir.1997) (drug wholesalers, but not retail pharmacies to whom they sell, may recover from manufacturers); *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 852–54 (3d Cir.1996) (attorneys, but the clients to whom they offer services, may recover overcharges for copies); *In re Beef Indus. Antitrust Litig.,* 710 F.2d 216, 218 (5th Cir.1983) (packers who sell to grocers may recover for their unlawful conduct but feeders who sell to packers may not). The court then determined that the plaintiffs were not indirect purchasers along a supply chain; "instead, the alleged conspiracy operated in the separate but related futures market, through which it sought directly to manipulate the price of copper the plaintiffs were buying." *Loeb,* 306 F.3d 482; see also *Sanner v. Board of Trade,* 62 F.3d 918, 929 (7th Cir.1995) (rejecting the proposition that "participants in the futures market were more

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported in...
2013 WL 4506000, 2013-2 Trade Cases P 78,499

Case: 3:1...Case21c50428-JTD...Doc22-4...Filed 05/21/21...Page 102 of 202...Page ID #:1580

directly injured," so as to preclude recovery by farmers in the cash market and finding that in the context of a market manipulation scheme, damages inflicted on the physical commodity market were not derivative of injuries in the futures market but rather formed a separate and compensable injury).

[12]   In their response to Defendants' motion to dismiss, the Asmann Plaintiffs set up an almost identical scenario:

> Here, the Petition alleges Defendants manipulated the index that is used to set the price for the products that Plaintiff purchased. Consequently, the price that retailers paid DFA for those products was increased and those retailers in turn increased their prices to the general public, including Plaintiff. In particular, Defendants purchased all the contracts on the Cheddar Spot market with the purpose and effect of raising the prices that DFA received for its products that use the Cheddar Spot market as the basis for their prices. Plaintiff's payment of higher prices for those products has been caused by the exact conduct forbidden by [antitrust statutes].

**\*14** This analysis—which looks separately at the futures and physical markets—guides the Court, but at the end of the day does not save Indirect Purchasers' federal claims. As the court in *Loeb* pointed out, while there may be separate markets giving rise to separate claims—"in the context of a market manipulation scheme, damages inflicted on the physical commodity market [are] not derivative of injuries in the futures market"—the "directness inquiry" presents a separate hurdle to Indirect Purchasers' claims. Even in the physical market, retail purchasers are classic examples of indirect victims of antitrust injury. Distributors and wholesalers already entered into monetary transactions involving these same products. In fact, there are numerous links in the chain of distribution before a finished dairy product reaches a retailer, including transactions between the retailer and its distributors or wholesalers, between distributors or wholesalers and manufacturers of cheese products, and between manufacturers and milk producers. [13] These companies at the least have suffered more direct injuries than the retail purchasers. *Cf. Sanner,* 62 F.3d at 927 (soybean farmers, clearly the most directly injured participants in the cash market because they were the only cash sellers of soybeans, were permitted to recover their soybean losses, but millers, wholesalers, or retailers of soybeans were not).

[13]   As discussed above, the fact that the alleged conspiracy operated in the separate but related futures market does not necessarily doom the Indirect Purchaser Plaintiffs' claims; however, it is a fact that the casual connection is even more attenuated and complicated here than in the typical indirect purchaser case because the allegedly price-fixed products are not components of the finished goods.

Ultimately, the directness inquiry focuses on the presence of more immediate victims of an antitrust violation who are presumed to be in a better position to advance an action. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party * * * to perform the office of a private attorney general." *AGC,* 459 U.S. at 542; see also *Serfecz v. Jewel Food Stores,* 67 F.3d at 598 (noting that "only parties who can *most efficiently* vindicate the purposes of the antitrust laws have antitrust standing") (emphasis added). Here, the directness of the injury weighs "particularly heavily" in the Court's analysis because the existence of a less remote party to vindicate the public interest is no hypothetical proposition. The direct purchasers have actively pursued their claims and they seek damages as well as "injunctive relief * * * to prevent future anticompetitive and unlawful conduct." See *Kochert,* 463 F.3d at 718–19; see also *In re Plasma–Derivative Protein Therapies Antitrust Litigation,* 2012 WL 39766, at *7–9 (N.D.Ill.2012) (concluding that indirect plaintiffs lacked antitrust standing to pursue federal antitrust claims). Thus, by denying Indirect Plaintiffs leave to proceed with their federal antitrust claims, the Court would not "leave a significant antitrust violation undetected or unremedied." *Kochert,* 463 F.3d at 718–19. For all of these reasons, the Court concludes that Indirect Purchaser Plaintiffs lack antitrust standing to pursue their federal antitrust claims. See also *In re Plasma–Derivative Protein Therapies Antitrust Litigation,* 2012 WL 39766, at *7–9 (N.D.Ill.2012) (concluding that indirect plaintiffs lacked antitrust standing to pursue federal antitrust claims).

## V. Subject Matter Jurisdiction and the MDL

**\*15** The parties have raised a number of other important issues, including whether and how the *AGC* factors apply to each of the various state antitrust claims that Plaintiffs seek to bring. Those questions will be deferred for the time

In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, Not Reported...

2013 WL 4506000, 2013-2 Trade Cases P 78,499

being because the Court must address two issues that have not been briefed by the parties: (i) whether the Court retains original jurisdiction pursuant to CAFA or, in the alternative, should decline to exercise supplemental jurisdiction now that it has been determined that all federal claims asserted by the Indirect Purchasers are subject to dismissal; and (ii) whether the dismissal of Indirect Purchaser Plaintiffs' federal antitrust claims should have any effect on the overall case management of this multi-district litigation.

More specifically, with the Indirect Purchasers' federal claims now subject to dismissal, the Court now must determine whether it retains original subject matter jurisdiction and if not, whether it should decline to exercise supplemental jurisdiction. See *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 634 (7th Cir.2007). At present, the parties have not addressed whether the Indirect Purchaser Plaintiffs' complaints meet CAFA's jurisdictional requirements. Moreover, in the event that CAFA's jurisdictional requirements are not met, the Court must consider whether to retain supplemental jurisdiction over Indirect Purchaser Plaintiffs' state law claims, given the comity concerns involved and the fact that to date substantial judicial resources have not been committed to the state law counts. Because Plaintiffs seek to establish federal jurisdiction, it is their burden to establish the jurisdictional facts by a preponderance of the evidence. See *Blomberg v. Serv. Corp. Int'l,* 639 F.3d 761, 763 (7th Cir.2011).

Finally, even if federal jurisdiction exists by virtue of the CAFA, the other cases that have been transferred to this Court all relate to Direct Purchaser claims in which all parties save Defendants Schreiber are engaged in settlement proceedings. Going forward, the Indirect Purchaser side of the case will involve a myriad of state-law claims. The Court invites the parties to address at the next status hearing and in any subsequent supplemental briefing how best to manage the rather unusual posture of this case in light of the purposes of coordinated multi-district pre-trial proceedings.

## VI. Conclusion

For the reasons stated above, the Court concludes that Indirect Purchaser Plaintiffs have Article III standing to pursue state-law claims based on New York, Tennessee, Michigan, and Kansas law, but lack antitrust standing to pursue their federal claims. Defendants' motions to dismiss [160, 197] are granted in part such that the federal claims are dismissed [14] and the remaining issues are deferred pending further input from the parties as to (1) the Court's subject matter jurisdiction under CAFA, (2) whether, if CAFA jurisdiction is lacking, the Court should exercise supplemental jurisdiction over the Indirect Purchaser Plaintiffs' state law claims given that all federal claims of the Indirect Purchaser Plaintiffs are subject to dismissal, and (3) how the Court's ruling today should affect the overall case management of these MDL proceedings. This matter is set for a status hearing on September 6, 2013 at 10:30 a.m. to address how best to obtain the parties' input on these matters.

[14]     Defendants have asked in their briefing that the dismissal be with prejudice and without leave to attempt to replead given that the Indirect Purchaser Plaintiffs already have had an original and two amended complaints; Plaintiffs request that the Court *sua sponte* grant leave to replead in the event of a dismissal order. The Court adopts a middle ground: if, after reviewing the Court's decision, the Indirect Purchaser Plaintiffs believe that they have a viable basis to replead, they may file a motion requesting leave to do so.

## All Citations

Not Reported in F.Supp.2d, 2013 WL 4506000, 2013-2 Trade Cases P 78,499

---

**End of Document**             © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 39766
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

In re: PLASMA–DERIVATIVE PROTEIN THERAPIES ANITRUST LITIGATION.

No. MDL 2109, 09 C 7666.
|
Jan. 9, 2012.

*MEMORANDUM OPINION & ORDER*

JOAN B. GOTTSCHALL, United States District Judge.

**\*1** The County of San Mateo ("San Mateo") filed suit against defendants CSL Limited, CSL Behring LLC, and CSL Plasma (collectively, "CSL"), Baxter International Inc. ("Baxter"), and Plasma Protein Therapeutics Association ("PPTA"), alleging that the defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, as well twenty-five states' antitrust laws and fourteen states' unfair competition or consumer protection laws, by virtue of a conspiracy to "restrict output to artificially raise, fix, maintain and/or stabilize the prices of Plasma–Derivative Protein Therapies in the United States." (*See* Indirect–Purchaser Plaintiff's Class Action Compl. ¶ 280, ECF No. 367–2.) The defendants have moved to dismiss the complaint, arguing that San Mateo lacks standing to pursue its claims, and that certain of San Mateo's state law claims fail for various reasons. For the reasons stated below, the court grants in part and denies in part the defendants' motion and requests additional briefing as to certain issues.

## I. BACKGROUND

This multi-district litigation presently consists of almost twenty actions brought on behalf of direct and indirect purchasers of plasma-derivative protein therapies against the defendants. In their consolidated amended complaint (*see* ECF No. 222), the direct purchaser plaintiffs alleged that CSL and Baxter, the two largest domestic producers of plasma-derivative therapies, conspired along with PPTA, a trade association, to restrict supplies of plasma-derivative therapies and to raise prices in violation of the Sherman Act, 15 U.S.C. § 1. All defendants moved to dismiss the consolidated amended complaint for failure to state a claim under the standard articulated in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and PPTA and CSL filed separate motions arguing additional grounds for dismissal. The court denied all of these motions. *See In re Plasma–Derivative Protein Therapies Antitrust Litig.,* 764 F.Supp.2d 991 (N.D.Ill.2011). In particular, while the court agreed that the defendants made "a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest," the court noted that at the motion to dismiss stage, "the plaintiffs need only allege a conspiracy which is plausible in light of the competing explanations," which the complaint had done. *See id.* at 1002–03. Following that decision, the parties submitted a proposed scheduling order, which this court entered. (*See* ECF No. 330.) Under the schedule, the direct purchaser plaintiffs' motion for class certification is not due until November 2012, after fact discovery closes.

At about the same time that the court entered the scheduling order, the Judicial Panel on Multidistrict Litigation transferred to this court a putative class-action suit filed by a single named plaintiff, San Mateo, which was brought on behalf of indirect purchasers of plasma-derivative therapies. (*See* Compl. ¶ 23 ("Plaintiff brings this action, on behalf of itself and all those similarly situated in an Identified State that purchased Plasma–Derivative Protein Therapies indirectly from Defendants.").) In the complaint, San Mateo explains that it operates a medical center through which it administers

In re Plasma-Derivative Protein Therapies Antitrust Litigation, Not Reported in F.Supp.2d...

2012 WL 39766, 2012-1 Trade Cases P 77,751

a county-wide health care system. (*Id.* ¶¶ 28–29.) As part of that program, the medical center indirectly purchases plasma-derivative protein therapies for use in treating patients, for sale to patients via its pharmacies, and for laboratory use. (*Id.* ¶ 29.) Prior to 2007, San Mateo purchased these therapies from spot markets organized by independent distributors or by group purchasing organizations ("GPOs") to which San Mateo belonged. (*Id.* ¶ 59.) Thereafter, San Mateo began purchasing annual allocations of the therapies either from distributors who had purchased the therapies from manufacturers, or from GPOs that negotiated contracts with manufacturers on behalf of their members. (*Id.* ¶ 60.) Despite these alternate arrangements, San Mateo claims it was forced to keep purchasing plasma-derivative protein therapies on the spot market at a higher price due to supply shortages caused by the defendants' conspiracy. (*Id.* ¶¶ 61–62.)

**\*2** San Mateo alleges the same violation of § 1 of the Sherman Act that the direct purchasers alleged (Count I), [1] but it also alleges violations of various state antitrust laws (Count II) [2] and state unfair competition or consumer protection laws (Count III) . [3] San Mateo includes argument directed toward its attempt to proceed as a class action under Federal Rule of Civil Procedure 23, and defines its "Indirect Purchaser Class" as follows:

[1] As the defendants note, San Mateo's complaint closely mimics—and in some instances appears to be taken verbatim from—the direct purchasers' consolidated amended complaint, at least with respect to the federal antitrust allegations. In contrast to the direct purchasers, however, San Mateo does not seek damages based upon the alleged § 1 violation. Such damages are not available to indirect purchasers under *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977); instead, San Mateo seeks injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. *See U.S. Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 627 (7th Cir.2003) ("[T]he direct-purchaser doctrine does not foreclose equitable relief."); *In re Brand Name Prescription Drugs Antitrust Litig.,* 878 F.Supp. 1078, 1083 (N.D.Ill.1995) ("Regardless of whether they are deemed indirect purchasers under *Illinois Brick* ... all of the plaintiffs may still pursue injunctive relief under § 16 of the Clayton Act.").

[2] These are Alabama, Alaska, Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Utah, Vermont, West Virginia, Wisconsin, and Wyoming. In its response, however, San Mateo agreed to dismiss the claims brought under the laws of Alabama and Maryland, as well as claims for damages based on Alaska and Wyoming law. (*See* Mem. in Opp'n to Defs.' Mot. to Dismiss at 1 n.1, ECF No. 369.) Therefore, these claims are dismissed.

[3] These are Colorado, the District of Columbia, Florida, Illinois, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Nebraska, New Mexico, New York, and Utah. As above, San Mateo agreed to dismiss its claims with respect to Kentucky, Utah, Maryland, Kansas, and Massachusetts. (*See* Mem. in Opp'n to Defs.' Mot. to Dismiss at 1 n.1.) These claims are dismissed as well. San Mateo requests leave to amend to add claims pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11, but having heard no argument with respect to the prejudice or futility of such an amendment, the court denies the motion at this time. If and when San Mateo is actually in a position to amend, it may seek leave to do so by filing a separate, properly briefed motion.

All persons and entities in the United States who purchased Plasma–Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present ("Class Period") and, which meet the definition of one or more of the Identified State Subclasses. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

San Mateo also defines thirty putative subclasses using this definition and replacing "the United States" with the name of each relevant state. San Mateo seeks to proceed under Rule 23(b)(3), arguing that common questions of fact will predominate in this case.

Together, the defendants have moved to dismiss the complaint under Rule 12(b)(6). First, they argue that this court should decide the issue of San Mateo's Article III standing before deciding whether to certify the class, and that San Mateo—being located in California and having not purchased plasma therapies in any other state—lacks standing to proceed except as to its California state law claims. Further, the defendants claim that San Mateo lacks antitrust standing based on the considerations delineated in *Associated General Contractors of California, Inc. v. California State Council*

of Carpenters ("AGC"), 459 U.S. 519 (1983), and that all of San Mateo's claims should be dismissed for this reason. Finally, the defendants allege that San Mateo's state law claims fail for various reasons, which the court does not reach at this time.

## II. LEGAL STANDARD

Under Rule 12(b)(6), the defendant may seek to dismiss the case if the plaintiff "fail[s] to state a claim upon which relief can be granted." The court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. *Stayart v. Yahoo! Inc.,* 623 F.3d 436, 438 (7th Cir.2010). But although Rule 8(a) only requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," nonetheless the complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. The relevant question is whether the complaint includes enough factual allegations to "raise a right to relief above the speculative level ." *Id.* In other words, to survive a motion to dismiss post-*Twombly,* " 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together,' and the question the court should ask is *'could* these things have happened, not *did* they happen." ' *Estate of Davis v. Wells Fargo Bank,* 633 F.3d 529, 533 (7th Cir.2011) (quoting *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404–05 (7th Cir.2010)).

**\*3** Moreover, Rule 8 "simply specifies the conditions of the formal adequacy of a pleading"—it does not set forth the complaint's "substantive adequacy, that is, its legal merit." *Cnty. of McHenry v. Ins. Co. of the West,* 438 F.3d 813, 818 (7th Cir.2006) (quoting *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7th Cir.1999) (internal quotation marks omitted)). Thus, the non-moving party is required to provide some legal basis in support of his complaint, and "although the district court is required to consider whether a plaintiff could prevail under any legal theory or set of facts, it 'will not invent legal arguments for litigants,' " nor is it " 'obliged to accept as true legal conclusions or unsupported conclusions of fact." ' *Id.* (quoting *Hickey v. O'Bannon,* 287 F.3d 656, 658 (7th Cir.2002), and *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1335 (7th Cir.1995)).

## III. ANALYSIS

A. Article III Standing and Class Certification
The standing inquiry is, at heart, an inquiry into whether a particular litigant "is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright,* 468 U.S. 737, 750–51 (1984) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). "This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.' " *Kowalski v. Tesmer,* 543 U.S. 125, 128–29 (2004) (quoting *Warth,* 422 U.S. at 498). The limitations on federal court jurisdiction stem from the Article III "case or controversy" requirement; a litigant cannot proceed unless he demonstrates "injury in fact plus redressability." *Kochert v. Greater Lafayette Health Serv., Inc.,* 463 F.3d 710, 714 (7th Cir.2006). In the case of alleged antitrust violations, prudential considerations also oblige the litigant to demonstrate what has been called "antitrust standing." *See Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110 n.5–6 (1986). The court turns to Article III standing and class certification first. *See Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors,* 522 F.3d 796, 800 (7th Cir.2008) ("[T]he prudential standing analysis assumes satisfaction of the Article III requirements.").

The defendants do not challenge San Mateo's Article III standing under the Sherman and Clayton Acts, nor do they argue that San Mateo lacks standing under California's Cartwright Act. Instead, the defendants focus on San Mateo's standing to bring the non-California state-law claims on behalf of unnamed putative class members. San Mateo claims that it is not seeking relief *"on behalf of itself,* under any law other than California's Cartwright Act," that "all of the damages sought under these thirty-six state laws are on behalf of the unnamed members of the putative class," and that "it is these unnamed putative class members' Article III standing to pursue such claims that is relevant, not [San

Mateo's].' " (Pl.'s Mem. of Law in Opp'n at 11 n.5, ECF No. 369.) Therein lies the crux of the debate: The defendants argue that the court must determine whether San Mateo has standing to pursue these claims *before* certifying a class, and that since San Mateo is located in California and did not purchase plasma therapies in other states, it lacks such standing. San Mateo counters by arguing that class certification is "logically antecedent" to Article III standing, and that the court should certify the class, then determine Article III standing "with reference to the class as a whole."

**\*4** San Mateo's "logically antecedent" language is drawn from two decisions, *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999) and *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997), wherein the Supreme Court grappled with attempts to settle an asbestos tort liability case. The settlement as proposed would have applied to "exposure-only" class members, *i.e.,* unnamed class members who did not yet suffer from any asbestos-related physical injury. While the Court recognized the general rule that "Article III court[s] must be sure of [their] own jurisdiction before getting to the merits," it went on to note that in *Ortiz* and *Amchem,* the class certification issues were " 'logically antecedent' to Article III concerns" and therefore could "properly be treated before Article III standing." *Ortiz,* 527 U.S. at 831; *see Amchem,* 521 U.S. at 612. The Court then delved into a detailed analysis of class certification issues, while staying " 'mindful that [Rule 23's] requirements must be interpreted in keeping with Article III constraints.' " *Ortiz,* 527 U.S. at 831 (quoting *Amchem,* 521 U.S. at 612–13).

As one observer noted, this "logically antecedent" concept "has caused a great deal of mischief." *See* Linda S. Mullenix, *Standing and Other Dispositive Motions After* Amchem *and* Ortiz: *The Problem of "Logically Antecedent" Inquiries,* 2004 Mich. St. L. Rev 703, 707 (Fall 2004). Some courts have taken an almost categorical approach, routinely resolving class certification questions prior to conducting a standing inquiry. *See In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 653–57 (E.D.Mich.2011) (providing a good overview of the state of the law). Others have taken a "nuanced" approach, attempting to fashion a governing principle to determine when class certification is considered "logically antecedent." *See* Mullenix, 2004 Mich. St. L. Rev at 727 (describing *Payton v. Cnty. of Kane,* 308 F.3d 673 (7th Cir.2002) and *Rivera v. Wyeth–Ayerst Labs.,* 283 F.3d 315, 319 n.6 (5th Cir.2002)). Finally, some courts limit *Ortiz* and *Amchem* to the "very specific situation of a mandatory global settlement class," and do not interpret those cases to require courts to consider class certification before standing. *See, e.g., Easter v. American West Fin.,* 381 F.3d 948, 962 (9th Cir.2004). Even with in this district, courts have not always taken a uniform view. *Compare, e.g., In re Aftermarket Filters Antitrust Litig.,* No. 08 C 4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov 05, 2009) ("*Ortiz* created an exception, limited to class actions, to the general rule that courts address standing as a threshold matter."), *with In re Potash Antitrust Litig.,* 667 F.Supp.2d 907, 920–23 (N.D.Ill.2009) ("*Ortiz,* as properly understood within the context of *Georgine* and *Amchem,* does not *require* district courts to postpone the threshold inquiry into Article HI standing until after class certification."), *rev'd on other grounds sub nom. Minn–Chem, Inc. v. Agrium Inc.,* 657 F.3d 650 (7th Cir.2011).

**\*5** Relevant here, the Seventh Circuit has applied the "logically antecedent" test beyond the narrow confines of the original *Amchem* and *Ortiz* decisions. *See Payton,* 308 F.3d at 680. On the other hand, even after *Ortiz* and *Amchem* the Seventh Circuit has continued to resolve standing challenges before class certification. *See, e.g., Arreola v. Godinez,* 546 F.3d 788, 794 (7th Cir.2008) (resolving standing as "an antecedent legal issue" prior to evaluating class certification). Together, the court interprets these decisions to mean that while *Ortiz* and *Amchem* are not confined to their particular facts, class certification issues are not always appropriate for a pre-standing evaluation. In this case, the court concludes class certification issues are not logically antecedent to the Article III standing question, but that San Mateo has established standing sufficient to allow it to pursue its non-California state-law claims for the time being.

San Mateo would have the court interpret the Seventh Circuit's *Payton* decision expansively. It argues that where a plaintiff is injured by "the same course of conduct for which it seeks a remedy on behalf of the class" and has standing under the laws of its "home state," standing for the remaining state-law claims must be addressed after class certification. (Pl.'s Mem. of Law in Opp'n at 9–10.) In the court's view, *Payton* should not be read so broadly. In that case, six arrestees who had been released on bail from various county jails filed a putative class action challenging an Illinois law that permitted the counties to impose a special bail fee as a condition for release. That fee was set individually by each county,

and cost between $1 and $45. The named plaintiffs sought to certify a class that would include everyone who paid the fee in nineteen counties, even though the named plaintiffs had direct claims in only two. The district court had dismissed all of the claims and denied the motion for class certification as moot. Upon review, the Seventh Circuit quickly concluded that the named plaintiffs had individual standing to proceed on their direct claims, and that the case should have advanced to the class certification stage as to those two counties. The Seventh Circuit then turned its attention to the "thorniest issue in this case: the propriety of maintaining a suit against the other 17 counties, for which we have no specific named plaintiffs." *Payton,* 308 F.3d at 677–78.

The court began by undertaking a detailed discussion of the "juridical link" doctrine, which permits a class action claim to go forward where "the plaintiffs as a group—named and unnamed—have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or [are] otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious.' " *Id.* at 678–79 (quoting *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 466 (9th Cir.1973)). Because the bail bond fee was permitted by state-wide statute, the constitutionality of that fee would not differ from one county to the next. Therefore, the Seventh Circuit concluded that the district court should have considered class certification first. *Payton,* 308 F.3d at 680. But in so deciding, the court emphasized that the existence of the Illinois statute "assure[d] that the representative ha[d] the *same legal claim* as the unnamed parties." *Id.* at 681–82 (emphasis added). The court also went on to stress that a named plaintiff cannot "acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs," since "a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action." *Id.* at 682 (internal quotation marks and citations omitted).

**\*6** Thus, in *Payton* the court found a juridical link between the defendants because the named and unnamed plaintiffs suffered identical injuries based on a uniform state law; this made it appropriate to engage in a class certification analysis prior to delving into standing. San Mateo's attempt to analogize to its own case falls flat. It would have the court look to the existence of the alleged conspiracy, as that conspiracy "is alleged to have caused injuries to all members of the class." (Pl.'s Mem. of Law in Opp'n at 7–8 n.4.) While this is true, to focus on a general "course of conduct" is to miss the mark; instead, it is the specific legal claims that are relevant. When San Mateo claims *not* to seek relief "on its own behalf" for the non-California state-law claims (*see* Pl.'s Mem. of Law in Opp'n at 11 n.5), it effectively concedes that it suffered no injury and has no claim as to those states. Thus, the class certification issue is not "logically antecedent," because "[a] ruling as to the named plaintiffs' standing depends in no way upon the standing of proposed class members." *See In re Wellbutrin XL Antitrust Litig.,* 260 F .R.D. 143, 155 (E.D.Pa.2009) (also noting that in *Ortiz* and *Amchem,* "the question of whether the proposed class members could become parties to the case was logically antecedent to the question of whether they had standing to make claims against the defendants in those cases").

Because class certification issues are not logically antecedent here, the court addresses San Mateo's standing to pursue the state-law claims. To the extent that San Mateo does not claim to suffer its own personalized injury by virtue of the defendants' alleged violations of non-California state-law, San Mateo lacks standing to assert those claims. *See Lewis v. Casey,* 518 U.S. 343, 357 (1996) ("[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' ") (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40, n.20 (1976)); *Payton,* 308 F.3d at 682.

That is not the end of the inquiry: San Mateo alleged that it was forced to purchase plasma-derivative protein therapies on the spot market, and in its opposition it claims that these spot markets required San Mateo to purchase the therapies "from anyone in the nation that had a sufficient supply," creating an open question as to where each purchase took place. [4] Nowhere in the complaint did San Mateo actually allege that a purchase took place in another state. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss at 8 ("San Mateo does not allege it made even a single plasma purchase in any state.").) Nor does the 134–page complaint contain any specific allegation that San Mateo suffered a personalized injury due to the defendants' alleged violations of other states' laws. But while "[t]he party seeking to invoke federal jurisdiction ... has

the burden of establishing that it meets the requirements of standing," *Disability Rights Wis., Inc.,* 522 F.3d at 800, at this stage San Mateo does not have to make specific allegations. Instead, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Lujan,* 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 889 (1990)); *cf. Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443–45 (7th Cir.2009) (holding the plaintiff to a higher standard where the defendant mounted a factual attack on the plaintiff's standing). While the complaint is silent as to how and where the alleged spot market transactions took place, the allegation of spot market purchases is the type of general allegation that is sufficient at this stage. *See Midwest Gas Servs., Inc. v. Indiana Gas Co.,* 317 F.3d 703, 709–10 (7th Cir.2003) ("We keep in mind that to survive a motion to dismiss ... a plaintiff need not include the particulars of his claim; only a 'short and plain statement' is needed. This is also true for antitrust cases.").

4    San Mateo also argues that it has standing to pursue at least some of its non-California state-law claims either because some states do not require any part of the alleged injury to have occurred within the state (*e.g.,* Michigan, Colorado), and because some states' statutes do not clearly require an in-state purchase (*e.g.,* Arizona, Wyoming). None of this obviates the need for San Mateo to establish a personalized injury in fact.

**\*7** None of this is to say that San Mateo will be able to establish standing at the summary judgment stage. Standing is not a "mere pleading requirement [ ], but rather an indispensable part of the plaintiff's case," which means that each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Apex Digital,* 572 F.3d at 443 (quoting *Lujan,* 504 U.S. at 561). Ultimately, San Mateo must support its standing with more than mere "unadorned speculation." *See Plotkin v. Ryan,* 239 F.3d 882, 885 (7th Cir.2001). For the time being, however, San Mateo has provided sufficient general allegations of its own individualized injury for its non-California state-law claims, and the court will not dismiss these claims for lack of Article III standing. As with the direct purchaser plaintiffs, any attempt by San Mateo to certify an indirect purchaser class shall proceed according to the case management schedule already in place.

B. Antitrust Standing

To establish antitrust standing, San Mateo must demonstrate both that (1) it has suffered an *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful," *Cargill,* 479 U.S. at 109 (quotation marks and citation omitted); and (2) it is the "proper party" to maintain an antitrust action. *See AGC,* 459 U.S. at 535 n.31 ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."); *Kochert,* 463 F.3d at 715–16 (citing *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 597–98 (7th Cir.1995)); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374 (7th Cir.1987). The court has little difficulty in concluding that San Mateo alleges an antitrust injury, because San Mateo claims that the defendants conspired to reduce output, thereby forcing San Mateo to pay higher prices. This is a core antitrust injury. *See U.S. Gypsum Co.,* 350 F.3d at 626–27 ("A private plaintiff must show antitrust injury—which is to say, injury by reason of those things that make the practice unlawful, such as reduced output and higher prices."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.,* 196 F .3d 818, 825 (7th Cir.1999) ("To recover under the antitrust laws, the plaintiff must show that its injury flows from that which makes the conduct an antitrust problem: higher prices and lower output.").

The "proper plaintiff" determination is less straightforward. In general, a court evaluates that issue by reference to the Supreme Court's *AGC* opinion, which requires "a case-by-case analysis [of] the link between a plaintiff's harm and a defendant's wrongdoing." *Loeb Indus. Inc. v. Sumitomo Corp.,* 306 F.3d 469, 484 (7th Cir.2002) (citing *AGC,* 459 U.S. at 535–36). A number of factors are considered: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Id.* (citing *AGC,* 459 U.S. at 537–45); *see Kochert,* 463 F.3d at 718.

**\*8** Here, the defendants argue that *AGC* governs both the state and federal antitrust claims, and that the application of the *AGC* factors demonstrates San Mateo's lack of antitrust standing. San Mateo responds that *AGC* is inapplicable because this case involves horizontal price fixing on behalf of indirect purchasers "who are 'down a chain of supply' of the price-fixed product." (*See* Mem. in Opp'n at 13 (quoting *In re Aftermarket Filters Antitrust Litig.,* 2009 WL 3754041 at \*7).) Furthermore, San Mateo claims that to apply *AGC* here would be to undermine the states' intent in enacting their own indirect purchaser antitrust legislation. San Mateo also argues that it has antitrust standing based on the factors set forth in *AGC.*

It is not clear whether San Mateo directs its "supply chain" argument to only the state law antitrust claims, or whether it argues that the reasoning in *Aftermarket Filters* applies to its federal antitrust claim as well. In any event, *Aftermarket Filters* is the only authority San Mateo cites in support of its argument that *AGC* is generally inapplicable to the case. In *Aftermarket Filters,* the district court concluded that *"AGC* was obviously never intended to apply to [a] situation involving claims of price fixing down a chain of distribution, because in the federal context such claims were already barred by *Illinois Brick,"* and that *"AGC* has no application to actions brought by Direct and Indirect Purchasers alleging a conspiracy to fix prices in an entire physical market." *In re Aftermarket Filters Antitrust Litig.,* 2009 WL 3754041, at \*7. The court seemingly went on to limit *AGC* to cases in which "the defendants' conduct causes damage in two separate but related markets." *Id.* (citing *Loeb Indus. Inc. v. Sumitomo Corp.,* 306 F.3d 469, 481–85 (7th Cir.2002)).

To the extent that *Aftermarket Filters* supports San Mateo's argument, this court must respectfully disagree with the reasoning set forth therein. *AGC* is not so limited. First, *Illinois Brick* does not resolve the question at hand, because *Illinois Brick* bars indirect purchasers only from bringing federal antitrust claims for damages. Injunctive relief under § 16 of the Clayton Act remains available, and necessitates an antitrust standing inquiry. *See Int'l Bhd. of Teamsters,* 196 F.3d at 823, 828 (noting that the "direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of *Associated General Contractors* are analytically distinct" and are "independent obstacle[s] to recovery"). And in any event, the antitrust standing doctrine was not created by the Supreme Court in *AGC;* instead, the *AGC* analysis "was an attempt by the Court to synthesize and clarify the confusing collection of the then-extant antitrust-standing rules." *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 850–51 & n.13 (3d Cir.1996) ("Recognizing that these alternative formulations for assessing antitrust standing often led to contradictory and inconsistent results, the Supreme Court in *AGC* attempted to articulate a unified set of factors that could be applied generally in determining antitrust standing."). Thus, courts have understood *AGC* to incorporate the principles of *Illinois Brick, id.,* and they have applied the *AGC* factors to cases that involve a single chain of distribution. *See, e.g., In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 401 (3d Cir.2000) (evaluating § 16 claim for injunctive relief brought by indirect purchasers of a prescription drug by reference to the *AGC* factors). While courts also have applied *AGC* to cases that involve "two separate but related markets," this court cannot identify any reason to limit *AGC* to such a scenario.

**\*9** The court therefore will apply *AGC,* at least to the federal claim. As an indirect purchaser, San Mateo may seek only injunctive relief. This fact necessarily modifies the court's analysis, because "standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries." *See Cargill,* 479 U.S. at 110–111 n.6. Still, the *AGC* analysis remains "effectively the same." *Sw. Suburban Bd. of Realtors, Inc.,* 830 F.2d at 1377–78. In effect, the court is left to consider the presence of improper motive, the causal connection between the violation and the harm, and the directness of the injury. San Mateo has alleged, *inter alia,* that the defendants intentionally signaled each other, "scrubbed" meeting minutes to hide evidence of their conspiracy, and purposefully restricted supplies of plasma-derivative protein therapies in order to raise prices. "As intent and motive may be generally averred in a pleading, *see* Fed.R.Civ.P. 9(b), this is a sufficient allegation of improper motive." *Omnicare, Inc. v. Unitedhealth Group, Inc.,* 524 F.Supp.2d 1031, 1043 (N.D.Ill.2007). San Mateo also has alleged a causal connection between the Sherman Act violation and the harm it purports to have suffered, as it alleges that it paid higher prices by virtue of the conspiracy to reduce output.

In re: Pharma Service Platein Therapies Antitrust Litigation, Not Reported in F.Supp.2d...
Case: 3:1 Case 21-50428-JTD Doc 22-4 Filed 05/21/21 Page 111 of 202 age ID #:1589
2012 WL 39766, 2012-1 Trade Cases P 77,751

But it is the directness of the injury that weighs "particularly heavily" in the court's mind, because " '[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." ' *See Kochert,* 463 F.3d at 718–19 (quoting *AGC,* 459 U.S. at 542). In this case, the existence of a less remote party to vindicate the public interest is no hypothetical proposition: the direct purchasers are actively pursuing their claims, and they seek damages and the same injunctive relief sought by San Mateo. By denying San Mateo leave to proceed, the court will not "leave a significant antitrust violation undetected or unremedied." *Id.* (citing *AGC,* 459 U.S. at 542). The court concludes that, based upon prudential considerations, San Mateo lacks antitrust standing to pursue its federal antitrust claim.

## C. Subject Matter Jurisdiction and the MDL

The parties have raised a number of other important issues, including whether and how the *AGC* factors apply to each of the various state antitrust claims San Mateo seeks to bring, and whether San Mateo fails to state a claim for relief because, *inter alia,* it fails to plead with the particularity required by Rule 9(b). Those questions must be put off for the time being, because the court must address two issues that have not been briefed by either party: whether the court has subject matter jurisdiction, and whether the dismissal of the federal antitrust claim has any effect on whether this particular case should continue as part of the multi-district litigation.

**\*10** First, although San Mateo set out class allegations in its complaint, it did not mention the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) as a basis for this court's jurisdiction. Instead, it alleged federal jurisdiction by virtue of § 16 of the Clayton Act, 15 U.S.C. § 26 (for injunctive relief based on the defendants' alleged violation of § 1 of the Sherman Act), and cited 28 U.S.C. §§ 1331 and 1337. (*See* Compl. ¶ 25.) Section 1332(d) is only mentioned in its response to the defendants' motion to dismiss, when San Mateo admits that its case "primarily involves state law," and that the case would have proceeded before a state court save for the fact that CAFA is now in effect. (*See* Mem. in Opp'n to Defs.' Mot. to Dismiss at 1.)

Based on the court's ruling above, the federal claim is now dismissed. This court must determine whether it has subject matter jurisdiction. *See Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 634 (7th Cir.2007). At present, the court has no idea whether San Mateo's complaint meets CAFA's jurisdictional requirements. San Mateo may have satisfied the requirement for at least 100 proposed class members. *See* 28 U.S.C. § 1332(5)(B), Compl. ¶ 302 (describing "thousands of Class members"). But the complaint never sets forth the amount in controversy, which must "exceed[ ] the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(2). Moreover, the court does not know whether there is any basis for the court to decline to exercise jurisdiction under CAFA. Because it is San Mateo that seeks to establish federal jurisdiction, it is San Mateo's burden to establish the jurisdictional facts by a preponderance of the evidence. *See Blomberg v. Serv. Corp. Int'l,* 639 F.3d 761, 763 (7th Cir.2011).

Second, even if federal jurisdiction exists by virtue of the CAFA, the other cases that have been transferred to this court all relate to direct purchaser claims under the Sherman Act. Not only does this case involve an indirect purchaser (or purchasers), but the federal claim has been dismissed, leaving the court with nothing but a myriad of state-law claims. It is clear that this case will complicate and delay the proceedings. Because the only potential basis for federal jurisdiction is CAFA, the court questions whether this particular case should remain a part of this multidistrict proceeding or whether it belongs in the Northern District of California.

As San Mateo bears the burden of proof on the subject matter jurisdiction question, it shall file an initial brief on these issues by February 10, 2012; the defendants' response is due March 2, 2012, and San Mateo's reply is due March 9, 2012. The briefs are not to exceed fifteen pages.

## IV. CONCLUSION

For the reasons stated above, the court concludes that San Mateo has Article III standing to pursue its state-law claims, but lacks antitrust standing to pursue its federal claim. The federal claim therefore is dismissed, and the remaining issues are held in abeyance pending the completion of briefing as to this court's subject matter jurisdiction under CAFA and the propriety of keeping this case as part of the multi-district referral.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 39766, 2012-1 Trade Cases P 77,751

---

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3119499
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

In re YASMIN AND YAZ (DROSPIRENONE) MARKETING,
SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION.
This Document Relates to:
Philadelphia Firefighters Union Local No. 22 Health and Welfare Fund,
et al., on behalf of themselves and all others similarly situated, Plaintiffs,
v.
Bayer Healthcare Pharmaceuticals Inc., et al., Defendants.

Nos. 3:09–md–02100–DRH–PMF, 3:09–cv–20071–DRH–PMF.
|
MDL No. 2100.
|
Aug. 5, 2010.

*ORDER*

DAVID R. HERNDON, Chief Judge.

**\*1** This cause comes before the Court for consideration of Defendant Bayer's motion to dismiss (Doc. 36) Plaintiffs' First Amended Complaint. (Doc. 21). Plaintiffs filed a response to the motion (Doc 39) and Bayer subsequently filed a reply. (Doc. 40). Oral arguments were heard on July 1, 2010. Upon careful consideration of the parties' arguments, the Court determines that Bayer's motion to dismiss shall be **GRANTED**.

## I. INTRODUCTION

Plaintiffs (Philadelphia Firefighters Union Local No. 22 Health and Welfare Fund and American Federation of State, County and Municipal Employees, District Council 47 Health and Welfare Fund), are health and welfare benefit funds that directly or indirectly pay for prescription drugs for their participants and their participants' dependents (health and welfare benefit funds such as Plaintiffs are commonly referred to as third party payors). (Doc. 21 ¶¶ 6–7). Plaintiffs seek to represent a proposed class consisting of "[a]ll third party payors in the United States and its territories that purchased, reimbursed, and/or paid for all or part of the cost of YAZ dispensed pursuant to prescriptions in the United States." (Doc. 21 ¶ 123).

Defendants are Bayer HealthCare Pharmaceuticals, Inc., Bayer Corporation, Bayer HealthCare LLC, and Bayer Schering Pharma AG (collectively "Bayer"). Bayer manufactures and markets the oral contraceptive YAZ.

Plaintiffs contend that Bayer and their associates engaged in (and conspired to engage in) a fraudulent, misleading, and unlawful advertising campaign ("fraudulent advertising campaign") that wrongfully promoted YAZ as safe and effective for unapproved off-label uses and concealed or omitted facts pertaining to YAZ's safety profile. (See e.g., Doc. 21 ¶¶ 4, 65, 66, 68, 70, 79). Plaintiffs claim that the alleged misrepresentations and omissions in the fraudulent advertising campaign expanded the market for YAZ and falsely inflated the price for YAZ, which in turn caused the Plaintiffs, as

Case: 3:11-cv-50428-JTD, Doc 22-4 Filed 05/21/21 Page 114 of 202 PageID #:1592

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2010 WL 3119499, RICO Bus.Disp.Guide 11,930

third party payors, to pay (and/or reimburse) an excessive price for an excessive amount of YAZ prescriptions. (See Doc. 21 ¶¶ 120, 121).

Plaintiffs have asserted claims under the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute and common law claims for negligence, fraud and misrepresentation, and unjust enrichment. Defendants seek to dismiss the complaint in its entirety for failure to state a claim. (Doc. 36).

## II. BACKGROUND

### A. Factual Background

YAZ "is a combined hormonal oral contraceptive consisting of estrogen and progestin." (Doc. 21 ¶ 36). The estrogen in YAZ is ethinyl estradiol and the progestin is drospirenone. (Doc. 21 ¶ 37). According to the Complaint, "drospirenone has certain side effects that are different from and more dangerous than the side effects associated with [other progestins]." (Doc. 21 ¶ 52; see also id. ¶ 63). Plaintiffs allege that these side effects include an increase in potassium levels which can result in hyperkalemia, a condition that could eventually lead to heart attack, pulmonary embolism, or stroke. (Doc. 21 ¶¶ 53–54). The Complaint also alleges that individuals who take YAZ have a "substantially increased risk of gallbladder complications." (Doc. 21 ¶ 56).

*2 The Food and Drug Administration ("FDA") has approved YAZ for the following uses: (1) as an oral contraceptive (doc. 21 ¶ 39); (2) as a treatment for moderate acne vulgaris in women who choose to use an oral contraceptive (doc. 21 ¶ 41); and (3) as a treatment for premenstrual dysphoric disorder ("PMDD") in women who choose to use an oral contraceptive. (Doc. 21 ¶ 40).

"PMDD is a condition associated with severe emotional and physical problems that are closely linked to the menstrual cycle." (Doc. 21 ¶ 44). PMDD and Premenstrual syndrome ("PMS") share some common symptoms, such as depression, anxiety, tension, irritability, and moodiness. (Doc. 21 ¶ 46). The symptoms associated with PMDD, however, are more severe than those associated with PMS. (Doc. 21 ¶ 46). PMDD is estimated to affect 5% of menstruating women. (Doc. 21 ¶ 44). PMS, on the other hand, affects an estimated 75% of menstruating women. (Doc. 21 ¶ 45).

### B. Plaintiffs' Claims

Plaintiffs contend that Bayer and its associates [1] engaged in (and conspired to implement and carry out) a fraudulent advertising campaign that allegedly misled a number of persons or groups of persons, including consumers; patients; physicians; third party payors; pharmacy benefit managers; the medical, pharmaceutical, and scientific communities; and "others involved in the selection, approval, distribution, and payment of the costs for prescription drugs." (See e.g., Doc. 21 ¶¶ 4, 78, 109). The fraudulent advertising campaign allegedly contained misrepresentations regarding the circumstances in which YAZ had been approved for use and YAZ's safety profile. (Doc. 21 ¶¶ 4, 78, 109). Specifically, Plaintiffs allege that YAZ was improperly promoted "as safe and effective for unapproved off-label uses lacking scientific support, including PMS, acne, anxiety, tension, irritability, moodiness, fatigue, headaches, and muscle aches." (Doc. 21 ¶ 68. See also Doc. 21 ¶¶ 68, 87, 97 (asserting that Bayer promoted YAZ as safe and effective for "unapproved off-label" or "off-label" uses); Doc 21 ¶¶ 79, 87, 98 (alleging that Bayer "overstated" YAZ's benefits); Doc 21 ¶ 70 (claiming that consumers selected YAZ over competing drugs and were willing to pay more for YAZ because of its purported "extra benefits")).

[1] For purposes of Plaintiffs' RICO claims, Plaintiffs allege the existence of two separate enterprises: The YAZ DTC Enterprise and The YAZ Medical Marketing Enterprise (Doc. 21 ¶¶ 137, 155). The YAZ DTC Enterprise is identified as "an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Bayer, including its employees and agents, the marketing firm Young & Rubicam, other marketing and publication firms that Bayer associated with to market YAZ directly to patients,

Case: 3:1-Case 21-50428-JTD-cont Doc 22-4 Filed 05/21/21 Page 115 of 202 PageID #:1593
In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...
2010 WL 3119499, RICO Bus.Disp.Guide 11,930

and the web designers who created www.YazUS.com." (Doc. 21 ¶ 137). The YAZ Medical Marketing Enterprise is identified as "an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Bayer including its employees and agents, medical education companies, pharmacy chains, and speakers paid by Bayer to promote YAZ for off-label uses at lunches, dinners, videoconferences, CMEs, and other 'educational' programs." (Doc. 21 ¶ 155).

In addition, Plaintiffs contend the fraudulent advertising campaign concealed or omitted the following: (1) that the side effects associated with YAZ are different from and more dangerous than the side effects associated with oral contraceptives that do not contain drospirenone; (2) that YAZ users have a higher risk for adverse events and are at risk of experiencing dangerous life-threatening side effects; (3) and that patients using YAZ should be monitored more regularly than normal while using YAZ. (See Doc. 21 ¶¶ 51–60, 65, 68).

Plaintiffs theorize that the purpose of the fraudulent advertising campaign was to increase profitability by, (1) expanding the market for YAZ and (2) fostering an environment that would allow Bayer to create and sustain a falsely inflated price for YAZ. (See e .g., Doc. 21 ¶ 4 ("[Bayer] conspired with others to implement and carry out" the fraudulent advertising campaign "in order to increase YAZ sales and price YAZ at a substantial but unwarranted premium as compared to safer, equally effective, and cheaper oral contraceptives."); Doc. 21 ¶ 70 ("Bayer expected and intended that such perception would increase consumer demand for YAZ in the form of increased consumption and willingness of consumers to pay more for YAZ than ordinary oral contraceptives in consideration of the purported extra benefits.")).

**\*3** A key component of Plaintiffs' allegations is that, in addition to oral contraception, YAZ had only been approved for two uses, the treatment of PMDD in women using oral contraceptives and the treatment of moderate acne in women using oral contraceptives. (See Doc. 21 ¶¶ 39–41). [2] Plaintiffs claim Bayer did not want the market for YAZ to be limited to the small subset of oral contraceptive users affected by PMDD or moderate acne. (See Doc. 21 ¶¶ 61, 62, 64, 110). [3] Accordingly, Plaintiffs contend, Bayer decided to promote YAZ as a safe and effective treatment for conditions or symptoms that are estimated to affect a greater number of potential users, namely acne of all severities, PMS, and/or other premenstrual symptoms not severe enough to warrant a diagnosis of PMDD. (See Doc. 21 ¶¶ 61, 62, 64, 65, 74–75, 77–79, 107–110).

[2]     As noted, the symptoms associated with PMDD and PMS overlap. (Doc. 21 ¶ 46). The distinction being the severity of the symptoms associated with PMDD. (Doc. 21 ¶ 46).

[3]     As noted, PMDD affects an estimated 5% of menstruating women while PMS affects an estimated 75% of menstruating women. (Doc. 21 ¶¶ 44, 45).

The fraudulent advertising campaign was allegedly accomplished using the following mechanisms: producing and sponsoring television commercials that allegedly promoted the drug as safe and effective for off label uses while minimizing risks associated with the drug (Doc. 21 ¶¶ 71–76); sponsoring a YAZ promoting website which "[falsely] indicat[ed] that all patients with moderate acne were candidates for YAZ and "failed to communicate any safety information" (Doc. 21 ¶ 77); providing financial incentives to pharmacies to draft "Dear Doctor" letters that promoted YAZ as a safe and effective treatment for PMS (Doc. 21 ¶ 103); sponsoring and/or promoting teleconferences, lectures, and continued medical education programs where physicians were given financial and other incentives to speak favorably about YAZ and promote YAZ for off label uses (Doc. 21 ¶¶ 91–97); and providing financial incentives to physicians as "rewards for past high-prescribing and inducements to write future prescriptions for off-label uses of YAZ." (Doc. 21 ¶ 92).

## III. ANALYSIS

### A. LEGAL STANDARD

Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. To state such a claim, the complaint need only contain a "short and plain statement of the claim showing that the pleader is

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2010 WL 3119499, RICO Bus.Disp.Guide 11,930

entitled to relief." Fed.R.Civ.P. 8(a)(2). In order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim for which relief can be granted, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563 (2007). Motions to dismiss are intended only to test the legal sufficiency of the plaintiff's complaint, not to address the claims on their merits; summary judgment motions are the proper vehicles to consider legal arguments and evidence.

Federal Rule of Civil Procedure 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In order to meet Rule 9(b)'s strictures and survive dismissal, a plaintiff must generally allege the who, what, where, and when of the alleged fraud. Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir.1999); DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990); see also Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 777 (7th Cir.1994).

## B. Counts I and II Civil RICO Claims

### 1. Overview

**\*4** In Counts I and II of their First Amended Complaint, Plaintiffs are seeking damages under the civil remedies provision of the federal RICO statute (18 U.S.C. § 1964(c)) for injuries that allegedly resulted from Bayer's alleged violations of 18 U.S.C. § 1962. In Count I, Plaintiffs allege that Bayer violated 18 U.S.C. § 1962(c) by committing acts of mail fraud and wire fraud (in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343). (Doc. 21 ¶ ¶ 134–173). Additionally, Plaintiffs allege that Bayer violated section 1962(c) by using interstate facilities to conduct "unlawful activity" (in violation of 18 U.S.C. § 1952). (Doc. 21 ¶¶ 134–173). [4] In Count II, Plaintiffs allege that Bayer violated 18 U.S.C. § 1962(d) by conspiring to violate section1962(c). (Doc. 21 ¶¶ 174–183). [5]

[4]    The term "unlawful activity" is defined to include a miscellany of criminal conduct, ranging from the violent (e.g., arson) to the non-violent (e.g., violation of state liquor laws). See 18 U.S.C. § 1952(b)(i)(1)-(3). Bribery is specifically enumerated as an "unlawful activity." See id. § 1952(b)(i) (2).

[5]    Section 1962(d) provides that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

Plaintiffs' allegations pertaining to mail and wire fraud are based on the alleged fraudulent advertising campaign (television commercials, YAZ promoting website, "Dear Doctor" letters, and other promotional or educational events sponsored by Bayer). (See Doc. 21 ¶¶ 69–78, 91–98, 146–149, 163–165; Doc. 39 pp. 11–12). Plaintiffs also generally allege that Bayer used the mails and wires to promote its fraudulent advertising campaign and to receive and distribute the proceeds of its fraudulent advertising scheme. (Doc. 21 ¶¶ 146–149, 163–165).

The activities that are the basis for Plaintiffs' allegations pertaining to use of interstate facilities to conduct "unlawful activity" is not entirely clear. The portions of the Amended Complaint that Plaintiffs reference in support of this claim contain only general conclusory allegations. (Doc. 39 p. 11 citing Doc. 21 ¶¶ 145, 148, 162, and 165). Paragraphs 91 through 104 of Plaintiffs' Amended Complaint, however, contain allegations regarding money and other benefits allegedly conferred on physicians and pharmacy chains to promote off-label uses of YAZ. (Doc. 21 ¶¶ 91–104). Assuming this section of the Amended Complaint sufficiently alleges bribery, a specifically enumerated "unlawful activity" under 18 U.S.C. § 1952(b), these allegations would be the basis for Plaintiffs' "unlawful activity" claims.

### 2. Standing

Plaintiffs cannot sustain their civil RICO claims unless they have standing. The RICO civil liability provision, 18 U.S.C. § 1964(c), confers standing on "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C.1964(c). The Supreme Court has held that the "by reason of" language requires a showing of proximate cause, i.e., a direct relationship between the plaintiff's injury and the defendant's injurious conduct. See Holmes v. Securities

Case: 3:11-50428-JTD Doc 22-4 Filed 05/21/21 Page 117 of 202 PageID #:1595

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2010 WL 3119499, RICO Bus.Disp.Guide 11,930

*Investor Protection Corp.,* 503 U.S. 258, 268 (1992); *RWB Services, LLC v. Hartford Computer Group, Inc.,* 539 F.3d 681, 686 (7th Cir.2008). Thus, in order to have standing, Plaintiffs must show a direct relationship between their alleged injury (paying too much for too many YAZ prescriptions) and the alleged RICO violation(s) (the alleged fraudulent advertising scheme and/or the alleged acts of bribery). [6]

[6]   For the purpose of its proximate cause analysis, the Court assumes that Plaintiffs have sufficiently alleged an "injury to business or property." The Court also assumes that the alleged wrongful conduct constitutes a violation of section 1962.

   **\*5** As is explained fully below, the Court finds that Plaintiffs cannot meet the direct relationship requirement. Accordingly, Plaintiffs do not have standing to bring a civil RICO cause of action. Absent standing, Plaintiffs cannot sustain their civil RICO claims and therefore, Counts I and II cannot survive Bayer's motion to dismiss.


### 3. RICO's Proximate Cause Requirement

In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258 (1992), the Supreme Court concluded that the "by reason of" language in 18 U.S.C. § 1964(c) requires a showing that the defendant's violation not only was the "but-for" cause of the plaintiff's injury, but the proximate cause as well. *See Id.* at 267–268. In so holding, the Court explained that it used the term " 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* at 268. As set forth in *Holmes,* in a civil RICO action, proximate cause is determined by examining whether a direct relationship exists between the injury asserted and the injurious conduct alleged. *See Id.* at 268–269 (describing the interpretation federal courts had given to the term in the past and holding that the same interpretation applies to section 1964(c) the Court stated that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Id. See also Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

The Court in *Holmes* discussed three policy considerations for requiring a direct relationship between the alleged harm and the alleged injurious conduct:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes,* 503 U.S. at 269–270 (internal citations omitted).


### 4. Direct Proximate Causation and Third Party Payor Actions Involving Prescription Drugs

#### a. Controlling Authority

Neither the Supreme Court nor the Seventh Circuit has addressed whether, in the prescription drug context, the claims of third party payors are too remote to satisfy civil RICO's direct proximate cause requirement. The Seventh Circuit addressed claims of a similar nature in *International Broth. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.* ("*Teamsters*" ), 196 F.3d 818 (7th Cir.1999). Extrapolating from *Teamsters,* however, is difficult because certain aspects of the case are unique to tobacco litigation and clearly distinguishable from the claims advanced

here. [7] Nonetheless, because the claims presented in *Teamsters* are at least in the same genre as the claims presented here, a brief review of the Court of Appeals decision for any relevant material is warranted.

[7]    The Court notes that in light of the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008), to the extent (if any) the Seventh Circuit's decision stands for the proposition that first party reliance is required to sustain a RICO claim it has been overturned.

**\*6** In *Teamsters,* welfare benefits funds and health insurers ("insurers") brought civil RICO claims against cigarette manufacturers for costs incurred in the provision of health care services to insured cigarette smokers. The claimed "racketeering acts" involved alleged misrepresentations by tobacco entities regarding the relation between smoking and health that were made to the public in general. *Id.* at 826. The insurers alleged that the misstatements influenced smokers and that they were injured by the amount they paid to provide medical care for smokers afflicted by lung cancer, heart disease, and other ailments.

The Court of Appeals concluded that the plaintiffs' RICO claims "flunk[ed] *Holmes." Id.* at 825. In reaching its decision, the Seventh Circuit stated: "The injury for which the plaintiffs seek compensation is remote indeed, the chain of causation long, the risk of double recovery palpable because smokers can file their own RICO suits, and the damages wickedly hard to calculate." *Id.* at 825. The Court of Appeals went on to articulate two reasons for deciding that the alleged injury was indirect. First, the alleged misstatements were directed at the public in general and affected the plaintiffs "(if at all) only because they may have influenced smokers." The insurers, the Seventh Circuit reasoned, were reacting to the medical results of smoking and not to the alleged misstatements. Second, the insurers were not seeking to recover money paid to the alleged wrongdoers; rather, they sought recovery of money paid to physicians and hospitals who treated the smokers without committing any wrong.

The Seventh Circuit also summarily rejected the contention that the insurers had been deceived by the alleged misstatements and as a result did not counsel their insureds about the dangers of smoking, which led to higher health expenses. The Court of Appeals explained that "[o]f all entities in society, insurers have the *best* information about the relation between smoking and health problems." *Id.* at 826. (emphasis in original). Further, the Court of Appeals found that attempting to determine what the insurers *would* have done and how effective such a campaign *would* have been was "hopelessly speculative." *Id.*

### b. Persuasive Authority

A number of other district courts have considered third party payor civil RICO claims in class actions involving pharmaceutical products. Plaintiffs bringing these claims have encountered a number of difficulties including their ability to meet the direct proximate cause requirement established in *Holmes.* A majority of courts considering the issue have concluded that the injury for which third party payors seek reimbursement is too remote and speculative to maintain a RICO claim. For instance, in *Ironworkers Local Union No. 68 v. Astrazeneca Pharmaceuticals LP, et al.* (Astrazeneca), 585 F.Supp.2d 1339 (M.D.Fla., Nov. 4, 2008), the defendant pharmaceutical manufacturer argued that the third party payor plaintiffs could not establish the requisite causal connection between the alleged RICO violation and plaintiffs' alleged injuries. Relying on the first *Holmes* policy consideration, Chief Judge Anne Conway of the Middle District of Florida, held that the third party payor plaintiffs' alleged injuries were too remote from the alleged misrepresentations to establish direct proximate cause. *Id.* at 1344. Judge Conway explained that it would be difficult to ascertain "damages caused by Defendants' alleged fraudulent conduct, as opposed to damages caused by other, independent, factors." *Id.* According to the district court, the "key independent factor" was that plan participants could only obtain the subject drug with a prescription. *Id.* The district court explained that physicians use independent medical judgment to decide whether to prescribe the subject drug to a particular patient and that judgment can be influenced by any number of factors. *Id.* Accordingly, establishing that the third party payors' injuries were caused by the alleged misconduct would require an inquiry into each doctor patient relationship to determine whether the physician was influenced by the alleged misrepresentations and to what extent. *Id.*

**\*7** Similar decisions were reached by other district courts in the following cases: *Southeast Laborers Health and Welfare Fund v. Bayer Corp.,* 655 F.Supp.2d 1270, 1278–12 (S.D. Fla. Jul 30, 2009) (third party payors could not establish proximate cause in civil RICO action against prescription drug manufacturer); *In re Schering–Plough Corp. Intron/Temodar Consumer Class Action,* 2009 WL 2043604, at 26 (D.N.J., Jul. 10, 2009) (dismissing third party payors' RICO claims in class action complaint alleging illegal or off-label promotion of prescription drugs where the "court or jury would have to determine whether each prescribing physician received fraudulent marketing information from the Defendants and whether each physician was influenced to prescribe the Subject Drugs on account of Schering's conduct"); *In re Actimmune Marketing Litigation,* In re Actimmune Mktg. Litig., 614 F.Supp.2d 1037 (N.D.Cal. Apr. 28, 2009) (recognizing that doctors prescribe drugs based on "personalized conditions," while rejecting the plaintiffs' claims on causation grounds); *District 1199P Health and Welfare Plan v. Janssen, L.P.,* 2008 WL 5413105, at \*9 (D.N.J. Dec. 23, 2008) (questioning whether third party payors "could ever properly plead proximate causation, as required by [*Holmes* ] or if the independent and individualized decision-making of physicians prescribing [the subject drug] breaks any chain of causation between Defendants' alleged misconduct and Plaintiffs' payment for the medication").

### 5. Direct Proximate Causation in this Case

Applying the proximate cause analysis of *Holmes* and its progeny, this Court is inclined to agree with other district courts that have found direct proximate cause lacking in cases of this nature. [8] In the instant case, multiple steps separate the alleged wrongful conduct (the fraudulent advertising campaign and/or the alleged bribery) and the alleged injuries (paying "too much" for "too many") YAZ prescriptions, including patient preference, the independent judgment of the prescribing physician, and the reimbursement decision rendered by the third party payor and its benefits manager. [9] Thus, the causal link necessarily involves the decision making process of the patient, the prescribing physician, and the third party payor. This demonstrates the attenuation in Plaintiffs' civil RICO claims.

[8]  Bayer contends that Plaintiffs' price inflation theory is a fraud on the market theory of causation and not a proper basis for recovery in RICO cases. (Doc. 36 pp. 3–4). Plaintiffs contend that they are not attempting to invoke the fraud on the market doctrine. (Doc. 39 pp. 9–10). The Court agrees that the fraud on the market doctrine is limited to securities fraud cases and would not be appropriate in a RICO case involving the prescription drug market. However, it is not clear that Plaintiffs are in fact attempting to invoke the fraud on the market doctrine. More importantly, the Court feels assessing whether Plaintiffs are attempting to invoke the fraud on the market doctrine unnecessarily complicates the task at hand. In the instant case, the central question is whether there is a sufficiently direct relationship between Plaintiffs' alleged injury (paying too much for too many YAZ prescriptions) and the alleged wrongful conduct.

[9]  Plaintiffs allege and the Court agrees that the presence of multiple victims does not necessarily foreclose a finding of proximate cause. (*See* Doc. 39 p. 6). Plaintiffs' argument is flawed, however, to the extent it asserts that the role of the prescribing physician constitutes the presence of multiple victims. (*See* Doc. 39 p. 6). The role of the prescribing physician is problematic because it is an additional factor that could have contributed to the Plaintiffs' alleged injury (demonstrating remoteness) and because it confounds the damages analysis (a significant policy consideration raised in *Holmes* ).

Further, the attenuated connection between the alleged RICO violations and Plaintiffs' alleged injury presents serious questions with regard to the ascertainment of damages. To assess damages, the Court would have to delve into the specifics of each physician patient relationship to determine what damages were caused by Bayer's alleged fraudulent conduct, as opposed to what damages were caused by the physician's independent medical judgment. After all, a physician is permitted to use prescription medication to treat conditions other than those stated on the labeling approved by the FDA when, in his or her best medical judgment, use of the drug will benefit the patient. *Piazza v. Myers,* 33 Phila.Co. Rptr. 144, 148 (Pa.C.P. Philadelphia Ct.1997); *see also In re Orthopedic Bone Screw Products Liability Litigation, MDL No.* 1014, 1996 WL 107556, at \*3 (E.D.Pa. Mar. 8, 1996) ("the decision whether or not to use a drug for an off-label purpose is a matter of medical judgment, not of regulatory approval") (citation and quotation marks omitted). *See also Leibowitz v. Ortho Pharmaceutical Corporation,* 224 Pa.Super. 418, 431 (1973) ("[i]t is for the prescribing physician to use his independent medical judgment, taking into account the data supplied to him from the manufacturer, other medical

In re Yasmin and Yaz (Drospirenone) Marketing, Sales,..., Not Reported in...

2010 WL 3119499, RICO Bus.Disp.Guide 11,930

literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug."). As an example, for some patients, the decision to prescribe YAZ may have simply been the result of the prescribing physician concluding that a drug approved to treat the severe symptoms of PMDD might also benefit a patient presenting with the similar but less severe symptoms of PMS. Attempting to ascertain damages in this scenario, would result in the type of speculative damages analysis the direct proximate cause requirement is intended to prevent. *See Anza,* 547 U.S. at 460 ("The element of proximate causation recognized in Holmes is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.").

**\*8** Plaintiffs' contentions with regard to foreseeability and intent do not alter the Court's proximate cause analysis. (*See e.g.,* Doc. 39 p.6 ("Here, victims like the plaintiff funds were not merely foreseeable, but were the intended and inevitable targets of defendants' schemes.")). [10] Plaintiffs' argument on this point goes astray. Bayer's alleged motive does not provide a basis for subjecting it to liability for remote injuries. See *Id.* at 460 ("RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense"). Additionally, the Supreme Court's recent decision in *Hemi Group, LLC v. City of New York, N.Y.,* 130 S.Ct. 983 (2010), raises questions with regard to the role of foreseeability in a civil RICO proximate cause analysis. [11] Most importantly, the Supreme Court has consistently held that the cornerstone of the Court's proximate cause analysis should be whether the alleged violation led directly to Plaintiffs' alleged injuries. ("[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries)" *See Anza,* 547 U.S. at 461. In light of the above, the Court will not stray from the direct relationship test by considering issues of foreseeability and intent. In the instant case, the remoteness of the injury and the speculative nature of any potential damages analysis prevent Plaintiffs from meeting the direct causal relationship requirement and proximate cause is therefore lacking.

[10]    Plaintiffs also allege that a direct relationship exists because, unlike plaintiffs in civil RICO actions involving the tobacco industry, they are seeking recovery of money paid to the alleged wrongdoer and not an innocent third party. (Doc. 39 p.5 n.2). This distinction, however, does not establish a direct relationship; other factors, such as the independent medical judgment of the prescribing physician, overwhelmingly demonstrate that the alleged injury is not sufficiently direct.

[11]    In *Hemi* the plurality criticized the dissent for basing its proximate cause analysis on foreseeability and intended consequences. *See Hemi,* 130 S.Ct. at 991 ("The dissent would have RICO's proximate cause requirement turn on foreseeability, rather than on the existence of a sufficiently "direct relationship" between the fraud and the harm."). *See also Id.* ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability."). This portion of the Court's proximate cause analysis, however, rests on a functional plurality (with Justice Gingsberg joining in the Court's opinion and the judgment but declining to endorse the proximate cause analysis of either the dissent or the majority).

One final argument raised by Plaintiffs with regard to proximate causation warrants review. At oral argument, Plaintiffs asserted that if they had been aware of the alleged misrepresentations they would have minimized the number of YAZ prescriptions purchased or reimbursed (presumably by altering their formulary to exclude or restrict coverage for YAZ or through participant education), this argument is no different than the argument raised by the Plaintiffs and rejected by the Seventh Circuit in *Teamsters.* 196 F.3d at 826. In the instant case, attempting to determine what the Plaintiffs *would* have done and how effective patient education *would* have been is "hopelessly speculative" and militates against finding that the alleged injury is sufficiently direct. *See Teamsters,* 196 F.3d at 826.

Considering the intricate damages analysis presented by this case and the remoteness of the alleged injury, the Court finds that Plaintiffs cannot meet the direct proximate cause requirement; therefore, Plaintiffs cannot sustain their RICO claims.

**C. Counts III–V Common Law Claims** [12]

12    The class certification issue has not been addressed in this case. Accordingly, the Court considers Plaintiffs' common law claims pursuant to the law of Pennsylvania, the state in which the representative Plaintiffs reside. (Doc. 21 ¶¶ 6–7).

Plaintiffs have brought common law claims for negligence, fraud and misrepresentation, and unjust enrichment. In order to prevail on the common law claims of negligence and fraud or misrepresentation, there must be a causal connection between the wrongful conduct and the plaintiff's injury. *See MIIX Insurance Co. v. Epstein,* 937 A.2d 469 (Pa.Super., 2007) ("an admittedly negligent act does not necessarily entail liability; rather even when it is established that the defendant breached some duty of care owed the defendant, *it is incumbent upon a plaintiff to establish a causal connection between defendant's conduct and the plaintiff's injury.*) (emphasis in original) citing *Hamil v. Bashline,* 392 A.2d 1280, 1284 (1978)); *Wilson v. Donegal Mut. Ins. Co.,* 598 A .2d 1310, 1316 (Pa.Super., 1991) (proximate cause is an essential element of a cause of action for fraud or deceit); *Petrucelli v. Bohringer and Ratzinger,* 46 F.3d 1298 (3d Cir.1995) (to prevail on a claim of fraudulent misrepresentation, the plaintiff must prove a causal connection between the representations and the alleged harm). Further, the proximate cause analysis for Plaintiffs' common law actions mirrors the direct proximate cause analysis applicable in civil RICO actions. *See e.g., Alumni Ass'n, Delta Zeta Zeta of Lambda Chi Alpha Fraternity v. Sullivan 369 Pa.Super.* 596, 601–602 (Pa.Super.,1987)

> **\*9** [T]he question of foreseeability is not to be confused with the question of legal or proximate causation. Even where harm to a particular plaintiff may be reasonably foreseeable from the defendant's conduct, and that conduct is the cause-in-fact of the plaintiff's harm, the law makes a determination that, at some point along the causal chain, liability will be limited. The term "proximate cause", or "legal cause" is applied by courts to those considerations which limit liability, even where the fact of causation can be demonstrated. Because of convenience, public policy, or a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point, as no longer a "proximate" or "legal" consequence naturally flowing from the wrong-doer's misconduct. To put it simply, at a certain point, negligent conduct will be viewed as too remote from the harm arising to the plaintiff, and thus not a substantial factor in bringing about the plaintiff's harm.

Accordingly, for the reasons already discussed, Plaintiffs cannot establish proximate causation and their claims for negligence and misrepresentation must be dismissed.

As to Plaintiffs' unjust enrichment claim, Plaintiffs must show: (1) Bayer received a benefit; (2) Bayer appreciated the benefit; and (3) Bayer's retention of the benefit without payment of value would be inequitable or unjust. *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 447 (3d Cir.2000) (applying Pennsylvania law). Unjust enrichment may be predicated on either quasi-contract or tort. In the present case, Plaintiffs base their unjust enrichment claim on a tort theory, specifically; Plaintiffs allege that Bayer "represented YAZ in a false and misleading manner." (Doc. 21 ¶ 208). The Court has concluded that Plaintiffs cannot maintain their common law tort claim for fraud or misrepresentation. Accordingly, Plaintiffs' unjust enrichment claim, which is based on this tort theory, fails as a matter of law. *See Allegheny Gen. Hosp.,* 228 F.3d at 446–447 (applying Pennsylvania law and noting that "[t]here is no justification for permitting plaintiffs to proceed on their unjust enrichment claim once it is determined that the District Court properly dismissed the traditional tort claims.") (internal citation omitted).

## IV. CONCLUSION

For the foregoing reasons the Court **GRANTS** Bayer's Motion to Dismiss (Doc. 36).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3119499, RICO Bus.Disp.Guide 11,930

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Myers v. Seung Heun Lee

United States District Court for the Eastern District of Virginia, Alexandria Division

September 21, 2010, Decided; September 21, 2010, Filed

No. I:10cv!31 (AJT/JFA)

**Reporter**
2010 U.S. Dist. LEXIS 99707 *

ANDREW H. MYERS, Plaintiff, v. SEUNG HEUN LEE, et al., Defendants.

**Prior History:** Myers v. Lee, 2010 U.S. Dist. LEXIS 69012 (E.D. Va., July 12, 2010)

**Counsel:** [*1] For Andrew H. Myers, Plaintiff: Jennifer Anne Short, LEAD ATTORNEY, Robert Thomas Hicks, Holland & Knight LLP, McLean, VA; Thomas John McIntosh, Holland & Knight LLP (DC), Washington, DC.

For Seung Heun Lee, also known as, Ilchi Lee, also known as, Seuseungnim, also known as, Grand Master Seung Heun Lee, also known as, Sung Hung Lee, Defendant: Adrien Caulder Pickard, LEAD ATTORNEY, Fiske & Harvey PLLC, Alexandria, VA; Bernard Joseph DiMuro, DiMuro Ginsberg & Mook PC, Alexandria, VA.

For Dahn World Co., Ltd., Defendant: Bernard Joseph DiMuro, DiMuro Ginsberg & Mook PC, Alexandria, VA; Blair Gerard Brown, Susan Dudley Klaff, Zuckerman Spaeder LLP (DC), Washington, DC; Dawn Elizabeth Boyce, John David McGavin, Trichilo Bancroft McGavin Horvath & Judkins PC, Fairfax, VA; Katherine Anne Goetzl, Littler Mendelson PC, Washington, DC.

For BR Consulting NJ, Inc., Defendant: Bernard Joseph DiMuro, LEAD ATTORNEY, Hillary Jane Collyer, Nina J. Ginsberg, DiMuro Ginsberg & Mook PC, Alexandria, VA; Blair Gerard Brown, Zuckerman Spaeder LLP (DC), Washington, DC; Katherine Anne Goetzl, Littler Mendelson PC, Washington, DC.

For Dahn Yoga & Health Centers, Inc., Defendant: John David McGavin, LEAD ATTORNEY, [*2] Dawn Elizabeth Boyce, Heather Kathleen Bardot, Trichilo Bancroft McGavin Horvath & Judkins PC, Fairfax, VA; Bernard Joseph DiMuro, DiMuro Ginsberg & Mook PC, Alexandria, VA; Blair Gerard Brown, Zuckerman Spaeder LLP (DC), Washington, DC; Katherine Anne Goetzl, Littler Mendelson PC, Washington, DC.

For Dahn Yoga and Healing Family Center, also known as, Alexandria Dahn Yoga Studio, also known as, Alexandria Dahn Yoga Center, Defendant: John David McGavin, LEAD ATTORNEY, Dawn Elizabeth Boyce,

Trichilo Bancroft McGavin Horvath & Judkins PC, Fairfax, VA; Blair Gerard Brown, Zuckerman Spaeder LLP (DC), Washington, DC; Katherine Anne Goetzl, Littler Mendelson PC, Washington, DC.

For Tao Fellowship, Defendant: Katherine Anne Goetzl, LEAD ATTORNEY, Littler Mendelson PC, Washington, DC; Bernard Joseph DiMuro, DiMuro Ginsberg & Mook PC, Alexandria, VA; Blair Gerard Brown, Zuckerman Spaeder LLP (DC), Washington, DC.

For Dahn Foundation, Defendant: Randell Hunt Norton, LEAD ATTORNEY, Thompson, O'Donnell, Markham, Norton & Hannon, Washington, DC; Bernard Joseph DiMuro, DiMuro Ginsberg & Mook PC, Alexandria, VA; Blair Gerard Brown, Zuckerman Spaeder LLP (DC), Washington, DC; Katherine Anne Goetzl, [*3] Littler Mendelson PC, Washington, DC; Michael Lawrence Pivor, Thompson & O'Donnell LLP, Washington, DC.

For HSP Ranch, Inc., also known as, HSP Earth Village, Defendant: Bernard Joseph DiMuro, LEAD ATTORNEY, Hillary Jane Collyer, Nina J. Ginsberg, DiMuro Ginsberg & Mook PC, Alexandria, VA; Katherine Anne Goetzl, Littler Mendelson PC, Washington, DC.

**Judges:** Anthony J. Trenga, United States District Judge.

**Opinion by:** Anthony J. Trenga

# Opinion

### Memorandum Opinion

On July 23, 2010, plaintiff Andrew Myers ("Myers") filed an Amended Complaint (Doc. No. 76), in response to which the defendants filed Defendants' Joint Motion for Partial Dismissal of Plaintiff Myers' Amended Complaint (Doc. No. 89) (the "Motion"). [1] Specifically, Myers' seven

---

[1] In response to the original Complaint (Doc. No. 1),

count Amended Complaint alleges RICO and RICO conspiracy claims as to all defendants (Counts One and Two); federal wage and hour law violations as to defendant Dahn Yoga & Health Centers, Inc. (Counts Three and Four); violation of the Virginia Consumer Protection Act as to defendants Ilchi Lee, Dahn Yoga & Health Centers, Inc., and Tao Fellowship (Count Five); common law fraud as to defendants Ilchi Lee, Dahn Yoga & Health Centers, Inc., Tao Fellowship, Dahn Foundation, and HSP Ranch [*4] (Count Six); and intentional infliction of emotional distress as to defendants Ilchi Lee, Dahn Yoga & Health Centers, Inc., Tao Fellowship, Dahn Foundation, and HSP Ranch (Count Seven). The defendants move to dismiss all claims except for the wage and hour law violations under Counts Three and Four. The defendants also raise jurisdictional challenges, arguing that should the Court dismiss the RICO claims, the Court would lack

subject matter jurisdiction over the state law claims and personal jurisdiction over all but defendant Dahn Yoga & Health Centers, Inc. As to the RICO and RICO conspiracy claims (Counts One and Two), defendants claim that the Amended Complaint fails to sufficiently allege, for the purpose of Section 1962(c) (1), a pattern of racketeering activity; (2) defendants' employment by or association with a RICO enterprise; or (3) an enterprise that exists sufficiently separate and apart from the defendants themselves. A hearing on the Motion was held on September 10, 2010, following which the Court took the matter under advisement.

After consideration of the Motion, the opposition filed thereto and the arguments of counsel, the Court concludes that Myers has failed to sufficiently allege a RICO enterprise that is separate and distinct from the defendants themselves and that the RICO and RICO conspiracy claims should be dismissed on those grounds. The Court also concludes that in the absence of the RICO and RICO [*7] conspiracy claims, this Court should not exercise its supplemental jurisdiction over the alleged state law claims (Counts Five, Six, and Seven). For these reasons, those claims will be dismissed without prejudice; and this case will proceed only against defendant Dahn Yoga & Health Centers, Inc. on Counts Three and Four, alleging violations of the Fair Labor Standards Act.

---

defendants moved to dismiss pursuant to Fed. R. Civ. P 12(b)(6) and 12(b)(2). In those [*5] motions, the defendants claimed that the fraudulent statements alleged as the basis for the mail and wire fraud that formed the pattern of racketeering activity in Count One (RICO) lacked sufficient specificity as required under Fed. R. Civ. P. 9(b). A similar claim was made as to the common law fraud claims and claims under the Virginia Consumer Act. In addition, defendant Dahn World challenged personal jurisdiction. By order dated July 12, 2010 (Doc. No. 75), the Court denied defendants' motions to dismiss the RICO claims, finding that although some of Myers' allegations lacked specificity required by Rule 9(b), there were specific allegations against then defendant Alexandria Dahn Yoga Center ("ADYC") sufficient for the purposes of alleging mail and wire fraud as predicate acts. The Court also found that Myers' failure to attribute multiple misrepresentations to each defendant was not fatal to the RICO counts as the alleged mail and wire fraud scheme pertained to all of the defendants and sufficiently alleged their participation in that scheme to defraud. The Court dismissed the state law fraud claim and the claim under the Virginia Consumer Protection Act as to all defendants except [*6] ADYC, concluding that the Complaint failed to allege specific misrepresentations by the other defendants. The Court dismissed the intentional infliction of emotional distress claim against all defendants except ADYC. The Court also dismissed as to all defendants claims for unjust enrichment, negligent infliction of emotional distress, and breach of fiduciary duty. The Court granted leave to file an amended complaint that attributed additional specific statements to specific defendants. In their motions to dismiss, the defendants did not challenge the sufficiency of the Complaint's allegations pertaining to the RICO enterprise and the Court did not consider that issue. As stated by the defendants, the defendants' challenge to the RICO claims is prompted by the Amended Complaint's new allegations of agency.

## Statement of Facts

Plaintiff's specific allegations are discussed in this Court's Memorandum Opinion dated July 12, 2010 (Doc. No. 74). Very briefly summarized, Myers claims he was systematically indoctrinated and defrauded over the course of a year, from September 2007 to August 2008, by the defendants acting through a network of affiliated entities formed and controlled by defendant Sung Heun Lee (hereinafter "Ilchi Lee" or "Lee"), the network's spiritual leader. [2]

---

[2] The Amended Complaint, while expanding the original complaint from 77 pages to 90 pages, does not materially add to the plaintiff's substantive allegations of wrongdoing, but rather (1) eliminates as a defendant Alexandria Dahn Yoga Center, which is now alleged to be, in fact, part of defendant Dahn Yoga & Health Centers, Inc., which was the sole shareholder [*8] of ADYC until July 2007, at which time ADYC was merged into DYHC; and (2) alleges a number of agency relationships among the defendants, through which Myers attributes the fraudulent statements to certain defendants, including the substance of those alleged misrepresentations

Named as defendants in the Amended Complaint in addition to Lee are (1) Dahn World Co., Ltd. (hereinafter "Dahn World"); (2) Dahn Yoga & Health Centers, Inc. (hereinafter, "DYHC"); (3) Dahn Foundation; (4) BR Consulting NJ, Inc. (hereinafter "BR Consulting"); (5) HSP Ranch; (6) Tao Fellowship; and (7) John Does Nos. 1-20. In paragraphs 9 through 17 of the Amended Complaint, Myers describes the defendants and their relationships to each other. As alleged in the Amended Complaint, defendant Lee is the "Grand Master" of the entire Dahn network, which consists of Lee and the other defendants. Amended Complaint. at ¶¶ 9, 34. In that connection, Myers alleges Lee formed, operates and controls defendant Dahn World, which provides internet and computer services. Dahn World, in turn, owns 74% of the defendant DYHC. DYHC operates directly **[*9]** or is affiliated with nearly 1,000 Dahn yoga centers worldwide, including the Dahn Yoga and Health Family Center, in Alexandria, Virginia (hereinafter "ADYC"), where Myers was first introduced to Lee's affiliated entities and where Myers later worked. DYHC also founded defendant Dahn Foundation, which coordinates volunteer activities in fifteen cities, providing "brain education" training to members of those communities. The Dahn Foundation also provides support for a community service initiative known as the "Phoenix Project," which Myers also attended.

Lee also serves as a director of defendant Tao Fellowship, which owns and operates mediation and retreat centers, youth camps, and healer schools, including two retreats that Myers attended, "Tao Holistic Healing" and "Dahnmudo School." Lee is also the founder, President and Chief Operating Officer of defendant BR Consulting, which licenses proprietary rights (i.e. Lee's "philosophy," etc.) to other Dahn related entities and also owns and operates as a subsidiary defendant HSP Ranch, where Myers attended a "Chunhwa Mediation Tour" at "HSP Earth Village" in July 2008.

## Legal Standard

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), **[*10]** a complaint must set forth "a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In that regard,

the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995). For that reason, a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 555 U.S. at 556. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 129 S. Ct. at 1949 (2009); *Twombly*, 550 U.S. at 555. A complaint is also insufficient if it relies upon "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at 1949 (internal citations omitted). The central **[*11]** purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," and the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response. *Twombly*, 550 U.S. at 555.

## Analysis

I. Failure to State a Claim as to Counts One (RICO. 18 USC § 1962 (c)) and Two (RICO Conspiracy. 18 USC § 1962(d))

In order to state a RICO claim, Myers must adequately allege that a defendant engaged in the (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. Myers must also allege that he was injured in his business or property because of the RICO violation. *D'Addario v. Geller*, 264 F. Supp. 2d 367, 396 (E.D. Va. 2003).

### A. Plaintiff Has Not Sufficiently Alleged An Enterprise Distinct from the Defendants

Section 1962(c) limits RICO liability to a "person employed by or associated with any enterprise." 18 U.S.C. § 1962(c). An "enterprise" is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." 18 U.S.C. § 1961(4). Courts are **[*12]** in agreement that for the purposes of liability under Section 1962(c), a RICO person must be distinct from the RICO enterprise.

---

the Court previously determined had been adequately pled as to former defendant ADYC.

Case: 3:1... Case: 3:1... Document #: 903-4 Filed: 05/21/21 Page 89 of 160 PageID #:1604
Case: 21-50428_JTD Document #... Filed: 05/21/21 Page 126 of 202

2010 U.S. Dist. LEXIS 99707, *12

*Palmetto State*, 117 F.3d 142, 148 (4th Cir. 1997). [3] Thus, "liability depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's affairs,'* not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993) (emphasis in the original); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of America*, 18 F. 3d 1161, 1163-64 (4th Cir. 1994) (finding the alleged RICO person, the International, Union, United Mine Workers of America and its employees, was not distinct from the alleged enterprise consisting of the Union along with its local chapters). [4]

For the RICO enterprise (hereinafter referred to as the "Dahn Organization"), Myers alleges that "[a]t all times relevant to this [Amended] Complaint, the defendants . . . , along with others, constituted an 'enterprise' as defined in 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter, the 'Dahn Organization')." Amended Complaint at ¶ 34. Further describing the "enterprise," Myer alleges that "[t]he Dahn Organization was an association in fact among the individuals and corporations acting in concert to target, control, and defraud its victims of their health, liberty, and property for the financial benefit of the Dahn Organization and its leader, Ilchi Lee." Amended Complaint at ¶ 34. Myers further alleges that the "Dahn Organization's component entities share officers and directors and are otherwise interrelated." Amended Complaint at ¶ 37. In that regard, the Dahn Organization allegedly operates in a "hierarchical manner" and defendant Lee "coordinates and directs the Dahn Organization's strategy within the United States and worldwide," such that "in the [*14] United States, instructions and information flow from Ilchi Lee and national elements of the Dahn Organization to individual Dahn Yoga Centers." Amended Complaint at ¶ 38. This top-down command and control is accomplished by defendants' acting through a series of interconnecting agency

relationships, including the following non-party participants:

- Jung Sun Lee, known as "Master Lee" (not to be confused with defendant Lee), Master of the Alexandria Dahn Yoga Center; regional Master for the Dahn Organization, employee of DYHC, and agent of Ilchi Lee, Dahn Foundation, and HSP Ranch.
- Michael Munson, Master of the Dahn Organization who led Myers in various activities including the DahnMuDo School (operated by defendant Tao Fellowship), the Phoenix Project (operated by defendant Dahn Foundation), and the Young Earth Human Alliance ("YEHA") (hosted by defendant Tao Fellowship).
- Chun Hae, also known as Master Blue Ocean, an employee of DHYC who also represented Tao Fellowship and a "high level Master" of the Dahn Organization, who trained Myers at a YEHA camp in Ellenville, New York (separate and distinct from the Sedonia location operated by Tao Fellowship) and at the DahnMuDo School.

- [*15] Byuk Won Sunsaengnim, a high level Master of the Dahn Organization, who trained Myers at the DahnMuDo School, an employee of DYHC and agent of Tao Fellowship at the DahnMuDo School.
- Hyerin Moon, a Master for the Dahn Organization, employee of DYHC and agent of Dahn Foundation at the Phoenix Project.
- Woo Seok Jang, a high-level Master for the Dahn Organization, employee of DYHC and agent of Tao Fellowship at the DahnMuDo School.
- Master Bright, a high level Master, Washington D.C. Regional Director for the Dahn Organization, employee of DYHC and agent of Tao Fellowship, who persuaded Myers to attend a Dahn Center Internship Training Program and Dahn Ho training.
- Master Song, a Master for the Dahn Organization, employee of DYHC and agent of Tao Fellowship, who supervised Myers at the Dahn Ho training.
- Melissa [Last Name Unknown], a Master of the Dahn Organization and Regional Master in New Mexico, personal assistant to defendant Lee, an employee of DYHC, and an agent of Tao Fellowship, HSP Ranch, and Ilchi Lee at the Dahn Center Internship Training and Chunwa Mediation Tour.
- Alex Lee, an instructor with the Dahn Organization, an employee at DYHC, and agent of Tao Fellowship.

---

[3] Every Circuit now holds that the RICO enterprise must be distinct from the RICO persons, with the Eleventh Circuit the final court to do so. *See United States v. Goldin Indus.*, 219 F.3d 1268, 1270 (11th Cir. 2000) (reversing its position that 1962(c) does not contain a distinctiveness requirement, and noting that every circuit is now in agreement).

[4] In *Boyle v. United States*, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009), the Supreme Court liberally construed the structure requirements [*13] of an association-in-fact enterprise. It did not alter the distinctiveness required between the RICO person and the RICO enterprise.

• Master **[*16]** Hong, an instructor and healer at Tao Holistic Healing program (associated with the Tao Fellowship), and an employee of DYHC and/or Tao Fellowship

Overall, Myers alleged that "the purpose of the Dahn Organization, operating through its members and other affiliated individuals, is to financially exploit the Dahn Organization's customers, members and employee's for the benefit of the Dahn Organization and its leader Ilchi Lee." Amended Complaint at ¶ 42.

The Amended Complaint fails to allege a RICO enterprise that operates or functions in a way distinct from the defendants themselves. There is a complete overlap between the defendants, their alleged agents, and the enterprise. Indeed, the defendants are alleged to be, in fact "the Dahn Organization," and nowhere in the Amended Complaint are there any allegations that the affairs of the enterprise are any different from the affairs of the defendants. *See Arzuaga-Collazo v. Oriental Federal Savings Bank, el al.*, 913 F.2d 5, 6 (1st Cir. 1990) (Breyer, C.J.) ("[A]n 'enterprise' does not *'conduct and participate . . . in the conduct of'* that same enterprise's affairs.") (emphasis in original).

The defendants through their various agents are **[*17]** alleged to have made fraudulent statements encouraging Myers and others to participate in various activities and programs in order to recruit and extort individuals under the auspices of inherently fraudulent spiritual and physical healing. These allegations are no different from the alleged activities attributed to the enterprise. In fact, Myers alleges that defendant Lee formed, dominates, and controls the network of affiliated defendants precisely for the same purposes of promoting and facilitating his allegedly fraudulent scheme as those attributed to the RICO enterprise consisting of the same defendants. The sum total of the allegations set forth in the Amended Complaint does no more than allege that the defendants associated with themselves for the purpose of conducting defendant Lee's and the other defendants' business affairs through entities created for that purpose. *See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Union 639*,839 F.2d 782, 791, 268 U.S. App. D.C. 103 (D.C. Cir. 1988) (holding that "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself."), *modified on other grounds en banc*, 913 F. 2d 948, 951, 286 U.S. App. D.C. 182 (D.C. Cir. 1990); **[*18]** *Arzuaga-Collazo*, 913 F.2d at 6 (concluding that the complaint fails to state a claim under RICO because it does not allege that the defendants conducted or

participated in the conduct of "some other, larger, unlawful enterprise").

Myers argues that he has properly alleged a distinctiveness between the defendants and the enterprise because each of the defendants meets the definition of a "person" under RICO, relying heavily on the holding in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001) (finding the president and sole shareholder of a corporation a distinct RICO "person" from the RICO "enterprise" he managed). While Myers is correct that each of the defendants meets the definition of a "person" for the purposes of RICO, the activities of the alleged enterprise must be distinguishable from the normal day to day activities of these "persons." As the Supreme Court observed in *Cedric*:

> We do not quarrel with the basic principle that to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name. The statute's language, read **[*19]** as ordinary English, suggests that principle. The Act says that it applies to "persons" who are "employed by or associated with" the "enterprise." § 1962(c). In ordinary English one speaks of employing, being employed by, or associating with others, not oneself.

*Id.* at 158.

Here, Myers has alleged only an enterprise that is the defendants by a different name, the Dahn Organization. In the end, the Amended Complaint alleges only that the RICO persons joined together for the purposes of conducting their own affairs. In reaching its decision, this Court does not reject the possibility, recognized in several circuits, [5] that a RICO defendant can be both a RICO "person" and one of a number of members of the RICO "enterprise." While the Dahn Organization may qualify as an association-in-fact enterprise, Meyers must still prove these defendants participated "in the conduct of enterprise's affairs, not just their own affairs." Reves, 507 U.S. at 185. The complete identity between the defendants, their agents, and the enterprise is particularly clear in this case since, as alleged, the purposes and personality of defendant Lee dominate

---

[5] *See, e.g., Cullen v. Margiotta*, 811 F.2d 698, 729-30 (2d. Cir 1987); *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989).

both the defendants and the enterprise, neither of which **[*20]** has a purpose distinct from the goals and objectives of the other, from defendant Lee himself, or from his inherently fraudulent philosophy and activities. *See* Amended Complaint at ¶ 34.

For these reasons, the Court concludes that Myers has failed to allege a RICO enterprise distinct from the defendants.

### B. Plaintiff Has Not Properly Alleged A RICO Conspiracy Claim

To state a claim for RICO conspiracy pursuant to § 1962(d), Myers must allege that there was (1) an agreement to further or facilitate (2) an act that is independently wrongful under RICO. *See Beck v. Prupis*, 529 U.S. 494, 505, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000); *Salinas v. U.S.*, 522 U.S. 52, 65-66, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997). Myers adequately alleged that the various defendants agreed to further the goals of the Dahn Organization. However, as discussed above, Myers failed to adequately plead the existence of an enterprise distinct from the defendants. Having failed to allege adequately a RICO offense that was the object of the alleged conspiracy, Myers' alleged RICO conspiracy must be dismissed. *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 (4th Cir. 2001) **[*21]** ("Because the pleadings do not state a substantive RICO claim under § 1962(c), Plaintiffs' RICO conspiracy claim fails as well.").

### C. This Court Declines to Exercise Supplemental Jurisdiction over the State Law Claims

28 U.S.C. § 1367(a) provides:
> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Myers invokes this Court's federal question jurisdiction

and its supplemental jurisdiction under § 1367. [6] In the absence of the RICO and RICO conspiracy claims, this Court has federal question jurisdiction under 28 U.S.C. § 1331 only as to the Fair Labor Standards claims asserted against defendant DYHC in Counts Three and Four.

Myers' state law claims have little affinity to the FLSA claims. Rather, they are based on essentially the same allegations as the deficient RICO and RICO conspiracy claims, and the overwhelming majority of the 90 page, 220 paragraph Amended Complaint relate to those state law and RICO claims, as opposed to the FLSA claims. While the allegations related to the state law claims may be sufficiently related to the FSLA claims to "form part of the same case or controversy under Article III of the United States Constitution;' there is no doubt that they "substantially predominate over the claim or claims over which the court has original jurisdiction." 28 U.S. C. § 1367 (c)(2). They also present "novel or complex issues of state law," including issues pertaining to personal jurisdiction over certain defendants and whether under state law certain of the **[*23]** alleged misrepresentations are actionable. For these reasons, this Court declines to exercise supplemental jurisdiction over Counts Five, Six and Seven.

### Conclusion

For the above reasons, the Court dismisses Counts One and Two, and declines to exercise supplemental jurisdiction over Counts Five, Six, and Seven.

An appropriate Order will issue.

/s/ Anthony J. Trenga

Anthony J. Trenga

United States District Judge

Alexandria. Virginia

September 21, 2010

---

[6] In his opposition to defendants' motion to dismiss, Myers claims that **[*22]** this Court also has subject matter jurisdiction over the state law claims based on diversity of citizenship, 28 U.S.C. § 1332. However, Myers did not assert such jurisdiction in either the original Complaint or the Amended Complaint and this Court will not consider whether it has jurisdiction other than as pleaded in the Amended Complaint.

End of Document

2015 WL 1331291
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Diane Goldring Nesbitt, Plaintiff,

v.

James Regas, Christian Nesbitt, Regas, Frezados & Dallas, LLP, Peter Regas, Peter G. Frezados, William D. Dallas, Suzanne Regas, Allyson Regas, Jerry F. Miceli, Adams Appraisal Corp., and Douglas Adams, Defendants.

No. 13 C 8245
|
Signed March 20, 2015

**Attorneys and Law Firms**

Stuart Jay Chanen, Valorem Law Group LLC, Chicago, IL, for Plaintiff.

Michael P. Tone, Geoffrey Alexander Belzer, Kimberly Elizabeth Blair, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Alvin R. Becker, Howard L. Teplinsky, Katherine Anne Grosh, Beermann Pritikin Mirabelli Swerdlove LLP, Catherine A. Cooke, Vincent Thomas Borst, Robbins, Salomon & Patt, Ltd., Chicago, IL, Craig Michael Capilla, Justin Nathan Fielkow, Franklin Law Group, Northfield, IL, for Defendants.

Christian Nesbitt, Evanston, IL, pro se.

### *MEMORANDUM OPINION AND ORDER*

John J. Tharp, Jr., United States District Judge

**\*1** Plaintiff Diane Goldring Nesbitt ("Goldring") brings this action against eleven defendants, alleging that each played a role in a fraudulent scheme that resulted in substantial losses to Goldring. She asserts violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act Section 1962(c) against all defendants ("Count I"), RICO conspiracy claims against James Regas, Christian Nesbitt, Regas, Frezados & Dallas LLP, and Adams Valuation Corporation ("Count II"), as well as four state law counts relating to the alleged fraud. The Court has stayed briefing on the state law counts, and pending before the Court are a motion to dismiss filed by James Regas (Dkt. 24), a motion to dismiss filed by Allyson Regas (Dkt. 27), a joint motion to dismiss filed by Douglas Adams and Adams Valuation Corporation (Dkt. 30), and a joint motion to dismiss by Peter Regas, Peter G. Frezados, William D. Dallas, and the law firm Regas, Frezados & Dallas, LLP (Dkt. 32). Also pending is Goldring's motion for default judgment against Suzanne Regas (Dkt. 68) as well as Suzanne Regas's motion to quash service or to dismiss (Dkt. 73).

For the reasons that follow, the motions by Allyson Regas (Dkt. 27) and Regas, Frezados & Dallas, LLP (Dkt. 32) are granted, and both Count I and Count II are dismissed against these movants without prejudice. Suzanne Regas's motion (Dkt. 73) is denied with respect to quashing service, but granted with respect to dismissing Count I against Suzanne Regas without prejudice. The motions by James Regas (Dkt. 25) and Adams Valuation Corp. (Dkt. 30) are granted in part, with respect to dismissing Count I without prejudice, and denied in part, with respect to Count II. Goldring's motion for default judgment (Dkt. 68) is denied. Accordingly, Count I is dismissed without prejudice as to James Regas, Allyson Regas, Suzanne Regas, Peter Regas, Peter Frezados, William Dallas, Regas, Frezados & Dallas LLP, Douglas Adams, and Adams Valuation Corp. Count II is dismissed without prejudice as to Regas, Frezados & Dallas LLP.

# BACKGROUND [1]

[1]  The facts in this chronology are drawn from the factual allegations of the complaint, which are taken as true on a motion to dismiss. *Jennings v. Auto Meter Prods., Inc.,* 495 F.3d 466, 472 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

This case arises out of two bank failures caused by an unlawful insider loan scheme. In 2009, the Illinois Department of Financial and Professional Regulation closed Mutual Bank of Harvey ("Mutual Bank"), and the Federal Deposit Insurance Corporation ("FDIC") was appointed its receiver. Also in 2009, the Office of the Comptroller of the Currency ("OCC") restricted the operations of Western Springs Bank and Trust Co. ("WS Bank"), and entered into a consent decree. Eventually, in 2011, the FDIC shut down WS Bank, as well. Investigation of the records of both banks revealed extensive use of unlawful insider loans involving James Regas and his family members, who were insiders for both banks. James Regas was Chairman of WS Bank and Vice–Chairman of Mutual Bank, as well as outside general counsel for both banks.

**\*2**  The insider loans scheme involved Regas [2] using his position within the banks to approve illegal insider loans while obscuring the creditworthiness of the borrowers, concealing his own interest in the loans, inflating the appraised values of the real property securing the loans, and siphoning off funds for his own use. In order to do so, Regas and his longtime business partner Christian Nesbitt arranged for the law firm of Regas, Frezados, and Dallas, LLP ("RFD") to create business entities nominally under the control or ownership of Regas's children or Nesbitt's wife, Plaintiff Diane Goldring. [3]  In reality, however, these entities were not legitimate business entities at all, and were instead sham entities under the control of Regas and Nesbitt. Nesbitt and Regas arranged for these entities to purchase real properties using funds loaned by the victim banks, using Regas's position as an insider at these banks. Nesbitt and Regas also arranged for Adams Valuation Corporation ("Adams Valuation") and its president Douglas Adams to systematically overvalue these real properties in its appraisals so that the sham entities could qualify for larger loans. Also, Nesbitt and Regas would arrange for Regas's son Dean Regas and Nesbitt's wife Goldring to unwittingly sign guarantees for these loans without knowing that the property values were inflated, that the loans did not go through proper underwriting procedures, or that the banks were unaware of Regas's self-dealing. Regas would ensure that the banks approved the loans without following proper underwriting procedures by using his influence, with fellow bank officers Allyson Regas and Jerry F. Miceli, to pressure bank employees into approving the loans without following proper procedures. RFD would then represent all parties (the victim banks, guaranty victims like Goldring and Dean Regas, and the sham entities) in performing the legal work relating to the purchase and financing of these overvalued properties. Nesbitt and Regas would then skim off funds from the sham entities for their own personal use.

[2]  There are four individual defendants named "Regas" in this case: James Regas, his brother Peter Regas, and his two daughters Suzanne and Allyson Regas. In addition, Goldring is suing the law firm of Regas, Frezados & Dallas LLP. Because James Regas is the alleged leader of the scheme, this Opinion will refer to James Regas as "Regas" and to his family members by their full names.

[3]  Goldring's full name is Diane Goldring Nesbitt, but because she refers to herself as "Goldring," so does the Court. "Nesbitt" in this Opinion refers to Christian Nesbitt.

Goldring alleges that this basic scheme was executed multiple times. In October 2001, Regas directed RFD to create Baybrook Bristol LLC for the purpose of holding title to 32 acres of land, which was used to secure a loan from either Mutual Bank or WS Bank. In October 2004, Regas formed Hanover Capital Group, Inc. to purchase and purportedly develop 110 acres of land using loans from WS Bank or Mutual Bank. In November 2004, Regas formed Jefferson Capital Group, Inc. to purchase and develop 925 Edgemere Court in Evanston, Illinois, which was used to secure $5.7 million in loans from Mutual Bank. Ultimately, the Edgemere property was sold with a loan deficiency of $3.2 million. In December 2004, Regas created 1104 Sheridan LLC with plans to devote $1 million to develop a property at 1104

Sheridan. [4] In January 2005, Regas created SDAR LLC for development of multiple pieces of property in St. Francis, Wisconsin, and arranged for loans from Mutual Bank or WS Bank. In June 2005, Regas created 7500 Kenosha to purchase and develop property in Bristol, Wisconsin, and arranged for a $2.5 million loan from Mutual Bank. In May 2006, Regas formed 913 Forest–Evanston LLC, which purchased a $2.2 million property ("Forest Property") that was used to secure a $3.0 million purchase loan, which was later expanded to $3,425,500. Ultimately, the Forest Property was sold with a loan deficiency of $3.4 million. Also in May 2006, Regas formed Damen, Fullerton, Clybourn LLC to purchase and develop a property in Chicago. In September 2007, Regas formed 917 Edgemere LLC to purchase a property in Evanston, Illinois.

[4]    The complaint does not describe the municipality in which the 1104 Sheridan is located.

While executing this multi-year scheme, Regas and Nesbitt once arranged for Goldring to guarantee another loan under false pretenses and to personally lend $200,000 to her husband—which was falsely listed in bank records as a "correction offset," presumably to conceal the broader scheme. Eventually, the victim banks collapsed, and government investigators pieced together much of the information relating to the scheme. In June 2012, the federal government indicted Regas for his participation in the scheme. Regas pled guilty to lying to government agents and admitted that between 2004 and 2009 he repeatedly arranged for unlawful insider loans so that he could use bank funds for his own benefit while concealing the improper conflicts of interest.

**\*3** After the banks collapsed, Goldring discovered that she was exposed to considerable guaranty liability on these loans, which she discovered were undersecured because of the inflated appraisal values on the collateral. [5] As a result, Goldring suffered losses in the form of three seven-figure judgments (Goldring has to date paid $200,000 in settling two out of the three judgments), the $200,000 personal loan to Nesbitt, approximately $150,000 in legal fees and costs, and approximately $25,000 in other indebtedness caused by the scheme. Goldring filed this lawsuit, alleging a substantive civil RICO claim (Count I), RICO conspiracy claim (Count II), claim under Illinois Deceptive Business Practices Act (Count III), Fraudulent Inducement (Count IV), Fraud (Count V), and Aiding and Abetting a Fraud (Count VI). Defendants James Regas, Allyson Regas, and Suzanne Regas have each moved individually to dismiss the complaint. [6] RFD, Peter Regas, Peter Frezados, and William Dallas ("the Law Firm Defendants") have moved jointly to dismiss the complaint, as have Adams Valuation and Douglas Adams ("the Appraiser Defendants"). [7]

[5]    In his brief, Regas repeatedly belittles Goldring's claims as the product of domestic disputes she should have taken up with her (now former) husband, Nesbitt, and implying that because the insider loan scheme was not aimed at her, she cannot now sue defendants with whom she has never had any relationships, "legal or otherwise." He stops short, however, of asserting that she has no claim on that basis, however, and for at least two good reasons. First, because she was sued, and judgments were entered against her as a guarantor on a number of these undersecured loans, Goldring was (assuming her allegations to be true) indeed a direct victim of the fraud who relied on misrepresentations made in furtherance of the scheme. And second, even if that were not the case, "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud." *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 649 (2008).

[6]    Suzanne Regas has also filed a motion to quash service on the basis that she was never properly served, but in the alternative has joined her codefendants' motions to dismiss.

[7]    Christian Nesbitt answered the complaint.

## DISCUSSION

## I. Service of Process on Suzanne Regas

The Court first turns to the preliminary question of whether Defendant Suzanne Regas was properly served. Goldring filed her complaint on November 15, 2013. Goldring's attorneys sent requests for waivers of service to all the defendants in this case, pursuant to Fed. R. Civ. P. 4(d). Suzanne Regas did not return a waiver of service, although she was aware of the pending lawsuit. On December 20, 2013, Suzanne Regas sent a letter to her insurer and attached a copy of the complaint and summons in this case, explaining that she had not been personally served and had "no intention of waiving service." Suzanne Regas Letter, Dkt. 75–3, at 1. Goldring hired a process server, who attempted service at Suzanne Regas's home (which is also registered as her address with the Illinois Attorney Registration and Disciplinary Commission ("ARDC")), on five different occasions between February 26 and March 12, 2014. *See* Kirby Aff., Dkt. 75–4, at ¶¶ 57, 9, 11. Each time, the process server encountered a doorman at Suzanne Regas's residential building, and Suzanne Regas did not answer the doorman's phone calls. In addition, the process server attempted service once at her parents' home and once at her former place of employment. The time limit prescribed by the Federal Rules of Civil Procedure expired on March 15, 2014, 120 days after the complaint was filed. *See* Fed. R. Civ. P. 4(m).

On August 29, 2014, Goldring filed a motion for service by publication. In that motion, Goldring outlined the five attempts to serve Suzanne Regas at home and the two attempts to serve her at other associated addresses. Mot. to Serve, Dkt. 65, at 2. The motion also brought to the Court's attention that Suzanne Regas was accused of evading service in another case relating to insurance coverage for Goldring's claims in this case. *See* Mot. for Service by Publication, *Wesco Ins. Co. v. Regas,* No. 14 C 716, Dkt. 12 (describing ten attempts to serve Suzanne Regas at home in April 2014); Mot. for Service by Publication, No. 14 C 716, Dkt. 26 (describing nine attempts to serve a cross complaint in May and June 2014). Further, the complaint in the *Wesco Insurance* case showed that Suzanne Regas was actually aware of this case. Goldring argued that further attempts to locate and personally serve Suzanne Regas "would be impractical and futile without assistance from the Court." After a hearing, the Court granted Goldring's motion with the additional requirement that Goldring also attempt service by overnight mail to Suzanne Regas's residence of record and to her parents' home address. *See* Minute Order, Dkt. 67.

**\*4** After providing the alternative notice authorized by the Court, Goldring moved for a default judgment against Suzanne Regas. *See* Motion, Dkt. 68. A few days later, an attorney entered an appearance in this case on behalf of Ms. Regas, and she subsequently filed a motion to quash service of process (or, in the alternative, to dismiss the complaint). *See* Motion, Dkt. 73.

Ms. Regas argues that service was insufficient under federal and Illinois law. She first asserts that Rule 4(m) of the Federal Rules of Civil Procedure requires that the Court dismiss this case, because Goldring is not able to demonstrate "good cause" for an extension past the 120–day limit and did not move to extend the time limit before the time expired. This "good cause" argument need not be considered, because even "[i]f the plaintiff cannot show good cause, then the decision to grant an extension is left to the discretion of the district court." *United States v. Ligas,* 549 F.3d 497, 501 (7th Cir. 2008) (citing *Henderson v. United States,* 517 U.S. 654, 66263 (1996)). Further, plaintiffs are entitled to request (and courts have discretion to grant such requests) even after the 120–day time limit has already expired. *See United States v. McLaughlin,* 470 F.3d 698, 701 (7th Cir. 2006) ("When delay in service causes zero prejudice ..., the granting of extensions of time for service, whether before or after the 120–day period has expired, cannot be an abuse of discretion"). In the absence of any prejudice to Ms. Regas (her motion identifies none), the Court was well within its discretion to extend the 120–day service period.

Second, Suzanne Regas argues that even if the Court did not abuse its discretion in failing to dismiss the case after the 120–day deadline, the manner of service was insufficient under the Federal Rules and Illinois law. The Federal Rules permit plaintiffs in this Court to effect service by following Illinois law. *See* Fed. R. Civ. P. 4(e)(1). Illinois law generally requires personal service or abode service, 735 ILCS 5/2–203(a), but also allows special service by court order when either personal service or abode service is impractical. *See* 735 ILCS 5/2–203.1. Special service may be authorized when two conditions are met: the plaintiff must show that "a diligent inquiry as to the location of the individual defendant was made and reasonable efforts to make service have been unsuccessful." *Id.*

Case: 3:17-cv-50428-JTD Doc #: 22-1 Filed: 01/22/24 Page 99 of 160 PageID #:1612
Case: 3:17-cv-50428-JTD Doc #: 22-1 Filed: 05/21/21 Page 134 of 202 PageID #:1612

Nesbitt v. Regas, Not Reported in F.Supp.3d (2015)
2015 WL 1331291

As to the first condition, Goldring performed a "diligent inquiry as to the location of the individual defendant," *id.,* when she relied on Suzanne Regas's residence of record with the ARDC, [8] and when the doorman at the building confirmed that Suzanne Regas lived at that address. *See* Kirby Aff., 65–2, at 3–4. All parties agree that Goldring's process server had the correct address for Suzanne Regas's residence. *See, e.g.,* Suzanne Regas Decl., Dkt. 74–1, at ¶ 3. Further, Goldring performed a diligent inquiry by exhausting the possibilities of attempting service at Suzanne Regas's former employer and her parents' home. *Id.*

[8]  During this period of attempted service, Suzanne Regas was a practicing attorney licensed to practice in Illinois, and was therefore required to keep her ARDC address up to date. *See* ILCS S.Ct. Rule 756(c) (requiring notice to the ARDC within 30 days of an address change). She does not, in any event, contest that service was attempted at the correct address.

**\*5** Goldring also satisfied the second requirement of making "reasonable efforts to make service," 735 ILCS 5/2–203.1, through a process server trying on multiple occasions to effect service at Suzanne Regas's home, each time unsuccessfully trying to call Suzanne Regas and leaving a business card with the building's doorman. Unlike a single family house, Suzanne Regas's fourteenth-floor residence would not give a process server any external indicators of whether a resident is home. Further, the building doorman and lack of public access to Suzanne Regas's unit increase the practical difficulty of service. As required by 735 ILCS 5/2–203.1, Goldring filed with her motion for special service the process server's affidavit of diligence, outlining the attempts at her home, at her parents' home, and at her former place of employment. *See* Dkt. 65–2. Based on the record in this case of five unsuccessful attempts to serve Suzanne Regas, as well as ten unsuccessful attempts to serve a summons and nine separate unsuccessful attempts to serve a cross complaint in case number 14 C 716 in this Court, the Court determined that further efforts to attempt personal service or abode service on Suzanne Regas would be futile and therefore impractical. *See People ex rel. Waller v. Harrison,* 348 Ill.App.3d 976, 804, 810 N.E.2d 589, 594 (Ill.App.Ct.2004) ( "[T]he statute does not require futile attempts to serve a defendant ...."); *compare Glens of Hanover Condominium Ass'n v. Carbide,* 2012 IL App (2d) 120008–U, at ¶ 29 (Ill.App.Ct.2012) (unpublished opinion) (disapproving of special service when process server made no effort to find defendant in places other than defendant's home). Suzanne Regas's post hoc argument that further attempts would not in fact have been futile and that she could have been served with further attempts is insufficient to show that the Court's earlier order was invalid. *See Waller,* 348 Ill.App. at 804–05, 810 N.E.2d at 594–95 (implicitly placing the burden on the defendant to show that a different course of action would have been successful in effecting service [9] ). Therefore, this Court was authorized by Illinois law to grant service by special order under 735 ILCS 5/2–203.1.

[9]  Under the federal rules, plaintiffs still bear the burden of showing that proper service occurred, *Cardenas v. City of Chicago,* 646 F.3d 1001, 1005 (7th Cir. 2011), but this is a separate question from whether an alternative method of service is permitted under Illinois law.

Once personal or abode service are found to be impractical, "[t]he court order may order service to be made in any manner consistent with due process." 735 ILCS 5/2–203.1. In the context of service of process, due process requires only that the court provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones v. Flowers,* 547 U.S. 220, 226 (2006) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)). Several factors lead the Court to believe that overnight mail to her home could reasonably be expected to provide actual notice. First, Suzanne Regas registered her home address with the Illinois ARDC, which indicates that her home address is the best place to contact her regarding attorney licensing and that she consents to service by mail at that address for ARDC proceedings. *See* ILCS S.Ct. Rule 765(a) (authorizing service for ARDC proceedings "by delivery of any such notice ... to the address listed on the master role for the attorney"); ILCS S.Ct. Rule 765 committee comments (explaining that the rule was revised to provide for service "by lawful means other than personal service on an attorney"). Obviously, this proceeding is not an ARDC proceeding, but consent to being served by mail at an address for other matters suggests that this method can be "reasonably calculated" to provide actual notice of this proceeding. *Jones,* 547 U.S. at 226; *see also Sato v. Demos,* 2012 IL App (1st) 1112968–U, at ¶ 34 (Ill.App.Ct.2012) (unpublished opinion) (holding that service pursuant to § 2–

203.1 by mail to a P.O. Box where a landlord receives rent checks is sufficient to serve the landlord). Another factor suggesting that Suzanne Regas would have actual notice of this suit is that several of her family members and her former employer are defendants in this matter. Also, Suzanne Regas was already aware of this case and had already filed a claim with her insurance provider. [10]  In addition, the method used to serve Suzanne Regas was also the method used to notify her as to Goldring's motion for default judgment, to which she promptly responded and appeared. [11]  Finally, Suzanne Regas did not suffer any prejudice in this case. Despite appearing later than the other defendants, she is not in a different position from her co-defendants. With her motion to quash, she also filed a motion to dismiss, which is granted on the merits below. Therefore, the Court concludes that service by overnight mail to Suzanne Regas's ARDC-registered address, when combined with service by overnight mail to her parents' home and service by publication, when Suzanne Regas already had actual notice of the suit, comported with the requirements of due process. [12]

[10]   The other case in which Suzanne Regas was accused of intentionally evading service was a declaratory action by her insurer asserting that they had no duty to defend or indemnify her in this underlying RICO case. Attached to the complaint was a letter from Suzanne Regas that discussed this case, by case number, and discussed Suzanne Regas's beliefs as to the merits of Goldring's claims and the motivation behind the lawsuit. *See* Suzanne Regas Letter, *Wesco Ins. Co. v. Regas,* No. 14 C 716, Dkt. 1–C.

[11]   Actual notice, standing alone, is of course insufficient to establish personal jurisdiction over a defendant, and Rule 4 must be strictly followed. *See, e.g., United States v. Ligas,* 549 F.3d 497, 504 (7th Cir. 2008); *McMasters v. United States,* 260 F.3d 814, 817 (7th Cir. 2001). The Court has done so in this case, in determining that Rule 4(e)(1) allows service by any method permissible under Illinois law and that 735 ILCS 5/2–203.1 permits any manner of service consistent with due process.

[12]   Having concluded that Rule 4(e)(1) permits service in accordance with state law and that the Court followed the requirements of 735 ILCS 5/2–203.1 in authorizing service by overnight mail in this case, the Court need not consider whether the service by publication was valid under 735 ILCS 5/2–206.

 **\*6**  In summary, the Court concludes that the manner of service on Suzanne Regas complies with the requirements of Rule 4, 735 ILCS 5/2–203.1, and the Due Process Clause, and that this Court may therefore exercise personal jurisdiction over Suzanne Regas. Accordingly, Suzanne Regas's Motion to Quash Service, Dkt. 73, is denied with respect to quashing service of process, dismissing the complaint for lack of personal jurisdiction, or dismissing the complaint for insufficient service of process. On the other hand, because Suzanne Regas has appeared and responded to the complaint, Goldring's Motion for Default Judgment Against Suzanne Regas, Dkt. 68, is denied.


## II. Elements of a § 1962(c) Claim

The Court now turns to the defendants' motions to dismiss. Goldring alleges that she is entitled to recover under RICO's civil cause of action because she has been injured by the defendants' RICO violations. Specifically, Goldring alleges that the defendants violated RICO Section 1962(c), which states:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). As the Supreme Court has explained, a § 1962(c) violation has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985) (footnote omitted). Further, a plaintiff in a civil RICO action must show that she suffered an injury proximately caused by the substantive RICO violation. *James Cape & Sons Co. v. PCC Const. Co.,* 453 F.3d 396, 403 (7th Cir. 2006) (citing *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 457 (2006)).

### A. "Conduct of an Enterprise"

The "conduct" and the "enterprise" elements of a § 1962(c) violation are closely related, and determining the "conduct" of the enterprise first requires the determination of what the alleged enterprise is and who its members are. Therefore, the Court first analyzes what the structure and identity of the enterprise and who its members are, and then analyzes the allegations against each defendant to determine whether they participated in the "conduct" of that enterprise.

#### 1. The Enterprise

Enterprises can be formal associations with a clearly defined legal structure, such as a corporation, partnership, or other business entity, or enterprises can be informal associations of persons, sometimes referred to as "association-in-fact" enterprises. Goldring asserts that the defendants comprised an association in fact enterprise that "did not go by a specific name." Compl., Dkt. 1, at ¶ 64. She alleges that the racketeering enterprise "acted as a continuing and cohesive unit," the primary objective of which was to "illegally steal funds belonging to the Banks and to make other unwitting third parties—and not themselves—legally responsible in the event that any of the fraudulent loans ... were not repaid." *Id.*

An association-in-fact enterprise must have an ascertainable structure with "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States,* 556 U.S. 938, 946 (2009). The Supreme Court in *Boyle* rejected inferring additional structural requirements, such as a "hierarchical structure," "fixed roles" for its members, "name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* at 948. In doing so, the Supreme Court abrogated a body of Seventh Circuit case law that required RICO enterprises to have a more discernable structure through hierarchical organization or leadership. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.,* 610 F.3d 382, 388 (7th Cir. 2010) ("But the Supreme Court's recent decision in *Boyle v. United States* throws all in doubt.") (internal citation omitted). Thus, pleading the *existence* of an enterprise does not require allegations that plausibly establish anything more than the three structural features listed in Boyle.

*7 None of the defendants seriously, or effectively, argues that the complaint's allegations are sufficient to satisfy *Boyle* 's three structural requirements, so a brief review of the facts supporting each requirement necessary to plausibly allege the existence of an enterprise will suffice. [13] Goldring alleges that the enterprise had a common purpose of enriching the defendants—especially Regas and Nesbitt—at the expense of WS Bank, Mutual Bank, Regas's son Dean Regas, and Goldring herself. Compl., Dkt. 1, at ¶¶ 1–2, 4–5. The complaint adequately alleges relationships between Regas and Nesbitt, who were longtime business partners and controlled multiple business entities together. *Id.* at ¶¶ 3, 6. Further, Regas had longstanding family and business relationships with Allyson Regas, Peter Regas, Suzanne Regas, the RFD firm and its partners, who in turn had family and business relationships with one another. *Id.* at ¶¶ 19–24, 28–29, 31. The complaint also alleges that the Adams defendants had relationships with each other and with Regas. *Id.* at ¶¶ 36–38, 40–41. The third Boyle requirement, longevity sufficient to achieve the enterprise's purpose, is met by the complaint's allegation of an eight-year scheme involving at least seven illegal loans and five sham business entities. *See id.* at ¶¶ 31(a), (c), (f), (g), 44–45, 52, 58, 60; Pl.'s Resp., Dkt. 42, at 8–9.

[13] The Adams defendants briefly argue that the complaint does not establish "even the existence of a RICO enterprise under a common goal," but does not expand on this argument further, as the rest of the paragraph argues that Adams did not share in any profits of the purported scheme. Adams Br., Dkt. 30, at 7 (citing *Baker v. IBP, Inc.,* 357 F.3d 685, 691 (7th Cir. 2004)). Profits are not a *Boyle* requirement, and the profit-sharing argument is analyzed separately below.

#### 2. Conduct of the Enterprise's Affairs

*Boyle* may have confirmed that the definition of a RICO "enterprise" is expansive, but the Seventh Circuit has since clarified that Boyle did not do away with the requirement that a plaintiff prove that the defendant "person" be a distinct entity from the "enterprise" or that the defendant used the enterprise to further an illegal scheme. *See United Food &*

*Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.,* 719 F.3d 849, 85354 (7th Cir. 2013) ("Section 1962(c) requires a plaintiff to identify a 'person'—i.e., the defendant—that is distinct from the RICO enterprise. And that 'person' must have 'conducted or participated in the conduct of the "enterprise's affairs," not just [its] own affairs.' ") (internal citations omitted); *Jay E. Hayden Found.,* 610 F.3d at 389 ("Even so, the RICO offense is using an enterprise to engage in a pattern of racketeering activity."). A RICO complaint—especially one that alleges an association-in-fact enterprise where the distinctions between the alleged "enterprise" and the individual defendants may not be clear—must allege that the defendant acted on the enterprise's behalf, rather than merely serving the defendant's own, individual, interests. *See, e.g., Walgreen Co.,* 719 F.3d at 854–855 (drug manufacturer and pharmacy did not conduct affairs of an enterprise where complaint failed to set forth how alleged drug-switching scheme advanced enterprise interests independent of the defendants' respective individual interests); *Crichton v. Golden Rule Ins. Co.,* 576 F.3d 392, 400 (7th Cir. 2009) (holding that a marketing arrangement by which an insurance company targeted a membership organization's members for fraud would not suffice to suggest that either the insurance company or the membership organization acted on behalf of any shared enterprise); *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 647 (7th Cir. 1995) (finding that defendants were not distinct from an association-in-fact enterprise when the complaint alleged only that the defendants defrauded the plaintiff directly, without the participation of other enterprise members).

To conduct, or participate in the conduct of, the affairs of an enterprise, a defendant must "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 183 (1993). That does not mean, however, that § 1962's reach is limited to those who were calling the shots; the Reves Court also noted that an enterprise also may be operated "by lower-rung participants ... who are under the direction of upper management." *Id.* at 184; *see also MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 62 F.3d 967, 978–79 (7th Cir. 1995) (reversing dismissal of § 1962(c) claim against low-level firms who carried out directions of other members of the enterprise). Operation and management of an enterprise does not, however, include an outsider acting as "merely a hireling," *Bachman v. Bear, Stearns & Co.,* 178 F.3d 930, 933 (7th Cir. 1999). [14] Under *Reves,* "a RICO enterprise may be operated at least by upper management, lower-rung participants in the enterprise who are under the direction of upper management, or others associated with the enterprise who exert control over it....' " *MCM Partners,* 62 F.3d at 977 (internal quotation omitted).

[14]   Goldring argues that the holding in *Bachman* has been limited by the Seventh Circuit's later ruling in *United States v. Sheneman,* 538 Fed.Appx. 722 (7th Cir. 2013), which observed that a defendant who does not directly receive any disbursed funds from a wire fraud scheme may still be guilty of wire fraud when he intentionally participates in a scheme to enrich another co-schemer. *Id.* at 723–24. Goldring's reliance on *Sheneman* is misplaced for three independent reasons. First, the issue discussed in *Sheneman* was whether a person could be guilty of wire fraud without receiving any proceeds, not whether a participant who only receives its normal fees participated in the "operation or management" of a RICO enterprise. *See id.* Second, the language cited by Goldring is dicta and is not binding on this court. *See id.* at 723 (noting that the evidence at trial "showed that Sheneman *did* receive $360,000 directly from the property sales, plus more than $600,000 his [co-conspirator] gave him."). Finally, *Sheneman* was an *order* published in the Federal Appendix, not an *opinion* published in the Federal Reporter, so even the holding would not be binding on this court. *See* 7th Cir. R. 32.1 ("Orders, which are unsigned, are released in photocopied form, are not published in the Federal Reporter, and are not treated as precedents.").

**\*8** To meet this standard with respect to an association in fact enterprise, the complaint must therefore plead facts plausibly alleging that the defendants engaged in a degree of cooperation and coordination "that fell outside the bounds of the parties' normal commercial relationships." *Walgreen Co.,* 719 F.3d at 856; *see also In re Insurance Brokerage Antitrust Litig.,* 618 F.3d 300, 378 (3d Cir. 2010) (holding that members of an enterprise "participated in the operation or management of the enterprise itself" by "commit[ing] [violations] that they [could not] accomplish alone" in a coordinated bid rigging scheme) (quoting *Reves,* 507 U.S. at 183; Gregory P. Joseph, *Civil RICO: A Definitive Guide* 332 (3d ed.2010)).

An important factor in assessing whether a defendant can be deemed to have participated in the enterprise's affairs, rather than its individual affairs, is whether the scheme's success depended on a particular defendant's knowing cooperation, or whether that particular defendant played a fungible role that could have been performed by outsiders. *Compare Insurance Brokerage,* 618 F.3d at 378 (finding each participant in bid-rigging to be acting on behalf of the enterprise

because the scheme could not succeed without all bidders colluding), *and MCM Partners,* 62 F.3d at 979 (finding lower-rung participants to be "vital" to the scheme's success because "only they had the ability" to effectuate the scheme), *with Reves,* 507 U.S. at 186 (no "operation or management" for outside auditor hired to prepare financial reports), *Walgreen Co.,* 719 F.3d at 856 (no "operation or management" of enterprise, despite both participants knowing of the other's role, when pharmacy could have accomplished its role in the scheme without the drug manufacturer's knowledge, and drug manufacturer could have accomplished its role in the scheme with any pharmacy chain), *and Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 727–28 (7th Cir. 1998) (no "operation or management" for granting a license of one's own name and likeness to promote enterprise or distributing promotional materials for the enterprise). [15]

[15] This line of demarcation does not fully explain the Seventh Circuit's reasoning in *Jay E. Hayden Foundation v. First Neighbor Bank,* 610 F.3d 382 (7th Cir. 2010). In that case, the Seventh Circuit held that there was no use of an enterprise by bank employees who helped conceal a long-running embezzlement scheme. *See id.* at 384–85, 389. That case can be distinguished on another basis because the predicate acts of racketeering were committed by a single conspirator acting on his own behalf, so the Seventh Circuit determined that the defendants, in covering up that leading conspirator's actions, "did not use the conspiracy (the enterprise); they were the conspiracy." *Id.* at 389.

Even gross departures from industry practice may not be enough to show more than an ordinary commercial relationship, if there is another business reason for the hired outsider's actions. *See Walgreen Co.,* 719 F.3d at 854 ("[N]othing in the complaint reveals how ... these communications or actions were undertaken on behalf of the enterprise as opposed to on behalf of [the alleged participants] in their individual capacities, to advance their individual self-interests."); *D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.,* No. 10 C 8159, 2013 WL 1286696, at *10 (N.D.Ill. Mar. 28, 2013) ("Though Plaintiffs make much of the fact that Mitchell was interested in retaining Allstate's business, a vendor's interest in retaining its business relationship is neither unusual nor suspicious.").

**\*9** Turning to Goldring's allegations in this case, the Court must analyze whether each moving defendant satisfies the *Reves* requirement that each defendant participate in the "operation or management" of the alleged distinct enterprise rather than acting for itself.

### a) James Regas

As alleged, the conduct of Regas (and Nesbitt [16]) easily suffices to plausibly allege participation in the management and operations of the alleged enterprise. According to the complaint, Regas and Nesbitt orchestrated the scheme, while others —lawyers, appraisers, corporate shareholders and officers, and bank officers—acted at Nesbitt's or Regas's direction. The complaint accuses both Nesbitt and Regas of creating and using multiple sham entities and directing the actions of the other defendants to obscure from the banks the real nature of these self-dealing loans. Like the *Hosseini* defendants' commingling of funds and joint operation of the multiple auto dealerships (without regard to the formal legal ownership of the entities), *see* 679 F.3d at 548–49, 558, Regas and Nesbitt are alleged to have freely transferred money from these entities to themselves, without regard to the formal shareholders of the sham entities. Compl., Dkt. 1, at ¶¶ 4–7, 28–34. These allegations easily surpasses the *Reves* minimum threshold requirement that Regas play "some part in directing the enterprise's affairs." 507 U.S. at 179.

[16] Nesbitt has not moved to dismiss the complaint, and so has not challenged the sufficiency of the allegations that he conducted, or participated in conducting, the affairs of an enterprise. His conduct is discussed here only as necessary to provide context to the allegations regarding the participation of Regas and other defendants in the affairs of the alleged enterprise.

Further, the enterprise alleged was distinct from Regas acting on his own behalf. Regas used the sham entities (and the associated shareholders and officers) to conceal his self-dealing interest and the high risk of default in the loans, and the concealment of Regas's involvement could not have succeeded without multiple participants "acting in concert on behalf of a shadow enterprise." *See Walgreen Co.,* 719 F.3d at 855. According to the complaint, the amounts approved

Case: 3:17-cv-50428 JTD Doc #: 22-4 Filed: 05/21/21 Page 139 of 202 PageID #:1617
Nesbitt v. Regas, Not Reported in F.Supp.3d (2015)
2015 WL 1331291

in the insider loans were also inflated through Regas's alleged agreement with Adams Valuation to inflate the appraised values of the collateral, furthering the scheme's purpose of siphoning off as much money as possible. Compl., Dkt. 1, at ¶ 36. These allegations go beyond "garden variety" commercial relationships or "parallel, uncoordinated fraud," because the inflated appraisal portion of the scheme could not have succeeded with Nesbitt and Regas only acting on their own. *Walgreen Co.,* 719 F.3d at 855; *see also Insurance Brokerage,* 618 F.3d at 378 (finding conduct of an enterprise where "defendants band together to commit violations they cannot accomplish alone") (internal quotations omitted). Regas and Nesbitt needed the participation and acquiescence of, at a minimum, the banks and the appraisers, to carry out the insider loan scheme. Like the "prototypical RICO case," the alleged scheme involved the use of formal business entities and their "appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts." *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 227 (7th Cir. 1997). Therefore, the complaint is more than sufficient to state that Regas was a member (indeed, the head) of an enterprise distinct from himself.

### b) Law Firm Defendants

**\*10** The complaint also alleges that Regas controlled the law firm defendants in furtherance of the scheme. At Regas's behest, RFD allegedly created at least some of the sham entities and performed the legal work relating to the loans, the real property securing those loans, and obtaining the third party guarantees. Compl., Dkt. 1, at ¶¶ 29, 31, 42. As an example, Goldring asserts:

> So, it would be quite common that Regas (and the Regas Firm at his direction) would prepare the corporate-creation documents for the underlying corporate entity and then follow that by preparing the loan transaction documents for one of the Banks, while the entire time keeping from the Banks the fact that the loans were being issued to the Entities, companies that Regas himself had created and continued to control.

*Id.* at ¶ 42.

These allegations are essentially that Regas used RFD as a law firm, to provide legal services—an ordinary commercial relationship. The complaint does not allege that the law firm defendants knew of the insider loan scheme or that the legal work that they were engaged to provide related to entities that were fictitious or transactions that were fraudulent. [17] It does allege that RFD breached its duties and knowingly put its own interests or Regas's interests before that of the banks (which would be an unsurprising consequence, given the highly conflicted nature of the alleged representation), but the fact that the law firm defendants may have taken engagements that presented inappropriate conflicts of interest does not turn RFD's relationship with the enterprise into an "insider" relationship. *See Walgreen Co.,* 719 F.3d at 856 (no conduct of an enterprise even when both participants knew of the other's "activities [that] were by all appearances illegal"). Nor was RFD's participation vital to the success of the scheme, because unlike the colluding bidders in *Insurance Brokerage* or the sole contracting authorities in *MCM Partners,* the scheme could have succeeded even if RFD had refused to participate. *See Insurance Brokerage,* 618 F.3d at 378; *MCM Partners,* 62 F.3d at 979. Indeed, the complaint alleges that Regas himself sometimes did the legal work necessary to create the sham legal entities. Compl., Dkt. 1, at ¶ 29. Further, any law firm—not just RFD—could have performed the legal work of creating business entities and preparing loan transaction documents, particularly given the fact that it was not essential (and is not alleged) that the law firm defendants knew of the insider loan scheme. Accordingly, RFD's role in the scheme is more like that of the fungible auditors of *Reves* or *Bachman.* Even if the complaint is correct about RFD's role in the scheme, the allegations are only enough to accuse RFD and its attorneys [18] of being mere "hirelings." *Bachman,* 178 F.3d at 933. Thus, the complaint fails to state a § 1962(c) claim against RFD or its attorneys.

[17]     The Complaint does not sufficiently allege that James Regas was a partner in RFD or that his knowledge is imputable to that firm for any other reason.

18     The Court concludes that the complaint does not state a claim against Suzanne Regas for her role as an attorney at RFD, but because Goldring also accuses Suzanne Regas of playing other roles in the scheme, those allegations are analyzed separately below. The complaint also describes Peter Regas as "Secretary and Treasurer" of WS Bank, but does not allege that he took any actions in that capacity to further the scheme.

### c) Appraiser Defendants

**\*11** The complaint alleges a more active role in the operations of the enterprise for the appraiser defendants. Goldring alleges that Adams Valuation agreed to systematically overvalue properties in appraisals performed on the real property controlled by Regas. Compl., Dkt. 1, at ¶ 36. In exchange, Regas would exercise his control over Mutual Bank to retain Adams Valuation for approximately 50% of the appraisals. *Id.* The appraiser defendants argue that this case bears much in common with *Decatur Ventures, LLC v. Stapleton Ventures, Inc.,* where a district court dismissed § 1962(c) claims against appraisers who were alleged to have inflated appraisals of real properties. 373 F.Supp.2d 829, 837–38 (S.D.Ind.2005). That court held that even though the appraisers played a critical role in the scheme, they were nonetheless "outside" the enterprise because the plaintiffs had failed to allege that the appraisers had knowledge of the scheme, had failed to allege the actual values of the subject properties, and had failed to allege the appraisers' involvement in the predicate acts of racketeering. *Id.* at 837–38. In contrast, Goldring has alleged that Adams Valuation "agreed" to the scheme, has listed the true values of the subject properties in this case, and has identified several specific allegedly inflated appraisals performed by Adams Valuation. Compl., Dkt. 1, at ¶ 36. These specific allegations paint a knowing, involved, and integral role played by Adams Valuation that required Adams Valuation to perform certain acts differently than would have been performed by other appraisal firms. So while this Court agrees that the *Decatur Ventures* court applied the correct test, applying that test to the appraisers of this case leads to a different result.

The Adams defendants argue that they did not "act[ ] in any way distinct from their normal professional capacity" as appraisers, Adams Reply, Dkt. 50, at 3, but the complaint alleges differently, and at this juncture the Court must credit the allegations of the complaint as correct. Moreover, the inflated appraisal values were not merely "a vendor's interest in retaining its business relationship" with the banks, *D.M. Robinson Chiropractic,* 2013 WL 1286696 at \*10, because inflating appraisal values advanced the interests of the enterprise *at the expense of their own clients* (in this scheme, the banks that required the appraisals of the property securing the loans). Therefore, the complaint sufficiently alleges that the Adams defendants had more than just ordinary business relationships with the enterprise and were knowing participants in the enterprise.

Finally, the appraiser defendants argue that they did not participate in the conduct of the enterprise because the complaint "does not present a single factual claim asserting that Adams had any interest in the outcome of the alleged scheme beyond his own individual interest" or that the appraiser defendants "shared in any profits of the alleged enterprise or received any additional fees ... beyond its customary fee." Adams Br., Dkt. 30, at 7–8. That argument overlooks the fact that while its fee may have been normal, the high volume of appraisals it conducted for the enterprise may not have been; the fee is only one variable that affects whether the firm derived benefit from the enterprise and the Complaint plausibly alleges that Adams Valuation was the beneficiary of an unusually, and inappropriately, high volume of work relating to the enterprise. Compl., Dkt. 1, at ¶ 36. The appraiser defendants cite *Bachman,* which they argue imposes a requirement that a defendant share in the profits or in the proceeds of an illegal scheme in order to be liable under § 1962(c). Adams Br., Dkt. 30, at 8. *Bachman* could be read to suggest such a requirement in its discussion of a mere "hireling" that only received its "normal fee," 178 F.3d at 933, but a profit-sharing requirement cannot be reconciled with *MCM Partners,* where the Seventh Circuit held that "operation" of an enterprise could even include a participant's acquiescence to *losing* money to advance the enterprise's goals. [19] 62 F.3d at 979. Rather, *Bachman* teaches that profit-sharing can be a relevant (but not dispositive) factor in determining whether a defendant was member of the enterprise or an outside "hireling." 178 F.3d at 933. Therefore, despite being silent on what interest Adams Valuation had in the

success of the scheme, the complaint sufficiently alleges that the appraiser defendants participated in the operation or management of the enterprise.

19   The scheme alleged in *MCM Partners* had a purpose of maintaining a monopoly on forklift rentals, which benefited the "upper management" of the scheme, but also resulted in the "lower-rung" defendants having to pay above-market prices as customers of the forklift rental services. *See* 62 F.3d at 971. The Seventh Circuit held that these "lower-rung" defendants—coerced into following "upper management" orders—could still qualify as participants in the operation of the enterprise, despite the fact that the enterprise's success would result in *losses,* rather than profits, for these participants. *Id.* at 979.

### *d) Allyson and Suzanne Regas*

**\*12**  The complaint contains very few allegations pertaining to the claims against Allyson and Suzanne Regas. The complaint alleges that James Regas listed his daughters Allyson and Suzanne as "members and shareholders" in the sham entities, but it also alleges a similar role for Goldring herself as a purported victim. Compl., Dkt. 1, at ¶¶ 28, 31(a)-(c), 31(f)-(g), 44. More importantly, the complaint does not allege any actions taken by Suzanne or Allyson Regas in their capacities as members or shareholders in these entities so the Court has no facts to analyze under the *Reves* "operation or management" test.

The complaint does, however, accuse Allyson Regas, in her capacity as Chief Financial Officer and Vice President of one of the victim banks, of "substantially assist[ing]" Regas by obtaining inflated appraisals, approving the loans without using proper underwriting practices, and concealing the true nature of the loans. Compl., Dkt. 1, at ¶ 54. [20]  In other words, the complaint alleges that Allyson Regas abused her position as a bank officer to knowingly put the interests of the enterprise above the interests of the bank to whom she owed a fiduciary duty. These allegations go far enough beyond the purely self-interested actions alleged in *Walgreen Co.* or *Jay E. Hayden Foundation* to assert that Allyson Regas "improperly hijack[ed] the business operations of [the bank] for illicit ends." *Walgreen Co.,* 719 F.3d at 854–55; *see also Jay E. Hayden Found.,* 610 F.3d at 389 (observing in dicta that the complaint could have sufficiently stated a RICO claim if the plaintiff had alleged that the bank officers used the bank to commit fraud). Therefore, the complaint's allegations suffice to establish that Allyson Regas participated in the conduct of an enterprise in her capacity as a bank officer, but are insufficient to state a claim against Suzanne Regas.

20   The Court notes that the same allegation is leveled against defendant Miceli, who has not yet been required to respond to the Complaint. There seems little reason to believe that the analysis would be any different with respect to him.

### B. "Pattern of Racketeering Activity"

A plaintiff alleging a § 1962(c) violation must also establish that the enterprise acted "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Pattern" means "at least two acts of racketeering activity" within a 10–year period, and usually will require more than two. *Id.* § 1961(5); *see also H.J. Inc. v. Nw. Bell. Tel. Co.,* 492 U.S. 229, 232 (1989). Further, the plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.,* 492 U.S. at 239. For RICO violations predicated on acts of mail fraud or on obstruction of justice involving dishonesty, the complaint must identify the predicate acts with particularity. Fed.R.Civ.P. 9(b); *Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1327 (7th Cir. 1994) (mail fraud). [21]  Therefore, to survive these motions to dismiss, the complaint must identify with particularity predicate acts of racketeering that are both "related" and "continuous." *H.J. Inc.,* 492 U.S. at 239, 242.

21   Although not every conceivable violation of 18 U.S.C. § 1512 (titled "Tampering with a witness, victim, or informant") would necessarily involve fraud or dishonesty, Goldring's complaint clearly alleges that the defendants "fraudulently concealed extensive facts," "repeatedly told [Goldring] it was nothing to worry about," and "fabricate[d] buyers to extend [a] falsehood." Compl., Dkt. 1, at ¶¶ 43–45. These particular § 1512 allegations sound in fraud, so in this case, Rule 9(b) also governs these

allegations. *See Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 507 (7th Cir. 2007) (claims "premised upon a course of fraudulent conduct" implicate Rule 9(b)'s heightened pleading requirements regardless of whether fraud is an element of the claims themselves); *Jones v. Ada S. McKinley Cmty. Servs.,* No. 89 C 319, 1989 WL 105231, at *3 (N.D.Ill. Sept. 1, 1989) (applying Rule 9(b) to RICO claims predicated on § 1512 violations).

**\*13** Mail fraud under 18 U.S.C. § 1341 requires the defendant's (1) participation in a scheme to defraud; (2) with the intent to defraud; (3) using the mail in furtherance of the fraud. *See* 18 U.S.C. § 1341; *United States v. Howard,* 619 F.3d 723, 727 (7th Cir. 2010). "Intent to defraud," the second element, "requires a wilful act by the defendant with the specific intent to deceive or cheat." *Corley v. Rosewood Care Ctr., Inc. of Peoria,* 388 F.3d 990, 1005 (7th Cir. 2004). Rule 9(b) requires "only a general outline" of the scheme to defraud and the intent to defraud, but must "describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud.' " *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir. 1992) (quoting *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.,* 927 F.2d 988, 992 (7th Cir. 1991)).

Each individual mailing in furtherance of the scheme would qualify as a distinct mail fraud violation. *See, e.g., United States v. Giovenco,* 773 F.3d 866, 868 (7th Cir. 2014) (describing six counts of mail fraud as six mailings to advance one fraudulent scheme). To constitute a mail fraud violation, an individual mailing need not contain misrepresentations, or even be essential to the scheme—it is enough that an individual mailing be "incident to an essential part of the scheme." *Schmuck v. United States,* 489 U.S. 705, 710 (1989) (quoting *Pereira v. United States,* 347 U.S. 1, 8 (1954)). And unlike common law fraud, federal mail fraud only requires that the fraudulent scheme cause the plaintiff's injuries in some way and does not require that the harmed plaintiff personally rely on the fraudulent misrepresentations. *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 648–49, 656–57 (2008) (holding that a RICO violation predicated on mail fraud could occur even without a plaintiff's first party reliance, as when a plaintiff is harmed by a third party reliance on the defendant's representations).

Turning to the individual mailings alleged in this case,[22] the majority have little to no relation to the alleged fraud. The mailings from non-defendants that amount to service of documents relating to other litigation[23] are not even "incident to an essential part of the scheme." *Schmuck,* 489 U.S. at 710. If anything, those mailings contain truthful information from fellow victims of the scheme that would tend to *frustrate*—rather than advance—the scheme by alerting Goldring to the fraud. Similarly, Goldring gives no indication of how letters from non-defendant creditors or government agencies furthered the scheme or caused her losses, and so those mailings must be disregarded as well. This leaves only seven remaining mailings alleged to constitute mail fraud:

| Date | From | To | Description |
| --- | --- | --- | --- |
| 2006-06-09 | Adams Valuation | Tom Pacocha (Mutual Bank) | Letter and Appraisal for 913-15 Forest Avenue in Evanston |
| 2006-07-27 | Martin Hall (Regas, Frezados & Dallas LLP) | David Azran | Letter re: 913 Forest-Evanston LLC |
| 2006-08-09 | Bette Lally (Mutual Bank) | Diane Goldring | Letter enclosing appraisal for 913-915 Forest Ave in Evanston |

| 2007-03-17 | James Regas (Regas Frezados & Dallas LLP) | Diane Goldring | Letter re: "Various Projects" [24] |
|---|---|---|---|
| 2011-06-28 | Suzanne Regas (7500 Kenosha LLC) | Diane Goldring | Demand for payment of expenses with accompanying exhibits |
| 2011-09-21 | Suzanne Regas (7500 Kenosha LLC) | Diane Goldring | Demand for payment of expenses with accompanying exhibits [25] |
| 2012-03-19 | Christian Nesbitt | Illinois Secretary of State | 2010 Annual Report for North Park Webster2011 Annual Report for North Park Webster2012 **\*14** Webster2012 Annual Report for North Park WebsterApplication for Reinstatement |

Am.App. A, Dkt. 46, at 1–4.

[22]   Since Goldring has identified specific mailings and their contents in her proposed Amended Appendix A, Dkt. 46, she has satisfied Rule 9(b)'s particularity requirements regarding the mailings. *Midwest Grinding,* 976 F.2d at 1020.

[23]   Goldring's proposed Amended Appendix A, Dkt. 46, lists 17 letters from law firms (who have not named as parties in this case) serving copies of summons, pleadings, motions for default judgment or for summary judgment, supporting briefs, notices of depositions, notices of hearings, and court orders relating to litigation against Goldring in her capacity as guarantor of the delinquent loans or in her capacity as officer in the sham entities.

[24]   This letter was incorporated by reference in Exhibit 3 of the complaint, the Government's Sentencing Memorandum in James Regas's criminal case, Dkt. 1–3, at 3, which was in turn incorporated by reference in the complaint itself. *See* Compl., Dkt. 1, at ¶ 8. Even if the contents could not be considered to fall within the four corners of the complaint, a redacted version of the letter is available as a public record on James Regas's criminal case docket, *see* Exhibit B, *United States v. Regas,* 12 CR 461, Dkt. 27–2, and the Court could simply take judicial notice of its contents. Fed.R.Evid. 201(b); *see also Michigan v. U.S. Army Corps of Eng'rs,* 758 F.3d 892, 899 (taking judicial notice of official government reports).

[25]   This letter is listed twice on Goldring's proposed Amended Appendix A to the complaint. *See* Dkt. 46, at 3.

The first three letters listed, from 2006, concern a property at 913 Forest Avenue in Evanston, Illinois. The complaint's allegations relating to this "Forest Property" are that the Regas Firm incorporated an LLC called "913 Forest–Evanston LLC" under the actual control of Regas and Nesbitt, but with the purported managing members listed as "Dean and Suzanne Regas, and, for a time, Goldring." Compl., Dkt. 1, at ¶ 31(g). Regas and Nesbitt arranged for the Forest property, worth $2.2 million, to be overvalued in order to secure a $3.0 million loan. *Id.* at ¶¶ 38–39. To facilitate the loan, Regas and Nesbitt induced Goldring to personally guarantee the loan. *Id.* at ¶ 31(g). In a separate agreement, Regas and Nesbitt agreed to pay $450,000 from the loan to repay an investor, Azran Forest LLC ("Azran Forest"). *Id.* at ¶ 39. Although Regas and Nesbitt attempted to fraudulently withhold payment to Azran Forest, eventually Azran

Case: 1:17-cv-50428-JTD Doc #: 22-4 Filed: 05/21/21 Page 1 of 2 Page 4 1 of 202 PageID #:1622
Case: 3:17-cv-50428-JTD Doc #: 22-4 Filed: 05/21/21 Page 141 of 202 PageID #:1622
Nesbitt v. Regas, Not Reported in F.Supp.3d (2015)
2015 WL 1331291

Forest sued and accepted a $412,500 settlement. *Id.* Even after paying the Azran settlement, Regas and Nesbitt still "managed to successfully divert approximately $387,500" for themselves. *Id.* With this background, the fact that each of these three mailings was "incident to" the scheme is clear. *Schmuck,* 489 U.S. at 710. In the first letter, Adams Valuation sent the appraisal overvaluing the property by $800,000 to Mutual Bank as part of the loan approval process. The second letter, written by RFD attorney Martin Hall on behalf of 913 Forest–Evanston LLC, falsely represented to David Azran that there were insufficient funds to pay Azran—which Azran alleged was part of a conspiracy to defraud Azran. *See* Azran Compl., Dkt. 1–8, at ¶ 28. The third letter, from Mutual Bank, forwarded the falsely inflated appraisal in a communication to Goldring, who was a personal guarantor on the loan. *See* Compl., Dkt. 1, at ¶ 31(g). This inflated appraisal understated the substantial guaranty exposure incurred by Goldring, who could not appreciate that the property would eventually be foreclosed and that she would be personally liable for the deficiency in excess of $3.4 million. *Id.* Each of these mailings is identified with particularity in the complaint and each is related to the ongoing scheme.

 **\*15** The letter from James Regas to Goldring, sent on RFD letterhead on March 13, 2007, reported the status of the projects and business entities involving Regas, Nesbitt, and Goldring. In her complaint, Goldring accuses Regas and Nesbitt of four specific material omissions in persuading Goldring to sign the loan guarantees: (1) that the appraised values of the property securing the loans were artificially inflated, (2) that the loans did not follow underwriting formalities, (3) that the lenders were unaware of Regas's self-dealing, and (4) that the loans were procured in flagrant disregard of regulatory obligations and internal bank procedures. Compl., Dkt. 1, at ¶¶ 4–5. The March 13 letter does not mention the inflated appraisals, the hidden risks of default, or Regas's unlawful means of obtaining the loans; as such, it was an instrument of the fraud (assuming, as the Court must, that the letter is fraudulent because it fails to advise Goldring of those issues).

The complaint provides no context or description for the other three letters written by Suzanne Regas and Christian Nesbitt. It is unclear what Suzanne Regas's letters said or what role they played in the alleged scheme. [26] It is also unclear what purpose was served by Christian Nesbitt's letters to the Illinois Secretary of State. Therefore, those letters have not adequately provided "the who, what, when, where, and how" required under Rule 9(b) to show that the letters were in furtherance of the alleged scheme (as necessary to constitute predicate acts of racketeering). *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 507 (7th Cir. 2007).

[26]     As discussed above, the complaint does not provide enough detail to tie Suzanne Regas to the operation or management of the enterprise.

Goldring also alleges several instances of obstruction of justice, especially by Nesbitt. The complaint accuses Nesbitt of concealing information and preventing Goldring's receipt of correspondence relating to pending lawsuits in which Goldring had been sued on her personal guarantees, which delayed Goldring's discovery of the broader scheme by several years. Compl., Dkt. 1, at ¶ 44. Further, Nesbitt allegedly fabricated false buyers for the properties (including the creation of forged documents) in order to persuade Goldring not to investigate further into her own guarantee liability. *Id.* at ¶ 45. These allegations are not sufficient to state predicate racketeering actions under § 1512(c)(1) of the obstruction of justice statute, because that statute relates solely to acts taken with "the intent to impair the [document's] integrity or availability for use in an official proceeding." Goldring does not allege that Nesbitt, or any other defendant, tried to prevent the use of any document in any proceeding; rather, she alleges that Nesbitt concealed or altered such documents so that she would not be aware of the true status of law suits that had been filed against her. In other words, § 1512(c)(1) addresses attempts to conceal or tamper with evidence; that is not what Goldring alleges Nesbitt to have been doing when he concealed information about the lawsuits from her. Goldring alleges that Nesbitt concealed or altered documents to prevent Goldring from discovering the scheme and fails to explain how such documents would have been used in an official proceeding. [27]

Case 21-50428 Document 21-1 Filed 01/22/18 Page 145 of 150 PageID #:1623

27    In any event, all of the law suits at issue were filed in state court. Section 1512(c)(1) applies only to federal proceedings. *See*
      § 1515(a)(1).

In summary, then, Goldring's complaint and her proposed amended appendix outline four predicate acts of racketeering: three letters relating to the Forest Property mailed in 2006, and one letter written by James Regas that relates to the broader scheme relating to multiple properties and business entities. In order for Goldring to recover, however, these four predicate acts of racketeering must be sufficiently "related" to constitute a pattern. *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989). As the Supreme Court has observed, "relatedness" requires "similar purposes, results, participants, victims, or methods of commission." *Id.* at 240 (quoting *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n.14 (1985)). The relatedness requirement is not a particularly strict requirement. Here, the four letters served the scheme's general purpose of using inflated property appraisal values to obtain loans and guarantees of value. The three letters regarding to the Forest Property persuaded both the bank and Goldring to rely on Adams Valuation's inflated appraisal, and attempted unsuccessfully to prevent Azran Forest from collecting funds owed at closing. *See* Compl., Dkt. 1, at ¶ 39. The letter from Regas outlined a broad overview of multiple projects relating to the overall scheme, and presumably furthered the scheme by persuading Goldring to continue guaranteeing loans. *See generally* Regas Letter, *United States v. Regas,* 12 CR 461, Dkt. 27–2 (N.D.Ill.Dec. 10, 2012). These mailings, relating to the same broad scheme, are sufficiently related to each other and to the scheme.

**\*16**  Racketeering activity must also "pose a threat of continued criminal activity" in order to qualify as a "pattern." *H.J. Inc.,* 492 U.S. at 239. The parties agree that this case must be evaluated for "closed-end continuity," which may be found in a "closed period of repeated conduct." *Id.* at 241. The Seventh Circuit has outlined relevant factors for courts to determine the continuity of a pattern: "Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir. 1986). Of *Morgan* 's continuity factors, the duration factor is the "most important." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.,* 424 F.3d 659, 673 (7th Cir. 2005); *see also Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1024 (7th Cir. 1992) (describing the duration factor as "the closest thing we have to a bright-line continuity test").

Generally, the predicate acts underlying a "one-shot scheme" must occur over the course of more than a year in order to form a pattern. *Midwest Grinding,* 976 F.2d at 1024 (collecting cases where periods of "several months" to "several years" were insufficient to support a pattern); *see also Jennings v. Auto Meter Prods., Inc.,* 495 F.3d 466, 474–75 (7th Cir. 2007) (ten months insufficient); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 782 (7th Cir. 1994) (nine months insufficient). The earliest of the predicate acts occurred with a letter mailed on June 9, 2006, and the latest occurred about nine months later, on March 17, 2007. This nine-month period is insufficient under the Seventh Circuit case law. This conclusion is reinforced by the fact that the only predicate acts that Goldring has successfully alleged are mailings, which " 'are unique among predicate acts' because multiplicity of such acts 'may be no indication of the requisite continuity of the underlying fraudulent activity.' " *Midwest Grinding,* 976 F.2d at 1024 (quoting *U.S. Textiles, Inc. v. Anheuser– Busch Cos., Inc.,* 911 F.2d 1261, 1266 (7th Cir. 1990)) Courts have found insufficient continuity between even hundreds of mailings when the number of fraudulent transactions are small. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 781 (7th Cir. 1994) (finding no "pattern" from racketeering predicated only on a few acts of mail fraud); *Midwest Grinding,* 976 F.2d at 1024 (hundreds of mailings insufficient because there was only a single scheme with "a few" recipients and only one victim); *see also Hartz v. Friedman,* 919 F.2d 469, 473 (7th Cir. 1990) ("The Seventh Circuit, however, does not look favorably on relying on many instances of mail and wire fraud to form a pattern.").

And while Goldring has alleged a long, multi-year scheme in which the defendants had engaged in fraudulent and even criminal activity, only the predicate acts of *racketeering* count for the duration factor. Tortious or even criminal acts committed before the first act of racketeering do not start the clock. *See Midwest Grinding,* 976 F.2d at 1024 & n.5 (starting the duration count with "the first predicate act of mail fraud" rather than when the alleged coconspirators "began doing the groundwork"). Similarly, actions taken to cover up the completed scheme do not extend the duration, either. *Id.* (holding that actions to cover up discovery "do nothing to extend the duration of the underlying ... scheme");

*see also Jennings,* 495 F.3d at 474 (declining to consider later fraudulent cover-up attempts in the duration analysis). Therefore, although Goldring has alleged a long-running scheme involving a pattern of criminal activity with multiple perpetrators and multiple victims, the complaint falls short of alleging sufficient duration to establish a pattern of *racketeering* activity as defined in 18 U.S.C. § 1961(1).

### III. RICO Conspiracy Under § 1962(d)

**\*17** Goldring also asserts a RICO conspiracy claim against Regas, Nesbitt, RFD, and Adams Valuation. Compl., Dkt. 1, at ¶ 70–73. A RICO conspiracy within the scope of § 1962(d) requires a showing that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *DeGuelle v. Camilli,* 664 F.3d 192, 204 (7th Cir. 2011). In addition, the plaintiff must allege injury from an act that is ... independently wrongful under RICO," that is, a predicate act of racketeering. *Beck v. Prupis,* 529 U.S. 494, 505–06 (2000). [28]

[28]  In *Beck,* the Supreme Court left open the question of whether a RICO conspiracy claim must allege injury arising from an actionable violation of the substantive provisions of the act (§ 1961(a)-(c))—that is, whether the plaintiff's claimed injury must have been caused by a violation of RICO rather than just by conduct alleged to constitute a predicate act of racketeering. *See Beck,* 529 U.S. at 506 n.10. To the Court's understanding, this remains an open question; it is not discussed in *DeGuelle,* which appears to transmute *Beck* 's holding that a claim that alleges injury from conduct that does not constitute a predicate act fails to state a claim for RICO conspiracy to an affirmative holding that an allegation of injury arising from a predicate act will suffice. Neither party has addressed the question in this case.

As discussed above, Goldring alleges sufficient facts to infer conduct of an enterprise involving James Regas, Christian Nesbitt, Adams Valuation, and Allyson Regas (but not RFD). [29] Unlike the substantive RICO claim, however, a RICO conspiracy claim does not need to identify with particularity the two predicate acts, but only needs to allege an agreement that two predicate acts would occur. *See Gas Tech. Institute v. Rehmat,* 05 C 2712, 2006 WL 3743576, at \*33 (N.D.Ill.Dec. 15, 2006) ("The Seventh Circuit has not required the pleading of claims under § 1962(d) with particularity, nor has this court."); *Nat'l Org. for Women, Inc. v. Scheidler,* 897 F.Supp. 1047, 1071 (N.D.Ill.1995) (holding that RICO conspiracy claims are governed by the liberal pleading standards of Fed. R. Civ. P. 8(a), not the heightened requirements of Fed. R. Civ. P. 9(b)). From the detailed allegations of the role each defendant played in the operation of the enterprise over course of years, it is fair to infer that each willing participant in the enterprise agreed to participate in the scheme and that acts of wire or mail fraud would occur throughout the multi-year duration of the scheme.

[29]  The complaint only names Regas, Nesbitt, RFD, and Adams Valuation in Count II, and does not assert Count II against Allyson Regas or Douglas Adams. *See* Compl., Dkt. 1, at 27.

Further, and as discussed above, Goldring has already alleged several injuries suffered as a result of mail fraud in furtherance of the scheme. Mailings relating to the Forest Property led Goldring to rely on Adams Valuation's inflated appraisals in choosing to guarantee the loan, which ultimately led to a Goldring paying a $100,000 settlement, as well as legal fees, to resolve a $3.4 million judgment. *See* Compl., Dkt. 1, at ¶ 31(g); Am. App'x A, Dkt. 46, at 1. The March 13, 2007 letter sent by Regas to Goldring misrepresented the fundamental nature of Goldring's guarantees and the risk of default. *See generally* Regas Letter, *United States v. Regas,* No. 12 CR 461, Dkt. 27–2 (N.D.Ill.Dec. 10, 2012). Goldring identifies losses arising out of decisions made after the letter was sent, including a personal $200,000 loan that she agreed to provide on October 1, 2008. *See* Compl., Dkt. 1, at ¶ 58. And while the alleged mailings may not constitute a pattern of racketeering activity and therefore do not constitute a substantive RICO violation, this Court reads *DeGuelle* and *Beck* to allow plaintiffs to state RICO conspiracy claims for injuries caused by racketeering acts when the other RICO conspiracy elements are met—even if the plaintiff falls short of proving that a pattern of racketeering activity actually occurred. When read with the allegations of the broader fraudulent scheme, Goldring's injuries are sufficient to support

a RICO conspiracy claim. Therefore, the defendants' motions to dismiss Count II must be denied as to James Regas and Adams Valuation; it is granted as to RFD.

* * *

**\*18** In a nutshell, the complaint alleges that Nesbitt and Regas created sham entities, which (under Nesbitt's and Regas's control) purchased real property, and Adams Valuation appraised the properties at inflated values so that the bank officer defendants (Allyson Regas and Jerry Miceli) would approve undersecured insider loans, allowing Nesbitt and Regas to siphon off the excess funds for their own personal use. These allegations suffice to allege that James Regas, Christian Nesbitt, Douglas Adams, Adams Valuation, and Allyson Regas participated in the affairs of a RICO enterprise. The complaint falls short, however, in alleging that they did so through a pattern of racketeering activity. Nevertheless, the complaint adequately alleges that defendants Regas, Nesbitt, and Adams Valuation conspired to do so, and that Goldring was injured by the alleged predicate acts of racketeering, namely Regas's false letter of March 13, 2007, and three letters relating to the Forest Property. Therefore, the Court concludes that the complaint fails to adequately allege a violation of 18 U.S.C. § 1962(c)(1), and dismisses that Count without prejudice, but adequately alleges a violation of 18 U.S.C. § 1962(d). Goldring is granted leave to file an amended complaint that addresses the deficiencies identified in this Memorandum Opinion.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1331291

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Serfecz v. Jewel Food Stores

United States District Court for the Northern District of Illinois, Eastern Division

August 30, 1994, Decided ; August 31, 1994, Docketed

No. 92 C 4171

**Reporter**
1994 U.S. Dist. LEXIS 12239 *; 1994 WL 478576

JOSEPH SERFECZ and FIRST CHICAGO TRUST COMPANY, Trustee of Trust No. 684, Plaintiffs, v. JEWEL FOOD STORES, INC., et. al., Defendants.

**Judges:** **[*1]** Grady

**Opinion by:** JOHN F. GRADY

# Opinion

## *MEMORANDUM OPINION*

This case comes before the court on the motion of defendants Jewel Food Stores, Inc., and American Stores Properties, Inc., for summary judgment. For the reasons discussed below, we grant the motion for summary judgment on the antitrust and malicious prosecution claims in Counts I, II, and III. Summary judgment on the breach of lease claim in Count IV is granted in part and denied in part.

## *BACKGROUND*

Plaintiff First Chicago Trust Company of Illinois, as trustee, is the title holder of the Grove Mall Shopping Center ("Grove Mall") in Elk Grove Village. Plaintiff Joseph Serfecz is the beneficial owner of this trust. In 1963 defendant Jewel Food Stores, Inc. ("Jewel") entered into a lease with plaintiffs' predecessor-in-interest for retail space in the Grove Mall in which to operate a grocery store. When Serfecz purchased the Grove Mall in 1977, he assumed all existing leases, including the Jewel lease. Jewel's original lease ran until 1986 and provided Jewel three five-year options to renew. Jewel has exercised two of those options. Thus, its current lease runs until 1996, and it has one remaining option to renew until 2001. Defendant **[*2]** American Stores Properties, Inc. ("American Stores") is the real estate management and development arm of American Stores Company and its subsidiaries, of which Jewel is one, and is engaged in managing properties

owned or rented by Jewel.

Up until October 1987, Jewel owned and operated a grocery store in its leased space in the Grove Mall and was the mall's anchor tenant. In October of 1987, Jewel vacated the premises and moved its grocery operation to a building in the newly constructed Elk Crossing Mall, directly across the street from the Grove Mall. Since that time, the space formerly occupied by Jewel at the Grove Mall has remained vacant, and Jewel has refused to give up its leasehold interest in the premises, thereby preventing Serfecz from securing another grocery store as an anchor tenant. Since vacating its space, Jewel has continued to pay rent and has exercised its second option to renew the lease. Jewel proposed to sublet the space to defendant United Skates of America ("United Skates"), for use as a roller rink and games arcade. Serfecz objected to the proposed sublease because he considered United Skates to be an "obnoxious" tenant and because he was concerned that **[*3]** occupancy by United Skates would result in higher insurance rates. In February 1990, Jewel filed suit seeking a declaratory judgment regarding its right to sublet to United Skates. The trial court ruled against Jewel, and the appellate court affirmed.

Plaintiffs bring suit against Jewel, American Stores, and United Skates, and against the developers, owners and operators of the Elk Crossing Mall (collectively referred to herein as the "Elk Crossing defendants"), alleging that the defendants conspired to keep the Jewel space at the Grove Mall vacant, to prevent a major anchor tenant from taking over the space, to prevent Serfecz from re-developing the mall, to coerce Serfecz's other tenants to leave the Grove Mall and move across the street to the Elk Crossing Mall, and to otherwise devalue and destroy the Grove Mall. Plaintiffs maintain that this conspiracy is part of an overall marketing strategy of restricting the use of property in order to keep out competitors. In support of this claim, plaintiffs offer evidence of other similar restrictive lease arrangements throughout Illinois involving Jewel.

In Counts I and II of their complaint, plaintiffs maintain

that defendants have violated **[*4]** Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, by conspiring to restrain trade by eliminating competition in the grocery store and retail shopping center markets, and attempting to monopolize the grocery store business, the sale and development of commercial real estate, and the business of operating a retail shopping center within the relevant geographic market. Plaintiffs also bring state law claims in Count III for malicious prosecution based on the February 1990 declaratory judgment suit brought by Jewel, [1] and in Count IV for breach of lease. Before the court is the motion for summary judgment of defendants Jewel and American Stores. [2]

**[*5]** *DISCUSSION*

*I. Antitrust Standing*

Defendants move for summary judgment on Counts I and II, claiming that plaintiffs lack standing to bring antitrust claims against Jewel. Private civil actions to enforce the Sherman Act are allowed under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue there for . . . and shall recover threefold the damages by him sustained . . . ." However, despite this seemingly broad grant of authority to sue, the Supreme Court has emphasized that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated General Contractors of California v. California State Counsel of Carpenters,* 459 U.S. 519, 534, 74 L. Ed. 2d 723, 103 S. Ct. 897 (1983) (internal quotation marks and citation omitted). Thus, even though a plaintiff might suffer sufficient harm to satisfy the constitutional standing requirement of injury **[*6]** in fact, "the court must make the further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.* at 535 n. 31. Even when an antitrust violation under the Sherman Act has clearly occurred, Section 4 of the Clayton Act allows

only certain private parties to bring suit on the basis of that violation. [3] The Supreme Court recognized that given "the infinite variety of claims" that might arise under Section 4, it would be "virtually impossible to announce a black-letter rule that will dictate the result in every case." *Id.* at 536. Thus, the Court rejected rigid, one-dimensional tests for standing such as the "target area," "zone of interests," or "directness of injury" tests. *Southaven Land Co. v. Malone & Hyde,* 715 F.2d 1079, 1085 (6th Cir. 1983) (citing *Associated General Contractors,* 459 U.S. at 536 n.33). The Court instead identified various factors that should guide a case-by-case inquiry into whether a particular party has standing **[*7]** to seek an antitrust remedy. *Id.* (citing *Associated General Contractors,* 459 U.S. at 537). It is important to note at the outset that no single factor is decisive; rather, the court must balance all of the factors. *R.C. Dick Geothermal v. Thermogenics,* 890 F.2d 139, 146 (9th Cir. 1989). *See also, Los Angeles Memorial Coliseum v. N.F.L.,* 791 F.2d 1356, 1363 (9th Cir. 1986), *cert. denied,* 484 U.S. 826 (1987) ("Most cases will find some factors tending in favor of standing . . . and some against . . . and a court may finding standing if the balance of factors so instructs.").

**[*8]** The antitrust standing factors outlined by the Supreme Court in *Associated General Contractors* have been described and interpreted in various ways by the different circuit courts. However, as our colleague noted in *American Agriculture Movement v. Board of Trade,* 848 F. Supp. 814, 823 (N.D. Ill. 1994) (Marovich, J.), "the differences between the expressions of the *Associated General Contractors* factors are ones of form rather than substance." Thus we refer to cases from several different circuits in our effort to better

---

[1] Defendants correctly point out that in our previous opinion of March 26, 1993, we ruled that no other litigation could serve as a basis for plaintiffs' charge of malicious prosecution. Thus, we consider the malicious prosecution claim only insofar as it is based on the February 1990 declaratory judgment action.

[2] Also pending is the motion of the Elk Crossing defendants for summary judgment. However, due to repeated extensions in the briefing schedule, that motion is not yet fully briefed and thus is not considered by the court at this time.

---

[3] As the Seventh Circuit explained in *Indiana Grocery v. Super Valu Stores,* 864 F.2d 1409 (7th Cir. 1989), "While sections 1 and 2 of the Sherman Act focus on competitive conditions in the marketplace as a whole, . . . section 4 of the Clayton Act focuses on the *type* of injury claimed by a *particular* plaintiff and demands that it be an 'antitrust injury.'" *Id.* at 1419 (emphasis in original). The Seventh Circuit elaborated further on this important distinction: "It is tempting when performing an antitrust injury analysis to look first at the substantive antitrust provision the defendant allegedly has violated, to note next the harmful effects on competition the substantive provision is designed to prevent, to note further that some of those harmful effects might fall on parties such as the plaintiff, and to conclude, therefore, that the plaintiff should have standing to vindicate the substantive antitrust provision." Such an approach, according to the Seventh Circuit, "stand[s] the antitrust injury inquiry on its head." *Id.* at 1419 n. 6.

understand and apply the guidelines established in *Associated General Contractors.*

The first *Associated General Contractors* factor to be considered is whether there is a causal connection between the antitrust violation and the harm to the plaintiff, and whether the defendant intended to cause that harm. 459 U.S. at 537. Without elaborating in any detail, we believe that plaintiffs in the present case have presented enough evidence for the trier of fact to find a causal connection between the absence of a grocery store anchor tenant and the slow demise of the Grove [*9] Mall. There is also evidence that Jewel acted deliberately to prevent a competitor from occupying the space in the mall.

Another factor considered important by the Supreme Court in *Associated General Contractors* is the nature of the plaintiff's injury. The Court considered whether the injury was "'of a type that Congress sought to redress in providing a private remedy for violations of Antitrust laws,'" *Associated General Contractors,* 459 U.S. at 537 (citing *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 483, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982), bearing in mind the central policy underlying the Sherman Act of "assuring *customers* the benefits of price competition," and "protecting the economic freedom of *participants* in the relevant market." *Associated General Contractors,* 459 U.S. at 538 (emphasis added).

In *Southaven Land Co. v. Malone & Hyde,* 715 F.2d 1079 (6th Cir. 1983), a case strikingly similar to the one now before us, the Sixth Circuit considered [*10] the nature of the injury when evaluating the standing of a lessor of retail commercial space to challenge the alleged antitrust behavior of an owner and operator of retail grocery stores. Defendant leased premises from plaintiff Southaven for the purpose of operating a retail grocery business. Defendant then executed a series of subleases with successive third parties to operate grocery stores at the Southaven location. At the time defendant entered into its lease with plaintiff and thereafter, defendant also owned and operated other retail grocery outlets in the same geographical area. The last of defendant's successive subtenants went bankrupt, and defendant did not arrange for a replacement grocery store. Following the business demise of the last sublessor, plaintiff sought to negotiate a cancellation of defendant's lease so that plaintiff could replace defendant with a viable grocery operator, but defendant refused to execute the proposed cancellation agreement or otherwise surrender the premises, and

removed its equipment, thereby rendering the premises unfit for use as a grocery. Like plaintiff Serfecz in the present case, Southaven claimed that defendant intended to destroy [*11] the site as a location for the operation of a retail grocery outlet and to monopolize the grocery store market in the area. *Id.* at 1081.

Following the Supreme Court's guidance in *Associated General Contractors,* the Sixth Circuit in *Southaven* analyzed the nature of the plaintiff's injury by examining the status of the plaintiff in relationship to the relevant market. *Id.* at 1085-86. The court defined the relevant market as the retail grocery industry in the geographical area of the Southaven property, *id.* at 1086, and found that Southaven, as a lessor of retail commercial premises to grocery stores, did not qualify as a "competitor, purchaser, consumer or other economic actor in the grocery industry," even though its former and prospective grocery store tenants did compete in that market. *Id.* at 1081, 1086.

The Sixth Circuit noted, however, that under *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982), a plaintiff who is not, himself, a direct "participant" [*12] in the market, still may have standing if his injury is "'inextricably intertwined' with the injury sought to be inflicted upon the relevant market or participants therein." *Southaven,* 715 F.2d at 1086 (citing *McCready,* 457 U.S. at 483). In *McCready,* plaintiff, a psychotherapy patient, challenged her health insurance provider's practice of covering only the costs of seeing a psychiatrist, not the expenses of a psychologist. The Supreme Court found that plaintiff's injury as a consumer of psychotherapeutic services was "inextricably intertwined" with the injury sought to be inflicted on the suppliers of psychological services, and thus, granted plaintiff standing to complain that Blue Shield violated the antitrust laws by acting to restrain competition in the market for psychotherapeutic services. *McCready,* 457 U.S. at 483-84.

The Sixth Circuit applied the analysis of *McCready* to the facts in *Southaven,* in order to determine whether the plaintiff lessor's injury was "inextricably intertwined" with the injury to the grocery [*13] market. The court noted that the primary class of persons injured by an antitrust violation are those adversely affected as a result of controlled prices or an exclusion of competition. *Southaven,* 715 F.2d at 1087 n. 10. Because Southaven was not alleged to be a "member of a class of 'consumers' of grocery products or a class otherwise manipulated or utilized by (defendant) as a fulcrum, conduit or market force to injure competitors or

participants in the relevant product and geographical markets," the Sixth Circuit concluded that the injuries suffered by the plaintiff as an owner and lessor of retail space were not sufficiently intertwined with the injuries to the grocery market to give plaintiff standing under the rule of *McCready. Id.* at 1086. The Sixth Circuit further explained: "Although Southaven's injury may be a tangental [sic] by-product of [defendant's] averred monopolistic conduct, such injury is not *inextricably* intertwined to any injury inflicted upon the relevant market. . . . Its injury is not sufficiently linked to the pro-competitive policy of the antitrust laws." *Id.* at 1086-87 **[*14]** (emphasis in original).

In another case of warring grocery stores, the Southern District of New York applied the rules of *Associated General Contractors, McCready,* and *Southaven,* to evaluate the standing of the owner and developer of a shopping mall to complain that the defendant supermarkets conspired to prevent a grocery store from opening in its mall by filing state court lawsuits and attending local planing commission hearings to prevent the issuance of necessary permits. *Rosenberg v. Cleary, Gottlieb,* 598 F. Supp. 642 (S.D.N.Y. 1984). The court dismissed the antitrust counts because the alleged violation related to "the retail grocery business," and plaintiff, as a mall developer and owner, was not a direct participant in that market. *Id.* at 645. Rather, plaintiff's injuries related to its role as a participant in the construction and real estate market, and as such, were only tangentially related to the alleged antitrust violations and resulting lack of competition in the grocery market. *Id.* Thus, the court found plaintiff to be an "inappropriate" antitrust complainant. *Id.*

We turn now to examine the **[*15]** case law in our own circuit regarding the nature of the injury aspect of the standing analysis. A leading Seventh Circuit case on the issue is *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Assoc.,* 830 F.2d 1374 (7th Cir. 1987). In *Southwest Suburban,* the Seventh Circuit evaluated the standing of a trade association that provided listing services to real estate brokerage firms to challenge the defendant neighborhood planning association and defendant brokers' purported antitrust violations. The complaint alleged that the defendants conspired to boycott the plaintiff's listing service, and encouraged consumers to boycott the listing service as well. *Id.* at 1379. As a result of the Conspiracy, the plaintiff was no longer able to provide a comprehensive listing of properties to its subscribers.

Like the Sixth Circuit in *Southaven,* the Seventh Circuit's inquiry into the nature of the plaintiff's injury in *Southwest Suburban* focused on plaintiff's status in relationship to the relevant market. The *Southwest Suburban* court concluded that the plaintiff trade association lacked standing to sue for antitrust **[*16]** violations because it was neither a supplier nor a purchaser in the market for real estate brokerage services. *Id.* at 1379. Rather, the plaintiff acted as a supplier of a product, its list, to brokers. Noting the general rule in the Seventh Circuit that "suppliers of an injured customer may not seek recovery under the antitrust laws because their injuries are too 'indirect, secondary, or remote,'" *id.* (citing *In re Industrial Gas Litigation,* 681 F.2d 514, 519-20 (7th Cir. 1982), *cert. denied,* 460 U.S. 1016 (1983)), the court held that "any injury which [plaintiff] sustained by virtue of defendants' alleged boycott of the [listing service] was only indirectly related and incidental to the anticompetitive scheme, the intent and effect of which was . . . to gain control of the real estate brokerage services market." *Id.*

The paramount status of the consumer in antitrust law is made clear by other cases in the Seventh Circuit applying and interpreting the nature of the injury factor. The court closely scrutinizes whether the interests of the plaintiff are in line with the interests of consumers: **[*17]** "'When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust.'" *Nelson v. Monroe Regional Medical Center,* 925 F.2d 1555, 1564 (7th Cir. 1991) (citation omitted). As the Seventh Circuit explained in *Ball Memorial Hosp. v. Mutual Hosp. Ins.,* 784 F.2d 1325, 1338 (7th Cir. 1986), even a competitor in the market does not necessarily share the consumer's interest (and the antitrust laws' interest) in the protection and promotion of competition: "Action that injures rivals *may* ultimately injure consumers, but it is also perfectly consistent with competition." *Id.* at 1338 (emphasis in original). After all, the antitrust laws were designed to protect competition, not individual competitors. *Id.* (citing *Brunswick v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 488, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)).

In *Garot Anderson Marketing v. Blue Cross,* 772 F. Supp. 1054, 1062 (N.D. Ill. 1990), a colleague in this district **[*18]** applied the antitrust standing rules established in *McCready* and *Southwest Suburban* to determine whether the plaintiff insurance agents and agencies who sold the insurance products of one of the defendant insurance companies had standing to challenge the actions of the defendants in allegedly conspiring not to compete with each other for a

particular business. Plaintiffs alleged that they were injured by the loss of sales commissions resulting from the termination of a certain insurance product. The court concluded that the rule of *Southwest Suburban* did not bar the plaintiffs' suit. The court explained that "the plaintiff need not be the target of the alleged conduct. . . . It is sufficient that the plaintiff participated in some relevant way in the part of the market endangered by the alleged antitrust violation." *Id.* at 1062. Apparently, the court found that the plaintiffs' status as sellers of insurance qualified them as "participants" in the same market as the defendant suppliers of insurance.

Underlying the courts' efforts in *Associated General Contractors, McCready,* and their progeny, to limit antitrust standing to marketplace [*19] participants is the awareness that without such limits, the courts would be overwhelmed with duplicative antitrust litigation, and the knowledge that Congress did not intend the antitrust laws to provide a catch-all remedy for every injury remotely linked to an antitrust violation. The Supreme Court in *Associated General Contractors* noted the "strong interest . . . in keeping the scope of complex antitrust trials within judicially manageable limits." 459 U.S. at 543. As the Court explained in *McCready,*

> an antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 [the Clayton Act] there is a point beyond which the wrongdoer should not be held liable. . . . It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for [his] injury.

457 U.S. at 476-77 (internal quotation marks and citation omitted). [4]

---

[4] Fear of opening the floodgates was obviously a motivating factor behind the Sixth Circuit's denial of standing in *Southaven.* The Sixth Circuit worried that if it were to permit the shopping center landlord to sue the vacating grocery store for damages predicated upon diminished lease revenue resulting from reduced consumer activity at his shopping center, it would also have to grant standing to the other lessees as well, predicated upon their diminished sales. *Southaven,* 715 F.2d at 1088 n.12. In *Alpha Shoe Service v. Fleming Companies,* 849 F.2d 352 (8th Cir. 1988), *cert. denied,* 488 U.S. 942 (1988), the Eighth Circuit rejected just such a suit brought by shopping center tenants against a grocery store anchor tenant who vacated its space and left it empty for an extended period of time. The court declined to adopt plaintiffs' broad characterization of the relevant market as "the attraction of consumers," and found that the tenants

[*20] We turn now to the arguments in this case regarding the nature of Serfecz's injury as reflected by his status in relationship to the relevant marketplace, and the connection between his injury and the injury to that market. Defining the relevant market as the retail grocery industry, we, like the Sixth Circuit in *Southaven,* find that Serfecz, as a lessor of retail premises, does not qualify as a competitor or consumer in this industry, even though his former and prospective future tenants compete in that market. The case law in our own circuit supports this conclusion. In *Southwest Suburban,* 830 F.2d 1374 (7th Cir. 1987), the Seventh Circuit concluded that the plaintiff trade association, which supplied a real estate listing service to brokers, could not sue certain brokers for antitrust violations in the brokerage market because it was neither a direct supplier nor a purchaser in the relevant market. Similarly, Serfecz is neither a direct supplier nor purchaser in the grocery market. Rather, Serfecz, like the listing service, can be thought of as a supplier to the grocery stores which do directly compete in the market: he supplies retail space. [*21] Under the general rule stated in *Southwest Suburban,* the injuries of suppliers such as Serfecz are too indirect to support standing.

Serfecz argues that under *McCready* he has standing to sue because even though he is not a direct market participant, his injury is "inextricably intertwined" with the injury to the grocery market. Serfecz offers a creative argument regarding the close business tie that exists between a shopping mall developer and a grocery store anchor tenant; however, according to the case law, this does not qualify him as inextricably intertwined with the grocery market under the rule of *McCready.* As we explained above, the plaintiff in *McCready,* while not herself a competitor in the market for psychotherapeutic services, was actually a *consumer* of such services.

Plaintiffs also argue that Serfecz has standing because Jewel's actions were "aimed squarely at Serfecz and the Grove Mall, and *not* directly at a competitor." They cite *Hoopes v. Union Oil Co.,* 374 F.2d 480 (9th Cir. 1967), as a source for their reasoning. Plaintiffs' Memorandum in Support of its Response to the Motion for Summary Judgment ("Plaintiffs' [*22] Response") at 5-6. However, the "target area" test for standing employed by the Ninth Circuit in *Hoopes* was rejected by the

---

lacked standing because they "were not competitors, participants, or consumers in the relevant market." *Id.* at 354. The court rejected plaintiffs' broad definition of the market for fear of "expanding the scope of the private antitrust action far beyond its intended bounds." *Id.*

Supreme Court in *Associated General Contractors,* 459 U.S. at 536 n.33. [5]

[*23] In its desire to keep antitrust litigation within judicially manageable bounds and avoid duplicative suits, without forcing antitrust violations to go unchallenged altogether, the Supreme Court in *Associated General Contractors* also considered whether a party more directly injured by the violations might file suit as another factor relevant to the standing inquiry. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." 459 U.S. at 542. If more direct victims exist, denial of standing to those only tangentially injured "is not likely to leave a significant antitrust violation undetected or unremedied." *Id.* Applying a similar rationale in a case which foreshadowed the Supreme Court's reasoning in *Associated General Contractors,* the Seventh Circuit emphasized the importance of limiting antitrust standing to those plaintiffs able to most efficiently vindicate the antitrust laws. *In re Industrial Gas Litigation,* 681 F.2d 514, 516 & 520 (7th Cir. 1982). [*24] Thus, the standing inquiry focuses "not only on whether there has been an 'antitrust injury,' but also on whether the particular plaintiff is the appropriate antitrust enforcer." *Id* at 520. Like the Supreme Court in *Associated General Contractors,* the Seventh Circuit strove to strike a balance between the interest in "deterrence through private antitrust enforcement and redress for injury," on the one hand, and "the avoidance of excessive treble damages litigation," on the other hand. *Id.* The court concluded that the proper compromise could best be achieved by granting standing "only to those who, as

consumers or competitors, suffer immediate injuries . . . while excluding person whose injuries were more indirectly caused by the antitrust conduct." *Id.* The court believed that "this select class of plaintiffs" would be able to "impose the deterrent sting of treble damages at the smallest cost of enforcement." *Id.* The Seventh Circuit thus reduced this aspect of the inquiry to a basic costs/benefits analysis.

Under the rationale articulated in *Associated General Contractors* and *Industrial Gas,* the courts search for the most directly [*25] injured -- and thus, presumably, the best -- plaintiff. Accordingly, the Seventh Circuit in *Southwest Suburban* concluded that brokers who subscribed to plaintiff's listing service and whom might have been hurt by the boycott of the listing service would serve as more appropriate plaintiffs than the listing service itself, because their injuries were more direct. 830 F.2d at 1379-80. The Ninth Circuit in *R.C. Dick Geothermal Corp. v. Thermogenics,* 890 F.2d 139 (9th Cir. 1989), considered the standing of the landlord of one of the defendants to complain that the defendants' conspiracy to restrain trade by slowing production injured the landlord by reducing the royalties it received under the lease. The Ninth Circuit denied standing because the landlord, although injured by his decreased royalties revenue, was not the most directly injured potential plaintiff; rather, the court concluded that other sellers in the market would be "in a far better position to champion the public interest in vigorous antitrust law enforcement." *Id.* at 148. Likewise, in *Rosenberg,* the Southern District of New [*26] York observed that both supermarket consumers and the plaintiff shopping mall developer's prospective grocery store tenant would be more suitable complainants regarding the defendant supermarket's alleged actions in restraint of trade in the grocery store market. And, finally, in *Southaven,* the Sixth Circuit briefly noted that consumers and other market participants would be more direct victims, and thus, by implication, better plaintiffs.

We now consider whether a similar rationale can be applied to the present case: Is there an identifiable class of potential plaintiffs who might be better suited than Serfecz by virtue of their more direct injuries to bring suit and whose self-interest would motivate them to do so? In the case most directly on point, *Southaven,* the Sixth Circuit rather summarily concluded that consumers or other market participants would be more appropriate plaintiffs to seek a remedy for restraint of trade or monopolization in the grocery market. While, in theory, we agree with the Sixth Circuit, we lack that court's confidence that either of these two groups of potential

---

[5] Responding to the emphasis in the case law and defendants' memorandum in support of their motion for summary judgment on the market status of an antitrust plaintiff, Serfecz also resorts to the argument that he is in fact a consumer in the market because he shops for groceries in Elk Grove Village, and that, in order to sustain his shopping center, he is "willing" to become a competitor in the market by opening his own grocery store in the Grove Mall. Plaintiffs' Response at 7. However, the antitrust allegations in the complaint frame this case as a suit to remedy the injuries suffered by Serfecz as the owner of a competing shopping mall, not the injuries he may have suffered as a grocery consumer or prospective grocery store competitor. Thus, we reject Serfecz's last ditch efforts to obtain standing by re-casting his case in a manner unsupported by the complaint.

plaintiffs would be sufficiently motivated to actually bring suit. We suspect that [*27] Serfecz might be correct that a competing grocery store not yet operating in the area, such as Dominicks, would be more likely to forgo a location than to incur the high start-up costs of litigation. Indeed, according to plaintiffs, the fact is that no Competitor has filed an antitrust lawsuit against Jewel although there is evidence that Jewel has been restricting locations throughout Illinois for the last ten years. As regards a consumer suit, the degree of harm suffered by an individual consumer as a result of reduced competition in the grocery market in Elk Grove Village would probably not be sufficiently great to give him incentive to sue. Thus, we fear that there is a high risk that a significant antitrust violation will go unremedied if we do not grant plaintiffs standing to sue in this case. However, the case law in the various circuits, including our own, makes it clear that the mere existence of competitors or consumers in the relevant market who *could* sue is considered a factor in favor of denying standing. Where a more directly injured class of potential plaintiffs exists, we are left with very little leeway to address the likelihood of whether any members of that [*28] class would actually bring suit. While the result may be somewhat frustrating in this particular case, it does provide a straightforward rule of law and eliminates the need for us to consider evidence on the speculative question of whether and when a more appropriate plaintiff might sue.

The Supreme Court in *Associated General Contractors* examined the directness of the plaintiff's injury as a factor in the standing analysis not only to prevent excessive and duplicative litigation, but also to avoid highly complicated damage determinations. 459 U.S. at 542-544. As the Sixth Circuit explained in *Southaven,* "indirect injuries may render damages highly speculative or create situations of complexity that would foreclose an equitable determination and apportionment of damages." 715 F.2d at 1087. The Sixth Circuit reviewed the damages sustained by the plaintiff shopping center lessor in *Southaven,* and noted that there had been no breach or failure to perform under the lease; in fact, the defendant grocery store operator had continued to tender rental payments when due even though it was no longer [*29] operating at the Southaven location. Rather, the plaintiff complained of its inability to command premium rent from its other lessees (or perhaps to even attract lessees at all) due to the reduced consumer traffic at a shopping center without an operating grocery store. The Sixth Circuit believed that "ascertainment of damages to compensate such injury would necessitate wide ranging speculation,

particularly since diminished consumer activity at any given shopping area could result from myriad independent reasons unrelated to the alleged antitrust violation." *Southaven,* 715 F.2d at 1087. Thus, at the heart of the Sixth Circuit's preference for antitrust plaintiffs with direct injuries, is the difficulty inherent in establishing causation of an indirect injury, which in turn creates difficulty in determining damages. Thus, the existence of a causal connection between the antitrust violation and the harm to the plaintiff is not only an independent factor in the *Associated General Contractors* analysis, *supra* p. 6-7, but also underlies the examination, under *Associated General Contractors,* of the directness of the plaintiff's injury.

In *Greater Rockford Energy & Technology v. Shell Oil Co.,* 998 F.2d 391 (7th Cir. 1993), [*30] *cert. denied,* 127 L. Ed. 2d 375, 114 S. Ct. 1054 (1994), the Seventh Circuit, too, acknowledged the difficulty of proving that the harm suffered by a plaintiff resulted from the alleged antitrust activity. "An antitrust violation need not be the sole cause of the alleged injuries, but the plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury." *Id.* at 401. Where there was not just one, but numerous intervening economic and market factors which could offer an alternative explanation for plaintiff's injuries, the Seventh Circuit observed that it would be difficult for the plaintiff to prove that the antitrust violations were the cause of the injuries. *Id.* at 402-404.

We turn now to the present case, and consider the difficulties facing Serfecz in attempting to prove that the injuries he suffered resulted from Jewel's alleged antitrust violations. Defendants argue that numerous factors might explain Serfecz's inability to attract either tenants or developers to the Grove Mall, including [*31] its aging, dilapidated condition, its poor design, and the presence of a new, more attractive competing mall across the street. Defendants are correct that in light of these possible independent reasons for the decline of the Grove Mall, it may be difficult for Serfecz to prove that his injuries were caused by antitrust violations. However, as we mentioned when discussing causation as an independent factor in the *Associated General Contractors* analysis, we believe that plaintiffs have cited enough evidence to raise a material issue of fact regarding causation. For example, in a sworn declaration, plaintiffs' retail shopping center expert explained that because of Jewel's actions in continuing to claim a leasehold interest in the premises, commencing various litigation against Serfecz, and

attempting to sublet to a roller rink with arcade games, prospective tenants and redevelopers would have no interest in the Grove Mall. Plaintiffs' Exhibits to Plaintiffs' Response, Declaration of Kenneth Leonard. However, there is still room for the kind of concern raised in both *Southaven* and *Greater Rockford Energy & Technology* regarding the difficulties of allocating the damages amongst **[\*32]** the "myriad" possible causes.

In summary, applying the factors established by the Supreme Court in *Associated General Contractors,* we find that plaintiffs lack standing to challenge Jewel's antitrust activity in the retail grocery market. We believe that Serfecz has raised a dispute of material fact regarding whether Jewel's alleged antitrust conduct caused his harm. However, we are ultimately persuaded by the Sixth Circuit's reasoning in *Southaven,* as well as that of the Southern District of New York in *Rosenberg,* that plaintiffs' injuries were too indirect to be considered inextricably intertwined with the injury to the relevant marketplace, the retail grocery business, and thus the plaintiffs are not the proper plaintiffs to challenge antitrust activity in that market. The emphasis in our own circuit on the interests of the consumer and the status of a plaintiff in relation to the marketplace persuades us that the approach to the shopping center/grocery store battle taken by the Sixth Circuit in *Southaven* and the Southern District of New York in *Rosenberg* would be good law here in the Seventh Circuit. Thus, we grant Jewel's motion for summary judgment and dismiss **[\*33]** for lack of standing plaintiffs' antitrust claims against both Jewel and American Stores in Counts I and II of the complaint insofar as they pertain to Jewel's alleged antitrust activities in the retail grocery market. [6]

However, plaintiffs' antitrust claims against Jewel are not limited to the grocery business. Plaintiffs also have clearly alleged that Jewel participated in a Conspiracy with the Elk Crossing **[\*34]** defendants and United Skates to restrain trade and monopolize sales and

development in the business of operating a retail shopping center and leasing commercial premises to retail tenants. *See, e.g.,* Complaint at PP 25, 40, 85, 86. Defendants have offered no dispute regarding the direct injuries suffered by plaintiffs as participants in that market, [7] and thus, we conclude that plaintiffs have standing to challenge Jewel's actions in relation to the market for operation of retail shopping centers. However, our determination that plaintiffs have standing to assert limited antitrust claims against Jewel does not end our review of the motion for summary judgment. The motion raises substantive challenges to the antitrust claims which go beyond the question of standing. These challenges will be discussed *infra* in Part II of this opinion.

**[\*35]** *II. The Merits of Plaintiffs' Claims of Antitrust Violations*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548, (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Dribeck Importers, Inc. v. G. Heileman Brewing Co.,* 883 F.2d 569, 573 (7th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *See Regner v. City of Chicago,* 789 F.2d 534, 536 (7th Cir. 1986). **[\*36]** Summary judgement will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

---

[6] In arguing the motion for summary judgment brought by Jewel and American Stores, the parties have made no attempt to distinguish the situation of Jewel from that of its property manager and sister company, American Stores. Apparently, the parties view the role of these two defendants as identical. Therefore, even though very little information has been provided to the court regarding American Stores, as distinguished from Jewel, we assume that its responsibility for the alleged antitrust activities is the same of that of Jewel, and we treat it identically for purposes of this motion for summary judgment.

[7] Indeed, defendants, themselves, at one point acknowledge that Jewel might be found liable for antitrust violations in the market for retail shopping centers on a conspiracy theory. *See* Defendants' Memorandum in Support of Motion for Summary Judgment ("Defendants' Memorandum") at 12 n.1. ("Because Jewel does not compete in the market for retail shopping centers . . . Jewel cannot be found to have monopolized . . . this market. . . . Jewel can only be found liable on a monopolization theory in this market by virtue of a conspiracy.")

Defendants argue that even if plaintiffs have standing to bring antitrust claims against Jewel, plaintiffs have failed to make a factual showing sufficient to establish the essential elements of those claims. In order to establish a violation of Section 1 of the Sherman Act, plaintiffs must establish the existence of a contract, combination or conspiracy intended to restrain competition. *Greater Rockford Energy & Technology,* 998 F.2d at 396. Plaintiffs claim that Jewel and American Stores participated in a conspiracy to restrain trade in the retail shopping center market in violation of Section 1 by helping to destroy the viability of the Grove Mall. In furtherance of that conspiracy, Jewel ceased operations at Grove Mall, vacated the premises and moved across the street to the newer Elk Crossing Mall, yet continued to renew its lease at the **[*37]** Grove Mall, thereby tying up the anchor tenant space and preventing another grocery store from moving in. Subsequently, Jewel attempted to sublet to United Skates for the "obnoxious" use of operating a roller rink with arcade games.

The plaintiff bears the ultimate burden of proving that there was in fact such a conspiracy. *Market Force v. Wauwatosa Realty,* 906 F.2d 1167, 1170 (7th Cir. 1990) (citing *Monsanto v. Spray-Rite Serv.,* 465 U.S. 752, 763, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984)). However, a conspiracy to engage in anti-competitive conduct "need not, and generally will not, be established by direct evidence." *Contractor Utility Sales v. Certain-teed Products,* 638 F.2d 1061, 1074 (7th Cir. 1981). Rather, "the requisite concerted action may be inferred from . . . circumstantial evidence." *Id.* Following the holdings of the Supreme Court in *Matsushita Elec. Indus v. Zenith Radio,* 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986), and *Monsanto* regarding the sufficiency of the standard **[*38]** of proof in a Section 1 claim, the Seventh Circuit has adopted a three-step inquiry. The court first reviews the plaintiff's evidence of a conspiracy. The court then considers whether the plaintiff's evidence of conspiracy is ambiguous; that is, is it as consistent with the defendants' permissible, legitimate independent business interests as with an illegal conspiracy? If the defendants can show a plausible and justifiable reason for their conduct that is consistent with proper business practice, the burden then shifts to the plaintiff to come forward with direct or circumstantial evidence that tends to exclude the possibility that defendants were pursuing these independent interests. *Market Force,* 906 F.2d at 1170-71. If the plaintiff cannot do so, a grant of summary judgment for the defendant is appropriate. *Id.*

In *Monsanto,* a price-fixing case, the Supreme Court

applied this standard, and concluded that there was a triable issue of fact regarding the existence of a conspiracy. The evidence in that case included direct evidence of agreements to maintain prices, such as testimony from a district manager that defendant Monsanto approached price-cutting **[*39]** distributors and warned them that if they did not maintain the suggested resale price, they would not receive adequate supplies of a certain product. When one of the distributors did not agree, Monsanto complained to the distributor's parent company, and the parent company instructed its subsidiary to comply; the distributor then informed Monsanto that it would charge the suggested price. The Court found this evidence "plainly . . . persuasive as to a meeting of minds." *Monsanto,* 465 U.S. at 765. In *Market Force* by contrast, the Seventh Circuit noted that evidence of informal communications and meetings among defendants, and of similarity in policies, for example, would not be considered unambiguous support for a inference of conspiracy. *Market Force,* 906 F.2d at 1172-73.

We apply the analytical framework of *Monsanto* and *Matsushita,* as set forth in *Market Force,* to the facts of the present case. Plaintiffs' prima facie evidence of Jewel's involvement in the averred conspiracy is the fact that Jewel benefitted greatly from the slow but steady demise of the Grove Mall and the **[*40]** resulting increase in consumer traffic at the Elk Crossing Mall. Therefore, plaintiffs argue, Jewel had a compelling motive to participate in a conspiracy. When considering whether a genuine issue for trial exists on a claim of antitrust conspiracy, the Supreme Court views evidence of motive to conspire, or lack thereof, as "highly relevant." *Matsushita,* 475 U.S. at 595-97. "Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596-97.

Defendants argue that Jewel's purported actions in furtherance of the alleged conspiracy were entirely consistent with Jewel's permissible independent business interests. Jewel maintains that it moved to the Elk Crossing Mall in order to take advantage of the newer, larger, and overall more attractive facilities and open a companion Osco drugstore (which was prohibited under **[*41]** its lease at the Grove Mall). Jewel further maintains that it attempted to sublet to United Skates simply to fulfill its legitimate business interest in earning some rent on the property. Similarly,

Case: 3:17-cv-50428-JTD Document #: 900-1 Filed: 05/23/18 Page 105 of 160 PageID #:1635
Case 21-50428 Doc 22-4 Filed 05/21/21 Page 157 of 202

1994 U.S. Dist. LEXIS 12239, *41

Jewel's departure from the Grove Mall to serve as the anchor tenant at Elk Crossing also served the legitimate business interests of Jewel's alleged co-conspirators, the Elk Crossing defendants. However, what Jewel has failed to satisfactorily explain to the court is its legitimate interest in continuing to pay rent on a vacant store and its refusal to cancel the lease or accept Serfecz's offer to pay the rent Jewel would have received from United Skates. Certainly, the rational trier of fact might conclude that Jewel's motive in refusing was purely anticompetitive.

However, plaintiffs are not yet over the hurdle in terms of meeting their burden of proof of conspiracy under Section 1 of the Sherman Act. A "fundamental prerequisite" of a Section 1 violation "is unlawful conduct by two or more parties pursuant to an agreement, explicit or implied." *Contractor Utility Sales,* 638 F.2d at 1074. Thus, evidence that two defendants each benefitted from anticompetitive [*42] practices does not itself establish an unlawful conspiracy; evidence of an agreement is critical. *Id.* at 1075. "Solely unilateral conduct, regardless of its anticompetitive effects, is not prohibited by Section 1. Rather . . . there must be evidence that two or more parties have knowingly participated in a common scheme or design to accomplish an anti-competitive purpose." *Id.* at 1074.

It is on this issue that plaintiffs' response to the defendants' summary judgment motion is notably silent. Certainly, there is evidence that both Jewel and the Elk Crossing defendants reaped the benefits of the demise of the Grove Mall. But on the issue of Conspiracy, plaintiffs offer only speculation, hunch, and theory. [8] For example, as evidence of the Elk Crossing defendants' participation in the purported anticompetitive scheme, plaintiff emphasizes that the Elk Crossing defendants planned from the start to duplicate the tenant mix of the Grove Mall. Plaintiffs maintain that "no rational real estate developer would *duplicate* the tenant mix of a mall directly across the street unless he knew the existing mall was going to be devalued [*43] and

prohibited from competing and obtaining new tenants," Plaintiffs' Response at 16, and ask us to infer from the duplication a conspiracy to devalue the Grove Mall. In support of their theory, plaintiffs cite the opinion of their shopping center expert that "the way the center was planned clearly showed a 'very strong, very confident pattern of activity that showed [defendants] had no fear of competition coming from the old center.'" Plaintiff's Response at 16 (citing Leonard Deposition at 114). The persuasiveness of this opinion is doubtful, given the commonplace appearance of look-alike strip-malls on opposite corners of busy intersections throughout the suburbs. Be that as it may, the fact that the Elk Crossing defendants may have been fairly confident that they would be able to successfully compete with the dilapidated mall across the street is not itself sufficient evidence of a conspiracy between Jewel and American Stores and these defendants. Plaintiffs emphasize also the close business tie between a grocery anchor tenant and the shopping center location it occupies, characterizing Jewel as a "partner in interest" with the owners and developers of the Elk Crossing Mall. While [*44] it is true that the business interests of the anchor tenant and the interests of the landlord shopping mall may be aligned, this "confluence of interest," to quote plaintiffs, is not, alone, sufficient evidence to support an inference of participation in an illegal antitrust conspiracy.

In the absence of evidence of an agreement between Jewel and American Stores and their co-defendants to destroy competition, we must grant the motion for [*45] summary judgment as to plaintiffs' claims of Sherman Act Section 1 violations in Count I. [9]

[*46] For similar reasons, we must also grant

---

[8] We note also that what few arguments plaintiffs do advance regarding the existence of a conspiracy concern only Jewel and the Elk Crossing defendants and United Skates; no attempt has been made by plaintiffs to suggest that their claim of a Section 1 violation might be based on a conspiracy between Jewel and its sister company, American Stores. In fact, as discussed earlier, *supra* note 6, very little at all has been said by either party about American Stores. Thus, we do not address whether evidence of such a conspiracy would constitute a proper basis for a Section 1 claim.

[9] Plaintiffs complain repeatedly of delays in production of various discovery materials and their inability to take the deposition of defendant Patrick F. Daly, real estate developer and president of the beneficial owner of the Elk Crossing Mall. Yet, it was upon plaintiffs' own motion that the court agreed to consider this motion on an expedited basis. *See* order of June 29, 1994. Thus, it would be difficult for plaintiffs now to argue that the matter was not yet ripe for summary judgment due to incomplete discovery. However, we can make no definitive assessment regarding the status of discovery because on October 20, 1993, we referred all discovery disputes to the designated Magistrate-Judge. If, after additional discovery, plaintiffs are able to present evidence in support of their conspiracy claim, and can demonstrate why this evidence was not available earlier, we would be willing to entertain a motion to reconsider.

defendants' motion for summary judgment on plaintiffs' claims in Count II of monopolization in violation of Section 2 of the Sherman Antitrust Act. Section 2 of the Sherman Act, unlike Section 1, does not require proof of a conspiracy between two or more parties; rather, the focus of this section is on the actions of a single firm to control a market. 15 U.S.C. § 2; *Okansen v. Page Memorial Hosp.,* 945 F.2d 696, 710 (4th Cir. 1991), *cert. denied,* 117 L. Ed. 2d 137, 112 S. Ct. 973 (1992). However, because of our findings in Part I of this opinion, *supra* pp. 22-24, regarding standing, evidence of a conspiracy between defendants Jewel and American Stores and the Elk Crossing defendants would be required. We found that plaintiffs had standing to challenge Jewel's actions only in relation to the retail shopping center market, not the grocery market. Obviously, Jewel and American Stores could not, by themselves, illegally monopolize the market for retail shopping centers. They could, however, be found liable for Section 2 violations by **[*47]** virtue of a conspiracy between themselves and players in the retail shopping center market, the Elk Crossing defendants. Because the plaintiffs have not presented sufficient evidence to raise a genuine issue of concerted action between the two sets of defendants, we must grant summary judgment for Jewel and American on Count II as well.

### III. The Breach of Lease Claim

In Count IV of their complaint, plaintiffs claim that Jewel's actions in keeping its space at the Grove Mall dark and vacant in furtherance of its alleged antitrust goals constitutes a breach of requirements in its lease that the premises be used only to operate a grocery store and only for lawful purposes.

### A. Unlawful Use

The first sentence of Paragraph 1 of Jewel's lease ("sentence 1") provides:

> Lessee shall not use the demised premises for any unlawful purpose nor shall it commit waste.

and the second sentence ("sentence 2") provides:

> It shall comply with all lawful requirements of the local Board of Health, Police and Fire Departments, and state and federal authorities, respecting the manner in which it uses the leased premises.

Defendants' Memorandum, Exhibit 4 ("Lease"). Plaintiffs **[*48]** maintain that Jewel's use of the premises to restrain trade and to monopolize the grocery store business violates Sections 1 and 2 of the Sherman Act,

and thus constitutes an unlawful use of the premises in violation of sentence 1 of paragraph 1 of the lease. Because we have found in Part II of this opinion that plaintiffs have not met their burden of proof of conspiracy and, thus, have not established a Section 1 violation, Section 1 cannot serve as a basis for plaintiffs' breach of lease claim. As regards the alleged Section 2 violation, we found that plaintiff had standing to challenge Jewel only in relation to the retail shopping center market, not the grocery market, and that Jewel could be found liable for monopolistic conduct in this market only on a theory of conspiracy. Again, because there was insufficient evidence of a conspiracy, we granted summary judgment as to Section 2 as well. However, Section 2, unlike Section 1, does not itself require proof of a conspiracy. Thus, plaintiffs' lack of standing under the Clayton Act to sue Jewel for monopolizing the grocery market does not mean that a violation of Section 2 of the Sherman Act has not occurred; it means only that plaintiffs **[*49]** are not the appropriate parties to bring a civil action for antitrust remedies on the basis of such a violation. Nor does plaintiffs' lack of antitrust standing mean that they lack standing as parties to the lease to sue for breach of a lease provision relating to violations of the law, arguably including violations of Sherman Antitrust Act Section 2. [10] But because of their position that plaintiffs lack standing to bring an *antitrust* suit on this basis, defendants have not even addressed the question of whether there is sufficient evidence that Jewel illegally monopolized the grocery market in violation of Section 2. For purposes of considering defendants' motion regarding the breach of lease claim, and in the absence of contrary arguments by defendants, we assume that there is sufficient evidence of monopolistic conduct in the grocery market by Jewel in violation of Section 2.

---

[10] Defendants might argue that because plaintiffs lack standing to sue for the underlying antitrust violations, plaintiffs also lack standing to sue for breach of the unlawful use covenant based on these antitrust violations. However, plaintiffs' standing as lessors to sue on the lease is independent of the question of standing to sue on the underlying violations. For example, even though a lessor lacks standing to prosecute his tenant for operation of a drug dealership or gambling ring on the leased premises under the criminal code, he could sue for breach of an unlawful use covenant in the lease. Indeed, defendants appear to concede that plaintiffs have standing to bring exactly this type of suit. Defendants' Memorandum at 23. Applying similar reasoning, we believe plaintiffs have standing to sue for breach of the lease based on their tenant's alleged illegal antitrust behavior.

Case: 3:17-cv-50428 Document #: 106-2 Filed: 01/05/18 Page 11 of 50 PageID #:1637
Case: 21-50428   JTD   Doc 22-4   Filed 05/21/21   Page 159 of 202

1994 U.S. Dist. LEXIS 12239, *50

 [*50]  We must next consider whether this type of illegal act was the type of act contemplated by the language of the lease prohibiting the use of the premises for unlawful purposes. Neither party has offered much case law to guide our interpretation of this language. The only relevant case cited is *Deutsch v. Phillips Petroleum Co.,* 56 Cal. App. 3d 586, 128 Cal. Rptr. 497, 498 (Cal. App. 2d Dist. 1976). In *Deutsch,* the Court of Appeals of California interpreted a lease provision somewhat similar to sentence 2 of paragraph 1 of the Jewel lease, and concluded that the alleged antitrust violations did not constitute a breach of the lease. However, the California court's analysis rested primarily on language which is not present in the provision of the Jewel lease regarding unlawful use. The *Deutsch* lease stated that the lessee "shall conduct its business on the said demised premises in conformity with all State or Federal Statutes and Municipal Ordinances applicable thereto . . . ." *Id.* at 499. The California court made much of the concluding words "applicable thereto," which it found to modify the word "premises." Based on this wording,  [*51]  the *Deutsch* court concluded that a breach of this provision of the lease could result only from a violation of a statute directly "applicable to the premises," and that the antitrust violation in question did not meet this requirement because it had no significant relation to the premises. *Id.* at 500-501. The court further noted that the purpose of such a provision was to "ensure[] that the lessee will harm neither the physical attributes nor the reputation of the property." *Id.* at 501.

The Jewel lease, unlike the lease described in *Deutsch,* has two separate sentences dealing with use of the premises, the first restricting unlawful use and the second dealing with compliance with various laws relating to the premises. It is sentence 2 which corresponds to the lease provision at issue in *Deutsch.* However, plaintiffs' claim of breach of lease is based primarily on sentence 1's prohibition of unlawful use, and not sentence 2's requirement of compliance with the requirements of various governmental authorities. Thus, the *Deutsch* holding is on point here only insofar as sentence 1 of the Jewel lease is similar in language and purpose to sentence 2 and the analogous [*52] *Deutsch* provision. There is no reason to believe that sentence 1 of the Jewel lease is merely an introduction to or duplication of sentence 2; more likely, it has a separate and somewhat different focus from sentence 2. Otherwise, its presence in paragraph 1 would be redundant and somewhat meaningless. Moreover, by contrast to the disputed provision in the *Deutsch* lease, sentence 1 of the Jewel lease is a general provision prohibiting the use of the premises "for any unlawful

purpose." Sentence 1 of the Jewel lease has no clause restricting its application to laws "applicable to the premises," and thus, we believe that breaches of this provision, unlike the *Deutsch* provision, need not necessarily involve violations of laws directly related to the premises. We find that sentence 1 is not analogous to the provision at issue in the *Deutsch* lease, and accordingly, we decline to follow the ruling in *Deutsch.*

In a further attempt to escape the application of sentence 1, defendants argue that this provision relates to the use of the premises only for such activities as prostitution, drug-dealing, or gambling. While it is true that these activities might be more traditionally **[*53]** and typically characterized as "criminal" or "illegal," as compared to antitrust conduct, defendants have offered no evidence to support their narrow interpretation of "unlawful purpose."

In light of the unambiguous, [11] broad and non-restrictive wording of sentence 1, we conclude that use of the leased premises in furtherance of a Section 2 antitrust violation could indeed constitute a breach of the lease. Thus, we deny the motion for summary judgment on the claim of breach of lease in Count IV insofar as it is based on the illegal use provision of the lease.

## B. Continuous Operation

Plaintiffs also argue that by acting to keep the premises vacant, Jewel has breached paragraph 28 of the lease, which provides that "Lessee shall use the leased premises only for the operation **[*54]** of a grocery supermarket." Plaintiffs contend that the requirement in paragraph 28 that the premises be used "only for the operation of a grocery" implies that the premises must be occupied and used, as opposed to left dark and vacant. In other words, plaintiffs infer into paragraph 28 a continuous use requirement although one is not expressly provided.

However, not only does paragraph 28 not expressly require continuous use, but elsewhere, the lease actually anticipates a situation of extended vacancy and contains express provisions to address just these circumstances. In paragraph 17, the lease provides that

---

[11] If there were any ambiguity, we would follow the general rule of contract interpretation which requires courts to construe an ambiguity against the drafter. However, there is no evidence as to which party drafted the lease at issue in this case.

in addition to a minimum base rental, "lessee covenants to pay as percentage rental an amount equal to one percent (1%) of all sales in excess of four million four hundred forty thousand and no/100 Dollars . . . made in or from the leased premises per lease per year." Paragraph 17 further states that "the obligation to pay percentage rental shall not be deemed to require Lessee to conduct business on the leased premises nor to operate its business so as to produce percentage rental."

Also directly relevant is paragraph 30, which provides that "in the event that the Lessee [*55] allows the leased premises to remain vacant or fails to open for business for a period of sixty (60) consecutive days or more during the term, Lessee shall for the purpose of calculating the percentage rental be deemed during each week that it is not open for business . . . to have made sales in an amount equal to the amount of the average sales per week made during the three (3) years prior to such time."

Because paragraphs 17 and 30 explicitly and specifically address the situation of extended vacancy and inoperation, these two paragraphs override any suggestion that a continuous use requirement might be inferred from the "use for operation as a grocery" provision in paragraph 28. Thus, it is clear from the express language of the lease that Jewel's behavior regarding its leased premises at the Grove Mall is well within its rights under the lease.

Plaintiffs cannot avoid this harsh result but resort to the covenant of good faith and fair dealing. A covenant to deal fairly and in good faith is implied in every contract in Illinois, *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir. 1992) (citing *Martindell v. Lake Shore Nat'l Bank,* 15 Ill. 2d 272, 154 N.E.2d 683 (1958)), [*56] including property leases. *See, e.g., Abbott v. Amoco Oil,* 249 Ill. App. 3d 774, 619 N.E.2d 789, 798, 189 Ill. Dec. 88 (Ill. App. 2nd Dist. 1993), *appeal denied,* 624 N.E.2d 804 (1993); *P.M.C. v. Ekstein,* No. 91 C 3709, 1992 U.S. Dist. Lexis 7306, *6 (N.D. Ill. May 13, 1992). However, the implied covenant of good faith and fair dealing is not an independent source of duties for either party to a contract. *Beraha,* 956 F.2d at 1443. Rather, it is an interpretive rule of construction, which "'comes into play in defining and modifying duties which grow out of specific contract terms and obligations.'" *Id.* (citing *Gordon v. Matthew Bender & Co.,* 562 F. Supp. 1286, 1289 (N.D. Ill. 1983)). The covenant, then, is merely "an estimate of 'what parties would agree to if they dickered about the subject

explicitly.'" *Continental Bank, N.A. v. Everett,* 964 F.2d 701, 705 (7th Cir. 1992) (quoting *Jordan v. Duff & Phelps,* 815 F.2d 429, 435-36 (7th Cir. 1987)), [*57] *cert. denied,* 113 S. Ct. 816 (1992). The covenant is thus used to fill contractual gaps. Where the disputed issue in a contract is governed by express terms, however, there is no gap to be filled, and the parties' behavior is assessed according to the express provisions, without resort to an implied covenant of good faith and fair dealing. *Continental,* 964 F.2d at 705. Unfortunately for plaintiffs, this is just such a situation. The express language of paragraphs 17 and 30 leaves no room for the implied covenant of good faith and fair dealing to step in. Serfecz has inherited a highly unfavorable lease, and we cannot rewrite the contract now.

Defendants' motion for summary judgment on the claim of breach of lease in Count IV must be granted insofar as it is based on Jewel's failure to continue operating or release its space at the Grove Mall.

### IV. The Malicious Prosecution Claim

In February 1990, Serfecz learned that Jewel was in the process of negotiating a sublease with United Skates. To prevent the proposed sublease, Serfecz changed the locks to the facility. Jewel then brought a declaratory judgment action [*58] against Serfecz in state court regarding its right to sublease its premises to United Skates. Plaintiffs maintain that the lawsuit was devised solely for the purpose of harassing and intimidating Serfecz and his attorneys, and otherwise interfering with Serfecz's efforts to redevelop the Grove Mall. Accordingly, in Count III of their complaint, plaintiffs charge Jewel with malicious prosecution.

"Actions for malicious prosecution of a civil proceeding are not favored in Illinois on the ground that courts should be open to litigants for resolution of their rights without fear of prosecution for calling upon the courts to determine their rights." *Keefe v. Aluminum Co. of America,* 166 Ill. App. 3d 316, 519 N.E.2d 955, 956, 116 Ill. Dec. 740 (Ill. App. 1st Dist. 1988), *appeal denied,* 526 N.E.2d 831 (1988). A malicious prosecution claimant must prove the following five elements:

(1) Institution and prosecution of judicial proceedings by the defendant;

(2) Lack of probable cause for those proceedings;

(3) Malice in instituting the proceedings;

(4) Termination of the prior cause in plaintiff's [*59] favor; and

(5) Suffering by plaintiff of some special injury, beyond the anxiety, loss of time, attorney fees and necessity for defending one's reputation which are the common incidents of most lawsuits.

*Id.*

There is no question in the present case as to proof of elements (1) and (4), regarding institution and prosecution of judicial proceedings and termination of the suit in plaintiffs' favor. Additionally, we find that plaintiffs have sufficient evidence to create a factual dispute as to the third element, malicious intent, especially given the requirement that on summary judgment the court must view all inferences in the light most favorable to the nonmoving party. *See Regner v. City of Chicago,* 789 F.2d at 536. In support of their interpretation of events, plaintiffs point to Jewel's misconduct during discovery in the state court suit, implying that Jewel's dilatory discovery tactics were intended primarily to exacerbate the harassment suffered by plaintiffs as a result of the litigation. Plaintiffs also note that prior to trial in the state court action, Jewel rejected Serfecz's offer to pay Jewel the same rent it would have received from [*60] United Skates, a decision by Jewel which further implies that Jewel's true goal in bringing suit was not to sublet to United Skates and earn rental income but to harass Serfecz. Paragraph 31 of the Jewel lease states that "no sublease shall be made . . . which increases the insurance rates with respect to the leased premises without Lessor's written consent." A major focus of the lawsuit concerned the impact that the subtenancy of a roller rink and games arcade would have had on the Grove Mall's property insurance rates. Plaintiffs point to evidence that despite the importance of the insurance issue, Jewel's primary witness had no idea what the effect on insurance rates would be. This ignorance on Jewel's part suggests a lack of preparation and investigation. Plaintiffs also note that Jewel waived its right to use an insurance expert. This evidence further supports plaintiffs' position that the lawsuit was merely a "sham" brought primarily for purposes of harassment and intimidation.

Probable cause in the context of a malicious prosecution claim means the existence of facts "that would lead a person of ordinary caution and prudence to believe that he had a justifiable claim." *Keefe,* 519 N.E.2d at 956. [*61] We find that plaintiffs have

sufficient evidence to support a finding of lack of probable cause, the second element of malicious prosecution. At trial, the state court directed a finding for Serfecz, concluding that Jewel had presented no evidence to support its case. Plaintiffs' Response, Exhibits ( *Jewel v. Serfecz,* No. 90 CH 7124, (Circuit Court of Cook County 7/13/90)). The appellate court affirmed the trial court, noting that Jewel had presented "no competent testimony" regarding the insurance rates. Plaintiffs' Response, Exhibit 5 *(Jewel v. Serfecz,* No. 1-90-2576, (Ill. App. 1st Dist. May 31, 1991). We agree with plaintiff that the fact that Jewel did not thoroughly research or present evidence on the insurance question supports an inference that it lacked probable cause to believe that it would win the case.

Defendants note that Jewel succeeded in its quest for a temporary restraining order ("TRO") against plaintiffs, and argue that as a matter of law, this preliminary success conclusively establishes probable cause. In *Keefe,* the court held that a civil judgment entered by the circuit court would constitute conclusive evidence of probable [*62] cause, even though that judgment was subsequently reversed on appeal. 519 N.E.2d at 956. The Illinois Appellate Court said nothing, however, about the evidentiary impact of the issuance of a TRO. While obviously a grant of a TRO would be some evidence of probable cause, we do not believe it to have the same *per se* conclusive weight as a final judgment by the trial court, presumably reached after a period of more careful and thorough consideration of all the issues than is typical at the TRO stage of litigation. Moreover, defendants have not presented much information regarding the nature of the TRO that was issued. We know only that Serfecz attempted to oust Jewel from the premises by changing the locks, and that as a result of the TRO, Jewel regained control of the property it leased in the Grove Mall. The mere fact that the trial court concluded that Jewel was entitled to access to its leased property does not conclusively establish that Jewel had probable cause to believe that it was entitled to a declaratory judgment regarding its right to sublet to United Skates. Thus, we conclude that there remains a material factual [*63] dispute on the issue of probable cause.

Finally, we consider the element of special injury. Defendants argue that plaintiffs have failed to present evidence of some unique injury, such as seizure of property or personal arrest, that differs from the usual stresses and demands inherent in defending a law suit. The Illinois Appellate Court explained in *Equity Assoc. v. Village of Northbrook,* 171 Ill. App. 3d 115, 524 N.E.2d

1119, 121 Ill. Dec. 71 (Ill. App. 1st Dist. 1988), *appeal denied,* 530 N.E.2d 243 (1988), that special injury involves interference with property so great as to "suspend" the victim's "right to the free use of his own property during the pendency" of the prosecution. *Id.* at 1123 (citing *Lasswell v. Ehrlich,* 92 Ill. App. 3d 935, 416 N.E.2d 423, 48 Ill. Dec. 392 (1981) (citing *Norin v. Scheldt Manufacturing,* 297 Ill. 521, 130 N.E. 791 (1921))). The result is either an actual seizure or an effective or constructive seizure of the property, far beyond mere "interference." **[*64]** *Equity Assoc.,* 524 N.E.2d at 1123. Unless a plaintiff can prove such special injury, "the institution of an ordinary civil action or proceeding, no matter how unfounded, vexatious or malicious it may be, does not give rise to an action for malicious prosecution." *Bank of Lyons v. Schultz,* 78 Ill. 2d 235, 399 N.E.2d 1286, 1288, 35 Ill. Dec. 758 (1980) (internal quotation marks and citation omitted). Plaintiffs' argument regarding injury focuses on the harm Serfecz suffered in his efforts to redevelop the Grove Mall as a result of the litigation. However severe this injury may have been, it is simply not the type of "special injury" envisioned by the Illinois courts. [12]

**[*65]** Thus, we must grant defendants' motion for summary judgment on the claim of malicious prosecution in Count III for failure to prove special injury.

### CONCLUSION

For the reasons discussed above, the motion of defendants Jewel and American Stores for summary judgment on the antitrust and malicious prosecution claims in Counts I, II, and III is granted. Summary judgment is also granted on Count IV insofar as the breach of lease claim is based on Jewel's failure to continue operating a grocery store at the Grove Mall, and denied insofar as it is based on the unlawful use provision in the lease. The only claim remaining against Jewel and American Stores, then, is the state law claim in Count IV for breach of lease based on Jewel's alleged use of the premises in furtherance of a monopolistic scheme in violation of Sherman Antitrust Act § 2. We

have supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a). *Timm v. Mead Corp.,* Slip Op. No. 93-3629 at 7 (7th Cir. Aug. 9, 1994). [13]

**[*66]** DATED: August 30, 1994

ENTER:

John F. Grady, United States District Judge

---

End of Document

---

[12] We note that a preliminary injunction which prevents a plaintiff from using his property would constitute a special injury under Illinois law. *Bank of Lyons,* 399 N.E.2d at 1288-89. However, the temporary restraining order issued in this case does not constitute such an injury. While the state court ultimately concluded that Jewel was not entitled to sublet to United Skates, there is no indication that plaintiffs were injured by the TRO which, apparently, merely gave their legal tenant, Jewel, access to and control of its leased premises.

[13] Even were we to dismiss all the federal claims against the other defendants, we would decline to exercise our discretion under § 1367(c) to dismiss the remaining pendent state law claims, but rather, weighing concerns of judicial economy, fairness and comity, we would continue to exercise supplemental jurisdiction. This case is well over a year old, and, like the court in *Timm,* we see "no need to delay the resolution of this matter (and add to the burdens of the Illinois court system) by having the parties litigate the . . . state law issues anew in state court," *id.* at 8-9, especially given the fact that the remaining state law breach of lease claim involves a claim of violations of federal antitrust law.

Case: 3:17-Case 2:1-50428-JTD Doc 22-4 Filed 05/21/21 Page 163 of 202
...Pt #:22-4ile0...EvRice1221Page 242 of 360 PageID #:1641

2009 WL 3151807
United States District Court,
S.D. New York.

SOUTHERN ILLINOIS LABORERS' AND EMPLOYERS HEALTH AND WELFARE FUND, et al., Plaintiffs,

v.

PFIZER INC., Defendant.

No. 08 CV 5175(KMW).
|
Sept. 30, 2009.

*POPINION and ORDER*

KIMBA M. WOOD, District Judge.

**\*1** Plaintiffs are a putative nationwide class of health care and welfare funds, and third-party payors, who paid a portion of the purchase price of Lipitor, Defendant Pfizer's cholesterol-lowering drug. [1] Plaintiffs allege in the Second Amended Complaint (hereinafter, the "Complaint") that Defendant fraudulently marketed Lipitor to physicians by concealing the side effects of Lipitor and by misrepresenting the efficacy of Lipitor in certain patient groups. Plaintiffs argue that this fraudulent conduct caused Plaintiffs to pay more than they otherwise would have paid to treat their plan members for elevated cholesterol levels.

[1]  The named Plaintiffs are: (1) Southern Illinois Laborers' and Employers Health and Welfare Fund; (2) NECA–IBEW Welfare Trust Fund; (3) Midwestern Teamsters Health and Welfare Fund; (4) The Welfare Fund of Teamsters Local Union 863; (5) Plumbers and Pipefitters Local Union 630 Welfare Trust Fund; (6) Cleveland Bakers and Teamsters Health and Welfare Fund; (7) Electrical Workers Benefit Trust Fund; (8) Fire & Police Retiree Health Care Fund, San Antonio; (9) Laborers' District Council Building and Construction Health and Welfare Fund; (10) Laborers' District Council Heavy and Highway Utility Health and Welfare Fund; and (11) New York City Police Sergeants and Benevolent Association Health and Welfare Funds.

Plaintiffs bring the following claims against Defendant: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1861, *et seq.;* (2) unjust enrichment, fraudulent misrepresentation, negligent misrepresentation, and civil conspiracy under various states' common laws; and (3) violations of several state consumer protection acts. [2]

[2]  Plaintiffs bring claims under Illinois, New Jersey, Florida, Ohio, Indiana, Texas, Pennsylvania, and New York consumer protection acts. Defendant seeks to dismiss for statute-specific reasons all but the Florida claim.

Defendant moves to dismiss all of Plaintiffs' claims on the ground that Plaintiffs lack standing. For the following reasons, the Court agrees with Defendant that the Complaint, as currently pled, fails to establish standing.

Accordingly, the Court GRANTS Defendant's motion to dismiss in its entirety. The Court *sua sponte* GRANTS Plaintiffs leave to amend most, but not all, of their claims. [3]

[3]  Plaintiffs have not moved for leave to amend the Complaint. However, the Court has the discretion to grant leave to amend *sua sponte. Steger v. Delta Airlines, Inc.,* 382 F.Supp.2d 382, 387 (E.D.N.Y.2005) ( "[E]ven if not requested by the Plaintiff, the Court may *sua sponte* grant leave to amend."); *Witkowich v. Gonzales,* 541 F.Supp.2d 572, 590 (S.D.N.Y.2008) (same).

## I. Background

### A. Facts

Defendant Pfizer sells Lipitor, a statin drug that lowers patients' cholesterol levels by blocking their bodies' production of certain enzymes needed to produce cholesterol. (Compl.¶¶ 19, 24.) In 1996, the FDA approved Lipitor for use in accordance with the third revision of the Adult Treatment Panel guidelines (hereinafter, "ATP III Guidelines"). (Compl.¶ 38.)

#### 1. *ATP III Guidelines*

The ATP III Guidelines, devised by an expert panel on cholesterol management, advise physicians on how to formulate patient treatment plans that help to prevent the onset of coronary heart disease in certain patients and to manage already existing coronary heart disease in other patients. (Compl.¶¶ 41–42.) The ATP III Guidelines set target (or "goal") low-density lipoprotein ("LDL") levels for each patient demographic.

The ATP III Guidelines recommend that drug therapy be prescribed only after a physician considers the following four factors: (1) a patient's LDL level; (2) whether a patient is already suffering from chronic heart disease; (3) the number of risk factors a patient faces for developing chronic heart disease; [4] and (4) a patient's ten-year probability for developing chronic heart disease. (Compl.¶ 45.)

[4]    Cigarette smoking, hypertension, age, gender, and a family history of heart disease are examples of risk factors for developing chronic heart disease.

Based on these factors, the ATP III Guidelines recommend that some patients be treated with therapeutic lifestyle changes alone (*e.g.,* changes in exercise, diet, and stress management) and that some patients be treated with drug therapy in conjunction with therapeutic lifestyle changes. (Compl.¶ 46.)

#### 2. *Fraudulently Minimizing Health Risks*

**\*2**  Plaintiffs allege that Defendant intentionally: (1) failed to disclose some of Lipitor's side effects to physicians; and (2) minimized the remaining side effects when advertising to physicians. (Compl.¶¶ 84–89, 98.) According to Plaintiffs, Defendant's conduct was part of a plan to encourage physicians to prescribe Lipitor instead of other lower-priced statins, and to prescribe Lipitor to patients who might not otherwise have been prescribed drug therapy. (Compl.¶ 81.)

#### 3. *Fraudulently Expanding Market for Lipitor*

Plaintiffs allege that Defendant promoted the use of Lipitor for certain patient groups even though Defendant knew Lipitor would not be effective in those patient groups. (Compl.¶¶ 100–103.)

Plaintiffs also allege that Defendant fraudulently expanded the market for Lipitor by engaging in off-label marketing [5] and then obscuring the fact that its recommendations were for off-label use. (Compl.¶ 144.) For example, Defendant's sales representatives allegedly misled physicians and pharmacy benefit decision makers [6] ("PBDMs") by stating that the ATP III Guidelines indicate that drug therapy should be used in all patients with LDL levels above their respective LDL goals. However, the ATP III Guidelines indicate that drug therapy should be used only under certain circumstances when patients' LDL levels are above their respective LDL goals. (Compl.¶¶ 138–144.)

[5]    A physician may prescribe a drug or medical device for uses that are not expressly approved by the FDA. *See* 21 U.S.C.S. § 396 (2009). When a patient has been prescribed and has used a FDA-approved drug or medical device for a purpose for which the FDA has not expressly approved, this is called "off-label use." The Supreme Court and the FDA have recognized

Case: 3:17-Case 21-50428-JTD Doc 22-4 Filed 05/21/21 Page 165 of 202
Souders Illinois Laborers and Employers Health and..., Not Reported in... Page 128 of 260 PageID #:1643

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

and approved of the off-label use of drugs and medical devices. *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 350, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (explaining that " 'off-label' usage of medical devices ... is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine.").

[6]   Plaintiffs state that PBDMs are "persons who help third-party payors [such as Plaintiffs] design their pharmacy benefit plans." (Complaint ¶ 118.) PBDMs help third-party payors "mak[e] choices about which drugs to cover and how much third-party payors will reimburse for certain drugs." (*Id.*)

### 4. *Lipitor's* Price

According to Plaintiffs, the cost per-patient per-month for Lipitor was much higher than the cost would have been if the physician had prescribed a generic statin or recommended therapeutic lifestyle changes alone.[7] (Compl.¶ 96.) Plaintiffs state that they would not have paid this premium for Lipitor if they had know that Defendant was engaging in unlawful marketing.

[7]   Plaintiffs cite a Consumer Reports analysis that found, as of February 2007, that a prescription for 10 milligrams per day of Lipitor had an average monthly cost of $93, whereas generic statins for a comparable dose ranged in price from $32 to $83. (Compl.¶ 96.)

Plaintiffs contend they were unaware of Defendant's unlawful marketing because they relied on Defendant's statement on its website that it was lawfully advertising Lipitor. (Compl.¶ 125.)

### B. Procedural History

On April 3, 2006, Plaintiffs filed a complaint in the Northern District of Illinois, alleging claims substantially similar to the claims alleged herein. On February 2, 2007, Defendant moved to transfer the claims of the non-Illinois Plaintiffs to their home states, or in the alternative, to move all the claims to the Southern District of New York, the jurisdiction in which the Defendant is headquartered.[8]

[8]   When the case was still in the Northern District of Illinois, Defendant also filed a motion for judgment on the pleadings and a motion to dismiss. The presiding judge in the Northern District of Illinois found that these motions were mooted by subsequent proceedings.

On September 4, 2007, while the motion to transfer was pending, Plaintiffs filed the Second Amended Complaint, the complaint at issue here. On October 4, 2007, Defendant filed a timely motion to dismiss all of Plaintiffs' claims.

On May 29, 2008, Defendant's motion to transfer the case was granted. Shortly thereafter, the case was transferred to the Southern District of New York.[9] When the case was transferred to this Court, the October 4, 2007 motion to dismiss had yet to be resolved.

[9]   From June 5, 2008 to February 27, 2009, the case was assigned to the Honorable Sidney H. Stein, Southern District of New York. On February 27, 2009, the case was transferred to the undersigned.

Accordingly, this Court now turns to Defendant's motion to dismiss for lack of standing. For the following reasons, the Court GRANTS in its entirely, Defendant's motion to dismiss Plaintiffs' claims. The Court GRANTS *sua sponte* leave to amend some, but not all, of Plaintiffs' claims.

### II. Standing

**\*3**   Defendant moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) on several grounds, including the ground that Plaintiffs have failed to adequately allege that Defendant's conduct *caused*

their alleged injury. The Court holds that Plaintiffs have not adequately alleged causation, and, thus, they lack standing to bring any of their claims against Defendant.

The Court dismisses with leave to amend the RICO claim as well as most of Plaintiffs' state law claims. The Court denies Plaintiffs leave to amend six of their claims on the ground that amending these six claims would be futile.

### A. Standard of Review

When a defendant moves to dismiss for lack of standing pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject-matter jurisdiction. *Wiwa v. Royal Dutch Petroleum Co.,* 96 Civ. 8386(KMW), 2009 U.S. Dist. LEXIS 34843, at *11–12 (S.D.N.Y. Mar. 18, 2009) (*citing Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). In the context of RICO claims, the Rule 12(b)(1) standard is "substantially identical" to the standard for a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003).

Under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,* 517 F.3d 104, 115 (2d Cir.2008) (citation omitted).

Courts engage in a two-pronged approach when deciding a motion to dismiss. "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). Then, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotations omitted) (*citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

### B. RICO Standing

Defendant seeks to dismiss Plaintiffs' RICO claim on the ground that Plaintiffs have not adequately alleged that Defendant's purported RICO violations *caused* their injury.

#### 1. *Legal Standard*

Under 18 U.S.C. § 1964 ("RICO Section 1964"), a private claimant may sue a person or entity for engaging in "a pattern of racketeering activity," when the party being sued maintains an enterprise that is engaged in, or affects, interstate commerce. 18 U.S.C. § 1962(b).

Courts have required RICO claimants to meet the following three standing requirements: there must be (1) a RICO violation by the defendant, as defined by RICO Section 1962; (2) an injury to the plaintiff's business or property; and (3) a causal relationship connecting defendant's RICO violation to plaintiff's injury. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 767 (2d Cir.1994); *First Capital Asset Mgmt. v. Brickelbush, Inc.,* 150 F.Supp.2d 624, 631 (S.D.N.Y.2001).

#### a. *Alleging RICO Violation*

**\*4** A plaintiff must allege with particularity the RICO violation, stating why the conduct in question was fraudulent and how it involved interstate commerce. Fed.R.Civ.P. 9(b) ("In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993) (stating that Rule 9(b)'s particularity requirement applies to allegations of mail and wire fraud in civil RICO claims). [10]

Case: 3:17-cv-50428-JTD   Doc #: 22-4   Filed: 05/21/21   Page 167 of 202
Source: Illinois Laborers and Employers Health and..., Not Reported in... PageID #:1645

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

10      Typically, a plaintiff must state the contents of the communications, who was involved, where and when the communications took place, and in what way the communications were fraudulent. *Mills,* 12 F.3d at 1176; *Official Publ'ns, Inc. v. Kable News Co., Inc.,* 692 F.Supp. 239, 245 (S.D.N.Y.1988), aff'd in part, rev'd in part on other grounds, 884 F.2d 664 (2d Cir.1989). "In cases in which the plaintiff claims the mails or wires were simply used in furtherance of a master plan to defraud, ... a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.,* 995 F.Supp. 451, 456 (S.D.N.Y.1998). Particularity as to the mailings themselves is unnecessary. *AMA v. United Healthcare Corp.,* 588 F.Supp.2d 432, 443 (S.D.N.Y.2008).

    b. *Alleging Injury*

To establish standing under RICO, a plaintiff must also allege injury to her business or property that resulted from the defendant's alleged fraud. 18 U.S.C. § 1964. A plaintiff alleging damages in out-of-pocket losses must allege these damages as a quantifiable, "clear and definite" monetary amount. *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 227 (2d Cir.2008) (quoting *First Nationwide Bank,* 27 F.3d at 768); *AMA,* 588 F.Supp.2d at 441 (finding that the plaintiff's alleged injury of "hundreds of millions of dollars or more" is "neither clear nor definitive"). Courts disfavor damage estimates that require speculation, or that are based upon factors other than the defendant's misrepresentations. *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 459, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) (finding that the plaintiff had failed to allege an injury because "[b]usinesses lose and gain customers for many reasons, and it would require a comple assessment to establish what portion of [the plaintiff]'s lost sales were the product of [the defendant]'s decreased prices.").

    c. *Alleging Causal Relationship*

The final requirement for establishing standing under RICO is causation. Under RICO Section 1964(c), a RICO claimant must have been injured "by reason of" the defendant's RICO violation. 18 U.S.C. § 1964(c). A plaintiff must show that a defendant's RICO violation was *both:* (1) a "but for" cause of his injury; and (2) the proximate cause of his injury. *Bridge v. Phoenix Bond & Indem. Co.,* —— U.S. ——, —— – ——, 128 S.Ct. 2131, 2142–43, 170 L.Ed.2d 1012 (2008); *see also Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *McLaughlin,* 522 F.3d at 222 (2d Cir.2008).

When courts analyze the "but for" cause of an injury, they consider whether the conduct at issue was the factual cause of an injury. *See, e.g., Holmes,* 503 U.S. at 265. In other words, courts assess whether "but for" the defendant's conduct, the injury would not have occurred.

Unlike "but for" causation, proximate causation is a "flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.' " *Bridge,* 128 S.Ct. at 2142 (quoting *Holmes,* 503 U.S. at 272 n. 10). Courts "use proximate cause to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts with a particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.' " *Id.* (internal citations omitted) (quoting Holmes, 503 U.S. at 268.); *see Anza,* 547 U.S. at 461.

 *5  Courts assessing whether a party has alleged proximate cause, consider whether the party has alleged "some direct relation between the injury asserted and the injurious conduct alleged." *Bridge,* 128 S.Ct. at 2142 (*quoting Holmes,* 503 U.S. at 268); *Anza,* 547 U.S. at 461. A direct relationship between the injury and the injurious conduct is often established by a plaintiff's allegations that it relied on the defendant's fraudulent statements, and this reliance caused its injury.

A plaintiff's allegation of reliance is often necessary to establish proximate causation. In *Bridge,* the Supreme Court explained that the "complete absence of reliance may prevent the plaintiff from establishing proximate cause."[11] 128 S.Ct. at 2144. A failure to allege reliance may also hamper a plaintiff's ability to assert "but for" causation. *Id.* ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the [defendant's] misrepresentation.").

11    The Supreme Court left open the possibility that a plaintiff could have standing to bring a RICO claim without alleging reliance. The Supreme Court used the word "may" before "prevent" to refer to the effect the absence of reliance could have on a party's ability to allege proximate cause.

    The Second Circuit has declined to reach the issue of whether a plaintiff can ever allege a RICO violation without alleging reliance. *City of New York v. Smokes–Spirits.com, Inc.,* 541 F.3d 425, 444 n. 24 (2d Cir.2008) ( "[W]e need not address the question of whether an allegation of proximate cause fails where there are absolutely no allegations of reliance.").

To establish reliance, a plaintiff need not allege that the plaintiff itself relied on the defendant's misrepresentations. *Id* . The plaintiff can allege reliance by stating *either* that the plaintiff itself relied on the misrepresentation *or* that a third-party relied on the defendant's misrepresentation. [12] *Id* .

12    The Supreme Court recognized that in reaching this issue it was resolving a conflict among the Courts of Appeals.

### 2. *Application*

In this Order, the Court's RICO analysis focuses exclusively on Plaintiffs' failure to adequately allege *causation.* The Court assumes *arguendo* that Plaintiffs have adequately alleged a RICO violation when they allege that Defendant fraudulently disseminated inaccurate information about the relative safety and efficacy of Lipitor through the mail, by email, and by phone. The Court also assumes *arguendo* that Plaintiffs adequately allege an injury when they allege that they suffered an economic loss as a result of paying for Lipitor instead of cheaper, safer, and equally effective courses of treatment.

Plaintiffs advance three theories of causation, none of which is adequately plead in the Complaint. The first theory of causation is that Defendant made fraudulent misrepresentations to physicians regarding Lipitor's efficacy and safety, and that *physicians' reliance* on these misrepresentations *caused* Plaintiffs' injury. The second theory of causation is that Defendant made misrepresentations directly to Pharmacy Benefit Decision Makers ("PBDMs") and this *caused* Plaintiffs' injury. The third theory of causation is that Defendant made a fraudulent misrepresentation directly to Plaintiffs regarding Defendant's marketing scheme, and *Plaintiffs' reliance* on this misrepresentation *caused* Plaintiffs' injury.

### a. *Misrepresentations to Physicians*

The first theory of causation is that the alleged overpayment for patients' cholesterol treatment was *caused* by Defendant's fraudulent misrepresentations to physicians regarding the efficacy and safety of Lipitor as compared to alternative cholesterol therapies. Plaintiffs contend that Defendant made these misrepresentations to physicians in general, and as a result of these misrepresentations, Plaintiffs had to pay for Lipitor rather than cheaper statins or non-drug therapies for treating high cholesterol.

**\*6** Implicit in Plaintiffs' theory of causation is the claim that physicians relied upon Defendant's misrepresentations when they decided to prescribe Lipitor instead of other cholesterol-lowering treatments. However, Plaintiffs do not explicitly allege that physicians in fact relied on Defendant's misrepresentations.

Plaintiffs do not cite a single instance in which a physician received the fraudulent information and decided to prescribe Lipitor based on the information she received. Plaintiffs do not even explicitly allege the more general claim that physicians in general relied on Defendant's misrepresentations. Accordingly, this causation argument fails as currently pled. [13]

13    Plaintiffs argue that they do not have to allege reliance to establish causation because *Bridge* does not state that reliance is *always necessary* to establish causation. Plaintiffs further contend that they can establish causation by stating that (1) Plaintiffs'

Case: 3:17 Case 21-50428 JTD Doc 22-4 Filed 05/21/21 Page 169 of 202 Page ID #:1647
Source: Illinois Laborers and Employers Health and..., Not Reported in... Page 142 of 160 PageID #:1647

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

injury was a "foreseeable and natural consequence" of Defendant's scheme,(2) no "independent factors" account for Plaintiffs' injury, and (3) there is "no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation." *Bridge,* 128 S.Ct. at 2144.

> The Court finds that Plaintiffs have not adequately alleged causation even if the Court assumes *arguendo* that under certain circumstances an allegation of reliance is unnecessary. Plaintiffs in their briefing state that "no independent factors account for Plaintiffs' injury," but their Complaint does not contain allegations that support this legal conclusion.

### b. *Misrepresentations to Physicians*

Plaintiffs contend that Pfizer made misrepresentations to the PBDMs that were similar to the misrepresentations made to physicians. Then, PBDMs allegedly included Lipitor on their recommended formularies. [14]

[14]     A formulary is a list of drugs that are covered by a given drug benefit plan.

Based on the allegations as currently plead, the Court finds that this does not constitute a viable theory of causation. Plaintiffs do not allege that the PBDMs in fact relied on Plaintiffs' misrepresentations regarding the cost effectiveness, efficacy, or safety of Lipitor when the PBDMs decided to include Lipitor on the recommended formularies. In addition, Plaintiffs do not specifically allege that Plaintiffs used formularies that were developed by PBDMs. Therefore, the Court finds that Plaintiffs fail to adequately establish that the alleged misrepresenations to PBDMs were the cause of Plaintiffs' overpayment for Lipitor.

### c. *Misrepresentations to Plaintiffs*

Plaintiffs' third theory of causation is that Plaintiffs were injured when they relied on Defendant's misrepresentation on its website. Defendant's website allegedly stated that its marketing of Lipitor to physicians was lawful, when it was not. Plaintiffs allege that they would have restricted their coverage of Lipitor if Defendant had *not* stated on its website that it was lawfully marketing Lipitor. Thus, according to Plaintiffs, Defendant's misrepresentations about the nature of its advertising campaign caused Plaintiffs' economic loss.

The Court rejects this theory of causation as currently pled. Plaintiffs do not allege that Defendant provided Plaintiffs with misleading substantive information about Lipitor; thus, Plaintiffs' assessment of Lipitor's value, efficacy, and safety could not have been affected by Defendant's alleged misrepresentations.

The Court recognizes that had Plaintiff known the truth about Defendant's allegedly fraudulent advertising campaign, Plaintiffs may have been able to provide information to physicians that countered the information provided by Defendant. However, this lost opportunity to counter Defendant's misinformation is immaterial unless Plaintiffs allege that the physicians were in fact relying on Defendant's misrepresentations. Because Plaintiffs do not allege that physicians relied on Defendant's misrepresentations, Plaintiffs' reliance on Defendant's claim that it was lawfully advertising Lipitor, is legally irrelevant.

**\*7** For these reasons, Plaintiffs' efforts to equate their claims to those in *Desiano v. Warner–Lambert Co.,* 326 F.3d 339, 349 (2d Cir.2003), is misplaced. In *Desiano,* the plaintiffs, who were health insurers, alleged that the defendant, pharmaceutical company Warner–Lambert and its affiliates, made misrepresentations about anti-diabetes drug Rezulin's *safety* directly to the plaintiffs. The plaintiffs in *Desiano* alleged that they "would have taken steps so as not to purchase Rezulin at the prices set by Warner–Lambert" had they known that Warner–Lambert was misrepresenting Rezulin's safety. [15] 326 F.3d at 349. The Second Circuit in *Desiano* found that misrepresentation regarding Rezulin's safety "directly *caused* economic loss to [the plaintiffs] as purchasers, since they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by [Warner–Lambert's] misrepresentations." *Id.* at 349. (emphasis added).

Case: 3:17 Case 2:5p428 JTD Doc #22-4 Filed 05/21/21 Page 170 of 202
Southern Illinois Laborers and Employers Health and..., Not Reported in... Page #20 of 700 PageID #:1648

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

15    The Second Circuit stated that "[a]mong the steps Plaintiffs might have taken were to exclude it altogether from their approved schedules, set a low scheduled value, set a high copay obligation, and otherwise dissuade doctors from prescribing it." *Desiano,* 326 F.3d at 349 n. 9.

Here, the alleged misrepresentation to Plaintiffs is of a materially different kind than the misrepresentations in *Desiano.* Here, Plaintiffs do not allege that Defendant misrepresented Lipitor's safety directly to Plaintiffs, but rather that Defendant made a single, very general misrepresentation on its website; Defendant allegedly stated that its advertising campaign was lawful, when it was not. Moreover, as the Court noted above, this misrepresentation would be material only if Plaintiffs allege that physicians had relied on Defendant's misrepresentations.

The Court, therefore, GRANTS Defendant's motion to dismiss the RICO claim for lack of standing. The Court dismisses this claim without prejudice, and *sua sponte* GRANTS Plaintiffs leave to amend the RICO claim.

### C. State Law Claims

Plaintiffs bring claims pursuant to their respective state consumer fraud acts. The Court dismisses all of these claims on the ground that Plaintiffs have failed to establish standing under Article III of the Constitution.

The Court dismisses most of the state law claims without prejudice. The Court *sua sponte* GRANTS Plaintiffs leave to amend most of their claims. However, for the reasons set forth below, the Court dismisses six of the claims with prejudice and without leave to amend.

#### 1. *Article III Standing*

The Court finds that Plaintiffs have failed to establish Article III standing for the same reasons the Court finds Plaintiffs have failed to establish standing under RICO—Plaintiffs have not alleged a causal connection between the alleged injury and the challenged act. [16]

16    Here, like in the RICO analysis, the Court assumes *arguendo* that Plaintiffs have adequately alleged injury and the challenged act is likely to be redressed by a favorable decision.

#### a. *Legal Standard*

Under Article III, judicial power extends only to "cases and controversies." *See* U.S. Const. art. III, § 2. Therefore, a plaintiff must allege that its claim is a case or controversy in order to establish Article III standing. A plaintiff can do so by alleging: (1) an injury in fact, (2) a causal connection between the alleged injury and the challenged act, and (3) that the alleged injury is likely to be redressed by a favorable decision. *Nat'l Council of La Raza v. Mukasey,* 283 Fed. Appx. 848, 850 (2d Cir.2008) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 329, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999).

#### b. *Application*

**\*8**  Plaintiffs fail to allege the necessary causal connection between their alleged overpayment for Lipitor and Defendant's alleged misrepresentations. As the Court discussed above, Plaintiffs assert a theory of causation that is dependant upon the allegation that physicians relied upon Defendant's misrepresentations. Because the Plaintiffs do not expressly allege that physicians relied upon Defendant's misrepresentations, the Court finds that Plaintiffs have not alleged the necessary causal connection, and thus have not established Article III standing. Accordingly, Defendant's motion to dismiss Plaintiffs' state law claims is GRANTED.

#### 2. *Amending Claims*

Case: 3:17-cv-50428-JTD Doc #: 22-4 Filed: 05/21/21 Page 171 of 202 PageID #:1649
Source: Illinois Laborers and Employers Health and..., Not Reported in... Page 329 of 460

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

The Court now addresses *sua sponte* whether to grant Plaintiffs leave to amend their claims. Leave to amend should be given freely. Fed.R.Civ.P. 15(a) ( "The court should freely give leave when justice so requires."); *Smokes–Spirits,* 541 F.3d at 452 (*quoting* Fed.R.Civ.P. 15(a)). Accordingly the Court grants Plaintiffs leave to amend the following claims for: (1) unjust enrichment; (2) fraudulent misrepresentation; (3) negligent misrepresentation (except for the negligent misrepresentation claims under Illinois common law, Ohio common law, and Indiana common law); (4) civil conspiracy; (5) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law; (6) violation of Indiana's Deceptive Consumer Sales Act; (7) violation of New York General Business Law; and (8) violation of Florida's Deceptive and Unfair Trade Practices Act.

Leave to amend should not been given when amending the claims would be futile. *Smokes–Spirits.com,* 541 F.3d at 452 ("Leave to amend need not be granted, however, where the proposed amendment would be futile.") (internal citations and quotations omitted). For the reasons set forth below, the Court finds that it would be futile to allow Plaintiffs to amend the following claims for: (1) violation of the Ohio Consumer Sales Protection Act; (2) violation of Texas's Deceptive Trade Practices and Consumer Protection Act; (3) violation of the New Jersey Consumer Fraud Act; (4) negligent misrepresentation under Illinois common law; (5) negligent misrepresentation under Ohio common law; and (6) negligent misrepresentation under Indiana common law. The Court, therefore, dismisses these claims with prejudice and without leave to amend.

   a. *Ohio Consumer Sales Protection Act*

Ohio Plaintiff Cleveland Bakers and Teamsters Health and Welfare Fund (hereinafter, "Ohio Plaintiff") brings a claim pursuant to the Ohio Consumer Sales Protection Act, Ohio Rev.Code Ann. § 1354.01(A) (hereinafter, "Ohio Act"). Defendant contends that Ohio Plaintiff cannot establish standing because only natural persons can engage in a consumer transaction under the Ohio Act. The Court agrees, and thus finds that Ohio Plaintiff is unable to bring a claim under the Ohio Act.

The Ohio Act provides that a "consumer" may recover economic damages for unconscionable or deceptive acts made in connection with a "consumer transaction." Ohio Rev. Cod. Ann. § 1345.09. Under the Ohio Act, a "consumer transaction" must be a "a sale ... to an individual [defined as a natural person] for purposes that are primarily personal, family, or household." Ohio Rev. Cod. Ann. § 1345.01(A).

 **\*9** Because a sale must be to a natural person in order to constitute a "consumer transaction" within the meaning of the Ohio Act, the sales from Defendant to Ohio Plaintiffs cannot be characterized as a "consumer transaction." *See City of Findlay v. Hotels.com, L.P.,* 441 F.Supp.2d 855, 862 (N.D.Ohio 2006) ("Because the City is not a natural person, it may not assert an [Ohio Act] claim."). [17]

[17]   *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.* explains that plaintiffs who are third-party payors do not have standing under the Ohio Act for the following reason:

   [E]ven if the sale of [medication] from defendants to the patients is characterized as, at least in part, a sale to the plaintiff because the plaintiff paid for the medicine, that sale does not qualify as a "consumer transaction" because transactions between suppliers and corporations, that is, non-natural persons, do not constitute sales to individuals and therefore do not qualify as "consumer transactions" for purposes of standing to bring a claim.

   495 F.Supp.2d 1027, 1032 (N.D.Cal.2007).

Ohio Plaintiff is not a natural person, and thus is unable to engage in a "consumer transaction" within the meaning of the Ohio Act.

Accordingly, the Court finds that allowing Ohio Plaintiff to replead its claim would be futile. Defendant's motion to dismiss Ohio Plaintiff's claim is GRANTED with prejudice and without leave to amend.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:17-Case21-50428-JTD tDoc022-4-FileEile05/21/21 Page 172t of 202
Source: Illinois Laborers and Employers Health and..., Not Reported in... Page 180 of 260 PageID #:1650

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

b. *Texas's Deceptive Trade Practices and Consumer Protection Act*

Texas Plaintiff F & P Retiree Health Care Fund (hereinafter, "Texas Claim") sues Defendant pursuant to Texas's Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com.Code Ann. § 17.41–63 (hereinafter, the "Texas Act"). Defendant argues that Texas Plaintiff cannot establish standing because Texas Plaintiff did not use Lipitor itself. The Court agrees that the Texas Plaintiff is unable to establish standing.

The Texas Act grants standing to a "consumer" who "seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com.Code Ann. § 17.45(4). Texas courts have expressly stated that to state a cause of action under the Texas Act, as Texas Plaintiff seeks to do, the "goods and services, ... must be purchased or leased for use by the party seeking to state a cause of action." *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 386 (Tex.2000) (internal quotations omitted); *In re Bextra & Celebrex Mktg. Sales Practices,* 495 F.Supp.2d at 1036.

The Court finds that Texas Plaintiff is not a consumer within the meaning of the Texas Act because it does not "use" Lipitor. Defendant's motion to dismiss Texas Plaintiff's claim is GRANTED with prejudice and without leave to amend.

c. *New Jersey Consumer Fraud Act*

Plaintiff Welfare Fund of Teamsters Local Union 863 (hereinafter, "New Jersey Plaintiff") alleges that Defendant violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8–1 *et seq.* (hereinafter, the "New Jersey Act"). Defendant argues that New Jersey Plaintiff cannot establish standing because New Jersey Plaintiff is not a "consumer" within the definition of the New Jersey Act. The Court agrees.

New Jersey state courts have defined a "consumer" as "one who uses (economic) goods, and so diminishes or destroys their utilities ." *In re Rezulin Prods. Liab. Litig.,* 390 F.Supp.2d 319, 339 (S.D.N.Y.2005) (*quoting City Check Cashing, Inc. v. National State Bank,* 244 N.J.Super. 304, 309, 582 A.2d 809 (App.Div.1990)); *see also Lithuanian Commerce Corp. v. Sara Lee Hosiery,* 179 F.R.D. 450, 469 (D.N.J.1998) (explaining that New Jersey courts have held that a company that purchases a product for resale is not a consumer because it has not diminished or destroyed the product through use); *Windsor Card Shops v. Hallmark Cards,* 957 F.Supp. 562, 567 n. 6 (D.N.J.1997) (same). As Plaintiffs note, one New Jersey court has adopted a more expansive definition of "consumer." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* No. ATL–L–3015–04, 2004 WL 3767338, at *4–6 (N.J.Super.Ct.Law.Div. July 8, 2004) (finding that third-party payors are "consumers" for the purposes of bringing a illicit marketing practices claim against a drug manufacturer under the New Jersey Act). [18]

[18] The New Jersey Supreme Court, in reviewing this decision and reversing on other grounds, assumed *arguendo* that a third-party payor has standing under the New Jersey Act. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* 192 N.J. 372, 377 n. 1, 929 A.2d 1076 (2004) ("We presume, for purposes of this analysis, that [the third-party payor] qualifies as a consumer as that term is intended in our consumer fraud statute."). Because the New Jersey Supreme Court has not reached the issue of whether a third-party payor is a consumer under the New Jersey Act, the Court relies upon the decisions by the New Jersey state appellate courts that have addressed this point of law. As noted above, these New Jersey appellate courts have largely found that a "consumer" must personally use the good, and thus third-party payors cannot be "consumers" within the meaning of the New Jersey Act.

**\*10** The Court, however, finds that the weight of New Jersey authority supports a finding that New Jersey Plaintiff is not a consumer within the meaning of the New Jersey Act because it does not use Lipitor in a way that diminishes or destroys its utility. Accordingly, Defendant's motion to dismiss New Jersey Plaintiff's claim is GRANTED with prejudice and without leave to amend.

d. *Illinois Negligent Misrepresentation*

Southern Illinois Laborers and Employers Health and..., Not Reported in...

Case: 1:17-cv-50428-JTD   Doc: 22-4   Filed: 05/21/21   Page: 173 of 202   PageID #:1651

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

Illinois Plaintiffs Southern Illinois L & E, NECA–IBEW, and Midwestern Teamsters H & W (hereinafter "Illinois Plaintiffs") sue for negligent misrepresentation under Illinois common law. Defendant argues that Illinois Plaintiffs' claim fails as a matter of law because the Illinois common law provides that a party cannot recover for negligent misrepresentation if it alleges only an economic loss. *Nepomoceno v. Knights of Columbus,* No. 96 C 4789, 1999 WL 66570 at * 11 (N.D.Ill. February 8, 1999) ("In a nutshell, [the economic loss] doctrine bars a plaintiff from recovering in negligence for losses which are purely economic, that is, do not involve personal injury or property damage .... [T]ort law is not intended to compensate parties for monetary loses suffered as a result of duties which are owed to them simply as a result of a contract.").

Illinois common law recognizes an exception to the economic loss doctrine where the defendant is in the business of providing information. *See Tolan and Son, Inc. v. KLLM Architects, Inc.,* 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 294 (Ill.App.Dist.1999) (explaining that "negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in business transactions is an exception to the [economic loss] doctrine"). Businesses that provide legal or accounting services are examples of businesses that are in the business of providing information. *Id.*

The economic loss exception also applies when the defendant provides both tangible goods and informational services, as long as these two aspects of the business are entirely distinct. *Id.* at 299. When courts consider whether two aspects of a business are entirely district, they consider whether the business's informational service is intertwined with the business's provision of a tangible good. If the two aspects of a business are intertwined, then the economic loss exception does not apply. *Id.; Orix Credit Alliance v. Taylor Mach. Works,* 125 F.3d 468, 476 (7th Cir.1997) (finding that because the defendant's appraisals of customers' machinery was intertwined with the tangible goods the defendant sold, the defendant could not be characterized as selling information); *see also Coleman Cable Sys. v. Shell Oil Co.,* 847 F.Supp. 93, 95 (N.D.Ill.1994) (stating that the exception to the economic loss doctrine is inapplicable because "any information supplied by the manufacturer was considered merely incidental to the sale of goods" when the manufacturer was in the business of selling computers and roofing materials).

**\*11** Illinois Plaintiffs argue that they can state a claim for negligent misrepresentation even though they suffered only an economic loss because Defendant was in the business of supplying information: "Pfizer-supplied information about Lipitor was crucial in driving the demand for and setting the price of Lipitor, as well as for the [Plaintiffs'] reimbursement decision." The Court rejects this argument. The information Defendant provided was fundamentally intertwined with its sale of Lipitor, a tangible product. Therefore, the exception to the economic loss doctrine does not apply.

Accordingly, the Court finds that Illinois Plaintiffs are unable to establish a claim for negligent misrepresentation under Illinois common law because they only allege an economic loss and the exception to the economic loss rule does not apply. [19] The Court GRANTS Defendant's motion to dismiss Illinois Plaintiff's negligent misrepresentation claim with prejudice and without leave to amend.

[19]     Illinois Plaintiffs also argue that the economic loss doctrine is inapplicable here because they are not alleging a product defect. However, Illinois law does not require a product defect to find the economic loss doctrine applicable, and therefore the Court rejects this argument. *See County of Kane v. Shell Pipeline Co., LP,* No. 04 cv 8014, 2005 WL 1026583, at *3 (N.D.Ill. Apr.6, 2005) ("[C]ourts have not strictly limited the economic loss doctrine to products liability claims.").

### e. *Ohio Negligent Misrepresentation*
Ohio Plaintiffs bring a negligent misrepresentation claim against Defendant under Ohio common law. Defendant argues that Ohio Plaintiffs' claim necessarily fails because Defendant is not in the business of providing information. The Court agrees.

Source: Illinois Laborers and Employers Health and..., Not Reported in...

2009 WL 3151807, RICO Bus.Disp.Guide 11,779

Under Ohio common law, "[t]he elements for negligent misrepresentation clearly require (1) a defendant who is in the business of supplying information; and (2) a plaintiff who sought guidance with respect to his business transactions from the defendant." *Nichols v. Ryder Truck Rental,* No. 65376, 1994 Ohio App. LEXIS 2697, *11 (Ohio Ct.App. June 23, 1994); *see also Thornton v. State Farm Mut. Auto. Ins. Co.,* No. 06 cv 00018, U.S. Dist. LEXIS 83968, at *50 (N.D.Ohio Nov. 17, 2006) (applying *Nichols* ).

Defendant is in the business of providing a tangible product and not information. Accordingly, Ohio Plaintiffs fail to adequately plead a negligent misrepresentation claim under Ohio common law. Thus, the Court GRANTS Defendant's motion to dismiss Ohio Plaintiffs' negligent misrepresentation claim with prejudice and without leave to amend.

### f. *Indiana Negligent Misrepresentation*

Indiana Plaintiff Electrical Workers Benefit Trust Fund (hereinafter, "Indiana Plaintiff") bring a negligent misrepresentation claim. Defendant argues that the claim should be dismissed on the ground that the parties are not in an employer-employee relationship. The Court agrees.

Indiana common law recognizes claims for negligent misrepresentation only in the context of a relationship between an employer and an employee. *Trytko v. Hubbell, Inc.,* 28 F.3d 715 (7th Cir.1994); *Greg Allen Constr. Co. v. Estelle,* 798 N.E.2d 171 (Ind.2003). Indiana Plaintiff was not in an employer-employee relationship with the Defendant. Accordingly, the Court GRANTS Defendant's motion to dismiss Indiana Plaintiff's claim with prejudice and without leave to amend.

## III. Conclusion

**\*12** The Court GRANTS Defendant's motion to dismiss in its entirety on the ground that Plaintiffs have failed to establish standing. The Court GRANTS Plaintiffs leave to amend all of their claims, except for their claims under the Ohio, Texas, and New Jersey consumer protection acts and their claims for negligent misrepresentation under Illinois, Ohio, and Indiana common law.

Any amended complaint shall be submitted to the Court by *Monday, November 2, 2009 at 5:00 p.m.*

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2009 WL 3151807, RICO Bus.Disp.Guide 11,779

---

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# St. Paul v. FMC Corp.

United States District Court for the District of Minnesota, Third Division

February 26, 1990, Decided

Civil File No. 3-89-0466 Class Action

**Reporter**

1990 U.S. Dist. LEXIS 18142 *; 1991-1 Trade Cas. (CCH) P69,305

City of St. Paul, a municipal corporation, Plaintiff, v. FMC Corporation; Occidental Chemical Corporation; Stauffer Chemical Company; The Dow Chemical Company; PPG Industries, Inc.; Diamond Shamrock Corporation; Pennwalt Corporation; The B. F. Goodrich Company; Vulcan Materials Company; Georgia-Pacific Corporation; and Kaiser Aluminum and Chemical Corporation, Defendants

**Counsel:** [*1]  John A. Cochrane, Esq., Cochrane & Bresnahan, P.A., St. Paul, Minnesota, and Vance K. Opperman, Esq., Richard A. Lockridge, Esq., Opperman, Heins & Paquin, South, Minneapolis, Minnesota, and Edward P. Starr, City Attorney, City of St. Paul, St. Paul, Minnesota, for the plaintiff.

Joseph A. Walters, Esq., O'Connor & Hannan, Minneapolis, Minnesota, and James W. Rankin, Esq., Alan R. Kidston, Esq., Kirkland & Ellis, Chicago, Illinois, for defendant FMC Corporation.

Thomas D. Jensen, Esq., Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, Minnesota, and Bruce W. Kauffman, Esq., David H. Pittinsky, Esq., Carl W. Hittinger, Esq., Richard J. Bortnick, Esq., Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pennsylvania, for defendant Occidental Chemical Corporation.

John H. Schafer, Esq., S. William Livingston, Jr., Esq., Covington & Burling, Washington, D.C., and William T. Egan, Esq., Rider, Bennett, Egan & Arundel, Minneapolis, Minnesota, for defendant Stauffer Chemical Company.

John D. Levine, Esq., Michael E. Bress, Esq., Dorsey & Whitney, Minneapolis, Minnesota, and James T. Halverson, Esq., Joseph Iarocci, Esq., Shearman & Sterling, New York, New York, for defendant The Dow Chemical [*2]  Company.

Joseph T. Dixon, Jr., Esq., Henson and Efron, P.A., Minneapolis, Minnesota, and Robert C. Hein, Esq., Mary A. McLaughlin, Esq., Judy L. Popper, Esq., Dechert, Price and Rhoads, Philadelphia, Pennsylvania; and Thomas E. Zemaitis, Esq., Pepper, Hamilton & Scheetz, Philadelphia, Pennsylvania, for defendants Diamond

Shamrock Corporation and Pennwalt Corporation.

Gordon G. Busdicker, Esq., Wendy J. Wildung, Esq., John Beukema, Esq., Faegre & Benson, Minneapolis, Minnesota; John W. Thomas, Esq., Senior Counsel, PPG Industries, Inc., Pittsburgh, Pennsylvania; and David Armstrong, Esq., Daniel P. Stefko, Esq., Dorothy Davis, Esq., William Thomson, Esq., Dickie, McCamey & Chilcote, Pittsburgh, Pennsylvania, for defendant PPG Industries, Inc.

Thomas Demitrack, Esq., Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant The B. F. Goodrich company.

James J. Garrett, Esq., Michael L. Zigler, Esq, Morrison & Foerster, San Francisco, California; and Jan D. Halverson, Esq., Felhaber, Larson, Fenlon & Vogt, Minneapolis, Minnesota, for defendant Vulgar Materials Corporation.

Kenneth Kramer, Esq., Shearman & Sterling, New York, New York, for defendant Georgia-Pacific Corporation.

Elliot S.  [*3]  Kaplan, Esq., Deborah J. Palmer, Esq., Robins, Zelle, Larson & Kaplan, Minneapolis, Minnesota, for defendant Kaiser Aluminum & Chemical Corporation.

**Judges:** Paul A. Magnuson, United States District Judge.

**Opinion by:** MAGNUSON

# Opinion

*MEMORANDUM AND ORDER*

This matter is before the court upon defendants' motions for: 1) judgment on the pleadings; 2) dismissal for lack of subject matter jurisdiction; and 3) to limit the class action complaint. For the reasons set forth below, defendants' motions for judgment on the pleadings and dismissal are denied, and the motion to limit the

complaint is granted.

*FACTS*

This class-action antitrust case owes its existence to the Supreme Court's recent decision in California v. ARC America Corp., U.S. , 109 S.Ct. 1661 (1989), which held that indirect-purchaser antitrust actions under state law are not preempted by the Illinois Brick rule's limitation of federal antitrust actions to direct purchasers. Plaintiff, the City of St. Paul, brings this action as an indirect purchaser of chlorine and caustic soda products, alleging that the defendants, all chlorine and caustic soda producers, have engaged in price-fixing conduct for these products in violation of both **[*4]** the Sherman Act and Minnesota's antitrust statute. The procedural history of prior antitrust litigation between these same parties, as well as the changes in antitrust law noted above, constitute much of the relevant background for the instant motions. On June 17, 1986, St. Paul brought a class action against defendants in this court alleging essentially the same antitrust violations alleged in this case. St. Paul sought to represent a nation-wide class of municipalities and other public entities under both Minnesota law and under Section 1 of the Sherman Act Law, then amended the complaint by alleging a class of Minnesota public entities and dropping the Minnesota antitrust claims. In its second amended complaint St. Paul reinstated the allegations as they were in the original complaint. St. Paul does not deny that it brought this action as both a direct and an indirect purchaser of chlorine and caustic soda from defendants.

On December 2, 1986, the city of Philadelphia brought a class-action antitrust claim against a group of defendants including all of the defendants in this case alleging price-fixing for chlorine and caustic soda products in violation of Section 1 of the Sherman **[*5]** Act. The class consisted of all public entities -- nationwide -- which purchased chlorine and caustic soda directly from the named defendants. Meanwhile, in May, 1987, the 9th Circuit Court of Appeals held several state antitrust statutes, to the extent they provided actions for indirect purchasers, preempted by Federal Antitrust law. In re Cement and Concrete Antitrust Litigation, 817 F.2d 1435 (9th Cir. 1987). The Cement and Concrete court relied heavily on the Supreme Court's decision in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061 (1977), which held that Section 4 of the Clayton Act does not provide a cause of action to indirect purchasers. 817 F.2d at 1445.

Subsequent to the Philadelphia complaint and the Cement and Concrete decision, on May 31, 1988, St. Paul entered into a stipulation of dismissal with defendants. Regarding indirect-purchaser claims, the stipulation states that "this dismissal is without prejudice to all [public entities], . . . located within the State of Minnesota . . . that purchased chlorine or caustic soda indirectly from any of the above-named defendants" (emphasis added). These claims were further subject to the follow **[*6]** proviso:

No such claims may be brought against the above-named defendants by the indirect purchasers unless and until a final decision is rendered in the matter of In re Cement and Concrete Antitrust Litigation, docket nos. 84-2865, 85-1670, and 85-1722 to 85-1724, by the Supreme Court and the Ninth Circuit Court of Appeals reversing the Ninth Circuit's ruling that section 325D.57 of the Minnesota Antitrust Statute, to the extent it purports to permit recovery by indirect purchasers, is preempted by operation of Article VI, clause 2 of the United States Constitution; provided further that no such claims shall be brought if the Supreme Court or the Ninth circuit rules, for any other reason, that indirect purchasers may not bring suit under the Minnesota Antitrust Statute.

The stipulation stated the following regarding direct purchasers: "All [public entities] located within the State of Minnesota that purchased chlorine or caustic soda directly from any of the defendants . . . are deemed members of the class certified in [the Philadelphia litigation] . . . unless . . . such direct purchasers out-out [sic] of the class certified by that court."

St. Paul does not dispute **[*7]** that it subsequently received proper class notice and an opportunity to opt out of the Philadelphia litigation. The notice unequivocally presented class members with the choice of opting out or remaining and being bound by the ultimate resolution, as well as defining the class as direct purchasers. Several settlement agreements eventually resolved the Philadelphia litigation as to all defendants. The settlements released the class members' claims according to the following language:

"Upon the Court's approval of this Agreement and the settlement set forth herein pursuant to Rule 23, a final judgment . . . shall be entered which shall forever discharge [each settling defendant] from any and all claims, demands, causes of action, obligations, damages and liabilities and all other claims of any kind, . . . of every member of the Class who did not timely

request exclusion in the manner provided for in the pertinent notice to the Class (including all of each Class member's parents, subsidiaries, affiliates, predecessors and successors) under the antitrust laws of the United States, or the antitrust or similar laws regulating competition of any State thereof or of any other jurisdiction [*8] to the date hereof based upon, arising out of, or having connection in any way whatsoever with any act, omission, cause or matter that is in whole or in part the subject of or asserted in or any claims that could have been asserted under the antitrust laws of the United States or the antitrust or similar laws regulating competition of any State thereof or of any other jurisdiction, as well as any other claims based on the allegations asserted in, the Consolidated Amended Class Action Complaint or any of the complaints filed in the cases enumerated in Exhibit A hereto."

(emphasis added). The supplemental notice clearly stated that the class consisted of direct purchasers whose recovery would be apportioned pro rata according to the amount of their direct purchases. The claim forms sent to class members in this direct-purchaser action provided a column for the entry of direct purchases. No column was provided for indirect purchases, i.e. purchases from non-defendants.

Following the Supreme Court's decision in ARC America, St. Paul filed its complaint in the instant case, seeking recovery as an indirect purchaser under Minnesota law for what is conceded to be the defendants' [*9] same anticompetitive acts. The complaint further alleges that some of the purchases were "on a basis equatable to a cost plus basis." The putative class is nation-wide. Defendants now move for judgment on the pleadings based on the doctrines of claim preclusion or res judicata (part I); dismissal for lack of subject matter Jurisdiction (part II); and an order limiting the class (part III).

*DISCUSSION*

I.

CLAIM PRECLUSION AND RES JUDICATA

Defendants first argue that St. Paul, as a direct-purchaser member of the Philadelphia direct purchaser class, is precluded from bringing this action based on the judgments in that case. Similarly, defendants argue that St. Paul is precluded under the doctrine of res judicata. The court will discuss these issues separately although it reaches the same conclusions on both

issues.

A. Claim Preclusion in Class Actions

This issue requires the court to determine the effect of the Philadelphia litigation settlements upon St. Paul, which by the May 1988 stipulation of dismissal deemed itself a member of the Philadelphia class. The stipulation clearly preserved indirect-purchaser claims for indirect purchasers. The stipulation also clearly subjected direct [*10] purchasers to the results of the Philadelphia litigation. The problem is that the stipulation does not specifically address how parties with both indirect and direct purchasers - like St. Paulare to be treated. Defendants correctly observe that nothing in the stipulation gave St. Paul the right to remain in the Philadelphia direct-purchaser action and later bring an indirect purchaser action. The converse, however, is also true.

Because the stipulation is silent the next step is to analyze the extent of the Philadelphia class-action's preclusive effect. St. Paul argues that its interests as an indirect purchaser were not the subject of the Philadelphia litigation and consequently were not adequately represented. Because the indirect claims were not represented, St. Paul further argues, they cannot be precluded.

"Adequate representation is required to support preclusion by judgment in a class action. One major requirement of representation draws from the due process perception that absent persons cannot be represented by parties who have fundamentally divergent interest in the subject of the representation." Wright, Miller, and Cooper, Federal Practice and Procedure, § 4455 at [*11] 477 (West 1981) (citing Hansberry v. Lee, 311 U.S. 32 (1946)). "The reasons for limiting preclusion to the subject of the class action are even stronger than the reasons for imposing similar limits on preclusion by other representative litigation. Id. at 484. "These limitations on preclusion by a class judgment are wrapped up with the general proposition that 'the court conducting the action cannot predetermine the [preclusive] effect of the judgment.'" Id. at 485 (quoting Gonzales v. Cassidy, 474 F.2d 67, 74 (5th Cir. 1973)).

In the instant case the court concludes that the Philadelphia litigation does not preclude St. Paul from collaterally pursuing its indirect claims in this action. This conclusion is compelled by the divergence of interests between a direct-purchaser representative and an indirect-purchaser claimant. The class certified was

Case: 3:17-cv-01017-JRD Document #: 190-1 Filed: 11/24/21 Page 186 of 360 PageID #:1656
Case 21-50428-JTD    Doc 22-4    Filed 05/24/21    Page 178 of 202

1990 U.S. Dist. LEXIS 18142, *11

of direct purchasers, the settlements were distributed pro rata according to direct purchases, and the class representative was a direct purchaser. The Supreme Court in Illinois Brick Co. v. Illinois, 431 U.S. 720, 738 (1977), recognized the substantial divergence of interest between direct and indirect purchasers:

Permitting [*12] the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge -- from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

As we have indicated, potential plaintiffs at each level in the distribution chain are in a position to assert conflicting claims to a common fund -- the amount of the alleged overcharge -- by contending that the entire overcharge was absorbed at that particular level in the chain.

The Illinois Brick court, in discussing its rationale for limiting private federal antitrust actions to direct purchasers, also anticipated the need for different classes with their own representatives should indirect-purchaser claims be allowed:

But allowing indirect purchasers to recover using pass-on theories, even under the optimistic assumption that joinder of potential plaintiffs will deal satisfactorily with problems of multiple [*13] litigation and liability, would transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant. In treble-damages actions by ultimate consumers, the overcharge would have to be apportioned among the relevant wholesalers, retailers, and other middlemen, whose representatives presumably should be joined. And in suits by direct purchasers or middlemen, the interests of ultimate consumers are similarly implicated.

431 U.S. at 740-41 (emphasis added). This divergence of interest between direct and indirect purchasers is still recognized despite the court's decision in ARC America. In holding that state indirect-purchaser actions do not interfere with the policies underlying federal law and thus are not preempted -- an analysis focusing on how

best to effectuate the goals of compensating of antitrust victims and deterring anticompetitive conduct rather than how to preserve adequate representation for particular classes of purchasers -- the court cost great doubt on the wisdom of including pendent indirect claims in federal antitrust actions:

First, the Court [*14] of Appeals concluded that state indirect purchaser statutes interfere with the congressional purpose of avoiding unnecessarily complicated proceedings on federal antitrust claims. But these state statutes cannot and do not purport to affect remedies available under federal law. Furthermore, state indirect purchaser actions will not necessarily be brought in federal court. 817 F.2d, at 1445. Unlike the federal indirect purchaser claims asserted in Illinois Brick, which would have been exclusively within the jurisdiction of the federal courts, 15 U.S.C. §§ 15(a), 26, claims under state indirect purchaser statutes could be brought in state court, separately from federal actions brought by direct purchasers. Moreover, federal courts have the discretion to decline to exercise pendent jurisdiction over state indirect purchaser claims, even if those claims are brought in the first instance in federal court. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-726, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966). Since many state indirect purchaser actions would be heard in state courts, at least when the federal courts determined that hearing those claims would be overly [*15] burdensome, any complication of federal direct purchaser actions in federal court would be minimal.

109 S.Ct. at 1666. In discussing the diluted recovery problem, moreover, the court noted "that direct purchasers may have to share with indirect purchasers is a function of the fact and form of settlement rather than the impermissible operation of state indirect purchaser statutes" 109 S.Ct. at 1667 (emphasis added).

Here, as noted above, the fact and form of the settlement was determined by a direct purchaser on behalf of direct purchasers resulting in a pro rata distributions according to each member's direct purchases. Considering the divergent interests noted above, the court concludes that the Philadelphia class representative had no interest in pursuing indirect claims for those members who were both indirect and direct purchasers, thus diluting its own recovery. Defendants rely heavily on TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456 (2d Cir. 1982),

which involved the settlement of a shareholder derivative class action "involving a dispute over a century-old lease." 675 F.2d at 457. The court affirmed the approval or the settlement over the objections of certain [*16] minority shareholders to the settlement's preclusion of "all claims that might be asserted in connection with the action . . . including [an] appraisal proceeding that had been dismissed without prejudice by the state court." 675 F.2d at 459. The court approved the settlement because the state-law claim was "based on the identical factual predicate as that underlying the claims in the settled class action." 675 F.2d at 460. The instant case is distinguishable. Unlike TBK, this case involves a class representative with no interest in the pursuit of indirect claims. This divergence of interest is based on the lack of an identical factual predicate. The anticompetitive conduct alleged is identical, but the indirect claims arise out of additional purchases of chlorine and caustic soda further along the distribution chain. As the TBK court recognized, "special care must be taken to ensure that the release of a claim not asserted within a class action or not shared alike by all class members does not represent 'an advantage to the class . . . by the uncompensated sacrifice of claims of members, whether few or many.'" 675 F.2d at 461 (quoting National Super Spuds, Inc. v. New [*17] York Mercantile Exchange, 660 F.2d 9, 19 (2d Cir. 1981)). Super Spuds, contrary to defendants' assertions, is the persuasive authority here. In Super Spuds the court refused to approve a class settlement on behalf of all those who purchased liquidated potato futures contracts to the extent it precluded separate state-court class actions by members who also had unliquidated potato future contracts, 660 F.2d at 919. The additional contracts prevented factual identity between the state and federal claims, resulting in a divergence of interest between the class representative and those with state claims and, in turn, resulting in inadequate representation. Claim preclusion was thus inappropriate. Id. Based on similar concerns the court must rule that the settlements in the Philadelphia litigation do not preclude St. Paul's collateral pursuit of this indirect-purchaser state action.

Defendants' res judicata arguments suffer the same fate for similar reasons. There are three elements to the res judicata doctrine: 1) the prior judgment must be rendered by a court of competent jurisdiction; 2) the prior judgment must be a final judgment on the merits; and the same cause of action [*18] and the parties were involved in both cases. Murphy v. Jones, 877 F.2d 682, 684 (8th Cir. 1989). "Put another way, whether two claims are the same for res judicata purposes depends

on whether the claims arise out of the same nucleus of operative fact or are based on the same factual predicate." Murphy, 877 F.2d at 684-85. Here, again, the two cases involve different facts -- different contracts leading to different damages. That the anticompetitive conduct was the same in both cases does not end the inquiry. Defendants correctly observe that, despite the Cement and Concrete holding, indirect-purchaser claims under state law were, at the time of the Philadelphia litigation, at least colorable. See Crown Oil Corp. v. Superior Court, 223 Cal. Rptr. 164, 177 Cal. App. 3d 604 (1986) (holding that indirect claims under state law were not preempted). The question here, however, is not whether colorable claims for state indirect-purchaser actions existed at that time; rather, the question is whether such claims had to be pursued in the Philadelphia litigation. The answer is no. Because the indirect claims are not based on the same factual predicate as the federal direct claims, [*19] res judicata does not apply here. Cases on which defendants rely, for this reason, have no weight in the instant case. See Nash County Bd. of Ed. v. Biltmore Co., Co., 640 F.2d 484 (4th cir. 1981) (holding res judicata applicable where antitrust factual predicates -- including evidence and damages -- were identical and the only difference between the first state-court action and the second federal-court action was the allegation of an interstate commerce nexus); Engelhardt v. Bell & Howell Co., 327 F.2d 30 (8th Cir. 1964) (holding res judicata applicable where, as above, the only difference between the first and second antitrust actions was the allegation of an interstate-commerce nexus). Res judicata, in sum, does not apply here because the Philadelphia litigation was based on a materially different factual predicate.

II.

SUBJECT MATTER JURISDICTION

Defendants assert, in a second motion, that this court lacks subject-matter jurisdiction because plaintiffs have failed to state a federal claim proving pendent jurisdiction for the indirect-purchaser claims. The court concludes that St. Paul has properly asserted a federal claim. Pendent jurisdiction over the state indirect-purchaser [*20] claim is consequently appropriate.

Defendants contend that St. Paul has failed to properly plead a federal cause of action under the "cost plus" exception to Illinois Brick. This exception allows recovery for indirect purchasers "where there is a pre-existing, fixed-quantity, cost-plus contract between the direct purchaser and its customer, as well as between all other parties in other parties in the distribution

chain[.]" Mid-West Paper Products Co. v. Continental Group, 596 F.2d 573, 577 (3d Cir. 1979) (citing Illinois Brick, 431 U.S. at 736). St. Paul's complaint alleges that it made indirect purchases of chlorine and caustic soda on a "basis equitable to a cost-plus basis." Defendants claim this allegation fails to state a federal cause of action, relying on cases granting summary Judgment for failure to put forth evidence of cost-plus contracts. In re Wyoming Tight Sands Cases, 866 F.2d 1286 (10th Cir. 1989); In re Midwest Milk Monopolization, 529 F.Supp. 1326 (W.D. Mo. 1982). These summary judgment holdings have little relevance here, given the great difference in the requirements of notice pleading under Fed. R. Civ. P. 8 and the requirement of providing [*21] evidence to avoid summary judgment. Although the court has serious doubts as to whether any such cost-plus contracts can be proven, it does not regard dismissal as appropriate. Pendent jurisdiction over the state indirect-purchaser statutes, in any event, exists because St. Paul has also made a claim for injunctive relief under the Clayton Act, 15 U.S.C. § 26. Such relief is available to both indirect and direct purchasers. See, e.g., Reiter v. Sonotone Corp., 486 F.Supp. 115, 121 (D. Minn. 1980). Because St. Paul has properly pleaded a federal claim, the court has pendent jurisdiction over the state indirect-purchaser action.

II.

MOTION TO LIMIT THE COMPLAINT

Defendants seek to limit the class action complaint to claims arising after August 1, 1984, the effective date of the amendment of Minnesota's antitrust statute to allow indirect purchaser actions. See Minn. Stat. § 325D.54. St. Paul counters by arguing that the amendment merely clarified existing law to explicitly allow indirect actions in light of Illinois Brick. The Minnesota Court of Appeals addressed the very same argument in Keating v. Philip Morris, Inc., 417 N.W.2d 132, 136 (Minn. Ct. App. 1007), [*22] and rejected it. Noting that Minnesota antitrust law is to be construed consistently with federal antitrust law and that Minnesota laws are not to be applied retroactively unless "clearly and manifestly so intended by the legislature," the Keating court concluded pre-amendment indirect claims are not provided for under the Minnesota statute. Id. The Minnesota Supreme Court, however, has not addressed this issue, which raises a question of whether the court of appeals case accurately set forth Minnesota law. In applying state law, federal courts are bound by the decisions of the state's highest court. Kifer v. Liberty Mutual Ins. Co., 777 F.2d 1325, 1329 (8th Cir. 1985).

When state law is unclear or unsettled, "it is the duty of a federal court to apply the rule it believes that state supreme court would follow." Gearhart v. Uniden Corp. of America, 781 F.2d 147, 149 (8th Cir. 1986). In making this determination, a decision of the state's intermediate appellate court is "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Commissioner [*23] v. Estate of Bosch, 387 U.S. 456, 465 (1967) (quoting West v. Amer. Tel. and Tel. Co., 311 U.S. 223, 237 (1940)). The court finds the Keating case persuasive here, particularly because Minnesota antitrust law is to be interpreted consistently with federal law. The court finds, moreover, no persuasive datum to the contrary. Accordingly, the complaint must be limited to post-August 1, 1984 purchases.

Defendants also seek to limit the complaint to purchasers within the State of Minnesota, advancing two arguments. First, they argue that the Minnesota antitrust statute applies only to Minnesota purchasers. The statute applies to the following:

a) any contract, combination, or conspiracy when any part thereof was created, formed or entered into in this state; and

(b) any contract, combination or conspiracy. . .whenever any of the foregoing affects the trade or commerce of this state.

Here, subdivision (a) clearly does not apply as all of the defendants are from foreign jurisdictions. Subdivision (b) clearly applies to purchases made by Minnesota municipal entities, but reading this provision to apply to foreign purchases is far more troublesome. In a nationwide market, such [*24] purchases might be seen to "affect the trade or commerce" of Minnesota by affecting the price Minnesota governmental entities pay for chlorine and caustic soda. On the other hand, the statute might be read to require a tighter nexus between the anticompetitive activity and these Minnesota purchases given the explicit purpose of protecting the trade or commerce of Minnesota. The latter interpretation strikes the court as more reasonable.

In any event, interpreting the statute to apply only to purchasers within Minnesota is compelled by defendants' second argument, that application of Minnesota law to a nationwide class is unconstitutional. Under Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965 (1985), the court must conduct a two-

Case: 3:17-cv-50417 Document #: 100-1 Filed: 11/25/18 Page 181 of 160 PageID #:1659
Case: 21-50428 JTD Doc 22-4 Filed 05/21/21 Page 181 of 202

1990 U.S. Dist. LEXIS 18142, *24

step analysis in determining whether to apply state law to a foreign class member. First, the court must determine whether Minnesota law is "in conflict with that of any other jurisdiction connected to this suit." 105 S.Ct. at 2976. Second, if there is a conflict of law, the court must determine whether Minnesota has a "significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class." **[*25]** 105 S.Ct. at 2979. This analysis is required "even in a nationwide class action" which can serve the important goal of providing an efficient resolution or large numbers of claims which might otherwise not be asserted. 105 S.Ct. at 2980. Here, the claims of foreign purchasers against foreign defendants simply have no meaningful contact with Minnesota. The conflicts analysis is thus determinative of the issue's outcome. The court concludes that Minnesota antitrust law is in conflict with other states' antitrust laws. The key is the availability of the private treble damage remedy to indirect purchasers. The following brief discussion, although in no way an exhaustive or detailed discussion of state antitrust laws throughout the nation, provides sufficient illustration of the antitrust conflicts involved several states do not provide antitrust damages actions. Other states do not allow treble damages, and several more require participation by the state attorney general. Most importantly, only fifteen jurisdictions allow indirect purchaser suits, four of them requiring that class actions asserting such claims be brought by the state attorney general. Case law in three states, moreover, **[*26]** does not allow indirect-purchaser recovery. The remaining states are <u>silent</u> on the indirect purchaser issue. St. Paul glibly asserts that this court should interpret these states' laws consistently with Minnesota law. This task would not only lead to the possibility of later inconsistencies; it would require a burdensome attempt to predict such states' laws. These concerns also support a final reason to limit the class to Minnesota purchasers. In applying Minnesota law, the court would have to perform a choice of law analysis for each state under Minnesota's elaborate multiple factor <u>Milkovitsch</u> test. <u>See In re Control Data Corp. Securities Litigation,</u> 116 F.R.D. 216, 223 (D. Minn. 1986). Given the burdensome nature of such a task, "the court does not consider performing a <u>Milkovitsch</u> choice of law analysis as a viable alternative to applying MInnesota law to all claims or allowing the class members to individually control the prosecution of their state claims." <u>Id</u>. (denying certification for foreign fraud claims under Minnesota common law -- despite the satisfaction of constitutional requirements). St. Paul relies on authorities from other jurisdictions which **[*27]** do not

apply Minnesota conflicts law, do not involve analysis of every state's antitrust laws, and involve claims connected to the forum. These authorities provide no guidance in this case. <u>See In re Seagate Technologies Securities Litigation,</u> 115 F.R.D. 264 (N.D. Cal. 1987) (applying California choice of law principles where all fraud claims had a connection to California); <u>Sollenbarger v. Mountain States Tel. and Tel. Co.,</u> 121 F.R.D. 417 (D. N.M. 1988) (analyzing potential conflicts in the contract law of seven states); <u>In re ORFA Securities Litigation,</u> 634 F.Supp. 1449 (D. N.J. 1987) (all pendent fraud claims had connection to the forum); <u>Kleiner v. First Nat'l. Bank of Atlanta,</u> 97 F.R.D. 683 (N.D. Ga. 1983) (analyzing potential conflicts in the contract law of five states). The court, in sum, concludes that this class should be limited to Minnesota governmental entities.

III.


<u>CONCLUSION</u>

Accordingly, IT IS ORDERED that:

1. Defendant's motion for judgment on the pleadings is DENIED;

2. Defendant's motion to dismiss for lack of subject matter jurisdiction is DENIED; and

3. The class is hereby limited to Minnesota governmental entities for purchases made after August **[*28]** 1, 1984.

---

**End of Document**

2009 WL 1543709
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

SUBURBAN BUICK, INC., Plaintiff,

v.

Jerry GARGO, Gail A. Gargo, Nicholas G. Gargo, Daniel J. Gargo Charles N. Owen, individually and as president of Chuck Owen Auto Body, Inc., David C. MOrmon, individually and as President of Dave's Auto Body, Greg S. Melvin, Katherine Pollack, Rosemary Young, Gargo Custom Homes, and Go Service, Defendants.

No. 08 C 0370.
|
May 29, 2009.

**Attorneys and Law Firms**

Brian E. King, Stephen M. Komie, Komie & Associates, Chicago, IL, for Plaintiff.

Clifford Lee Gunter, Attorney at Law, Joliet, IL, Matthew Patrick Connelly, Craig Edward Donnelly, Connelly, Roberts & McGivney, Chicago, IL, Vincent C. Mancini, Terry A. Ekl, EKL Williams PLLC Two Arboretum Lakes, James Stuart Harkness, Momkus, McCluskey, Monroe, Marsh & Spyratos LLC, Lisle, IL, for Defendants. David C. Morman, Sandwich, IL, pro se.

### MEMORANDUM OPINION AND ORDER

ROBERT W. GETTLEMAN, District Judge.

**\*1** Plaintiff Suburban Buick, Inc. has brought a six-count complaint against defendants Jerry D. Gargo ("J.Gargo"); his wife, Gail A. Gargo ("G.Gargo"); their sons, Nicholas G. ("N.Gargo") and Daniel J. Gargo ("D. Gargo" and together with N. Gargo, "the Gargo Sons"); Charles N. Owen ("Owen"); Owen's company, Chuck Owen Auto Body, Inc. ("COAB"); David C. Mormon ("Mormon"); Mormon's company, Dave's Auto Body; Greg S. Melvin ("Melvin"); Katherine Pollack ("Pollack"); Rosemary Young ("Young"); and two companies started by Jerry Gargo, Gargo Custom Homes and GO Service.[1] Plaintiff originally filed a verified complaint on January 17, 2008. On July 30, 2008, plaintiff sought and was granted leave of the court to file a first amended verified complaint. The first amended complaint (the "complaint") was filed on August 29, 2008.

---

[1] The following individuals/entities have been served but have not yet appeared or responded to the complaint: Dave's Auto Body, Gargo Custom Homes & GO Service.

The complaint: alleges violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1964, based on wire fraud (Count I), mail fraud (Count II), and money laundering (Count III); seeks injunctive relief to restrict defendants from disposing or selling certain assets (Count IV); and asserts claims for conversion (Count V) and civil conspiracy (Count VI). All of the counts are based on alleged intentional fraudulent conduct by defendants. The Court's jurisdiction is invoked pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1

Several of the defendants have filed motions to dismiss the first amended verified complaint pursuant to Fed.R.Civ.P. 9(b) for failure to plead allegations of fraud with particularity, and Rule 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons explained below, the motions are granted in part and denied in part.

### RELEVANT FACTS

The complaint alleges that the various defendants conspired to defraud Suburban Buick, a General Motors car dealership located in Wheaton, Illinois, of money and the honest value of its employees' services, with defendant Jerry Gargo serving as the central figure in all branches of the conspiracy. Jerry Gargo was a manager and/or officer of Suburban Buick. Nicholas and Daniel Gargo were unauthorized employees of Suburban Buick, hired by their father, Jerry Gargo. Daniel Gargo was a manager of Suburban Buick. Charles Owen is the owner and principal operator of Chuck Owen Auto Body, Inc., a company that he allegedly used in furtherance of the purported conspiracy. David Mormon owns and operates Dave's Auto Body, another defendant, which was also allegedly used in furtherance of the purported conspiracy. Mormon was previously a Suburban Buick employee. Greg Melvin served as the parts department manager of Suburban Buick. Katherine Pollack was Suburban Buick's office manager and treasurer and Rosemary Young was her assistant. Gargo Custom Homes is an entity through which the owners, Defendants Jerry and his wife, Gail Gargo, allegedly invested funds defrauded from Suburban Buick. GO Services is an entity that was allegedly organized by Jerry Gargo to facilitate the conspiracy.

**\*2** Plaintiff alleges that defendants conspired to engage in a pattern of racketeering activity by operating three kinds of scams through Suburban Buick; the defendant entities, Chuck Owen Auto Body, Dave's Auto Body, GO Services; and a non-party, Auto Service South, with J. Gargo functioning as the central figure in the conspiracy. The alleged scams are: (1) an auto body repair scam, (2) an auto parts scam, and (3) an unauthorized pay and salary scam.

### Auto Body Repair Scam

With respect to the auto body repair scam, plaintiff alleges that defendants J. Gargo and Owen entered into an illegal agreement to defraud Suburban Buick of funds by falsifying work orders. To accomplish this task, J. Gargo and Owen created false work orders for General Motors vehicles still under warranty. The work orders identified vehicles for which repair work was neither necessary nor actually obtained. The "repair work" was outsourced to Owen's company, Chuck Owen Auto Body. Owen would then create a repair order on his company's letterhead and mail the order to Suburban Buick for payment. Ultimately, Owen received payment from Suburban Buick based upon these invoices.[2] Plaintiff alleges that Owen sent a pre-determined amount of money (about fifty percent) from these payments to GO Service, a company owned by J. Gargo. J. Gargo and Owen purportedly met on a monthly basis in furtherance of this scam.

[2]     General Motors ultimately reimbursed Suburban Buick for these expenses, as the identified vehicles were still under warranty.

### Auto Parts Scam

With respect to the auto parts scam, plaintiff alleges that defendants Greg Melvin and J. Gargo converted auto parts acquired with Suburban Buick funds. Specifically, plaintiff alleges that Melvin, J. Gargo, and Owen operated a scheme whereby Owen would purchase auto parts from Suburban Buick through J. Gargo and Melvin at fifty percent of Suburban Buick's cost for the part. In furtherance of the scheme, Owen would telephone J. Gargo with a request for a specific auto part. J. Gargo redirected all such calls to Melvin, who, as parts department manager, would order the requested part using Suburban Buick's funds. Upon receipt of the parts, Melvin removed them from Suburban Buick's inventory and manipulated inventory records to conceal their theft. Melvin, together with J. Gargo, then sold the parts

to Owen and split the proceeds from these sales. Owen then sold the parts, which he knew to be stolen goods, to his customers at full retail price, thus enriching himself. Plaintiff also alleges that Melvin and J. Gargo sold David Mormon, a former Suburban Buick mechanic, transmissions for less than the amount Suburban Buick would usually charge its retail customers. [3]

[3]   General Motors also reimbursed Suburban Buick for the costs of these transmissions upon reliance on Gargo's representations that the transmissions were for vehicles under warranty.

### *Unauthorized Pay and Salary Scam*

Plaintiff alleges that defendants J. Gargo, the Gargo Sons, Greg Melvin, Pollack, and Young conspired to defraud Suburban Buick through an unauthorized pay and salary scheme. Specifically, plaintiff alleges that defendants J. Gargo (as general manager), Pollack (as office manager and treasurer), and Young (as Pollack's assistant) used their authority and positions to provide unauthorized pay increases and other compensation to themselves, the Gargo Sons, and Melvin, without approval of Suburban Buick's board of directors. Jerry Gargo, Pollack, and Young had the authority to act as signatories on Suburban Buick's checks. Under Suburban Buick's policy, all three were signatories on direct deposit payroll checks. The complaint identifies at least ten occasions on which defendants gave and/or received unauthorized compensation from the fall of 2003 through the summer of 2004. Plaintiff also alleges that J. Gargo hired his sons, Daniel and Nicholas, without plaintiff's authorization.

### *DISCUSSION*

**\*3**  Defendants, Greg Melvin, Charles Owen, and COAB have moved to dismiss under Rules 9(b) and 12(b)(6), arguing that the complaint: 1) fails to allege with particularity defendants' misconduct in Counts I (RICO Wire Fraud), II (RICO Mail Fraud), III (RICO Money Laundering), V (Conversion), and VI (Civil Conspiracy); 2) fails to allege with particularity that Suburban Bank is the defrauded and damaged party in Counts I, II, III, V, and VI; 3) fails to satisfy the elements for a RICO claim and, thus, fails to state a claim upon which relief can be granted in Counts I, II, and III; and 4) fails to state a claim for injunctive relief in Count IV. For the reasons discussed below, their motions are granted.

Defendants, J. Gargo, G. Gargo, and the Gargo Sons broadly seek dismissal on Rule 9(b) and 12(b)(6) grounds. G. Gargo and the Gargo Sons note that the complaint fails to allege any wrongdoing on their part with particularity. For the reasons discussed below, the court agrees and these motions are granted.

Defendants Pollack and Young seek 12(b)(6) dismissal of all counts on grounds that the allegations are "unclear," "contradictory and patently false" in comparison to police reports they attach to their motion to dismiss. [4] They also argue that plaintiff fails to allege that they actively participated in or had the requisite knowledge about the alleged fraudulent schemes; they simply performed their duties as Suburban Buick employees. For the reasons discussed below, the court denies Pollack and Young's joint motion to dismiss.

[4]   Plaintiff has neither attached nor referred to these reports in its complaint.

### ANALYSIS

### I. LEGAL STANDARDS

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. *Gibson v. Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). Federal notice pleading requires only that the plaintiff "set out in her complaint

a short and plain statement of the claim that will provide the defendant with fair notice of the claim." *Scott v. City of Chicago,* 195 F.3d 950, 951 (7th Cir.1999). When ruling on a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Szumny v. Am. Gen. Fin., Inc.,* 246 F.3d 1065, 1067 (7th Cir.2001). Further, the court will not consider the documents or other materials beyond those attached to or referred by the complaint itself. *See* Fed.R.Civ.P. 12(d); *see also Scibetta v. Rehtmeyer, Inc.,* No. 04C5246, 2005 WL 331559, at *1–*2 (N.D.Ill. Feb.9, 2005) (considering contracts attached to the plaintiff's complaint, but not exhibits attached to a motion to dismiss) (citing *Wright v. Assoc. Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir.1994)). To survive a Rule 12(b)(6) motion, a plaintiff need not provide detailed factual allegations, but must provide "more than labels and conclusions, and a formulaic recitation of the elements of the cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965.

**\*4** Allegations of fraud are subject to a heightened pleading standard. Fed.R.Civ.P. 9(b). Fraud must be pled with particularity, which means the complaint must allege the "who, what, when, where and how" of the fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). At the motion to dismiss stage, Rule 9(b) requires only that the plaintiff identify the alleged misrepresentations, not actually prove that the statement was false. *See Bankers Trust Co. v. Old Republic Ins., Co.,* 959 F.2d 677, 683 (7th Cir.1992). This standard also applies to allegations of predicate acts of fraud in the RICO context. *See Slaney v. Int'l Amateur Athletic Fed'n,* 244 F.3d 580, 597–99 (7th Cir.2001); *Haroco, Inc. v. Am. Natl. Bank and Trust Co.,* 747 F.2d 384, 405 (7th Cir.1984) (finding that the plaintiff adequately specified the transactions, the false representations, and the identities of those involved). The pleadings must be specific enough to put defendants on notice of the conduct alleged.

In the instant case, the court finds that plaintiff has failed to allege with particularity a grand scheme to defraud Suburban Buick. The complaint identifies six entities as RICO enterprises under 18 U.S.C. § 1961(4), but plaintiff has failed to identify what enterprises were used by which defendants to conduct which predicate acts in violation of the RICO statute. *See Appraisers Coalition v. Appraisal Inst.,* No. 93C913, 1993 WL 326671, at *7 (N.D.Ill. Aug.18, 1993) (noting the importance of linking each identified enterprise with at least one predicate act). Further, plaintiff fails to identify to which defendant(s) each of the six counts applies. In sum, plaintiff's allegations are insufficient to put the defendants on notice of the illegal conduct.

## II. J. GARGO'S MOTION TO DISMISS

Defendant J. Gargo moves to dismiss the complaint on the following four grounds: 1) plaintiff's failure to allege that it was defrauded and damaged by defendants; 2) the complaint's liberal use of "Defendants Gargo" and "Gargo" lacks specificity as to each defendant's conduct and as to the application of each count to each defendant; 3) the lack of specificity concerning each defendant's management of an enterprise; and 4) plaintiff's Count IV, for an injunction, is an improper means of seeking injunctive relief. The court agrees that plaintiff's allegations are insufficient.

The court agrees that the complaint lacks the specificity required under Fed.R.Civ.P. 9(b) for RICO violations and other fraud claims. "[I]n a case involving multiple defendants ... 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.' " *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 778 (7th Cir.1994) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)). The complaint should not lump multiple defendants together, but should "inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant." *Id.* at 778 (quoting *Balabanos v. North Am. Inv. Group, Ltd.,* 708 F.Supp. 1488, 1493 (N.D.Ill.1988)). As defendant J. Gargo duly notes, the amended complaint is replete with references to "Defendants Gargo" and "Gargo" when discussing the conduct of, and counts alleged against, each of the four Gargo defendants. The amended complaint also contains many broad references to "Defendants". This style of pleading is wholly inadequate to put defendants on notice of the conduct alleged.

**\*5** The complaint is also deficient because plaintiff fails to identify which defendants were managing the affairs of which enterprise. The complaint exhibits a kitchen-sink style of pleading, which has resulted in a very confusing, imprecise, and muddied set of allegations and counts against defendants. The complaint identifies six entities that qualify as enterprises under 18 U.S.C. § 1961(4). The plaintiff also refers to an "Enterprise" with a capital "E" as in, "The Defendants ... infiltrated the enterprise and conspired to use the Enterprise to facilitate the conspiracy[.]" This use of "Enterprise" suggests the existence of another sort of enterprise, in addition to the six identified. Perhaps plaintiff has attempted to allege an association-in-fact enterprise, consisting of the various defendants. However, plaintiff has fallen far short of pleading an association-in-fact enterprise.

This lack of clarity is fatal to plaintiff's claims. RICO claims under 18 U.S.C.1962(c) require a showing that each defendant directly or indirectly conducted or participated in an enterprise's affairs through a pattern of racketeering activity. The complaint fails to allege specifically which enterprise's affairs each defendant conducted through a pattern of racketeering activity. The complaint strongly suggests that Suburban Buick is one such enterprise, but the complaint is vague as to whether the allegations apply to the conduct of any other identified enterprise and/or an association-in-fact enterprise.

Further, under 18 U.S.C.1961(1), racketeering activity includes the predicate acts of wire fraud, mail fraud, and money laundering. Plaintiff has alleged three separate counts against the "Defendants" for each of these predicate acts, but entirely fails to identify which defendant is being accused of engaging in any of these predicate acts.

Finally, the court agrees that plaintiff's attempt to seek injunctive relief at this stage is improper. The complaint, on its face, is unclear as to whether plaintiff is seeking pre-judgment or post-judgment injunctive relief. To the extent that the complaint is seeking pre-judgment relief, the court refers the parties to its March 27, 2008, Order in which it denied plaintiff's motion for a preliminary injunction (Dkt.76). To the extent that plaintiff is seeking post-judgment relief, it is premature. Plaintiff has brought its claim for injunctive relief under 18 U.S.C. § 1964, which specifies remedies available for RICO violations. The court has jurisdiction "to prevent and restrain [RICO] violations" under section 1964(a). Pursuant to the Seventh Circuit's holding in *Nat'l Org. of Women, Inc. v. Scheidler,* plaintiff has statutory authority under 1964(c) to seek injunctive relief in a private action for RICO violations. 267 F.3d 687, 695–700 (7th Cir.2001), *aff'g* 897 F.Supp. 1047, 1083 (N.D.Ill.1995), *rev'd on other grounds,* 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003). If plaintiff is able to state an actionable RICO claim, plaintiff has the right under 1964(c) to seek injunctive, as well as monetary, relief. Thus, the issue may remain alive, and the court can revisit this if and when injunctive relief is sought upon the court's determination of liability. The request for equitable relief should be included in plaintiff's prayer for relief rather than in a separate count.

**\*6** For the foregoing reasons, the court grants J. Gargo's motion to dismiss as to all counts.

### III. G. GARGO'S AND THE GARGO SONS' MOTIONS TO DISMISS

Defendants, G. Gargo and the Gargo Sons, move to dismiss plaintiff's complaint on Rule 9(b) and 12(b) grounds. They contend that plaintiff fails to lodge specific allegations of wrongdoing. The court agrees.

Section 1962(c) makes it unlawful for "any person employed by or associated with [an] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of [an] unlawful debt." 18 U.S.C. § 1962(c). Section 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Consequently, a plaintiff must show that the defendants conducted the affairs of some legal entity or group of individuals *through* a pattern of racketeering (i.e., criminal) activity. [5]

5

Several of the defendants incorrectly argue that plaintiff fails to allege how they directed or controlled the affairs of a "criminal enterprise." A plaintiff need not show that the defendants conducted the affairs of a "criminal enterprise."

Plaintiff has failed to allege adequately that G. Gargo or the Gargo Sons conducted the affairs of any of the identified enterprises through a pattern of racketeering activity. Plaintiff has done nothing more than allege that G. Gargo is a co-owner of Gargo Custom Homes and the wife of the alleged mastermind, J. Gargo. Plaintiff has simply alleged that the Gargo Sons were hired by their father without Suburban Buick's authorization, they received unauthorized compensation, and D. Gargo served as a manager of Suburban Buick. Plaintiff has not alleged that any of these defendants had knowledge of the alleged scheme or did anything in furtherance of the schemes. Because racketeering activity under RICO involves predicate acts of fraud, plaintiff must allege that the predicate acts were committed willfully or with actual knowledge of the illegal activity. *See Emery v. Am. Gen. Fin., Inc.,* 71 F.3d 1343, 1346–1348 (7th Cir.1995) (discussing intent requirement for mail and wire fraud claim); *Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994) (upholding complaint's dismissal where plaintiff failed to allege sufficient facts for inference of fraudulent intent). Plaintiff has alleged neither willfulness nor knowledge. While the court may draw reasonable inferences from the facts alleged in the plaintiff's favor, any inferences as to these defendants' conduct would go well beyond the four corners of the complaint.

For the foregoing reasons, the court grants G. Gargo's and the Gargo Sons' motions to dismiss.

## IV. POLLACK AND YOUNG'S JOINT MOTION TO DISMISS

Defendants Pollack and Young move to dismiss plaintiff's complaint in light of, 1) contradictory information contained in police reports [6] attached to their motion, and 2) because they acted at the direction of others. Neither of these arguments is applicable to the pending motions to dismiss, but would resonate if this court were considering motions for summary judgment.

6

The referenced police reports suggest that Pollack and Young discovered, investigated, and reported the alleged auto body repair scheme.

**\*7** First, when reviewing motions to dismiss, the court is constrained to the four corners of the complaint. The police reports were neither attached to nor referenced in or central to plaintiff's amended complaint. Because this is a motion to dismiss and not a motion for summary judgment, the court will not consider the documents or other materials beyond those attached to the complaint itself. *See Scibetta v. Rehtmeyer,* No. 04C5246, 2005 U.S. Dist. LEXIS 5563, at \*4–\*5 (N.D.Ill. Feb. 9, 2005) (citing *Wright v. Assoc. Ins. Companies,* 29 F.3d 1244, 1248 (7th Cir.1994) (internal citations omitted); *compare Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (affirming consideration of contracts attached to motion, as the parties' contractual obligations were central to the complaint).

Second, Pollack and Young assert that they neither facilitated nor were responsible for any of the alleged unauthorized pay increases, much less "actively participated in, knew about or conspired with the other Defendants," because they acted at the direction of others. This argument is also not suited for the motion to dismiss context and is better suited for summary judgment, where the court's scrutiny extends beyond the complaint to other evidence in the record.

For the foregoing reasons, Pollack and Young's joint motion to dismiss is denied, although the claims against them are dismissed along with the claims against the other defendants.

## V. MELVIN AND OWEN'S MOTIONS TO DISMISS

### A. RICO Claims (COUNTS I, II, and III)

Defendants Melvin and Owen seek dismissal of plaintiff's RICO claims on the grounds that, 1) plaintiff has failed to plead with particularity the nature of their alleged fraudulent conduct in the "alleged criminal enterprise," [7] and 2) plaintiff

has failed to state a claim upon which relief can be granted, especially because plaintiff has failed to "establish" that it is the defrauded and damaged party. The court agrees that plaintiff's RICO claims should be dismissed for failure to plead with particularity, but disagrees that plaintiff bears the burden of "establishing" anything at the pleading stage.

7   As already explained, RICO violations do not arise from the operation of a "criminal enterprise," but from the operation of an enterprise for criminal purposes.

### 1. 18 U.S.C. § 1962

As the court has already noted, the complaint lacks particularity in a myriad of ways. Most significantly, the amended complaint lacks a clear identification of the specific section of the RICO statute at issue. As plaintiff duly notes in its amended complaint, 18 U.S.C. § 1964 provides a private right of action for injuries incurred as a result of violations of section 1962. Subsection (a) of § 1962 proscribes the investment of income, derived from a pattern of racketeering activity, in or for the establishment or operation of an enterprise that affects interstate or foreign commerce. Subsection (b) proscribes persons from acquiring or maintaining control of an enterprise that affects interstate or foreign commerce through a pattern of racketeering activity. Subsection (c) proscribes persons employed by or associated with an enterprise that affects interstate or foreign commerce from conducting or participating in the conduct of the enterprise's affairs through a pattern of racketeering activity. Subsection (d) proscribes conspiracies to violate any of the aforementioned provisions.

**\*8** Plaintiff fails to identify with clarity which subsection has been violated. Each of the RICO counts contains a reference to section 1962(a)'s prohibition of the use or investment of income derived from a pattern of racketeering activity. However, at no point has plaintiff alleged any injuries resulting from defendants' investment of income derived from racketeering activity. An allegation of injuries resulting from such investments is a necessary component of a section 1962(a) claim. See *R.E. Davis Chem. Corp. v. Nalco Chem. Co.,* 757 F.Supp. 1499, 1524–1525 (N.D.Ill.1990).

To further complicate matters, earlier in the amended complaint plaintiff alleges that a number of defendants "infiltrated the enterprise and conspired to use the Enterprise to facilitate the conspiracy and conduct unlawful acts." This suggests that the action is premised on a violation of 1962(c). However, without more specificity neither the court nor the defendants can be sure. Melvin and Owen appear to construe the action as one premised on a subsection 1962(c) violation and seek dismissal based, in part, on plaintiff's failure to allege with specificity that they conducted the affairs of the enterprise.

To state a claim under section 1962(c), plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Jennings v. Auto Meter Prods. Inc.,* 495 F.3d 466, 472 (7th Cir.2007) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985)). Each of these elements must be pled with particularity. *Rolls–Royce Corp. v. Alcor Engine Co.,* No. 1:04–CV–0968, 2007 WL 1021450, at \*5 (S.D.Ind. Mar.29, 2007) (dismissal of RICO claims for, in part, failure to allege one of the elements with particularity). A plaintiff must allege that defendants have engaged in at least two of the predicate acts enumerated in 18 U.S.C. § 1961(1) within a ten-year period. Plaintiff alleges that defendants committed various predicate acts of wire fraud, mail fraud, and money laundering. Melvin and Owen contend that plaintiff has failed to plead the particularities of the predicate acts.

### 2. Conduct

Melvin and Owen argue that plaintiff fails to allege that they controlled the operations of the enterprise. The court agrees.

To " 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (referring to 18 U.S.C. § 1962(c)). "In other words, [the defendant] must have participated in the operation or management of the enterprise itself." *United States v. Swan,* 250 F.3d 495, 498 (7th Cir.2000); *see also Reves,* 507 U.S. at 185. While adopting this

"operation or management test," the *Reves* court noted that "an enterprise is 'operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." *Reves* at 184; *see also MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 62 F.3d 967, 979 (7th Cir.1995) (reversing dismissal of section 1962(c) claim against lower-rung employees).

**\*9** As previously noted, plaintiff has identified several entities as enterprises under 18 U.S.C.1961(4), including Suburban Buick and COAB. Plaintiff has alleged several facts that Melvin conducted the affairs of the Suburban Buick enterprise. As Suburban Buick's parts department manager, Melvin had the ability and authority to maintain Suburban Buick's auto parts inventory, including ordering auto parts for Suburban Buick's vehicles and managing inventory records. Basic logic dictates that the parts department plays an important role in the affairs of a car dealership such as Suburban Buick.

With respect to Owen, plaintiff has adequately alleged that Owen conducted the affairs of the COAB enterprise. Owen is the owner of COAB. He has the ability to prepare and submit work orders for repair work on under-warranty vehicles sold by Suburban Buick, to funnel payments to other vendors for work purportedly done on vehicles, and to order auto parts to complete repair work.

However, the amended complaint is unclear as to whether Melvin and/or Owen also conducted the affairs of other identified enterprises, such as Go Service ("GO Service is an enterprise created by Defendants to defraud Suburban Buick of monies"), Auto Service South ("Auto Service South is an enterprise created by Defendants to defraud Suburban Buick of monies"), or the undefined "Enterprise." This confusion is heightened in the parties' briefs, where Melvin and Owen refer to another enterprise, an "alleged *criminal* enterprise." Plaintiff's response brief fails to refute the existence of this other enterprise.

### 3. Particularities of the Predicate Acts

A RICO complaint "must go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communication perpetrating the fraud." *United States Textiles, Inc. v. Anheuser–Busch Cos.,* 911 F.2d 1261, 1268 n. 6 (7th Cir.1990) (quoting *New England Data Servs., Inc. v. Becher,* 829 F.2d 286, 291 (1st Cir.1987). The pleadings must go beyond "loose references to mailings and telephone calls." *R.E. Davis Chem. Corp. v. Nalco Chem. Co.,* 757 F.Supp. 1499, 1516 (N.D.Ill.1990). "Pattern" under RICO "consists of at least two predicate acts of racketeering committed within a ten-year period." *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 779 (7th Cir.1994) (citing 18 U.S.C. § 1961(5)). However, a plaintiff must allege more than just the occurrence of two predicate acts. A plaintiff "must show that the predicate acts are related, and that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Seventh Circuit has set forth a multi-factor test for determining the relationship and continuity [8] of the predicate acts: 1) the number and variety of predicate acts, 2) length of time over which the predicate acts were committed, 3) the number of victims, 4) the presence of separate schemes, and 5) the occurrence of distinct injuries. *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975–76 (7th Cir.1986). Length of time is the most-important, but not all-determinative, factor. *See Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1024 (7th Cir.1992); *see also Vicom,* 20 F.3d at 780.

[8] The Supreme Court identified the existence of two types of continuity: a) closed, namely a "closed period of repeated conduct" or b) open-ended, namely "past conduct that by its nature projects into the future with a threat of repetition". *H. J., Inc.,* 492 U.S. at 241. GO Service.

**\*10** In the instant case, Melvin and Owen assert that plaintiff has also failed to set forth the details of the predicate acts. The court agrees. For example, although plaintiff has alleged three schemes (auto body repair scam, auto parts scam, and unauthorized pay and salary scam), plaintiff has failed to identify sufficiently the mail and wire transmissions that furthered the scams. In its claim for wire fraud (Count I), plaintiff asserts that "between November 1996 through April, 2005, Defendants, in whole or in part, committed *numerous* separate acts [of wire fraud]". (emphasis added).

Plaintiff then identifies *only two* specific instances on which "[d]efendants" submitted allegedly fraudulent repair orders, in an attempt to demonstrate that at least two acts of racketeering activity occurred within ten years of one another. Plaintiff's allegations are similarly broad in its claim for mail fraud (Count II). Plaintiff fails to identify the frequency or number of transmissions, the dates of the transmissions, or even which defendants conducted the alleged predicate acts. Consequently, plaintiff has failed to allege sufficiently a pattern of racketeering activity.

### 4. Defrauded or Damaged Party

Defendants Melvin and Owen assert that plaintiff's RICO claims should be dismissed because plaintiff has failed to "establish" that it was defrauded and damaged. To survive a motion to dismiss, a plaintiff need not "establish" anything; a plaintiff must only allege. A RICO plaintiff alleging predicate acts of fraud need not show that it relied on defendants' alleged misrepresentations. *See Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, ——, ——, 128 S.Ct. 2131, 2139, 2145, 170 L.Ed.2d 1012 (2008), *aff'g* 477 F.3d 928 (7th Cir.2007). A plaintiff need allege only that the defendants' scheme was a proximate cause of its injuries. *Holmes v. Secs. Investor Protection Corp.,* 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *see also Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006). In the instant case, plaintiff has alleged that it suffered damages resulting from defendants' conduct. As examples, plaintiff has alleged deprivation of its right to receive the honest services of its employees, loss of property, and loss of funds. These allegations of damages are sufficient. At the pleading stage, injuries (including those resulting from fraudulent conduct), need not be identified with particularity. *Recreation Servs. v. Odyssey Fun World,* 952 F.Supp. 594, 597 (N.D.Ill.1997).

In sum, although plaintiff has pled damages sufficiently, it has failed to state substantive claims for RICO violations of wire fraud (Count I), mail fraud (Count II), or money laundering (Count III). Melvin and Owen's motions to dismiss are granted.

### B. Conversion (Count V)

To state a claim for conversion, plaintiff must allege: 1) an unauthorized and wrongful assumption of control, dominion or ownership by defendant over plaintiff's personalty; 2) plaintiff's right to the property; 3) plaintiff's right to immediate possession of the property, absolutely and unconditionally; and 4) a demand for possession of the property. *Fonda v. Gen. Casualty Co. of Ill.,* 279 Ill.App.3d 894, 899, 216 Ill.Dec. 379, 665 N.E.2d 439 (1st Dist.1996). Because the claim alleges a conversion of money, the money must be capable of being described as a specific chattel, meaning plaintiff must have a right to "a specific fund or specific money in coin or bills." *Mid–America Fire and Marine Ins. Co. v. Middleton,* 127 Ill.App.3d 887, 892, 82 Ill.Dec. 555, 468 N.E.2d 1335 (4th Dist.1984). The money does not have to be "specifically earmarked" for plaintiff, and need not always be a segregated fund, but the converted funds must be "capable of being described, identified or segregated in a specific manner." *Indep. Trust Corp. v. Fidelity Nat'l Title Ins. Co. of New York,* No. 05C5749, 2007 WL 1017858 at *24 (N.D.Ill. Mar.30, 2007) (and cases cited therein).

***11** In count V, plaintiff claims that defendants converted in excess of $250,000.00 of plaintiff's property, including funds, for their personal use and gain. The complaint contains various allegations of how defendants converted plaintiff's property, including auto parts from plaintiff's inventory and funds in an alleged payroll scam. Defendants, Melvin and Owen seek dismissal of this count because of its purported failure to state a claim for conversion under Rule 12(b)(6). In sum, defendants argue that plaintiff lodges "undefined" allegations as to plaintiff's right to the converted property and fails to allege that it demanded the property's return. The court agrees this count should be dismissed.

In the instant case, plaintiff alleges that defendants converted certain funds belonging to plaintiff in an unauthorized pay and salary scam and deposited these fraudulently obtained funds into various bank accounts. Plaintiff also alleges that some of the defendants attempted to conceal the converted funds by investing in real estate, businesses, or paying off personal expenses. Some of the defendants also converted auto parts from plaintiff's inventory and profited from the sales of the stolen goods.

Plaintiff's claim is dismissed for indefiniteness because it is premised, at least in part, on the conversion of funds taken directly from plaintiff's coffers (as in the salary scam) or by indirect means (through the sale of stolen auto parts). Plaintiff cannot identify which specific funds went to which defendant or even if any of those funds are still in defendants' possession, especially given defendants' purported attempts to conceal the nature of the funds. In short, plaintiff alleges a general debt owed by defendants to plaintiff, which is insufficient to state a claim for conversion of money. *See TABFG, LLC v. Richard Pfeil,* No. 08 C 6979, 2009 WL 1209019 (N.D.Ill. May 1, 2009).

#### C. Civil Conspiracy (Count VI)

To state a claim for civil conspiracy, a plaintiff must allege: (1) an agreement between at least two people for the purpose of accomplishing some unlawful purpose or some lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement. *Faith Freight Forwarding Corp. v. Ruiz,* No. 95C7560, 1997 WL 159207, at *5 (N.D.Ill. March, 24, 1997). Additionally, a plaintiff must allege not only an agreement, but some factual allegation suggesting a "meeting of the minds." *Kunik v. Racine County, Wis.,* 946 F.2d 1574, 1580 (7th Cir.1991). "[A] conspiracy claim sounding in fraud must be pled with particularity." *Platinumtel Communs., LLC v. Zefcom, LLC,* No. 08–CV1062, 2008 WL 5423606, at *8–*9 (N.D.Ill.Dec.30, 2008). Failure to allege sufficiently the underlying fraud claim will result in dismissal of the conspiracy claim. *Id.; see also Cumis Ins. Soc'y v. Peters,* 983 F.Supp. 787, 794 (N.D.Ill.1997). Defendants Melvin and Owen argue that Count VI is deficient because plaintiff fails to set forth the elements of civil conspiracy with the required specificity under Fed.R.Civ.P. 9(b). The court agrees.

**\*12** In the instant case, plaintiff alleges that "[d]efendants agreed on multiple levels and in multiple conspiracies to defraud Suburban Buick." Later, plaintiff alleges that "multiple overt acts were committed by all members of the conspiracy in furtherance of the common scheme to defraud Suburban Buick." Plaintiff has failed to allege any specific agreement or any facts that suggest a "meeting of the minds" among all the defendants. Plaintiff has identified three different schemes and at least six different entities. According to plaintiff's description, not every defendant was involved in each scheme and not every defendant was operating within each identified entity. This renders each defendant's knowledge of, much less agreement to participate in, every scheme unlikely.

Plaintiff's style of pleading leaves the reader wholly confused as to the number of conspiracies plaintiff has alleged. Further, as previously discussed, plaintiff has not pled its underlying fraud claims with particularity. Accordingly, Melvin's and Owen's motions to dismiss plaintiff's civil conspiracy claim are granted.

#### CONCLUSION

For the reasons stated above, plaintiff's first amended complaint is dismissed. This matter is set for status on June 11, 2009 at 9:00 a.m., at which time plaintiff may request leave to file a second amended complaint.

#### All Citations

Not Reported in F.Supp.2d, 2009 WL 1543709

---

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:17-cv-50428-JTD    Doc 22-4    Filed 05/21/21    Page 192 of 202
Case 21-50428-JTD    Doc 1-4    Filed 01/22/18    Page 190 of 260    PageID #:1670
Sullivan v. All Web Leads, Inc., Slip Copy (2017)

2017 WL 2378079

2017 WL 2378079
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

William SULLIVAN, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

ALL WEB LEADS, INC., a Delaware Corporation, Defendant.

Case No. 17 C 1307
|
Signed 06/01/2017

**Attorneys and Law Firms**

Gary Michael Klinger, Ryan F. Sullivan, Kozonis & Associates Ltd., Chicago, IL, for Plaintiff.

Jeffrey H. Bunn, Latimer LeVay Fyock, Chicago, IL, for Defendant.


<u>**MEMORANDUM OPINION AND ORDER**</u>

Harry D. Leinenweber, Judge

**\*1** Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Strike the Proposed Class [ECF Nos. 7, 12]. For the reasons stated herein, the Motion is denied.


## I. FACTUAL BACKGROUND

Plaintiff William Sullivan ("Sullivan") filed this lawsuit under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (the "TCPA"), to address allegedly deceptive marketing practices of Defendant All Web Leads, Inc. ("All Web"). The following facts are drawn from Sullivan's Complaint and are, for purposes of this Motion, accepted as true, with all inferences drawn in his favor. *See, e.g., Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2015).

All Web offers services to insurance industry customers, typically insurance agents, by generating "leads." Specifically, All Web places calls to potential purchasers of insurance coverage and then transfers those calls to its customers. (Compl. ¶ 16.) To identify "leads," All Web owns and operates various websites claiming to offer insurance quotes. (*Id.* ¶ 18.) Upon visiting one of these websites, a consumer is directed to fill out a quote request form specific to the type of insurance of interest. (*Ibid.*) Sullivan was one such consumer. On January 13, 2017, he visited *www.affordable-health-insurance-plans.org* to obtain quotes on health insurance plans that would comply with the Patient Protection and Affordable Care Act, 52 U.S.C. § 18001 *et seq.* ("Obamacare"). (*Id.* ¶¶ 31, 37-38.) When prompted (see figure below), Sullivan entered his zip code and clicked "Start Now."



(Compl. ¶¶ 19, 32.) Once directed to the next page, Sullivan filled out the form (reproduced below) by entering personal information, including a "Day phone" number, and then clicked the "Submit" button.



(*Id.* ¶ 20.) Because it appeared in small print at the bottom of the page, Sullivan did not see All Web's consent language before he clicked "Submit":

By clicking 'Submit' I provide my signature, expressly authorizing up to eight insurance companies or their agents or partner companies, including GoHealth, to contact me at the number and address provided with insurance quotes or to obtain additional information for such purpose, via live, prerecorded or autodialed calls, text messages or email. I understand that my signature is not a condition of purchasing any property, goods or services and that I may revoke my consent at any time.

(*Id.* ¶ 23.) He therefore had no reason to suspect that he was agreeing to be contacted via autodialed calls. (*Id.* ¶ 26.) Soon after completing the quote form, Sullivan received an autodialed call from a representative at All Web. (Compl. ¶ 34.) Upon answering, Sullivan heard "an immediate pause on the other end, followed by a distinct 'clicking' noise before the connection with the representative was made." (*Id.* ¶ 35.) The representative asked Sullivan a series of questions, confirmed that he was seeking information about health insurance, and then transferred him to a health insurance agent. (*Id.* ¶ 36.) Sullivan informed the agent that he was seeking a health insurance plan that would comply with the Obamacare individual mandate; yet the agent attempted to persuade Sullivan "to enroll in a limited benefit non-major medical plan, and suggested that it was a better option than an 'Obamacare-compliant' plan." (*Id.* ¶ 38.) When it became clear that the agent was not offering the opportunity to review and compare "Obamacare-compliant" health insurance quotes, Sullivan ended the call. (*Ibid.*) He continued to receive additional similar phone calls over the next several days. (*Id.* ¶ 40.)

**\*2** Sullivan filed this lawsuit seeking injunctive relief and money damages on behalf of himself and a nationwide class of individuals who utilized the same website, clicked "Submit" on the associated quote form, and then received autodialed calls. (Compl. ¶ 42.)

## II. THE TELEPHONE CONSUMER PROTECTION ACT

The TCPA makes it unlawful for any "person within the United States" to, *inter alia*, "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or ... artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(A)(iii). (The exception to this prohibition—calls "made solely to collect a debt owed to or guaranteed by the United States"—is a non-issue here.) The TCPA authorizes the Federal Communications Commission (the "FCC") to promulgate regulations implementing the statute's requirements. 47 U.S.C. § 227(b)(2); *see also, Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 370 (2012) ("The Act ... directs the Federal Communications Commission (FCC or Commission) to prescribe implementing regulations."); *accord, Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682, 687 (7th Cir. 2013).

Under the express language of the TCPA, an automated call may be lawfully made to a cell phone in certain circumstances, only one of which is relevant to this case. Specifically, a call is not unlawful if it is made "with the prior express consent of the called party." 47 U.S.C. § 227(b)(A)(iii). The FCC recognizes that the statute itself is mute on what form of express consent—oral, written, or some other kind—suffices "for calls that use an automatic telephone dialing system or prerecorded voice to deliver a telemarketing message." *In the Matter of Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1838 ¶ 21 (Feb. 15, 2012) (hereinafter, the "2012 Order").

At one time, FCC implementing regulations required only "prior express consent" for automated calls to cell phones, meaning that a person had only to "knowingly release their phone number [to the caller] ... absent instructions to the contrary." 2012 Order at 1833 ¶ 7 n.20 (citation omitted). In 2012, however, the FCC announced a new rule to take effect on October 16, 2013, that modified the consent requirements for automated telemarketing calls under the TCPA. *See,* 2012 Order at 1831 ¶ 1; 47 C.F.R. § 64.1200. The new rule for automated telemarketing calls to cell phones requires the "prior express written consent of the called party." 47 C.F.R. § 64.1200(a)(2). The FCC defines "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). Prior express written consent means:

> an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or marketing messages to be delivered.

**\*3** 47 C.F.R. § 64.1200(f)(8). To be effective, such consent also must satisfy further requirements:

(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that: (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property goods, or services.

(ii) The term "signature" shall include an electronic or digital form signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

*Ibid.* In tandem with elevating these consent requirements, the FCC also promulgated certain exceptions. As relevant, it created an exemption from the prior express written consent requirement for health care messages made to cellular lines. That exception states that no person or entity may:

> (2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, *other than ... a call that delivers a "health care" message made by, or on behalf of a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103*[.]

47 C.F.R. § 64.1200(a)(2)(emphasis added). Despite some ambiguity in the wording of this "health care rule" (the parties' shorthand), the FCC has clarified that such calls are exempted only from the *written* consent requirement. *See, Consumer & Governmental Aff. Bureau Seeks Comment on Petition for Expedited Declaratory Ruling & Exemption from Am. Ass'n of Healthcare Admin. Mgmt.,* 29 F.C.C. Rcd. 15267, 15267 n.7 (Dec. 17, 2014); *cf. Jackson v. Safeway, Inc.,* No. 15 C 4419, 2016 WL 5907917, at *7 n.10 (N.D. Cal. Oct. 11, 2016) ("[B]oth parties assume that there is a 'prior express consent' requirement for such 'health care' calls.").

The "health care rule" speaks in HIPAA-defined terms and, as with most administrative alphabet soup, requires further explication. Under the Health Insurance Portability and Accountability Act ("HIPAA"), "health care" is defined as "care, services, or supplies related to the health of an individual," including, but not limited to, "(1) [p]reventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body; and (2) [s]ale or dispensing of a drug, device, equipment, or other item in accordance with a prescription." 45 C.F.R. § 160.103.

Last to mention is this lawsuit's bedrock. Section 227 of the TCPA "authorizes private litigation"; aggrieved parties need not depend on the FCC. *Holtzman,* 728 F.3d at 688; *accord, Mims,* 565 U.S. at 370. In general, a district court presiding over such litigation gives controlling weight to final decisions of the FCC implementing and interpreting the TCPA. *See, e.g., CE Design, Ltd. v. Prism Bus. Media, Inc.,* 606 F.3d 443, 449-50 (7th Cir. 2010) (noting that "Congress vested the power of agency review of final FCC orders exclusively in the courts of appeals"); *Jamison v. First Credit Servs., Inc.,* 290 F.R.D. 92, 97 (N.D. Ill. 2013) (stating in a TCPA case that the court is "bound by the FCC's orders, which are final and controlling").

## III. ANALYSIS

**\*4**  All Web seeks to dismiss Sullivan's Complaint under FED. R. CIV. P. 12(b)(6) for failure to state a claim on which relief can be granted. In the alternative, All Web moves to strike the class allegations in the Complaint for failure to satisfy the strictures of FED. R. CIV. P. 23.

### A. Motion to Dismiss

Based on a mélange of arguments, All Web moves to dismiss. The gravamen of its Motion is that Sullivan has pled himself out of court because the Complaint establishes his prior express consent or, alternatively, his prior express *written* consent to receive the call(s). Sullivan responds that All Web's Motion is bankrupt because its website, as alleged, does not procure valid express written consent.

### 1. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must state a claim that is plausible on its face." *Adams,* 742 F.3d at 728 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim enjoys "facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Adams,* 742 F.3d at 728 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A plaintiff must allege that all elements of his claim are satisfied, but cannot survive a Rule 12(b)(6) motion to dismiss by alleging only legal conclusions. *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1147 (7th Cir. 2010). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

To state a claim under the TCPA, Sullivan must allege that: (1) a call was made (2) using an automatic telephone dialing system or artificial or prerecorded voice; (3) the number called was assigned to cellular telephone service; and (4) the party making the call lacked the requisite consent. *See, e.g., Thrasher-Lyon v. Illinois Farmers Ins. Co.,* 861 F.Supp.2d 898, 904-05 (N.D. Ill. 2012).

### 2. Discussion

At the outset, Sullivan objects to treating the issue of consent at the pleading stage. (*See,* ECF No. 10 ("Pl.'s Response") at 6-7.) The prevailing view in this district is that "prior express consent" under the TCPA "is an affirmative defense on which the defendant bears the burden of proof; it is not a required element of the plaintiff's claim." *Kolinek v. Walgreen Co.,* No. 13 C 4806, 2014 WL 518174, at *2 (N.D. Ill. Feb. 10, 2014) (collecting cases). Because complaints need not anticipate and defeat affirmative defenses, dismissal is typically only appropriate if the affirmative defense "is set out entirely in the plaintiff's complaint." *Ibid.* For this reason, courts reject a TCPA defendant's attempt on a Rule 12(b)(6) motion to argue consent contrary to express allegations in a complaint or attack a complaint for not pleading lack of consent. *See, e.g., Charvat v. Allstate Corp.,* 29 F.Supp.3d 1147, 1149 (N.D. Ill. 2014); *Thrasher-Lyon,* 861 F.Supp.2d at 905; *Greene v. DirecTV, Inc.,* No. 10 C 117, 2010 WL 1506730, at *2 (N.D. Ill. Apr. 14, 2010). In more garden-variety circumstances, the Court would end the inquiry without engaging in a detailed consent analysis, because it is clear enough that Sullivan has alleged sufficient facts to alert All Web of the substance of his TCPA claim. *See, e.g., Bakov v. Consolidated Travel Holdings Grp., Inc.,* No. 15 C 2980, 2016 WL 4146471, at *3 (N.D. Ill. Aug. 4, 2016) (Leinenweber, J.) (finding that the plaintiffs sufficiently alleged that "they received unsolicited phone calls on their cell phones that were prerecorded," which "is all that is necessary" for a TCPA claim).

**\*5** However, All Web's Motion is at least formally premised on the allegations of (illegitimate) consent contained within the four corners of the Complaint. All Web does not attack the Complaint for failure to plead lack of consent. Nor does it speculate contrary to the facts of the Complaint, instead arguing only their legal significance. *See, e.g., U.S. v. Lewis,* 411 F.3d 838, 842 (7th Cir. 2005) ("The exception occurs where, as here, the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense...."). Alas, because the argument here is that Plaintiff's own consent allegations plead him out of court, the Court excavates the consent issue before denying All Web's Motion.

#### a. The Calls at Issue Fall outside the "Health Care" Rule

If the "health care rule" applies in this case, then All Web needed only Sullivan's prior express consent to autodial his cell phone. To qualify for the less demanding consent requirements of the "health care rule," an automated call must deliver a "health care message." All Web contends that the autodialed calls at issue qualify as "health care messages" because Sullivan was seeking "more affordable health insurance" and the calls were part of securing "supplies related to the health of an individual." (ECF No. 12 ("Def.'s Mot.") at 10.)

Sullivan v. All Web Leads, Inc., Slip Copy (2017)
2017 WL 2378079

Case: 3:17-cv-50428-JTD   Doc #: 22-4   Filed: 05/21/21   Page 198 of 202
Case: 1:17-cv-04229   Document #: 1   Filed: 01/25/18   Page 198 of 200 PageID #:1676

Although it abjures comprehensively defining "health care message," the FCC describes such calls as those placed by or on behalf of "the consumer's health care provider to the consumer ... concern[ing] the consumer's health." 2012 Order at 1855 ¶ 63. Archetypical messages include "immunization reminders," *ibid.*, "prescription notifications," *In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991,* 30 F.C.C. Rcd. 7961, 8031 ¶ 146 (July 18, 2015) (hereinafter the "2015 Order"), and flu shot notices. *See, e.g., Zani v. Rite Aid Headquarters Corp.,* No. 14 C 9701, 2017 WL 1383969, at *9-12 (S.D.N.Y. Mar. 30, 2017); *Jackson v. Safeway, Inc.,* No. 15 C 4419, 2016 WL 5907917, at *8-9 (N.D. Cal. Oct. 11, 2016). Guidance from the FCC and the limited case law on point establish the relevance of three factors to whether a call conveys a "health care message":

First, if such a call concerns a product or service that is inarguably health-related, ... it likely conveys a health care message. Such category would include the administration of medication "prescribed by a doctor or other healthcare provider," *but would not include any product simply because it may be construed to benefit a consumer's health.* Second, if such a call is made by or on behalf of a health care provider to a patient with whom she has an established health care treatment relationship, that too is material to application of the rule. Finally, if the call concerns the individual health care needs of the patient recipient, that too is material. The operative question as to this last factor would be whether a nexus exists between the subject matter of the call and the established health care needs of its recipient.

*Zani,* 2017 WL 1383969, at *11 (emphasis added) (internal citations omitted).

Applying these factors to this case leads inescapably to the conclusion that All Web's lead-generating calls are not "health care messages." First, such calls are not "inarguably health-related"; rather, they smack of messages designed to promote a "product simply because it may be construed to benefit a consumer's health." As the *Zani* court indicated, such subject matter is not as a matter of law "inarguably health-related."

Second, All Web does not autodial consumers "by or on behalf of a health care provider" in the course of an "established health care treatment relationship." All Web's calls neither remind patients who had a flu shot last year to come into the same pharmacy to receive this year's flu shot, nor confirm provision of medication to an individual "in accordance with a prescription." *See, Zani,* 2017 WL 1383969, at 11; *Jackson,* 2016 WL 5907917, at *8-9; 45 C.F.R. § 160.103; 2012 Order at 1855 ¶ 63 (noting that "immunization reminders" and calls " 'pushing' flu vaccines" may convey health care messages). Instead, All Web's calls represent an effort to inaugurate a new relationship between an individual and a health insurance *issuer.*

 **6** Finally, there is no nexus between the subject matter of an All Web autodialed call as alleged "and the established health care needs of its recipient." Recall that HIPAA defines "health care" in non-limiting fashion to include preventative, diagnostic, or therapeutic services "with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body" and medications or devices "dispensed in accordance with a prescription." 45 C.F.R. § 160.103. All Web's calls are hopelessly divorced from these examples of "health care." Indeed, a footnote in the FCC's 2015 Order confirms that "insurance-coverage calls"—even *where the insurer actually had a relationship with the insured* and was calling to notify a patient that coverage was available for a medical service *already rendered*—do not necessarily fall within the HIPAA definition of "health care." *See,* 2015 Order at 8028-39 ¶ 141 n.473 ("We note, additionally, that insurance-coverage calls, which are included in AAHAM's list of 'healthcare calls,' are not necessarily among the topics in HIPAA's definition of 'health care.' "); *In the Matter of American Association of Healthcare Administrative Management Petition for Expedited Declaratory Rulings and Exemption Regarding Non-Telemarketing Healthcare Calls,* CG Dkt. No. 02-278, at 3 (Oct. 21, 2014).

While All Web is correct in the narrow sense that, under these cases and FCC guidance, calls otherwise qualifying as "health care messages" need not eschew all advertising content, it has not shown how Sullivan's Complaint establishes the antecedent issue of the alleged calls' health care content. As such, for purposes of its Motion, All Web cannot rely on the TCPA's prior express consent requirement under the "health care rule."

Case: 3:17-cv-50428-JTD... Doc 22-4... Filed 05/21/21... Page 199 of 202
Sullivan v. All Web Leads, Inc., Slip Copy (2017)
Case 21-50428-JTD... Doc 22-4... Filed 01/22/18... Page 199 of 260 PageID #:1677

2017 WL 2378079

*b. All Web Needed, but Did Not as a Matter of Law Effectively Procure, Sullivan's Prior Express Written Consent*

All Web argues in the alternative that Sullivan's complaint does not adequately allege "telemarketing" calls triggering the heightened written consent requirement and that, even if it does, Sullivan pleads himself out of court by establishing that All Web had his prior express written consent.

All Web fails to show how its alleged calls to consumers like Sullivan constitute anything other than telemarketing calls. As set forth in its implementing regulations, the TCPA defines "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). That is, whether a call is a "telemarketing" call depends not on its content but instead on its purpose. *See, Golan v. Veritas Entertainment, LLC,* 788 F.3d 814, 820 (8th Cir. 2015); *see also, Payton v. Kale Realty, LLC,* No. 13 C 8002, 164 F.Supp.3d 1050, 1062-63 (N.D. Ill. Feb. 22, 2016). In this case, Sullivan alleges that All Web's purpose in placing these calls is to encourage the purchase of insurance from All Web's insurance industry customers. (Compl. ¶¶ 16-18, 21, 31, 36-38.) And, as set forth above, no content of these alleged calls falls within the ambit of the "health care rule." As such, Sullivan has adequately pled that All Web called him for telemarketing purposes. *See, e.g., Margulis v. Eagle Health Advisors, LLC,* No. 4:15 C 1248, 2016 WL 1258640, at *3 (E.D. Mo. Mar. 31, 2016) (denying motion to dismiss the plaintiff's claim, which adequately pled that the defendant used a "telemarketing robot" to place calls to him for the purpose of selling health insurance). All Web therefore needed Sullivan's prior express written consent.

The parties vigorously dispute whether Sullivan's Complaint establishes that he gave All Web his prior express written consent to make the calls. All Web claims that the consent language on the quote form webpage, coupled with the user's choice to click the "Submit" button, constitutes prior express written consent under the TCPA. Sullivan responds that this method of procuring consent is legally insufficient.

**\*7** The Court feels that the legal enforceability of All Web's consent language is an issue best left for later in the litigation when there is a fully developed factual record. In ruling on All Web's Motion to Dismiss, however, the Court must determine whether Sullivan states a plausible TCPA violation based on lack of (effective) prior express written consent, with inferences drawn in his favor. The Court finds it plausible on the facts alleged that All Web did not effectively procure Sullivan's consent. This is because the Complaint does not as a matter of law establish reasonable notice of the terms to which Sullivan purportedly gave prior express written consent, let alone a disclosure that was "clear and conspicuous" under the TCPA. 47 C.F.R. § 64.1200(f)(8)(i); *id.* 64.1200(f)(3) ("The term ***clear and conspicuous*** means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures.") (emphasis in original).

Sullivan unequivocally alleges not only that he lacked *actual* notice of All Web's consent language, but also that these disclosures were unreasonably camouflaged in the context of the webpage and below its "Submit" button. Given that *at least* reasonable notice to the consumer is required, consider how courts in contract cases analyze the reasonableness of notice of terms to online consumers. (Also note that the definition of "prior express written consent" relies on the concept of a "written agreement" and, at least in part, expressly incorporates contract law. *See,* 47 C.F.R. § 64.1200(f)(8)(ii) ("to the extent that such form of signature is recognized as a valid signature under ... state contract law").) Regardless of whether All Web's consent agreement is characterized as a "clickwrap" or a "browsewrap" agreement, contract law only permits its enforcement if there was reasonable notice of its terms plus some action capable of being construed as assent. The following cases establish this proposition and provide salient data points:

• *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1177 (9th Cir. 2014) (invaliding a browsewrap agreement, *i.e.,* a "Terms of Use" hyperlink placed directly below or a few inches away from the button users had to click to proceed with

checkout, because the website did not provide any notice to users or promote any affirmative action to demonstrate their assent to the agreement);

• *Hancock v. Am. Tel. & Telegraph Co., Inc.,* 701 F.3d 1248, 1256 (10th Cir. 2012) (enforcing a clickwrap agreement whose terms were displayed in a scrollable text box and underneath it were buttons labeled "Exit Registration," "I Reject," and "I Agree");

• *Specht v. Netscape Communications Corp.,* 306 F.3d 17, 32 (2d Cir. 2002) (Sotomayor, J.) (refusing to enforce an agreement whose terms were placed below the "Accept" button);

• *Sgouros v. TransUnion Corp.,* No. 14 C 1850, 2015 WL 507584, at *6-7 (N.D. Ill. Feb. 5, 2015) ("It is unreasonable to expect users to scroll down the Window when they are not aware of a possibility of being bound by the terms in the Window.");

• *Van Tassell v. United Marketing Group, LLC,* 795 F.Supp.2d 770, 790 (N.D. Ill. 2011) (invalidating a browsewrap agreement because the webpage failed to have any reference to the Conditions of Use and also required a multi-step process to locate the Conditions of Use);

• *Burcham v. Expedia, Inc.,* No. 4:07 C 1963, 2009 WL 586513, at *1, 3 (E.D. Mo. Mar. 6, 2009) (finding a valid clickwrap agreement where a "Continue" button led to a page that stated "By continuing on you agree to the following terms and conditions," provided the terms and conditions, and included a clickable box stating "I agree to the terms and conditions"); and

• *Feldman v. Google, Inc.,* 513 F.Supp.2d 229, 236 (E.D. Pa. 2007) (finding reasonable notice of a clickwrap agreement where users did not need to scroll down to a submerged screen to see the terms, and "a prominent admonition in boldface to read the terms and conditions ... and indicate assent" made the text of the agreement immediately visible to users).

**\*8**  In this case, after Sullivan input his personal information, he clicked the "Submit" button immediately below the end of the health insurance quote form without scrolling down further to the bottom of the webpage to read All Web's Lilliputian consent language. In these circumstances, the Court thinks it "reasonable for users to assume that their click merely constituted their assent to [an] authorization" submitting their personal information further to getting a health insurance quote. *Sgouros,* 2015 WL 507584 at *5. By clicking "Submit," users would likely expect quotes to be displayed on an ensuing webpage once their information was processed, especially in light of the website's promises of *speedy* quotes. (*See, e.g.,* Compl. ¶¶ 19 ("The Fastest Way to Get On & Off Exchange Quotes."), 20 ("The Fastest Way to Get Free Health Insurance Quotes.").) Given the website's silence on quotes proceeding by phone and failure to alert users that legal disclosures appear below the "Submit" box, the Court cannot, while drawing inferences in Sullivan's favor, find that All Web's alleged consent mechanism gave Sullivan reasonable notice sufficient for an enforceable written "agreement"—to say nothing of the TCPA's heightened "clear and conspicuous" disclosure requirement governing prior express written consent agreements. Thus, All Web has not made a legal showing based on the complaint's allegations that it effectively procured Sullivan's prior express written consent.

Presented with no other basis for dismissing Sullivan's complaint, the Court denies All Web's Rule 12(b)(6) Motion to Dismiss.

## B. Motion to Strike Proposed Class

In his Complaint, Sullivan proposes the following class definition:

> All persons within the United States who filled out and submitted an insurance quote form on Defendant's website www.affordable-health-insurance-plans.org and then received a non-emergency telephone call from All Web Leads, or any party acting on its behalf, to a cellular telephone through the use of an automated telephone dialing system or an artificial or prerecorded voice.

(Compl. ¶¶ 45, 49.) The Complaint goes on to exclude from the class All Web, any entities in which it has a controlling interest, its agents and employees, the Court and its staff, and all claims for personal injury, wrongful death, and emotional distress. (*Id.* ¶ 46.) Although he cannot pinpoint the exact number of putative class members, Sullivan asserts that they total in the thousands and can be identified through call records maintained by All Web. (*Id.* ¶¶ 47, 52.) Finally, he identifies several common questions of law and fact, such as whether All Web uses an automatic telephone dialing system to make non-emergency calls to class members' cell phones; whether All Web gives proper notice to those who fill out a quote form that it intends to place calls using an automatic dialing system to the phone numbers provided; whether the website's requirement that users consent to receive phone calls via the use of an autodialer as a condition to provision of services violates FCC rulings; and whether All Web can meet its burden of showing prior express written consent to make such calls. (*Id.* ¶¶ 53-55.)

As an alternative to its Motion to Dismiss, All Web argues that the Court should strike the proposed class for failure to comply with the requirements of FED. R. CIV. P. 23(a) and FED. R. CIV. P. 23(b)(3). (All Web does not claim that the proposed class is insufficiently ascertainable, which is an independent class certification requirement.) Courts generally address class certification at the pleading stage "only when the class allegations are facially and inherently deficient." *Machowicz v. Kaspersky Lab, Inc.,* No. 14 C 1394, 2014 WL 4683258, at \*5 (N.D. Ill. Sept. 19, 2014) (internal quotation marks omitted). The problem for All Web is that Sullivan's class allegations are not facially or inherently deficient.

The nub of All Web's typicality, commonality, adequacy, and predominance arguments is that Sullivan seeks impermissibly to represent putative class members regardless of the form of their consent. (*See,* Def.'s Mot. at 18-20; ECF No. 17 ("Def.'s Reply") at 8-10.) In a similar vein, All Web contends that the common issue of "whether Defendant gave proper notice to users" who filled out the quote form "cannot be resolved without a series of mini-trials." (Def.'s Reply at 10.) All Web grounds its argument in *Cholly v. Uptain Grp., Inc.,* No. 15 C 5030, 2017 WL 449176 (N.D. Ill. Feb. 1, 2017). There, the court struck the plaintiff's class allegations on typicality grounds because she sought to "represent a class of persons who received calls from Uptain where Uptain did not have express consent," whereas her individual claim was "based only on telephone calls made to her cellular phone *after she had expressly revoked her consent.*" *Id.* at \*3 (emphasis added). Thus, the plaintiff's class in *Cholly* was facially deficient under Rule 23(a)(2).

 \*9  Plainly, this is not the case here. Sullivan seeks to represent a class of individuals each of whom engaged in the same consent procedure that he did—filling out the quote form, clicking "Submit," and then receiving an autodialed cell phone call. Thus, absent some other interface with All Web, each putative class member gave the same consent; the ability of All Web to invoke consent as an affirmative defense to each class member is uniform; and determining the legal efficacy of this consent under the TCPA "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011); *Holtzman,* 728 F.3d at 684 ("Class certification is normal in litigation under § 227, because the main questions ... are common to all recipients."). All Web therefore fails to identify any facial deficiency in Sullivan's proposed class.

Even if Sullivan's class definition conceptually includes those consumers who gave All Web some sort of individualized consent, it would be premature at this pre-discovery procedural stage to determine whether this suit can proceed as a class action. "Courts determine whether issues of individualized consent defeat commonality and predominance in a TCPA [case] on a case-by-case basis after evaluating the specific evidence available to prove consent." *Buonomo v. Optimum Outcomes, Inc.,* 301 F.R.D. 292, 298 (N.D. Ill. 2014) ("Optimum, however, fails to present any specific evidence —as opposed to mere speculation—that this purportedly individualized issue predominates over common issues. Nor

Sullivan v. All Web Leads, Inc., Slip Copy (2017)
2017 WL 2378079

Case: 3:17-cv-50428-JTD Doc #: 22-4 Filed: 05/21/21 Page 202 of 202
Case 21-50428-JTD Doc 22-4 Filed 01/22/18 Page 280 of 460 PageID #:1680

can it given that Optimum has refused to provide any class discovery while its motion to strike is pending."). Indeed, many of the cases All Web invokes were denials of class certification based on evidence obtained through discovery. *See, e.g., Jamison,* 290 F.R.D. at 107 (finding that individualized consent issues predominated because the defendant "set[ ] forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone"); *Quality Mgmt. and Consult. Servs., Inc. v. SAR Orland Food, Inc.,* No. 11 C 6791, 2013 WL 5835915 (N.D. Ill. Oct. 30, 2013) (holding that the plaintiff failed to meet its burden on class certification to introduce evidence showing that the defendant's consent defense as to the representative plaintiff applied to the class as a whole); *Vigus v. Southern Illinois Riverboat/Casino Cruises, Inc.,* 274 F.R.D. 229, 235 (S.D. Ill. 2011) ("[T]he Casino has provided evidence that at least three telephone numbers identified using Vigus' culling process did *not* indicate reassigned numbers.") (emphasis in original). These cases furnish no support for All Web's motion to strike Sullivan's proposed class before discovery has commenced.

*Kasalo v. Harris & Harris, Ltd.,* 656 F.3d 557 (7th Cir. 2011), is not to the contrary. The authorization granted there to deny class certification "even before the plaintiff files a motion requesting certification" rested on the truism that the court "need not delay a ruling on certification if it thinks that *additional* discovery would not be useful in resolving the class determination." *Id.* at 563 (emphasis added) (citations omitted). Here, as mentioned above, this action can on its face be maintained on a class basis, and discovery—which has not occurred yet—may assist both parties in arguing the propriety of certification. Because All Web's arguments do not clarify why the proposed class is conceptually deficient, "discovery is needed to determine whether a class should be certified." *Santiago v. RadioShack Corp.,* No. 11 C 3508, 2012 WL 934524, at *4 (N.D. Ill. Feb. 10, 2012). Striking the class allegations would be premature.

In a final gambit, All Web points to language in Sullivan's Complaint that he was "tricked" into providing his cell phone number and clicking "Submit." This allegation of "trickery," All Web claims, amounts to a fraud claim necessitating mini-trials into whether each putative class member was deceived. Simply put, this argument strains credulity. Sullivan's only claims on behalf of the class are under the TCPA, and his belief that he was "tricked" seems merely an individual variation on the Complaint's objective theme that All Web's consent procedure is ineffective and unenforceable. Even if Sullivan had *actually* meant to plead a claim for fraud, this would not necessarily furnish grounds for striking all the class allegations prior to discovery. *See, e.g., Volling v. Antioch Rescue Squad,* 999 F.Supp.2d 991, 1006 (N.D. Ill. 2013) (noting that "there is no penalty for invoking the wrong [legal theory], or using the wrong name to identify a theory," and that it would be "premature to strike" the legal theories presented in different counts "before discovery reveals the appropriate theory").

**\*10** The Court therefore denies All Web's Motion to Strike as premature in light of the absence of any class discovery.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court denies Defendant's Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Strike the Complaint's Class Allegations [ECF Nos. 7, 12].

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 2378079

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.